# EXHIBIT K

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MARY JO BRADLEY, et al.

     Plaintiffs,

v.

OFFICER CASEY BENTON, et al.,

     Defendants.

Civil Action File No.
1:18-CV-01518-CAP

## DECLARATION OF WILLIAM L. WALLACE

I, WILLIAM L. WALLACE, hereby declare:

1.　　My name is William L. Wallace.  I am a police captain with the DeKalb County Police Department and a former commander of the DeKalb County Police Department Internal Affairs Unit.  I am over the age of eighteen and am competent to testify about the matters stated herein based on my employment with DeKalb County.

2.　　Attached hereto as **Exhibit 1** is a compact disk containing true and correct copies of the following audio and video recordings and photographs pertaining to the August 6, 2015 incident involving Troy Robinson, which are contained in the Georgia Bureau of Investigation's investigative file pertaining to

that incident (the "GBI File") and I understand were produced by Plaintiffs in the

above-captioned action:

      (a)    DeKalb County Police Department radio traffic (identified by the GBI as "02 Track 2");

      (b)    Surveillance video from Chevron (identified by the GBI as "CH16-2015-08-06-18-38-52");

      (c)    Cell phone video of Troy Robinson running (identified by GBI as IMG_1061);

      (d)    Video of surveillance video from Family Dollar (identified by the GBI as "IMG_1293");

      (e)    GBI interview of Michaelia Anderson (identified by the GBI as "150807_0095"); and

      (f)    Various photographs (Bates-numbered as GBI 0568, 0574, 0576, or 0583 or identified by the GBI as IMG_1313, IMG_1315, IMG_1316, IMG_1317, or IMG_1318).

    3.    Attached hereto as **Exhibit 2** are true and correct copies of various

additional excerpts from the GBI File, which I understand were produced by

Plaintiffs in the above-captioned action.

    4.    Attached hereto as **Exhibit 3** are true and correct copies of excerpts

from the DeKalb County Police Department's Internal Affairs file for the August

6, 2015 incident involving Troy Robinson, which I understand were produced to

Plaintiffs in response to an Open Records request.

5.      Attached hereto as **Exhibit 4** are true and correct copies of excerpts from the DeKalb County Police Department Employee Manual (the "Employee Manual") in effect on August 6, 2015, including portions on traffic enforcement (§ 4-3), vehicle stops (§ 4-5), use of force (§ 4-6), and foot pursuits (§ 4-14.23).

6.      Upon being hired by DeKalb County, police officers and other personnel with the DeKalb County Police Department are provided with a copy of the Employee Manual.  In the event any updates are made to the Employee Manual, DeKalb County police officers and other personnel must acknowledge in writing that they have received and reviewed such updates.

7.      Attached hereto as **Exhibit 5** are excerpts from the DeKalb County Police Department Internal Affairs file for the May 9, 2010 incident involving Audrecas Davis.

8.      Attached hereto as **Exhibit 6** are excerpts from the DeKalb County Police Department Internal Affairs file for the November 8, 2014 incident involving Kent Stephen-Kinlocke.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 31, 2019.

WILLIAM L. WALLACE
DeKalb County Police Department

- 3 -

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| MARY JO BRADLEY, et al. | |
| Plaintiffs, | |
| v. | Civil Action File No. 1:18-CV-01518-CAP |
| OFFICER CASEY BENTON, et al., | |
| Defendants. | |

## <u>NOTICE OF MANUAL FILING</u>

Please take notice that Defendants are manually filing Exhibit 1 to the

Declaration of William L. Wallace, because it is a compact disk containing audio

and video recordings and photographs and therefore cannot be electronically filed.

A copy of the compact disk containing the audio recordings is being served on all

other counsel.

Respectfully submitted, this 31st day of July, 2019.

s/ Aaron J. Ross
Aaron J. Ross
Senior Assistant County Attorney
Georgia Bar No. 461981

*One of the Attorneys for Defendants*

# EXHIBIT 2

# GEORGIA BUREAU OF INVESTIGATION
# FACE SHEET

**CASE NUMBER** 10-0038-34-16

**INCIDENT TYPE** USE OF FORCE

**NUMBER OF VOLUMES**

**REGION / UNIT** REGION 10

**DATE OPENED** 08/07/2015

**DATE CLOSED** 01/14/2019

**EVIDENCE ROOM CLEARED**

**CRIME LAB CONTACTED**

**INCIDENT DATE / TIME (MILITARY TIME)** 08/06/2015   1903   **TO**

**INCIDENT LOCATION** 2051 FLAT SHOALS ROAD ATLANTA GA COUNTY:DEKALB

**REQUESTING AGENCY** DEKALB COUNTY POLICE DEPT. 1960 W EXCHANGE PLACE TUCKER GA PHONE: (404)294-2512

| VICTIM | SEX | RACE | DOB | HOME PHONE | BUSINESS PHONE |
|---|---|---|---|---|---|
| | | | | | |

**ADDRESS**

| OFFENDER / SUBJECT | SEX | RACE | DOB | HOME PHONE | BUSINESS PHONE |
|---|---|---|---|---|---|
| | | | | | |

**ADDRESS**

## PROPERTY VALUE INFORMATION

**STOLEN**     **RECOVERED**     **CONTRABAND**

**CASE AGENT** ROCKY A BIGHAM     **SUPERVISOR** BAHAN RICH

**FILE REVIEW (Date / Initials)**     **DISTRIBUTION (Date / Person)**

## CLOSING STATUS

**FINAL INVESTIGATIVE ACTION**

ALL INVESTIGATIVE ACTIONS TERMINATED

NO JUDICIAL ACTIONS TAKEN BY PROSECUTOR

EXCESSIVE DELAY IN PROSECUTION

**REMARKS**

**JUDICIAL DISPOSITION**

## NARRATIVE

On Thursday, August 6, 2015, the Georgia Bureau of Investigation was requested by the DeKalb County Police Department to conduct a use of force investigation.   This investigation continues...

# GEORGIA BUREAU OF INVESTIGATION
# REGION 10
# EXHIBIT LIST

### 10-0038-34-16

| EXHIBIT NUMBER | DESCRIPTION |
|---|---|
| 1 | Investigative summary documenting the initial request for GBI assistance. |
| 2 | Investigative summary documenting the briefing by DCPD Captain Nicole Rutland. |
| 3 | Investigative summary documenting the interview of Tyrel Shields of the Family Dollar. |
| 4 | Interview of WILFRED SIMS, driver of the vehicle. |
| 5 | Interview of BEN TEKLE, clerk at Chevron gas station. |
| 6 | Summary documenting ASAC Whidby's interview of Natosha Davis. |
| 7 | Crime Scene summary on Thursday, August 6, 2015 in DeKalb County. |
| 8 | Investigative summary documenting photographs taken of deceased victim at emergency room |
| 9 | Investigative summary documenting the interview with DeKalb County Police Department Officer Casey Benton. |
| 10 | Investigative summary documenting the interview of Officer Lee Niemann. |
| 11 | Investigative Act Documenting Interview with Shernika Curtis |
| 12 | Search of WILFRED SIMS'S white GMC Yukon. |
| 13 | Investigative summary documenting the interview of Officer Charles Franklin. |
| 14 | Investigative Act Documenting Interview with Myiecha Andrews |
| 15 | Investigative summary documenting interview with DARISHIA LUMPKIN and DE████ SHAW. |
| 16 | Interview of ARON YOHANNES, clerk at Chevron gas station. |
| 17 | Interview of ABRAHAM DEBELA, clerk at Shell gas station. |

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor

GBI 00002

**10-0038-34-16**

| EXHIBIT NUMBER | DESCRIPTION |
| --- | --- |
| 18 | Investigative Act Documenting Interview with Neffertiti Geter |
| 19 | Investigative Act Documenting Interview with ▇▇▇▇ McWhorter and Nicky McWhorter |
| 20 | Investigative summary downloading numerous videos of the incident. |
| 21 | Investigative summary documenting the Receipt fo Documents from Captain Rutland. |
| 22 | Interview of LEWIS WRIGHT and MORGAN WRIGHT. |
| 23 | Interview of TESIME DEGEFE. |
| 24 | Obtained video surveillance from Chevron gas station. |
| 25 | Investigative summary documenting photographing the Family Dollar and contact with Wiljarius Patrick. |
| 26 | Interview of MICHAELIA ANDERSON. |
| 27 | Investigative summary documenting the receipt of information reference Operation DAGGER. |
| 28 | Collection of Green in Color Blast Door from taser cartridge |
| 29 | Investigative summary documenting the receipt of POST Records for Officer Casey Benton. |
| 30 | Summary documenting Taser data download for Taser X-26, bearing serial number X00-504758 |
| 31 | Investigative summary documenting the review of Officer Casey Benton's Internal Affairs File. |
| 32 | Investigative summary documenting the Follow-Up interview of Officer Casey Benton. |
| 33 | Investigative summary documenting the review of the Personnel File for Officer Casey Benton. |
| 34 | Executive synopsis |
| 35 | Investigative summary documenting the meeting with the family of Troy Robinson. |
| 36 | Investigative summary documenting the receipt of EMS Report from Forensic Death Investigator Mark Anglin. |

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor

GBI 00003

**10-0038-34-16**

| EXHIBIT NUMBER | DESCRIPTION |
|---|---|
| 37 | Investigative summary documenting a meeting with the medical examiner's office. |
| 38 | Investigative summary documenting use of force incidents in the area of Flat Shoals Road. |
| 39 | Investigative summary documenting the receipt of training records for Officer Casey Benton. |
| 40 | Investigative summary documenting the receipt of a complete supplemental report from DeKalb County Police Department. |
| 41 | Investigative summary documenting the collection of information from Taser. |

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor

GBI 00004

# GEORGIA BUREAU OF INVESTIGATION
# REGION 10
# INVESTIGATIVE SUMMARY

**10-0038-34-16**

## FINAL INVESTIGATIVE SUMMARY

On Wednesday, July 25, 2018, Assistant Special Agent in Charge (ASAC) ROCKY BIGHAM was located at the Georgia Bureau of Investigation Atlanta Regional Office for the purpose of reviewing this case.   ASAC BIGHAM had previously received a letter from District Attorney SHERRY BOSTON advising her office determined that no criminal charges should be brought against Officer BENTON.   ASAC BIGHAM will attach this letter to this investigative summary.

On this same date, at approximately 3:30 p.m., ASAC BIGHAM contacted Sergeant ANTHONY WILLIAMS of the DeKalb County Police Department.   ASAC BIGHAM made this contact in attempts to turn over evidence in this case.   ASAC BIGHAM left a voicemail and is awaiting a return call.   After the evidence is relinquished back to the custody of DeKalb County Police Department this case will be closed.

On January 14, 2019, ASAC BIGHAM was finally able to get the DeKalb County Police Department to accept the evidence in this case.   The evidence form will be attached to this investigative summary.

No further information at this time.

**ATTACHMENTS**
EVIDENCE RECEIPT (OTHER AGENCY)                                         (Attachments)

SPECIAL AGENT ROCKY A BIGHAM:   7/26/2018
rab:   7/26/2018

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor

EXHIBIT _____

666995

GBI 00033

# GEORGIA BUREAU OF INVESTIGATION
# REGION 10
# INVESTIGATIVE SUMMARY

**10-0038-34-16**

On Thursday, August 6, 2015, at approximately 8:00 p.m., Special Agent (SA) ROCKY BIGHAM was contacted by Assistant Special Agent in Charge BRIAN WHIDBY reference a request from the DeKalb County Police Department (DCPD).   The DCPD was requesting the Georgia Bureau of Investigation to conduct a use of force investigation.   SA BIGHAM was provided with the address of 2051 Flat Shoals Road, Atlanta, Georgia, which was an apartment complex where the incident occurred.   SA BIGHAM was also provided with the contact information for Captain NICOLE RUTLAND of the DCPD.

SA BIGHAM contacted Captain RUTLAND and was informed of the following:

This use of force incident involved the use of a Taser.   The information was limited at this time as Captain RUTLAND was not at the scene.   She was aware there were a total of three (3) officers at the scene during this incident.   The incident was initiated with a traffic stop where the passenger exited the vehicle and fled on foot.   The Taser was deployed by one officer during the foot chase.   There was also a civilian witness who was operating the vehicle which was stopped earlier this date.   The individuals involved in the incident were separated and remained at the crime scene.

No further information was obtained at this time.

518506

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor

EXHIBIT ___1___

GBI 00038

# GEORGIA BUREAU OF INVESTIGATION
# REGION 10
# INVESTIGATIVE SUMMARY

**10-0038-34-16**

On Thursday, August 6, 2015, at approximately 10:07 p.m., Special Agent MICHEAL BROOKS was located just past 2051 Flat Shoals Road in Decatur, DeKalb County, Georgia for the purpose of conducting a Crime Scene Examination.   Earlier on this date, a DeKalb County Officer stopped a vehicle near the Family Dollar.   While speaking with the driver of the vehicle, the passenger in the vehicle exited and began to run through the Family Dollar parking lot.   The Officer pursued the subject and attempted to deploy a Taser in attempts to stop the subject from fleeing the area.

The subject climbed a fence and wall jumping down on the other side.   A second Officer gave chase on foot around the wall.   The first responding Officer and the driver of the vehicle that was stopped traveled to the apartment complex at the previous address and located the subject.   The subject was initially believed to be unconscious but after examination revealed that the subject was deceased.   The subject was transported by DeKalb County EMS to Grady Memorial Hospital.

Agent BROOKS began the examination by photographing the area of the Family Dollar parking lot.   The Family Dollar was located just off of Flat Shoals Road and the parking lot ran northeast to southwest back towards the apartment complex.   Flat Shoals Road is located to the northeast of the parking lot.   The Taser location was on the northwest side of the building.

At the time of the examination it was dark with minimal exterior lighting other than those provided by the vehicles and a couple from the adjacent apartment complex.

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor

517827

EXHIBIT ___7___

GBI 00054

**10-0038-34-16**

On the southwest corner of the Family Dollar, Agent BROOKS noticed Taser wire running from this location across some bushes which crossed a standard chain link or metal fence and then across over to a concrete wall and into the apartment complex.   A power pole with an overhead light is in the location on the apartment complex side of this incident.

Between the back of the Family Dollar and the wall, among the shrubs, Agent BROOKS located the cartridge from the Taser.   The cartridge was laying just off the concrete behind the store.   Agent BROOKS attempted to find the AFIDS that are ejected from the cartridge, but none were located.   It should be noted that between the incident and the time of the examination, several strong rain storms had passed through the area.

From Flat Shoals Road traveling back through the Family Dollar parking lot measured to be approximately 260-270 feet.   From the edge of the concrete to the end of the building was 4 feet 11 inches and from the edge of the concrete to the brick wall was 13 feet 9 inches and from the concrete to the chain link fence was approximately 10 feet 1 inch.

Agent BROOKS left the cartridge in place with an officer from Dekalb County and traveled to the apartment complex side of the wall.

Agent BROOKS next came to the Highland Park area, the opposite side of the wall, where the subject was found after the Taser deployment.   The subject was found in the vicinity of a power pole with an exterior light on.   The light was on at the time of the examination.   Coming from the wall towards the power pole was Taser wire.   The power pole was marked with the number 3.   There were two pieces of paper

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor

517827

EXHIBIT   7

GBI 00055

<u>10-0038-34-16</u>

laying on the ground.   Agent BROOKS was advised that these papers were marking the probes of the Taser.   From the curb area to the brick wall in the vicinity of where the subject came across measured to be 6 feet 6 inches a slight gradual slope.   The wall measured to be approximately 7 feet 6 inches to 8 feet 2 inches, depending of which section of the wall the subject came over.   The power pole was 2 feet 2 inches away from the wall.

Agent BROOKS photographed the area and collected the probes, wires, and cartridge. Agent BROOKS also collected a cellular phone and pistol from within a near by patrol car.   These times were said to belong to the driver of the vehicle that the subject was riding in.

No other processing was conducted.

**<u>ATTACHMENTS</u>**
CRIME SCENE PHOTOS                                                                (Attachments)

**<u>EVIDENCE</u>**
 TASER WIRES AND PROBES AND CARTRIDGE                    AA82678-Evidence.pdf
 CELL PHONE                                                                   AA82681-Evidence.pdf
 RUGER SR40 PISTOL, SN: 342-75777, WITH MAGAZINE AND    AA82680-Evidence.pdf

SPECIAL AGENT MICHEAL L BROOKS:   8/6/2015
mar:  8/24/2015

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor
517827

EXHIBIT ___7___

GBI 00056

# GEORGIA BUREAU OF INVESTIGATION
## REGION 10
## INVESTIGATIVE SUMMARY

**10-0038-34-16**

On Friday, August 7, 2015, at approximately 3:36 p.m., SA RHIANNON MORGAN and SA CLINT THOMAS interviewed MICHAELIA ANDERSON in the parking lot of Wal-Mart located at 2327 Gresham Road S.E. in Atlanta, Georgia.   This investigative act was in reference to a use of force investigation requested by the Dekalb County Police Department on August 6, 2015.   During the interview, ANDERSON essentially stated the following:

ANDERSON stated that earlier on this date, she was at a restaurant, Phat Phish, located in the shopping center across from the Chevron gas station.   ANDERSON stated that as she was getting her bag, and offered another lady a ride back.   The lady stated that she was going to get "some" from BOOCHIE-BOY (NOTE: SA MORGAN believes BOOCHIE-BOY to be WILFRED SIMS).   ANDERSON stated that she is familiar with SIMS and believes that he sells drugs.   ANDERSON stated that as she was leaving, she observed SIMS "serving" the lady.   According to ANDERSON, SIMS was in a white Tahoe in the parking lot of the Chevron gas station across the street.   ANDERSON then observed police make contact with SIMS' vehicle.   ANDERSON stated that she did not see TROY ROBINSON exit SIMS' vehicle, but she did see him running from the Chevron gas station towards the Family Dollar.   ANDERSON noted that ROBINSON was being followed by one white police officer.

As ROBINSON was running, ANDERSON observed the officer use his taser on ROBINSON.   ANDERSON stated that ROBINSON was in the area between the dumpster in the Family Dollar parking lot but past the cigar store that is located next

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor

**10-0038-34-16**

door.   ANDERSON believed that the taser must have slowed ROBINSON down because she was able to drive around to her apartment and observed ROBINSON at the wall when she got there.   At that time, ANDERSON stated that ROBINSON jumped over the concrete wall and looked as though he lost his balance and fell.   According to ANDERSON, ROBINSON was facing the wall when he fell.   ANDERSON did not hear ROBINSON say anything when he fell.   When ROBINSON hit the ground, he moved a "little bit" then did not move again.   ANDERSON described ROBINSON as being on his back with his legs spread apart.   ANDERSON believed that ROBINSON was dead when he hit the ground.

Once ROBINSON was on the ground, ANDERSON believed that the police rolled him over to his side.   According to ANDERSON, ROBINSON'S cousin went over the officers and wanted to perform CPR on ROBINSON, but the officers told her to get back. ANDERSON also stated that it appeared as though a black police Dodge Charger may have run over ROBINSON'S leg, but ANDERSON stated that it was hard to tell from where she was.   Additionally, ANDERSON stated that one of the police officers spat on ROBINSON but ANDERSON did not know if the officer was just trying to spit on the ground.   ANDERSON stated that she has known ROBINSON for a long time through her brothers and she described him as a "trouble maker."   ANDERSON stated that if he had not run from the police officers, this would not have happened.   However, ANDERSON also noted that she believed that the police could have handled the situation better.

ANDERSON stated that she did not take any photographs prior to someone breaking a car window.   However, ANDERSON showed agents an Instagram social media account belonging to "quiseyluvinha4," who ANDERSON stated was QUISEY PULLIN, containing photographs of the scene.

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor

EXHIBIT    26

**10-0038-34-16**

ANDERSON could not provide additional information at this time.   The interview was concluded at approximately 4:00 p.m.

This interview was recorded on a GBI digital recording device and the digital file is attached to this summary.   For details regarding this interview, refer to the recording.

**ATTACHMENTS**

AUDIO                                                                                    (Attachments)

**ID DATA:**

**ANDERSON, MICHAELIA PERESS**
DOB: 1982
SEX/RACE: FEMALE/BLACK
ADDRESS: 2051 FLAT SHOALS ROAD, APT H9
DECATUR, DEKALB COUNTY, GA
COUNTRY: UNITED STATES
CELLULAR (Redacted)

SPECIAL AGENT RHIANNON MORGAN:   9/18/2015
rm:   9/18/2015

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor

EXHIBIT ___26___

520442

GBI 00106

# GEORGIA BUREAU OF INVESTIGATION
# REGION 10
# INVESTIGATIVE SUMMARY

**10-0038-34-16**

On Thursday, August 13, 2015, at approximately 11:45 a.m., SPECIAL AGENT JOSH
ELLIS was located at DeKalb County Police Headquarters in Tucker, DeKalb County,
Georgia, where he met with DeKalb County Police CAPTAIN NICOLE RUTLAND.
CAPTAIN RUTLAND indicated that the DeKalb County Police Department had
discovered a green in color blast door near the site where TROY ROBINSON was tased
by the DeKalb County Police Department.   This is a use of force investigation.

CAPTAIN RUTLAND provided SA ELLIS with the mentioned blast door and the attached
DeKalb County Police Department Property and Evidence Sheet.   SA ELLIS marked
this door with Inventory # AA82683.

No further action was taken at this time.

**ATTACHMENTS**
EVIDENCE RECEIPT (OTHER AGENCY)                                    (Attachments)
DeKalb County Evidence Receipt

**EVIDENCE**
 ONE GREEN IN COLOR BLAST DOOR                      AA82683-Evidence.pdf

SPECIAL AGENT JOSH ELLIS:  8/13/2015
je:  8/13/2015

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor

EXHIBIT ___28___

GBI 00109

# GEORGIA BUREAU OF INVESTIGATION
# REGION 10
# INVESTIGATIVE SUMMARY

**10-0038-34-16**

On Friday, August 14, 2015, at approximately 11:16 a.m., Special Agent (SA) ROCKY BIGHAM received an email correspondence from Director MITCH JONES of the Georgia Peace Officers Standards and Training Council reference Officer CASEY BENTON.   This act was in furtherance of a use of force investigation at the request of the DeKalb County Police Department.

SA BIGHAM asked all the required question of Director JONES and those responses were documented in the email correspondence attached to this investigative summary. SA BIGHAM also received a copy of the P.O.S.T. Profile for Officer BENTON.   SA BIGHAM learned that during his employment history, Officer BENTON had only been employed by the DeKalb County Police Department and his start date was August 14, 2006.   He had an active certification and had accumulated a total of one thousand nine hundred ninety-six (1996) training hours.   SA BIGHAM will attach a copy of the P.O.S.T. records to this investigative summary.

SA BIGHAM noted that on April 15, 2014, there was a Taser re-certification for Officer BENTON documented on his P.O.S.T. records.

No further information was obtained at this time.

**ATTACHMENTS**
   POST Records - Officer CASEY BENTON                    (Attachments)

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor

EXHIBIT ___29___

520343

GBI 00110

# GEORGIA BUREAU OF INVESTIGATION
# REGION 10
# INVESTIGATIVE SUMMARY

**10-0038-34-16**

On Friday, August 14, 2015 at approximately 1:45PM ASAC RYAN CARMICHAEL met with SA ROCKY BIGHAM at GISAC in reference to conducting a data download from a Taser related to this case. SA BIGHAM allowed ASAC CARMICHAEL access to a Taser X-26 bearing serial number X00-504758, and documented on GBI Evidence Tag number AA82679. Prior to download ASAC CARMICHAEL conducted a 5 second spark test, and the device appeared to be in proper working order.

ASAC CARMICHAEL then connected the device to a computer with Evidence Sync software installed, and the resulting download report is attached with this summary (see attached). Upon review of the download report it was noted that at the time of download the internal clock of the Taser was synced from August 14, 2014 at 14:00:28 hours to the current time of August 14, 2015 at 13:48:55 hours; indicating that the internal clock was 11 minutes 33 seconds ahead of actual time. There was only one activation of the Taser on the date in question; line 221 shows a 4 second cycle of the Taser being the only activity on August 6, 2015.

At approximately 2:05 PM ASAC CARMICAHEL left the Taser in SA BIGHAM'S custody.

**ATTACHMENTS**

  Download Report Taser X-26, SN:
X00-504758.

(Attachments)

SPECIAL AGENT IN CHARGE RYAN M CARMICHAEL:   9/14/2015
rmc:  9/14/2015                        *Rmc*

519851

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor

EXHIBIT ___30___

GBI 00112

# GEORGIA BUREAU OF INVESTIGATION
# REGION 10
# INVESTIGATIVE SUMMARY

**10-0038-34-16**

On Wednesday, September 30, 2015, at approximately 1:01 p.m., Special Agent (SA) ROCKY BIGHAM was in contact with Technical Compliance Manager BRYAN CHILES of Taser.   This act was in furtherance of the use of force investigation at the request of the DeKalb County Police Department.   A Taser was utilized during the use of force incident which occurred on August 6, 2015.   During the course of this investigation, it was learned that only one probe entered the skin of TROY ROBINSON (subject) and the second probe stopped at the clothing.   CHILES provided the following technical information reference the Taser:

There are numerous variables that can cause the Taser to not perform to the standards it was designed.   If both probes (darts) do not make contact with the skin then the effect of the Taser can be diminished to little or no effect.   Also if there is not a proper distance between both darts that enter the skin then the effect can be diminished.   If one dart lodges in clothing and does not enter the skin of the individual it is designed to arc approximately 1.5 inches to the skin.   The likelihood of the arcing can increase if the target individual is wet.   Even more so, if the target individual is wet from sweat as the salt content of sweat helps with arcing.   The factors which diminish the ability of arcing is distance from the skin and crossing of wires or wires lying on the ground.   If the wires cross or touch the ground this can cause a consumption of energy and decrease the likelihood of the arc jumping the air gap to the skin.

If an individual was standing in water it would not change the effect of the Taser. However, if one dart entered the skin of an individual and the second dart touched

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor

EXHIBIT ____41____

GBI 00133

**10-0038-34-16**

the water the individual was standing in then the individual could experience some effects of the Taser.

CHILES was asked about reasons why a Taser may not complete a full cycle which is five (5) seconds.   The two (2) main factors include the operator turning the power switch off or a battery disconnect.   The battery can become disconnected if the plastic grip becomes cracked and the operator squeezes the grip tightly.   This could cause the Taser to loose power and turn off prior to completing a full cycle.

CHILES believed the witness to the deployment of the Taser should be able to assist in the determination of the effectiveness of the Taser.   In his opinion, if an individual is experiencing the full effects of the Taser it would be very difficult for that person to continue to climb a fence or wall.

This act was completed at approximately 1:15 p.m.

**ID DATA:**

**CHILES, BRYAN**
SEX/RACE: MALE/
COUNTRY: UNITED STATES
EMPLOYER:
TASER
PHOENIX, AZ
BUSINESS:(480)905-2000

SPECIAL AGENT ROCKY A BIGHAM:   9/30/2015
rab:   9/30/2015

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor

EXHIBIT _____41_____

GBI 00134



# MEDICAL EXAMINER

## DEKALB COUNTY



# Medical Examiner's Inquiry

Case Number: _____ 15-1034 _____

Name of Deceased: _____ Troy Robinson _____

Race: __ Black __ Sex: __ Male __ Age: __ 32 __

Manner of Death: __ Accident __ Date of Death: __ August 6, 2015 __

Cause of Death: __ Blunt Force Trauma of the Neck and the Head __

_____

_____

Medical Examiner's Investigator: _____ Mark Anglin _____

## Procedure:

Autopsy: __Yes__ Limited Dissection: _____ External Examination: _____

Procedure Date: __ August 7, 2015 __ Day of Week: __ Friday __

## Certification by Medical Examiner:

Medical Examiner: __ Geoffrey Smith, M.D. __ Date: _____

Signature: _____

Medical Examiner: _____ Date: _____

Signature: _____

GBI 00137



*MEDICAL EXAMINER*

*DEKALB COUNTY*



COPY

---

**Geoffrey Smith, M.D.,**
**Associate Medical Examiner**
**AP, FP Board Certified**

**15-1034**
**Troy Robinson**
**Page 1 of 7**

# Autopsy Report

## General Information:

Under the provisions of the Georgia Death Investigation Act, an autopsy of the body is performed. This examination takes place in the DeKalb County Forensic Science Center on Friday, August 7, 2015 commencing at 1140 hours.

## Presentation of the Body:

The body is received within a white plastic body bag and items of clothing worn have been cut open during resuscitation procedures and consist of a gray cotton tee shirt with Nike brand logo and "Just Do It", a focally bloodstained sleeveless gray undershirt, blue denim jeans, turquoise green with navy trim underwear, white socks, and a pair of lace up Nike athletic shoes that are soiled with brown clay. A brown leather belt is in the belt loops of the pants. The tee shirt has a small defect on its upper right posterior surfaces.

## Evidence of Therapeutic Intervention:

1. An endotracheal tube exits the mouth.
2. A neck brace is secured around the neck.
3. EKG pads are affixed to the torso.
4. Bilateral chest drainage tubes are secured in the right and left anterior axillary lines.
5. Vascular access is via an intraosseous catheter protruding from the left anterior tibia.

## External Examination:

This is the unembalmed body of an adult black male, weighing 219 pounds, having a length of 74½", and an appearance that is consistent with the given age of 32 years. The body is cold to the touch and rigor mortis is discernible. Livor mortis is seen posteriorly.

The head is normocephalic and free of external trauma. The scalp hair is black, curly, and up to 6.0 cm in length. Facial petechiae are absent. The irides are brown and the pupils are fixed and dilated. Conjunctival petechiae are not identified. The ears are normally formed and set with earlobe piercings. The nose is in the midline and the nasal bone is intact.



# DEKALB COUNTY



**15-1034**
**Troy Robinson**
**Page 2 of 7**

## External Examination, continued:

A mustache and goatee beard are worn. The teeth in the upper and lower gums are natural and in a fair state of repair. There is no trauma of the oral cavity.

The neck is free of external trauma and the trachea is palpable in the midline.

The chest is generally unremarkable with a normal distribution of body hair.

The abdomen is protuberant, soft to palpation and on its anterior surface are a number of curvilinear and irregularly shaped abrasions, all separated by large areas of intervening uninvolved skin.  To the left of midline is the largest of these abrasions, convex to the left, and measuring in its greatest dimensions 16.0 x 0.5 cm. Slightly to the left of midline above the level of the navel at the mid to upper abdomen is an interrupted sequence of abrasions measuring 2.5 x 0.5 cm, and to the right of midline is a single interrupted linear abrasion measuring 4.5 x 0.3 cm. The right lateral and lower abdomen has a sequence of interrupted abrasions occurring over an area of 7.5 x 2.0 cm, with individual abrasions varying in size from 0.2-2.0 cm. Slightly to the right of midline of the anterior and lower abdomen are two interrupted sequences of abrasions, one measuring 5.0 x 0.5 and the other lower 4.0 x 0.5 cm. On the right hip region are three small circular abrasions, a posterior injury measuring 0.5 cm in greatest dimension and separated by a distance of 3.0 cm, two smaller abrasions measuring 0.3 and 0.2 cm, respectively. Located on the right upper back 59¾" from the right heel and ¾" to the right of midline is a partial thickness skin defect, near circular in configuration, with somewhat ragged margin measuring just over 1/16" in greatest dimension. The penis is circumcised and the testes are within the scrotum. The back is unremarkable.

All digits are accounted for on the hands and feet respectively, and other than a small amount of transferred blood on the thumb and index finger of the right hand, are generally unremarkable. On the dorsal left forearm are very fine sequences of interrupted abrasions, separated by varying intervals of uninvolved skin, and noted over an area measuring 8.0 x 5.0 cm.  These individual abrasions vary in sizes from 0.6-5.0 cm in length. The lower extremities disclose intact long bones and interrupted curvilinear abrasion on the medial left knee over an area measuring 8.0 x 0.3 cm, and a partial thickness laceration on the anterior right shin, at its mid point measuring 1.8 x 0.3 cm. The toes and feet are unremarkable.

GBI 00139



## DEKALB COUNTY



**15-1034**
**Troy Robinson**
**Page 3 of 7**

**Internal Injuries:**

Internal injuries are confined to the head and the neck.

The scalp is incised and reflected and a large scalp hematoma is accompanied by galeal hematoma over an area measuring 12.5 x 14.0 cm. The hematoma extends from the vertex to over the right parietal region. The calvarium and the base of the skull are intact.

Examination of the posterior neck discloses fresh hemorrhage within the soft tissues adjacent and covering the cervical spinal column, with hemorrhage extending into the right and left trapezius muscle region. Upon reflection of these muscles, the cervical spine is separated at the level of C3/C4, with transection of the spinal cord.

An examination of the neck organs disclose a large amount of retropharyngeal and laryngeal hemorrhage and fresh blood clot is accumulated adjacent to the upper airway. The fracture described previously also includes a fracture of cervical vertebrae #5, on its anterior body to the left of midline.

Incisions made into the soft tissues posteriorly including the extremities and the torso discloses a single small focus of hemorrhage at the level of the lateral upper thigh measuring 2.8 x 1.5 cm, and a small area of hemorrhage on the left mid posterolateral thigh measuring 1.5 x 1.0 cm. No other injuries are noted.

**Internal Examination:**

The body is opened with a Y-shaped incision and injuries of the neck are described above. The organs of the thoracic and abdominal cavities are in their normal anatomic positions. The sternum is fractured through its body and is associated with a moderate amount of retrosternal hemorrhage.

**Head:**

Injuries of the head are described above. The brain weighs 1,370 grams and dissection through the organ disclose no injuries or preexisting antemortem pathology. There are no epidural, subdural or subarachnoid hemorrhages.



DEKALB COUNTY



15-1034
**Troy Robinson**
**Page 4 of 7**

**Neck:**

The soft tissues of the anterior neck are free of trauma. The laryngeal cartilages and the hyoid bone are intact and the thyroid gland is in its usual location. The airway is unobstructed.

**Cardiovascular System:**

The heart weighs 390 grams and is morphologically unremarkable. The coronary arteries, cardiac valves and myocardium are free of natural disease, with no visible obstructions of the coronary arteries by atherosclerosis. The aorta and its major branches are intact.

**Respiratory System:**

The right and left lungs weigh 580 and 690 grams, respectively. The visceral pleural surfaces are smooth and glistening overlying congested pink and purple parenchyma. The airways and pulmonary arteries are unobstructed. The cut surfaces of both lungs exhibit congestion and edema but no consolidations, neoplasms or cavitations.

**Hepatobiliary System:**

The liver weighs 1,770 grams and has an intact capsule overlying homogenous brown parenchyma. Steatosis, cirrhosis and neoplasms are not seen. The gallbladder contains a moderate amount of bile.

**Gastrointestinal System:**

The tongue is normally formed and atraumatic and the esophagus is unobstructed. Gastric content amounts to approximately 100 grams of partly digested food material and admixed with semiliquid material. No foreign bodies are identified within the stomach. The small and large intestines are opened along their lengths to disclose partly digested food and feces only. No foreign objects or other material are identified. The pancreatic parenchyma has the usual lobular architecture.





MEDICAL EXAMINER

DEKALB COUNTY

15-1034
**Troy Robinson**
**Page 5 of 7**

**Genitourinary System:**

The right and left kidneys weigh 170 and 160 grams, respectively. The capsules strip with ease from dark red cortical surfaces. The renal vessels, collecting systems and ureters are normally formed with the ureters following their usual retroperitoneal courses to enter the bladder appropriately. The bladder contains approximately 120 mL of urine. The prostate gland and testes are unremarkable

**Reticuloendothelial System:**

The spleen weighs 100 grams and has an intact capsule overlying dark red parenchyma. There are no enlarged lymph nodes.

**Endocrine System:**

The adrenal glands and thyroid gland appear unremarkable.

**Musculoskeletal System:**

Injuries are described above.

**Summary:**

I.  Blunt force head and neck injuries:

   A.  Fell from a retaining wall (~8 feet high) while being pursued on foot by law enforcement.

   B.  Impact to the top of the head and cervical spinal injury (C3/C4) with spinal cord transection.

   C.  No skull or brain injuries.

II.  Use of "Taser" by law enforcement:

   A.  Skin defect on right upper back likely correlates with embedded dart.

   B.  Non-specific small abrasions on upper right thigh and small defects, right lower and posterior area of tee shirt.

GBI 00142



*MEDICAL EXAMINER*

## DEKALB COUNTY



<u>**Summary, continued:**</u>

III. Postmortem blood sample is indicative of marijuana use and negative for ethyl alcohol as well as other drugs.

IV. No other injuries of significance.

V. No natural disease.

VI. Investigational information correlates with accidental unrestrained fall from a retaining wall.

<u>**Other Procedures:**</u>

1. Documentary photographs are taken.
2. Tissue sections procured and held.
3. Blood is submitted to NMS labs for toxicology.
4. Blood spot filter cards are prepared.
5. Clothing is forwarded to the investigating agency.
6. GBI Special Agent Josh Ellis attends the autopsy.
7. Dissected organs are forwarded with the body.

<u>**Cause of Death:**</u>

**Blunt force trauma of the neck and the head**

<u>**Manner of Death:**</u>

**Accident**

<u>**Comment:**</u>

This 32-year-old male decedent died as the result of lethal head and neck injuries when he fell from a wall in the course of being pursued by law enforcement. He impacted the top of his head and broke his neck when he hit the ground. He appears to have been struck in the back by at least one of the "Taser" darts fired at him by a police officer, but there is no investigative information available



# MEDICAL EXAMINER

## DEKALB COUNTY



COPY

15-1034
**Troy Robinson**
**Page 7 of 7**

**Comment, continued:**

indicating that he was incapacitated at any stage by the "Taser" electrical discharge. In particular he is reported as moving and verbalizing of his own volition while on the wall itself.

_____

**Geoffrey Smith, M.D., M.E.**



**NMS Labs**
3701 Welsh Road, PO Box 433A, Willow Grove, PA 19090-0437
Phone: (215) 657-4900  Fax: (215) 657-2972
e-mail: nms@nmslabs.com
Robert A. Middleberg, PhD, F-ABFT, DABCC-TC, Laboratory Director

CONFIDENTIAL

*MSA 812915*

## Toxicology Report

**Report Issued**  08/20/2015 16:01

To:  10024
Dekalb Medical Examiner
Attn: Dr. Gowitt
3550 Kensington Road
Decatur, GA  30032

| | |
|---|---|
| **Patient Name** | ROBINSON, TROY |
| **Patient ID** | 15-1034 |
| **Chain** | 11860924 |
| **Age** 32 Y | **DOB** Not Given |
| **Gender** | Male |
| **Workorder** | 15240150 |

Page 1 of 3

COPY

### Positive Findings:

| Compound | Result | Units | Matrix Source |
|---|---|---|---|
| Delta-9 THC | 5.7 | ng/mL | 001 - Central Blood |
| Delta-9 Carboxy THC | 21 | ng/mL | 001 - Central Blood |

See Detailed Findings section for additional information

### Testing Requested:

| Analysis Code | Description |
|---|---|
| 8052B | Postmortem Toxicology - Expanded, Blood (Forensic) |

### Specimens Received:

| ID | Tube/Container | Volume/ Mass | Collection Date/Time | Matrix Source | Miscellaneous Information |
|---|---|---|---|---|---|
| 001 | Gray Top Tube | 10 mL | 08/07/2015 09:00 | Central Blood | |
| 002 | Gray Top Tube | 10 mL | 08/07/2015 09:00 | Central Blood | |
| 003 | Red Top Tube | 5.25 mL | 08/07/2015 09:00 | Central Blood | |

All sample volumes/weights are approximations.

Specimens received on 08/13/2015.

GBI 00145



**NMS LABS**

Patient ID    15-1034

Page 2 of 3



## Detailed Findings:

| Analysis and Comments | Result | Units | Rpt. Limit | Specimen Source | Analysis By |
|---|---|---|---|---|---|
| Delta-9 THC | 5.7 | ng/mL | 1.0 | 001 - Central Blood | GC-GC-GC/MS |
| Delta-9 Carboxy THC | 21 | ng/mL | 5.0 | 001 - Central Blood | GC-GC-GC/MS |

Other than the above findings, examination of the specimen(s) submitted did not reveal any positive findings of toxicological significance by procedures outlined in the accompanying Analysis Summary.

## Reference Comments:

1.  Delta-9 Carboxy THC (Inactive Metabolite) - Central Blood:

    Marijuana is a DEA Schedule I hallucinogen. Pharmacologically, it has depressant and reality distorting effects. Collectively, the chemical compounds that comprise marijuana are known as Cannabinoids.

    Delta-9-THC is the principle psychoactive ingredient of marijuana/hashish. Delta-9-carboxy-THC (THCC) is the inactive metabolite of THC with peak concentrations attained 32 to 240 minutes after smoking and may be detected for up to one day or more in blood. Both delta-9-THC and THCC may be present substantially longer in chronic users. THCC is usually not detectable after passive inhalation.

2.  Delta-9 THC (Active Ingredient of Marijuana) - Central Blood:

    Marijuana is a DEA Schedule I hallucinogen. Pharmacologically, it has depressant and reality distorting effects. Collectively, the chemical compounds that comprise marijuana are known as Cannabinoids.

    Delta-9-THC is the principle psychoactive ingredient of marijuana/hashish. It rapidly leaves the blood, even during smoking, falling to below detectable levels within several hours. THC concentrations in blood are usually about one-half that of serum/plasma concentrations. The active metabolite, 11-hydroxy-THC, may also fall below detectable levels shortly after inhalation. Delta-9-carboxy-THC (THCC) is the inactive metabolite of THC with peak concentrations attained 32 to 240 minutes after smoking and may be detected for up to one day or more in blood. Both delta-9-THC and THCC may be present substantially longer in chronic users.

    Reported usual peak THC concentrations in serum after smoking 1.75% or 3.55% THC marijuana cigarettes are 50 - 270 ng/mL after beginning of smoking, decreasing to less than 5 ng/mL by 2 hrs. Corresponding delta-9-carboxy-THC concentrations range from 10 - 101 ng/mL about 32 to 240 minutes after the beginning of smoking and decline slowly. Passive inhalation of marijuana smoke has been reported to produce blood THC concentrations up to 2 ng/mL. Delta-9-carboxy THC concentrations in blood may not be present following passive inhalation of marijuana smoke.

Unless alternate arrangements are made by you, the remainder of the submitted specimens will be discarded one (1) year from the date of this report; and generated data will be discarded five (5) years from the date the analyses were performed.

Workorder 15240150 was electronically signed on 08/20/2015 15:26 by:

*Denice M Teem*

Denice M. Teem,
Certifying Scientist

## Analysis Summary and Reporting Limits:

All of the following tests were performed for this case. For each test, the compounds listed were included in the scope. The Reporting Limit listed for each compound represents the lowest concentration of the compound that will be reported as being positive. If the compound is listed as None Detected, it is not present above the Reporting Limit. Please refer to the Positive Findings section of the report for those compounds that were identified as being present.

Acode 50013B - Cannabinoids Confirmation, Blood (Forensic) - Central Blood

v.15



CONFIDENTIAL                     Workorder     15240100
                                 Patient ID    15-1034

Page 3 of 3

### Analysis Summary and Reporting Limits:



-Analysis by Multi-dimensional Gas Chromatography/Mass
Spectrometry (GC-GC-GC/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| 11-Hydroxy Delta-9 THC | 5.0 ng/mL | Delta-9 THC | 1.0 ng/mL |
| Delta-9 Carboxy THC | 5.0 ng/mL | | |

Acode 8052B - Postmortem Toxicology - Expanded, Blood (Forensic) - Central Blood

-Analysis by Enzyme-Linked Immunosorbent Assay (ELISA) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Barbiturates | 0.040 mcg/mL | Salicylates | 120 mcg/mL |
| Cannabinoids | 10 ng/mL | | |

-Analysis by Headspace Gas Chromatography (GC) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Acetone | 5.0 mg/dL | Isopropanol | 5.0 mg/dL |
| Ethanol | 10 mg/dL | Methanol | 5.0 mg/dL |

-Analysis by High Performance Liquid Chromatography/
Time of Flight-Mass Spectrometry (LC/TOF-MS) for: The following is a general list of compound classes included
in this screen. The detection of any specific analyte is concentration-dependent. Note, not all known analytes in
each specified compound class are included. Some specific analytes outside these classes are also included.
For a detailed list of all analytes and reporting limits, please contact NMS Labs.
Amphetamines, Anticonvulsants, Antidepressants, Antihistamines, Antipsychotic Agents, Benzodiazepines, CNS
Stimulants, Cocaine and Metabolites, Hallucinogens, Hypnosedatives, Hypoglycemics, Muscle Relaxants, Non-
Steroidal Anti-Inflammatory Agents, Opiates and Opioids.

v 15

# Investigative Summary

DeKalb County Medical Examiner

COPY

**Chief Approval:**

| | | | | | |
|---|---|---|---|---|---|
| **CASE NUMBER** | 15-1034 | Troy | L | Robinson | |
| **Source County** | DeKalb | | | | |

| | | |
|---|---|---|
| | **DOB** 3/2/1983 | **SS#** |
| **AKA** | **AGE** 32  **RACE** B  **SEX** M | |
| **ID METHOD** VISUAL ONLY | **ETHNICITY** | |

**HOME ADDRESS** 325 Fairburn Rd. Atlanta, GA 30331

**REPORTED BY** RN Melinda Lackey    **DATE** 8/6/2015    **TIME** 8:15 PM

**AGENCY** 404-616-2226

**POLICE AGENCY** DeKalb County PD    **INCIDENT #** 15-077124

**INCIDENT DATE** 8/6/2015    **TIME** 7:00 PM

**STATUS** Witnessed/Not at Home/Outside

**ADDRESS** 2021 Flat Shoals Rd. Atlanta, GA

**Type of Place** WOODED AREA    APARTMENT

**PRONOUNCED** Dead on Arrival    **DATE** 8/6/2015    **TIME** 7:56 PM

**BY** Dr. Patrick Meloy #069897

**PLACE** Hospital; Grady Memorial, 80 Jesse Hill Jr Dr , Atlanta, GA 30303

**IF_FOUND** _____    **ADDRESS** _____

**LKA DATE** _____    **TIME** _____    **HOW LKA** _____

**FOUNDBY** _____    **RELATION** _____

**CONTACT** _____

**ME for Case** Geoffrey P. Smith, MD

**PROCEDURE** Autopsy    **Case Disposition Date** 9/18/2015

**EXAM BY** Andrew Adesinmilolu    **DATE** 8/7/2015    **TIME** 11:20 AM

**INVESTIGATOR** Mark Anglin    **DISPOSITION** AJ-IN CUSTODY

☑ **SCENE** To Morgue for Exam    **TRANSPORT TO DCME** Anglin/Bowen

GBI 00148

15-1034          Troy                    Robinson          

### Investigator's Initial Comments at time of death report

On Thursday, August 6,2015, at 2015 hours, I was contacted by Registered Nurse Melinda Lackey from Grady who was reporting the death of Troy Robinson, a black male, 32 years of age, with a date of birth of 3/2/83. Ms. Lackey reported that Mr. Robinson had been transported to Grady by American Medical Response Unit 83 after he had been tasered by a DeKalb County Police Officer. Ms. Lackey reported that after Mr. Robinson was tasered he fell off a wall and went unresponsive. I advised Ms. Lackey that I would respond to Grady.

I arrived at Grady Hospital at approximately 2050 hours along with Investigator Bowen. We met with Grady Security and were escorted to Trauma Room 1 where I then met with Officer's Penny and Hudson from the DeKalb County Police Department. Ms. Lackey escorted me into trauma room 1 where Mr. Robinson was located. Mr. Robinson was in a white disaster bag on a gurney. I unzipped the bag and observed the following:

Mr. Robinson was covered by a white sheet and he had been intubated by the staff at Grady. I photographed Mr. Robinson utilizing digital photography. The photographic CD will be maintained in the medical examiner's file. A chest tube had been placed on both sides of the chest, and a Intraosseous IV was in the left shin. A cervical collar was around the neck. I observed scratches to the abdomen and a small amount of blood on the left palm. I did not examine the back of Mr. Robinson due to a large amount of blood that had pooled under the body inside of the disaster bag. A brown bag with the clothing was inside of the disaster bag along with a clear bag containing U.S. Currency. The clothing and currency was transported to the medical examiner's office.

Ms. Lackey reported there was no blood drawn at Grady and no radiological x-rays were obtained. Troy Robinson was pronounced dead on Thursday, August 6, 2015 at 1956 hours by Dr. Patrick Meloy, Georgia License Number 069897 at Grady Hospital. Agent Clint Thomas from the GBI arrived at 2215 hours and photographed Mr. Robinson as well. I spoke with the mother of Mr. Robinson, Mary Bradley at Grady. I explained to Ms. Bradley the process and reason for the autopsy and the procedures for after the autopsy. Investigator Bowen and I transported Mr. Robinson from the hospital in the investigations transport vehicle to the Forensic Science Center for further examination by the medical examiner. My investigation into the death of Mr. Robinson finds the apparent manner to be undetermined at this time. All facts were made known to the medical examiner who will make the final determination as to the cause and manner of death.

### Scene Infomation at time of initial report:

GBI 00149

15-1034          Troy                    Robinson

**Medical Info**

COPY

| | |
|---|---|
| **NOK** | Mary Bradley |
| **ADDRESS** | 325 Fairburn Rd. Atlanta, GA 30331 |
| **RELATION** | PARENT |
| **PHONE** | (404) 207-8411 |
| **NOTIFIED BY** | Staff at Grady |

**MED RECORD#**          **ADMIT DATE**          **TIME**

**DJ_DOCTOR**          **DJPHONE**

**DJCAUSE**

Wednesday, October 07, 2015                                        Page 3 of 3

GBI 00150

# FollowUp

| 15-1034 | Troy | Robinson | DeKalb County Medical Examiner |

**15-1034**

**8/6/2015 10:17:02 PM**

JC Dillard

On 08/06/2015 @ 2051 hours, I arrived at the location on Flat Shoals Road. The immediate scene was behind the Family Dollar, located at 2021 Flat Shoals Road. Prior to the manipulation of the scene or any evidence, I took digital photographs. Behind the store was a small wooded area. There was an approximate four foot high chain link fence in the wooded area, approximately 20 feet away from the rear of the building. On the other side of the chain link fence was a brick wall, approximately five feet high. The space between the chain link fence and brick wall was approximatey four feet wide. A wire from the Taser was located on the ground approximately five feet from the rear of the Family Dollar building. The wire was found extended over the chain link fence and over the brick wall, continuing to the ground on the opposite side of the brick wall.

I went to the opposite side of the brick wall, which was located in the parking lot of the Hampton Apartments, 2051 Flat Shoals Road, Atlanta, DeKalb County, Georgia. The scene in the parking lot was cordoned off with yellow crime scene tape and monitored by uniformed patrol officers from the DeKalb County Police Department. The height of the brick wall was approximately eight feet on the side facing the apartments. The ground at the bottom of the wall was grass and fall approximately 3 inches over seven feet to the curb of the parking lot. The wires from the Taser were observed on the grass in front of the wall. One of the wires was observed wrapped once around the telephone pole beside the area where the decedent reportedly fell. Two prongs from the Taser were observed in the grass between the pole and the wall. The prongs were reportedly removed by EMS before transport.

Deputy Chief Henson met with the decedent's father, Terry Robinson, on scene and informed him of the death. Terry Robinson can be contacted at ▮▮▮▮ or ▮▮▮▮

I placed $ 33.80 in the investigators property room for safe keeping. (MAA)

06/07/2015 at 1037 hours, I received a call from Mr. Robinson's family stating they were wanting to come to the office to identify Mr. Robinson. I explained that we do not have a viewing facility but we would have some pictures to show if they wanted to do that. They also game Mr. Robinson's full name as Troy Lee Robinson. (EZM)

On 08/07/15 I received a call from Duffie Dixon (404-545-7257) of 11 Alive News confirm Mr. Robinson's name and cause of death. I provided Mr. Robinson's name, race, sex, and age. I also informed Ms. Dixon that Mr. Robinson sustained traumatic injuries that caused his death. I further informed Ms. Dixon that the investigation was still on going at this point. (Note: Steve Visser with AJC called. I returned his call and left a message on 8/7/15 and 8/10/15). PLB



# FollowUp

| 15-1034 | Troy | Robinson | Gochenouer | DeKalb County Medical Examiner |

**15-1034**

**8/10/2015 10:59:12 AM**

08-10-15: LG - Met with Mary Bradley, mother of decedent, who wanted to view a photo of the decedent for ID purposes. I showed her a photo taken in the lab on the day of Mr. Robinson's autopsy. The photo was identified as Troy Robinson, DOB: 03-02-83. I also released $33.80 and blue lighter that was placed into the investigator's property room for safekeeping.

8/11/15: I spoke with Agent Bigham of the GBI and he reported that the testing was conducted on the Taser model X26 that the officer used during the foot pursuit. The Taser registered being discharged and showed that the unit was turned off after 4 seconds. The particular model does not record if the probes made a complete circuit. Agent Bigham reported that several witnesses observed Mr. Robinson on top of the wall and was asking them to help him, and he suddenly fell off the wall. I asked Agent Bigham if Mr. Robinson was wanted for any crime and he stated that Mr. Robinson had told his family prior to the foot pursuit that he believed he was wanted for child support, but he in fact was not wanted for any crime. A meeting will be scheduled with Agent Bigham at a later date. (Inv. Anglin)

9/16/15 : Agent Bigham met with Director Bailey, Dr. Smith and myself at the Medical Examiner's Office. Agent Bigham reported that the GBI report was not complete as of yet but did share information that we needed to close our case. The officer involved in the incident stated that he discharged his Taser at Mr. Robinson while he was trying to go over the chain link fence. The officer stated that after he discharged the Taser he lost sight of Mr. Robinson and removed the cartridge from the Taser. A witness observed Mr. Robinson straddling the concrete wall with his right leg on the side of the apartment complex. The witness stated that Mr. Robinson was asking for someone to help him and then he fell off the wall onto the ground on the apartment side. Agent Bigham also reported that they were unable to locate any of the disks that exit the Taser cartridge when it is discharged. Agent Bigham stated that the testing of the Taser that was used by the officer showed that it was turned off after 4.5 seconds. The officer stated that he did not believe the Taser worked properly so he removed the cartridge, this will account for the 4.5 seconds as opposed to the normal 5 second cycle. (Inv. Anglin)

9/17/15: I spoke with Lt. Vanderpool from the DeKalb County Police Department and he stated that he removed one Taser probe from the upper back of Mr. Robinson at the request of medical personnel. Lt. Vanderpool stated that the second probe did not penetrate the body of Mr. Robinson and was stuck in the lower right portion of the shirt of Mr. Robinson near the waist line. (Inv. Anglin)

**15-1034**

**9/24/2015 2:11:24 PM**

**Inv. Eric Z. Minter**

On September 24, 2015 T 1308 hours, I submitted all Mr. Robinson's clothing to GBI. (EZM)

Wednesday, October 07, 2015

Page 2 of 2

COPY

GBI 00152

```
08/07/2015                  DeKalb Co Police-Fire Comm.              PAGE      1
09:21:00                        CAD Incident Detail                 USER CID


CAD Incident: 2015-00426101           ESN  : 0321            SP  F         AU
Phone    : 404 243-1334               Law  : DEKALB POLI     320 330 360 350
Name     :                            Fire : DEKALB FIRE     F06 ATF F26 F10
Address  : 2051 FLAT SHOALS RD        EMS  :
Community: ATLANTA                    Rescue: ANIMAL CONT     SW SC SE LN HN
Jurisdctn: DEKALB COUNTY
                                      Disp : C
SubDivisn: SOUTH                      Source: O
Low Intersection : VINEYARD WALK
Location Info: HIGHLANDS AT EAST ATLANTA APTS
.....................................................................
CAD Call Times: PD-LIFE-THREAT
.....................................................................
Incoming Call: 08/06/2015 19:04:59
Call Created : 08/06/2015 19:04:59    Created By: CJONES      Pos:012 TERM 12
Call Send Time   :        19:04:59    Sent By  : CJONES     Action:
Call Dispatch Time:       19:05:11    Event : 02L    3       Language:
Call Enroute Time :       19:05:11    Law  :         2  1CAR
Call Arrival Time :       19:05:11    Fire :         3  1CR   1ANT
Call Clear Time   :       02:11:39    EMS  :
Call Closed  :08/07/2015 02:11:39     Rescue:

Original Dispatch Remarks:
   FORMERLY EAST HAMPTON APTS B 321; F 6; LL 147; DPS #78737
.....................................................................
                              Narratives
.....................................................................

Narrative By: 012\CJONES     08/06/2015 19:06
MALE SUBJ UNSC... 30 YOA. HIGHLAND EAST ATL... SUBJ HIT GROUND..

Narrative By: 012\CJONES     08/06/2015 19:08
ADV EMS TO STEP IT UP.. BLDG #N... 2051 FLATS SHOALS RD

Narrative By: 012\CJONES     08/06/2015 19:09
MALE SUBJ WAS TASED...

Narrative By: 007\MLOWE      08/06/2015 19:10
bth units clr

Narrative By: 012\CJONES     08/06/2015 19:10
REQ ETA FOR EMS

Narrative By: 012\CJONES     08/06/2015 19:10
REQ ADDTL UNIT FOR CROWD CONTROL..

Narrative By: 012\CJONES     08/06/2015 19:11
ADV HAVE CLOSER EMS OR FIRE UNIT -76

Narrative By: 130\DPRESSWOO  08/06/2015 19:12
male witness called back adv male is not breathing and that subj was hit by veh
while running from pd...did not specify if he was struck by a pd unit ...404 482
```

GBI 0257

```
08/07/2015                DeKalb Co Police-Fire Comm.              PAGE      2
09:21:00                       CAD Incident Detail                USER CID
```

4389

Narrative By: 012\CJONES      08/06/2015 19:12
ADV ENG 6 10-7

Narrative By: 012\CJONES      08/06/2015 19:13
EMS CLR TO ENTER....

Narrative By: 012\CJONES   08/06/2015 19:17
313E CLR ON UPDATE ON TAC CHANNEL.. ADV HAVE COMPL 59

Narrative By: 009\MESAREY   08/06/2015 19:17
REQ 2ND ALS CPD IN PROGRESS

Narrative By: 012\CJONES      08/06/2015 19:22
ON C/B MALE COMPL ADV HE DIDN'T STATE HE WITNESS MALE SUBJ BEING STRUCK BY PD
VEH.. ADV HE STATES HE SAW MALE SUBJ LAYING ON GROUND AND PD VEH WAS NEXT TO
PAT... ADV HE ASSUMED OR IT APPEARED THE MALE WAS STRUCK BY VEH... COMPL DOES
NOT WANT TO 59

Narrative By: 012\CJONES      08/06/2015 19:22
313E CLR...

Narrative By: 012\CJONES      08/06/2015 19:22
CID 3305 10-7.. REQ FOR UNITS TO KEEP EYE ON SUBJ BEHIND HIM.. ADV SUBJ DO NOT
KNOW HE IS PD...

Narrative By: 012\CJONES      08/06/2015 19:28
TAC 40 REQ ON CALL IA

Narrative By: 012\CJONES      08/06/2015 19:41
CID 3305 REQ ADDTL UNITS FOR CROWD CONTROL..

Narrative By: 012\CJONES      08/06/2015 19:42
2115G 2112G 2113G 2129G 2130G 2114G UNITS -76 TO LOC...

Narrative By: 012\CJONES      08/06/2015 19:42
301 REQ K9 &90 TO MONITOR CHANNEL...

Narrative By: 012\CJONES      08/06/2015 19:42
ALL NET UNITS -76

Narrative By: 009\MESAREY   08/06/2015 19:43
REQ ADDITIONAL TRANS REF TO SUBJ IN CUSTODY...CUT TO HAND

Narrative By: 012\CJONES      08/06/2015 19:43
2123G -7

Narrative By: 012\CJONES      08/06/2015 19:44
355I ADV UNITS TO USE CAUTION @ GATES. SUBJS @ GATES...

GBI 0258

Narrative By: 012\CJONES      08/06/2015 19:50
CAR 17 CLR ON CALL..

Narrative By: 012\CJONES      08/06/2015 19:50
908 CLR ON CALL..

Narrative By: 012\CJONES      08/06/2015 20:01
CAR 17 ADV GBI CLR ON CALL & -76

Narrative By: 012\CJONES      08/06/2015 20:10
UNABLE TO LOG ON 2129 &2130 .. UNITS ARE -7

Narrative By: 012\CJONES      08/06/2015 20:20
TAC 82 REQ -21 APD FOR 1-2 UNITS TO 59  @ LOC IN REF TO S/65 @ TRAUMA RM#1

Narrative By: 012\CJONES      08/06/2015 20:21
CORRECTION **TAC 82 REQ APD 59 FOR 1-2 UNITS TO 59  @ GRADY IN REF TO S/65 @ TRA
UMA RM#1

Narrative By: 012\CJONES      08/06/2015 20:22
APD OPER 3809 CLR ON CALL @ GRADY

Narrative By: 012\CJONES      08/06/2015 20:25
TAC 82 REQ ETA FROM APD

Narrative By: 012\CJONES      08/06/2015 20:28
APD OPER 6561 ADV ETA LESS THAN 2

Narrative By: 012\CJONES      08/06/2015 20:28
TAC 82 ADV APD -7

Narrative By: 012\CJONES      08/06/2015 20:36
CAR 5 10-7

Narrative By: 012\CJONES      08/06/2015 21:16
CAR 17 -7

Narrative By: 012\CJONES      08/06/2015 21:16
CAR 17 ADV GBI 10-7 @ THIS TIME

Narrative By: 012\CJONES      08/06/2015 21:18
CAR 17 REQ ON CALL DISTRICT ATTORNEY INVESTIGATOR

Narrative By: 001\JPOOLE      08/06/2015 21:23
 ONCALL D.A. CLR...RDEBOSE

Narrative By: 012\CJONES      08/06/2015 23:55
REQ FOR ALL UNITS STILL ON SCENE TO 59 AT THE TOP OF THE HILL WITH GBI
[DPRESSWOOD 1
.....................................................................
UNIT   DEPT STATUS/DSP/CASE   LOCATION/REMARK           USER   DATE     TIME

```
08/07/2015                 DeKalb Co Police-Fire Comm.              PAGE      4
09:21:01                      CAD Incident Detail                  USER CID


. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
67         L01 DSP          Auto Backfill              CJONE 08/06 19:05:11
67         L01 ENR          Auto Backfill              CJONE 08/06 19:05:11
67         L01 OS                                      CJONE 08/06 19:05:11
382E       L01 DSP          Auto Backfill              CJONE 08/06 19:05:31
382E       L01 ENR                                     CJONE 08/06 19:05:31
351E       L01 DSP          Auto Backfill              CJONE 08/06 19:05:46
351E       L01 ENR                                     CJONE 08/06 19:05:46
361E       L01 DSP          Auto Backfill              CJONE 08/06 19:05:54
361E       L01 ENR                                     CJONE 08/06 19:05:54
313E       L01 DSP          Auto Backfill              CJONE 08/06 19:06:04
313E       L01 ENR                                     CJONE 08/06 19:06:04
67         L01              Event Change---Old: T      CJONE 08/06 19:06:15
313E       L01              Event Change---Old: T      CJONE 08/06 19:06:15
351E       L01              Event Change---Old: T      CJONE 08/06 19:06:15
361E       L01              Event Change---Old: T      CJONE 08/06 19:06:15
382E       L01              Event Change---Old: T      CJONE 08/06 19:06:15
82         L01 DSP          Auto Backfill              CJONE 08/06 19:07:14
82         L01 ENR          Auto Backfill              CJONE 08/06 19:07:14
82         L01 OS                                      CJONE 08/06 19:07:14
62         L01 DSP          Auto Backfill              CJONE 08/06 19:07:22
62         L01 ENR          Auto Backfill              CJONE 08/06 19:07:22
62         L01 OS                                      CJONE 08/06 19:07:22
E6         F01 DSP          0000066135/                MLOWE 08/06 19:09:10
AM64       F01 DSP                                     MLOWE 08/06 19:09:36
AM64       F01 ENR                                     MEDIC 08/06 19:09:42
E6         F01 ENR                                     ENG6  08/06 19:10:13
351E       L01 OS                                      DDWOO 08/06 19:12:37
E6         F01 OS                                      ENG6  08/06 19:13:53
361E       L01 OS                                      JLPOL 08/06 19:14:09
301        L01 DSP          Auto Backfill              CJONE 08/06 19:14:56
301        L01 ENR                                     CJONE 08/06 19:14:56
E26        F01 DSP                                     MLOWE 08/06 19:17:53
CSQ26      F01 DSP                                     MLOWE 08/06 19:17:54
E26        F01 ENR                                     ENG26 08/06 19:18:51
382E       L01 OS                                      CJONE 08/06 19:23:11
AM83       F01 DSP          Auto Backfill              MESAR 08/06 19:24:17
AM83       F01 ENR                                     MESAR 08/06 19:24:17
AM64       F01 OS                                      MEDIC 08/06 19:25:09
67         L01 OCA#         0000077124/                CBENT 08/06 19:25:37
E26        F01 OS                                      ENG26 08/06 19:25:51
40         L01 DSP          Auto Backfill              CJONE 08/06 19:28:59
40         L01 ENR          Auto Backfill              CJONE 08/06 19:28:59
40         L01 OS                                      CJONE 08/06 19:28:59
AM83       F01 TR           GRADY                      MESAR 08/06 19:30:48
AM83       F01 TR           GRADY                      MEDIC 08/06 19:33:09
AM64       F01 TR           GRADY                      MESAR 08/06 19:35:55
355I       L01 DSP          Auto Backfill              CJONE 08/06 19:39:20
355I       L01 ENR                                     CJONE 08/06 19:39:20
370I       L01 DSP          Auto Backfill              CJONE 08/06 19:39:30
370I       L01 ENR                                     CJONE 08/06 19:39:30
```

GBI 0260

```
08/07/2015                DeKalb Co Police-Fire Comm.            PAGE     5
09:21:03                     CAD Incident Detail                 USER CID


390I    L01 DSP            Auto Backfill            CJONE 08/06 19:39:40
390I    L01 ENR                                    CJONE 08/06 19:39:40
469S    L01 DSP            Auto Backfill            CJONE 08/06 19:40:49
469S    L01 ENR                                    CJONE 08/06 19:40:49
AM77    F01 DSP            Auto Backfill            MLOWE 08/06 19:43:31
AM77    F01 ENR                                    MLOWE 08/06 19:43:31
AM77    F01 ENR                                    MEDIC 08/06 19:43:44
AM77    F01 CASE           0000066145/              MLOWE 08/06 19:43:46
83      L01 DSP            Auto Backfill            CJONE 08/06 19:44:14
83      L01 ENR            Auto Backfill            CJONE 08/06 19:44:14
83      L01 OS                                      CJONE 08/06 19:44:14
AM83    F01 TRC            GRADY                    MEDIC 08/06 19:44:34
CSQ26   F01 CL             GRADY                    MESAR 08/06 19:44:41
370I    L01 OS                                      CJONE 08/06 19:45:01
355I    L01 OS                                      CJONE 08/06 19:45:01
390I    L01 OS                                      CJONE 08/06 19:45:02
301     L01 OS                                      CJONE 08/06 19:45:05
313E    L01 OS                                      CJONE 08/06 19:45:08
2115    L01 DSP            Auto Backfill            CJONE 08/06 19:46:57
2115    L01 ENR            Auto Backfill            CJONE 08/06 19:46:57
2115    L01 OS                                      CJONE 08/06 19:46:57
469S    L01 OS                                      SKWIL 08/06 19:47:51
2112    L01 DSP            Auto Backfill            CJONE 08/06 19:47:51
2112    L01 ENR            Auto Backfill            CJONE 08/06 19:47:51
2112    L01 OS                                      CJONE 08/06 19:47:51
2113    L01 DSP            Auto Backfill            CJONE 08/06 19:48:06
2113    L01 ENR            Auto Backfill            CJONE 08/06 19:48:06
2113    L01 OS                                      CJONE 08/06 19:48:06
361E    L01 OCA#           0000077134/              JLPOL 08/06 19:49:46
82      L01 OS             GRADY                    CJONE 08/06 19:50:08
83      L01 OS             GRADY                    CJONE 08/06 19:50:09
2114    L01 DSP            Auto Backfill            CJONE 08/06 19:53:12
2114    L01 ENR            Auto Backfill            CJONE 08/06 19:53:12
2114    L01 OS                                      CJONE 08/06 19:53:12
AM77    F01 OS                                      F489  08/06 19:57:05
AM77    F01 TRC                                     MEDIC 08/06 19:58:22
AM77    F01 AV             Available                MEDIC 08/06 19:58:25
2123    L01 DSP            Auto Backfill            CJONE 08/06 20:03:05
2123    L01 ENR            Auto Backfill            CJONE 08/06 20:03:05
2123    L01 OS                                      CJONE 08/06 20:03:05
361E    L01 TR             X1 MALE                  CJONE 08/06 20:04:13
                           JAIL
E6      F01 AV             Available                ENG6  08/06 20:05:42
341E    L01 DSP            Auto Backfill            CJONE 08/06 20:12:18
341E    L01 ENR            Auto Backfill            CJONE 08/06 20:12:18
341E    L01 OS                                      CJONE 08/06 20:12:18
361E    L01 TRC            JAIL                     CJONE 08/06 20:14:50
66      L01 DSP            Auto Backfill            CJONE 08/06 20:16:05
66      L01 ENR            Auto Backfill            CJONE 08/06 20:16:05
66      L01 OS                                      CJONE 08/06 20:16:05
AM83    F01 TRC            GRADY                    MEDIC 08/06 20:26:41
```

GBI 0261

```
08/07/2015                   DeKalb Co Police-Fire Comm.              PAGE      6
09:21:05                       CAD Incident Detail                    USER CID


AM83    F01 AV              Available                    MEDIC 08/06 20:26:43
                            GRADY
AM64    F01 TRC             GRADY                        F489  08/06 20:28:21
E26     F01 AIQ                                          ENG26 08/06 20:37:23
AM64    F01 AV              Available                    MEDIC 08/06 20:38:26
                            GRADY
361E    L01 TR              X1 MALE                      CJONE 08/06 20:40:27
                            GRADY
355I    L01 ENR             GRADY                        CJONE 08/06 21:01:03
390I    L01 ENR             GRADY                        CJONE 08/06 21:01:05
361E    L01 TRC             GRADY                        CJONE 08/06 21:05:29
CSQ26   F01 AIQ     65      GRADY                        MLOWE 08/06 21:07:43
382E    L01 MDTOF                                        ERMCW 08/06 21:11:36
390I    L01 OS              GRADY                        CJONE 08/06 21:17:52
355I    L01 OS              GRADY                        CJONE 08/06 21:17:52
382E    L01 MDTON           BEGINNING MILEAGE: 151600    ERMCW 08/06 21:30:36
317I    L01 DSP             Auto Backfill                CJONE 08/06 21:38:02
317I    L01 ENR             Auto Backfill                CJONE 08/06 21:38:02
317I    L01 OS                                           CJONE 08/06 21:38:02
317I    L01 TR              X1 MALE                      CJONE 08/06 21:38:18
                            GRADY
317I    L01 TRC             GRADY                        CJONE 08/06 21:47:28
469S    L01 MDTOF                                        SKWIL 08/06 21:49:03
469S    L01 MDTON                                        SKWIL 08/06 21:49:05
469S    L01 MDTOF                                        SKWIL 08/06 21:49:21
469S    L01 MDTON           BEGINNING MILEAGE: 10009     SKWIL 08/06 21:50:51
469S    L01 AV      63                                   CJONE 08/06 21:59:51
313E    L01 AV      63                                   CJONE 08/06 22:01:30
317I    L01 AV      63      GRADY                        MSCLO 08/06 22:02:34
382M    L01 DSP             Auto Backfill                CJONE 08/06 22:48:00
382M    L01 ENR                                          CJONE 08/06 22:48:00
355I    L01 AV      63      GRADY                        ACMAR 08/06 22:48:34
382E    L01 AV      63                                   ERMCW 08/06 22:54:58
351E    L01 AV      63                                   DDWOO 08/06 22:55:51
82      L01 AV      63      GRADY                        RDPEN 08/06 22:57:27
83      L01 AV              10-63                        HJHUD 08/06 22:57:41
                            GRADY
390I    L01 MDTOF           GRADY                        TCJOH 08/06 22:58:29
361M    L01 DSP             Auto Backfill                CJONE 08/06 22:59:10
361M    L01 ENR             Auto Backfill                CJONE 08/06 22:59:10
361M    L01 OS                                           CJONE 08/06 22:59:10
361M    L01 ENR                                          CJONE 08/06 22:59:14
361M    L01 ENR                                          CJONE 08/06 22:59:23
341E    L01 AV      63                                   BDHOL 08/06 23:00:50
361M    L01 ENR                                          WCHOU 08/06 23:00:58
382M    L01 OS                                           CJONE 08/06 23:06:50
370I    L01 AV      63                                   PRICE 08/06 23:10:36
361M    L01 OS                                           WCHOU 08/06 23:10:39
351M    L01 DSP                                          CJONE 08/06 23:17:51
351M    L01 ENR             GRADY                        CJONE 08/06 23:17:57
352M    L01 DSP             Auto Backfill                CJONE 08/06 23:21:25
```

GBI 0262

```
08/07/2015               DeKalb Co Police-Fire Comm.          PAGE      7
09:21:06                    CAD Incident Detail               USER CID


352M    L01 ENR                                       CJONE 08/06 23:21:25
352M    L01 OS                                        YCRAS 08/06 23:28:25
351M    L01 OS             GRADY                       EESPI 08/06 23:31:16
361E    L01 MDTOF          GRADY                       JLPOL 08/06 23:59:45
351M    L01 TR             X1 MALE                     DPRES 08/07 00:24:35
                           JAIL
66      L01 MDTOF                                      MDFRA 08/07 00:30:33
351M    L01 TRC            JAIL                        DPRES 08/07 00:46:42
62      L01 MDTOF                                      LONIE 08/07 00:48:59
351M    L01 AV   63        JAIL                        EESPI 08/07 01:14:42
66      L01 AV   63                                    DPRES 08/07 01:26:52
2115    L01 AV   63                                    DPRES 08/07 01:26:58
301     L01 AV   63                                    DPRES 08/07 01:27:04
2113    L01 AV   63                                    DPRES 08/07 01:27:07
2112    L01 AV   63                                    DPRES 08/07 01:27:10
2114    L01 AV   63                                    DPRES 08/07 01:27:13
2123    L01 AV   63                                    DPRES 08/07 01:27:16
67      L01 AV   65                                    DPRES 08/07 01:27:19
62      L01 AV   63                                    DPRES 08/07 01:27:22
40      L01 AV   63                                    DPRES 08/07 01:27:25
390I    L01 AV   63        GRADY                       DPRES 08/07 01:27:40
361E    L01 AV   63        GRADY                       DPRES 08/07 01:32:10
352M    L01 AV   63                                    YCRAS 08/07 02:09:44
382M    L01 AV   63                                    WILLI 08/07 02:10:43
361M    L01 AV   63                                    WCHOU 08/07 02:11:39
.............................................................................
UNIT / VEHICLE ASSIGNMENT
.............................................................................
67      2640         BENTON, C           10852           08/06 18:49:27
382E    3217         MCWHITE, E R        12300           08/06 21:30:47
351E    3149         WOOLFORK, D.D.      12321           08/06 15:46:33
361E    3165         POLANCO, JANN L.    12330           08/06 15:40:51
313E    2607         SMITH, JR, G E                      08/06 14:53:41
82      2172         PENNY, R D          12785           08/06 11:22:28
62      2047         NIEMANN, L O                        08/06 07:46:29
40      1736         VANDERPOOL, G T                     08/03 16:29:52
355I    3103         MARTINEZ, A         12335           08/06 13:20:55
370I    2939         PRICE, D W          12371           08/06 11:56:32
83      2116         HUDSON, H J         12233           08/06 11:34:05
2112    2931         HOLLOMAN, L L                       07/28 18:59:22
341E    3127         HOLLOMAN, B.D.      12334           08/06 15:54:13
66      1533         FRAZIER, M D        12122           08/06 11:55:59
317I    2237         CLOUDT, M S         12390           08/06 16:22:20
382M    3029         WILLIAMS, KEVIN W   12359           08/06 22:35:15
361M    2392         HOUSE, W C          12355           08/06 22:30:14
351M    3258         ESPINOZA, EDUARDO   12335           08/06 23:17:27
352M    3308         RASKIN, YOSEF C.    12321           08/06 23:20:56
```

GBI 0263

**V19 – X26 User Course**

**TASER**

**P r o t e c t   L i f e**

™

User Certification Course TASER® X26™ Conducted Electrical Weapon

Version 19 Released April 2013

GBI 0272

See Trademark Notice file on DVD.  © 2013 TASER International Inc.

**TASER TRAINING ACADEMY**



# TASER X26

## Constructed of impact resistant sonic welded polymer.  Mass = 7 ounces.

V19 – X26 User Course

Rear sight

CID

Safety

DPM release button

Stainless steel shock plate

Illumination selector

Serial number plate

DPM

Front sight

Trigger

LIL: Low Intensity Lights (LED)

TASER cartridge

Wire

LASER sight

Blast door

AFIDs

Probes

Blast door

TASER TRAINING ACADEMY

See Trademark Notice file on DVD.  © 2013 TASER International Inc.

# Cartridges











15 ft.
(4.6 meters)
Yellow blast doors
Live cartridge
Regular probe

21 ft.
(6.4 meters)
Silver blast doors
Live cartridge
Regular probe

XP 25 ft.
(7.6 meters)
Green blast doors
Live cartridge
XP probe

XP 35 ft.
Special Duty
(10.67 meters)
Orange door
Live cartridge XP probe

TASER ACADEMY
GBI 0383
© 2013 TASER International Inc.

See Trademark Notice file on DVD.

TASER TRAINING ACADEMY

# TARGETING

- Avoid intentionally targeting the CEW on sensitive areas of the body such as the head, throat, breast, chest or area of the heart, genitals, or known pre-existing injury areas without legal justification.

- The preferred target areas are below the neck area for back shots and the lower center mass (below chest or heart area) for front shots

  - Avoid sensitive areas

See Trademark Notice file on DVD.  © 2013 TASER International Inc.

V19 – X26 User Course

TASER TRAINING ACADEMY

TASER
GBI 0409 ACADEMY

# Preferred Target Zone Rear
## (when possible)

Below neck (blue zone)

– Large muscles

– Avoid head

*The back is always the preferred target area when reasonably practicable under the totality of circumstances of the incident.*

See Trademark Notice file on DVD. © 2013 TASER International Inc.

V19 – X26 User Course

TASER TRAINING ACADEMY



GBI 0415

See Trademark Notice file on DVD. © 2013 TASER International Inc.

TASER TRAINING ACADEMY

# Probe Placement

- If practicable, deploy probes at suspect's back:

    - Clothing fits tighter

    - Surprise factor

    - Stronger muscles – usually even more overwhelming

- Aim at preferred target zones

- Avoid sensitive areas of the body



# Some Causes of Limited Effectiveness

- Miss or single dart hit
- Incomplete, broken, or intermittent circuit
- Loose or thick clothing
- Low nerve or muscle mass
- Obese subject
- Limited probe spread
- Wires break
- Operator error

V19 – X26 User Course

TASER TRAINING ACADEMY

GBI 0421

See Trademark Notice file on DVD. © 2013 TASER International Inc.



# Probe Placement
## (Does not apply to 35 ft cartridges)

- Deployment range from point blank to 15, 21, or 25 feet depending on cartridge

- Preferred range = 7 to 15 feet from target for probe spread, officer safety, and accuracy

See Trademark Notice file on DVD. © 2013 TASER International Inc.

GBI 0437

Not To Scale

FLAT SHOALS RD

Family Dollar

Fence
Wall

End of Pursuit

Highland of East
ATLANTA Apartments

FAYETTEVILLE RD

Chevron

CST #2640
8/6/15

10-0038-34-16

GBI 0510

**Bigham, Rocky**

| | |
|---|---|
| **From:** | Mitch Jones <mjones@gapost.org> |
| **Sent:** | Friday, August 14, 2015 11:16 AM |
| **To:** | Bigham, Rocky |
| **Subject:** | Re: POST Review |
| **Attachments:** | Benton, Casey T POST profile.pdf |

Response per your inquiry for **Casey T Benton (Officer Key # O138818)** is as follows:

a.  Does the officer possess a P.O.S.T. certification and what is the status of the certification?  Yes, the officer possesses a basic law enforcement officer certification & it is in good standing.  (see attached POST profile)

b.  Has the officer completed the required training for each calendar year since completing the basic course?  Yes.

c.  Does the officer have power of arrest?  Yes.

d.  Does the officer's P.O.S.T. record show either the required training or a waiver issued for each required calendar year?  Yes.

e.  If the officer's record does not show either the required training or a waiver issued for each required calendar year, has the officer submitted all required training to P.O.S.T. to be documented on their record?  N/A

f.  Are there or have there been any prior, pending, or active P.O.S.T. investigations or complaints concerning the officer?  No.

g.  Are there any other P.O.S.T. issues concerning the officer not addressed in the above questions?  No.

On Fri, Aug 14, 2015 at 11:05 AM, Bigham, Rocky <Rocky.Bigham@gbi.ga.gov> wrote:

I am conducting a use of force investigation involving Officer Casey Benton with the DeKalb County Police Department (DOB: 1/24/1981).  Could you provide me with the answers to the following questions and a copy of his POST records?

 a.      Does the officer possess a P.O.S.T. certification and what is the status of the certification?

b.      Has the officer completed the required training for each calendar year since completing the basic course?

c.      Does the officer have power of arrest?

d.      Does the officer's P.O.S.T. record show either the required training or a waiver issued for each required calendar year?

e.      If the officer's record does not show either the required training or a waiver issued for each required calendar year, has the officer submitted all required training to P.O.S.T. to be documented on their record?

GBI 0518

f.      Are there or have there been any prior, pending, or active P.O.S.T. investigations or complaints concerning the officer?

g.      Are there any other P.O.S.T. issues concerning the officer not addressed in the above questions?

Thank you,


Special Agent Rocky Bigham

Georgia Bureau of Investigation

Atlanta Regional Office

2120 Iris Drive, Conyers, Georgia

Phone: 770-388-5019




--
Mitch Jones
Director - Certification & Training Standards
Georgia Peace Officer Standards & Training Council
P.O. Box 349
Clarkdale, GA  30111-0349
Phone:  (770)-732-5974
Fax:  (770)-732-5952
Email:  mjones@gapost.org

GBI 0519



DeKalb County Police Department
Joint Intelligence Section
1960 West Exchange Place
Tucker, Georgia  30084

Operation DAGGER

DeKalb Anti-Gang Guns Enforcement and Reduction Situation

The Gang Unit has seen an increase of recruitment and violent tendencies of the G-Shyne Bloods and SMM (Sex Money Murder). A large number of G-Shyne Bloods occupies the Highlands of East Atlanta Apartments (East Hampton; 2051 Flatshoals Road). The Gang Unit has recently made contact with several Blood members inside of this apartment complex. In a half of mile radius of this apartment complex the following crimes occurred from January 8th to July 7th:

1.      60 assaults

2.      24 burglaries

3.      19 stolen vehicles

4.      9 robberies

5.      19 miscellaneous thefts

6.      30 property damage cases

7.      11 entering autos

GBI 0530

# EXHIBIT 3

RECEIVED

AUG 1 0 REC'D

**DeKalb County Police Department**
**Internal Review Board**
Assistant Chief M.P. Yarbrough - Chairman

**INTERNAL**
**AFFAIRS**

Major A.B. Catlin - CID/Vice Chairman
Major S.E. Porter - SSD
Major T.S. Dedrick - Uniform/East Precinct
Major C.D. Medlin - SOD



Major K.D. Johnson - Uniform/South Precinct
Major T.S. Voss - Uniform/North-Central Precinct
Major G.A. Padrick - Uniform/Tucker Precinct

IA Case Number: 15-0803

Incident Date:   August 6, 2015

Officer(s):   C.T. Benton #2640

Review Date: March 16, 2016

Detective:   R.J. Renaud #2303

Disposition:   Closed - No Further Action

☒ IA Report   ☐ Chair Memo to Chief of Police   ☐ Chair Memo to Officer (copy)

| | | | |
|---|---|---|---|
| Asst. Chief M.P. Yarbrough - Chairman | ☐ Present/Returned | ☒ Abstain | ☐ Absent |
| Major A.B. Catlin - CID/Vice Chairman | ☒ Present/Returned | ☐ Abstain | ☐ Absent |
| Major S.E. Porter - SSD | ☒ Present/Returned | ☐ Abstain | ☐ Absent |
| Major T.S. Dedrick - Uniform/East Precinct | ☒ Present/Returned | ☐ Abstain | ☐ Absent |
| Major C.D. Medlin - SOD | ☒ Present/Returned | ☐ Abstain | ☐ Absent |
| Major K.D. Johnson - Uniform/South Precinct | ☒ Present/Returned | ☐ Abstain | ☐ Absent |
| Major T.S. Voss - Uniform/North-Central Precinct | ☒ Present/Returned | ☐ Abstain | ☐ Absent |
| Major G.A. Padrick - Uniform/Tucker Precinct | ☒ Present/Returned | ☐ Abstain | ☐ Absent |

Notes/Comments:

This incident involved the deployment of a Taser, and the board found that the incident did not contribute to the death of Mr. Robinson.

Date:   Wednesday, August 10, 2016

Signature:   **Major A.B. Catlin**   Digitally signed by Major A.B. Catlin
Date: 2016.08.10 09:54:06 -04'00'

DeKalb County Police Department

Rev 2 5 8/2016   cflood/bjean

## DeKalb County Police Department
## Internal Review Board
### Assistant Chief M.P. Yarbrough - Chairman

Major A.B. Catlin - CID/Vice Chairman
Major S.E. Porter - SSD
Major T.S. Dedrick - Uniform/East Precinct
Major C.D. Medlin - SOD



Major K.D. Johnson - Uniform South Precinct
Major T.S. Voss - Uniform/North-Central Precinct
Major G.A. Padrick - Uniform/Tucker Precinct

| | | |
|---|---|---|
| **To:** | **Chief James Conroy** | |
| **From:** | **Assistant Chief M.P. Yarbrough** | |
| **Officer/Employee:** | **C.T. Benton #2640** | **I.A. Case Number: 15-0803** |
| **Incident:** | **Use of Force (Other)** | |
| **Incident Date:** | **August 6, 2015** | |
| **Incident Location:** | **1981 Flat Shoals road, Atlanta Georgia 30035** | |
| **I.A. Case Detective:** | **R.J. Renaud #2303** | |
| **Rule/Regulation Violation:** | **(Amended Form)** | |

The DeKalb County Police Department's Internal Review Board (IRB) has thoroughly reviewed the Internal Affairs (IA) report and accompanying documents with regards to the above mentioned case. The board determined the following in reference to this incident;

1. The officer(s) involved were acting in the capacity of a law enforcement officer.

2. The officer(s) involved in this incident were JUSTIFIED in the use of force.

3. The officer(s) involved in this incident did not violate any county rules/regulations.

The voting members of the IRB with a quorum (at least five members) voted as recorded below;

Vote Type: Verbal/Full Meeting

| | | | | | | |
|---|---|---|---|---|---|---|
| Was the Officer(s) acting in the capacity of a law enforcement officer? | Yes: | 7 | No: | | Abstain: | 1 |
| Was the Use of Force justified? | Yes: | 7 | No: | | Abstain: | 1 |
| Was any policy, rule or regulation violated? | Yes: | | No: | 7 | Abstain: | 1 |

Recommendations: None

| | | |
|---|---|---|
| Aug 10, 2016 | **Major A.B. Catlin** Digitally signed by Major A.B. Catlin Date: 2016.08.10 09:54:38 -04:00 | |
| Date | Vice-Chairman | |
| Aug 10, 2016 | **M.P. Yarbrough 1484** Digitally signed by M.P. Yarbrough 1484 Date: 2016.08.10 11:45:07 -04:00 | |
| Date | Chairman | Comments (Concur, Re-file, Further Investigation) |
| Aug 10, 2016 | **Chief James W Conroy** Digitally signed by Chief James W Conroy Date: 2016.08.10 11:47:23 -04:00 | |
| Date | DeKalb County Chief of Police | Comments (Concur, Re-file, Further Investigation) |

DeKalb County Police Department

Rev 2.5 8/2016   ctlood/bjean

Open Records Request DKPD000510

# DeKalb County Police Department
## Internal Review Board
### Assistant Chief M.P. Yarbrough - Chairman

Major A.B. Catlin - CID Vice Chairman

Major S.E. Porter - SSD

Major T.S. Dedrick - Uniform/East Precinct

Major C.D. Medlin - SOD



Major K.D. Johnson - Uniform/South Precinct

Major T.S. Voss - Uniform/North-Central Precinct

Major G.A. Padrick - Uniform/Tucker Precinct

---

**To:**               C.T. Benton #2640

**From:**            Assistant Chief M.P. Yarbrough

**Date:**                      Mar 16, 2016

**I.A. Case Number:**   15-0803

**Incident:**           Use of Force (Other)

**Incident Date:**     August 6, 2015

The DeKalb County IRB reviewed the above mentioned case on: March 16, 2016

The Internal Review Board has thoroughly reviewed the Internal Affairs (IA) report and accompanying documents with regards to the above mentioned case. All investigatory reports and statements as well as the Internal Review Board Final Findings Report are maintained in Internal Affairs. The board determined the following in reference to this incident:

The officer(s) involved were acting in the capacity of a law enforcement officer.

The officer(s) involved in this incident were JUSTIFIED in the use of force.

The officer(s) involved in this incident did not violate any county rules/regulations.

**Vote Type:**             Verbal/Full Meeting

**Recommendation(s):**        None

M.P. Yarbrough 1484: Digitally signed by M.P. Yarbrough 1484
Date: 2016.08.10 11:45:40 -04'00'

Aug 10, 2016

Chairman - DeKalb County Police Department IRB

Date

DeKalb County Police Department

Rev 2.5 8/2016   eflood/bjean



# DeKalb County Police Department
## Internal Review Board
### Assistant Chief M.P. Yarbrough - Chairman

Major A.B. Catlin - CID Vice Chair

Major S.E. Porter - SSD

Major T.S. Dedrick - Uniform East Precinct

Major C.D. Medlin - SOD



Major K.D. Johnson - Uniform South Precinct

Major T.S. Voss - Uniform/North-Central Precinct

Major G.A. Padrick - Uniform/Tucker Precinct

**Member Name:** _Arthur B. Catlin_   **IA Case Number:** _15-0803_

**Officer:** _C.T. Beaton  # 2440_

I have thoroughly reviewed the Internal Affairs (IA) report and any accompanying document(s) with regards to the above mentioned IA case number and as a voting member of the DeKalb County Police Departments Internal Review Board I find the following:

Was the officer acting in the capacity of a Law Enforcement Officer?   (YES)   NO   ABSTAIN

Was the use (level) of force justified?   (YES)   NO   ABSTAIN

Was any policy, rule or regulation violated?   YES   (NO)   ABSTAIN

If "Yes", what was the policy rule
or regulation violated:

Comments/Notes:

**Signature** _____   **Date** _03/16/16_

DeKalb County Police Department

Rev 1 1 3/2016   cflood/byron



# DeKalb County Police Department
## Internal Review Board
### Assistant Chief M.P. Yarbrough - Chairman

Major A.B. Catlin - CID/Vice Chair

Major S.E. Porter - SSD

Major T.S. Dedrick - Uniform/East Precinct

Major C.D. Medlin - SOD

Major K.D. Johnson - Uniform/South Precinct

Major T.S. Voss - Uniform/North-Central Precinct

Major G.A. Padrick - Uniform/Tucker Precinct



**Member Name:** *Major TS Voss*     **IA Case Number:** *15-0803*

**Officer:** *C.T. Benton*

I have thoroughly reviewed the Internal Affairs (IA) report and any accompanying document(s) with regards to the above mentioned IA case number and as a voting member of the DeKalb County Police Departments Internal Review Board I find the following:

Was the officer acting in the capacity of a Law Enforcement Officer?      (YES)      NO      ABSTAIN

Was the use (level) of force justified?      (YES)      NO      ABSTAIN

Was any policy, rule or regulation violated?      YES      (NO)      ABSTAIN

If "Yes", what was the policy rule or regulation violated: _____

Comments/Notes:

**Signature:** *Tim Voss*          **Date:** *03-16-16*

DeKalb County Police Department

Rev 1 13/2016   cflood/bjean

Open Records Request DKPD000513



# DeKalb County Police Department
## Internal Review Board
### Assistant Chief M.P. Yarbrough - Chairman

Major A.B. Catlin - CID/Vice Chair

Major S.E. Porter - SSD

Major T.S. Dedrick - Uniform/East Precinct

Major C.D. Medlin - SOD



Major K.D. Johnson - Uniform/South Precinct

Major T.S. Voss - Uniform/North-Central Precinct

Major G.A. Padrick - Uniform/Tucker Precinct

---

**Member Name:** _MAJOR GA PADRICK_   **IA Case Number:** _15- 0803_

**Officer:** _C.J. BENTON # 2640_

I have thoroughly reviewed the Internal Affairs (IA) report and any accompanying document(s) with regards to the above mentioned IA case number and as a voting member of the DeKalb County Police Departments Internal Review Board I find the following:

Was the officer acting in the capacity of a Law Enforcement Officer?   (YES)   NO   ABSTAIN

Was the use (level) of force justified?   (YES)   NO   ABSTAIN

Was any policy, rule or regulation violated?   YES   (NO)   ABSTAIN

If "Yes", what was the policy rule or regulation violated: _____

Comments/Notes:

[blank box]

_MAJOR S.E. Per____ 1896_        _3 - 12 - 16_
**Signature**                    **Date**

DeKalb County Police Department                    Rev 1 13/2016   cflood/bjcm

Open Records Request DKPD000514



# DeKalb County Police Department
## Internal Review Board
### Assistant Chief M.P. Yarbrough - Chairman

Major A.B. Catlin - CID/Vice Chair
Major S.E. Porter - SSD
Major T.S. Dedrick - Uniform/East Precinct
Major C.D. Medlin - SOD



Major K.D. Johnson - Uniform/South Precinct
Major T.S. Voss - Uniform/North-Central Precinct
Major G.A. Padrick - Uniform/Tucker Precinct

**Member Name:** Sonya Porter   **IA Case Number:** 15-0803

**Officer:** C.T. Benton #2640

I have thoroughly reviewed the Internal Affairs (IA) report and any accompanying document(s) with regards to the above mentioned IA case number and as a voting member of the DeKalb County Police Departments Internal Review Board I find the following:

Was the officer acting in the capacity of a Law Enforcement Officer?   (YES)   NO   ABSTAIN

Was the use (level) of force justified?   (YES)   NO   ABSTAIN

Was any policy, rule or regulation violated?   YES   (NO)   ABSTAIN

If "Yes", what was the policy rule
or regulation violated:   _____

Comments/Notes:

_____
Signature

**Date** 3-16-16

DeKalb County Police Department

Rev 1 1 3/2016   cflood/bjean

Open Records Request DKPD000515

# DeKalb County Police Department
## Internal Review Board
### Assistant Chief M.P. Yarbrough - Chairman

Major A.B. Catlin - CID/Vice Chair

Major S.E. Porter - SSD

Major T.S. Dedrick – Uniform/East Precinct

Major C.D. Medlin - SOD



Major K.D. Johnson - Uniform/South Precinct

Major T.S. Voss - Uniform/North-Central Precinct

Major G.A. Padrick – Uniform/Tucker Precinct

---

**Member Name:** C.D Medlin          **IA Case Number:** 15-0803

**Officer:** C.T. Benton # 2640

I have thoroughly reviewed the Internal Affairs (IA) report and any accompanying document(s) with regards to the above mentioned IA case number and as a voting member of the DeKalb County Police Departments Internal Review Board I find the following:

Was the officer acting in the capacity of a Law Enforcement Officer?     (YES)     NO     ABSTAIN

Was the use (level) of force justified?     (YES)     NO     ABSTAIN

Was any policy, rule or regulation violated?     YES     (NO)     ABSTAIN

If "Yes", what was the policy rule or regulation violated: _____

Comments/Notes:

_____

**Signature** _C.D.L____ 17M     **Date** _3-16-11_

DeKalb County Police Department

Rev 1 13/2016   cflood/bjcon




# DeKalb County Police Department
## Internal Review Board
### Assistant Chief M.P. Yarbrough - Chairman

Major A.B. Catlin - CID/Vice Chair
Major S.E. Porter - SSD
Major T.S. Dedrick - Uniform/East Precinct
Major C.D. Medlin - SOD



Major K.D. Johnson - Uniform/South Precinct
Major T.S. Voss - Uniform/North-Central Precinct
Major G.A. Padrick - Uniform/Tucker Precinct

**Member Name:** _Major K.D. Johnson_     **IA Case Number:** _15-0803_

**Officer:** _C.T. Benton #2640_

I have thoroughly reviewed the Internal Affairs (IA) report and any accompanying document(s) with regards to the above mentioned IA case number and as a voting member of the DeKalb County Police Departments Internal Review Board I find the following:

Was the officer acting in the capacity of a Law Enforcement Officer?     (YES)     NO     ABSTAIN

Was the use (level) of force justified?     (YES)     NO     ABSTAIN

Was any policy, rule or regulation violated?     YES     (NO)     ABSTAIN

If "Yes", what was the policy rule or regulation violated: _____

Comments/Notes:

_Signature_ _1554_          _Date_ _3/16/16_

DeKalb County Police Department

Rev 1 13/2016   cflood/bjcan

Open Records Request DKPD000517



# DeKalb County Police Department
## Internal Review Board
### Assistant Chief M.P. Yarbrough - Chairman

Major A.B. Catlin - CID/Vice Chair

Major S.E. Porter - SSD

Major T.S. Dedrick - Uniform East Precinct

Major C.D. Medlin - SOD



Major K.D. Johnson - Uniform South Precinct

Major T.S. Voss - Uniform/North-Central Precinct

Major G.A. Padrick - Uniform/Tucker Precinct

---

**Member Name:** *Major T S Dedrick*    **IA Case Number:** *15-0803*

**Officer:** *C. T. Benton #2640*

I have thoroughly reviewed the Internal Affairs (IA) report and any accompanying document(s) with regards to the above mentioned IA case number and as a voting member of the DeKalb County Police Departments Internal Review Board I find the following:

Was the officer acting in the capacity of a Law Enforcement Officer?    (YES)    NO    ABSTAIN

Was the use (level) of force justified?    (YES)    NO    ABSTAIN

Was any policy, rule or regulation violated?    YES    (NO)    ABSTAIN

If "Yes", what was the policy rule
or regulation violated: _____

Comments/Notes:

---

*Major T S Dedrick*

**Signature**

*3-16-16*

**Date**

DeKalb County Police Department

Rev 1 I 3/2016  cflood/bjean

# DeKalb County Police Department
# Internal Affairs Unit



## Confidential Investigative Report

**IA Case #:**   15-0803

**Employee(s):**   Officer C. T. Benton #2640
Special Services Division / S.T.E.P. Unit

## Return to Internal Affairs After Final Review

Captain S. L. Slade
Commander
Internal Affairs Unit



## DeKalb County Police Department
### Internal Affairs Unit
### INVESTIGATIVE REPORT # 15-0803
### *CONFIDENTIAL*
(PLEASE INITIAL AND FORWARD THROUGH THE CHAIN OF COMMAND)

[X] Chief J. W. Conroy          (Review Date / Initial _J.W. Conroy_  2/9/16 )

[X] Captain S. L. Slade         (Review Date / Initial _1/25/16  CATXL_ )

[ ] Assistant Chief Uniform Division          (Review Date / Initial _____ )

    [ ] ____ North Central   [ ] ____ South   [ ] ____ East   [ ] ____ Tucker

    [ ] Supervisor completing **DAR** if required          (Print Name / Badge# _____ )

[ ] Assistant Chief Criminal Investigations Division          (Review Date / Initial _____ )

    [ ] ____ Special Investigations   [ ] ____ Robbery   [ ] ____ Special Victims   [ ] ____ Auto Theft

    [ ] ____ Homicide   [ ] ____ ILP   [ ] ____ Crime Scene   [ ] ____ Other Unit (specify) _____

    [ ] Supervisor completing **DAR** if required          (Print Name / Badge# _____ )

[ ] Assistant Chief Special Services Division          (Review Date / Initial _____ )
    **Support Services Section:**

    [ ] ____ Central Records   [ ] ____ Academy   [ ] ____ Property Room   [ ] ____ Taxi /Permits

    [ ] ____ Background / Recruiting   [ ] ____ Other Unit (specify) _____

    [ ] Supervisor completing **DAR** if required          (Print Name / Badge# _____ )

    [ ] **Special Operations Section:**

    [ ] ____ STEP   [ ] ____ SWAT   [ ] ____ STAR   [ ] ____ Other Unit (specify) _____

    [ ] Supervisor completing **DAR** if required          (Print Name / Badge# _____ )

IA Sergeant D. M. Bradbury          (Review Date / Initial _JMB/501   1-21-16_ )
IA Sergeant J. M. Love              (Review Date / Initial _____ )

**Upon final review, this investigative report must be returned to the Internal Affairs Unit.**

Open Records Request DKPD000520



# DEKALB COUNTY POLICE DEPARTMENT
# INTERNAL AFFAIRS UNIT



## CONFIDENTIAL INVESTIGATIVE REPORT

**I. A. Case #:**  15-0803

**Employee(s):**  Officer C. T. Benton #2640
Special Services Division / S.T.E.P. Unit

**Incident:**  Use of Force 2-2.66

**Incident Date:**  August 6, 2015

**Incident Location:**  1981 Flat Shoals Road, Atlanta, Georgia 30035

**Witnesses:**

Lieutenant G. T. Vanderpool #1736
Special Services Division / S.T.E.P. Unit

Officer C. M. Franklin #1774
Special Services Division / S.T.E.P. Unit

Officer L. O. Niemann #2047
Special Services Division / S.T.E.P. Unit

Special Agent Michael Brooks
Georgia Bureau of Investigation

**Findings:**  **\*\*\*\* To be determined by the Internal Review Board \*\*\*\***
**Report prepared by:** Detective F. J. Renaud #2303
**Date Completed:**  January 12, 2016

Investigator M. Anglin
DeKalb County Medical Examiner's Office
Dr. Geoffrey Smith
DeKalb County Medical Examiner's Office

Mr. Bryan Chiles
Technical Compliance Manager
Taser International
(480) 905-2000

Mr. Wilford Sims
2151 Flat Shoals Road
Apt L-2
Atlanta, Georgia 30316
███████████

Ms. Neffertiti Geter
2051 Flat Shoals Road
Apt 9
Atlanta, Georgia 30316
███████████

Ms. Darishia Lumpkin
2051 Slat Shoals Road
Apt L-4
Atlanta, Georgia 30316
███████████

Ms. Nicky McWhorter
2051 Flat Shoals Road
Apt N-9
Atlanta, Georgia 30316
███████████

(Juvenile)
Ms. Shaniyah McWhorter
2051 Flat Shoals Road
Apt N-9
Atlanta, Georgia 30316
███████████

**Exhibits:**

    A. DeKalb County Police CAD Incident 2015-00426101

    B. DeKalb County Police Use of Force Report 15-077124

Open Records Request DKPD000522



C. Taser Records for SN x00-504758

D. DeKalb County Medical Examiner's Office
- Investigative Summary
- Medical Examiner's Inquiry
- Autopsy Report
- NMS Lab Toxicology Report

E. G.B.I. Criminal Investigation File (R.I.F.)
- Arrest Records
- Face Sheet
- Summary by Exhibit
- Exhibit List
- ID Data
- Evidence
- Attachments

F. Crime Scene Photographs (R.I.F.)

G. Officer C. T. Benton #2640
- Employee Statement
- Employee Rights Form
- Employee Administrative Leave Notice
- Clinical Communication Form

H. Officer C. M. Franklin #1774
- Employee Statement
- Employee Rights Form
- Employee Administrative Leave Notice
- Clinical Communication Form

I. Officer L. O. Niemann #2047
- Employee Statement
- Employee Rights Form
- Employee Administrative Leave Notice
- Clinical Communication Form

J. Mr. Wilford Sims
- Internal Affairs Statement
- Citizen Complaint Form
- Photograph

K. Audio (R.I.F.)
- 911 Special Operations Radio Channel
- South Precinct Radio Channel
- Audio Recorded Interviews

Open Records Request DKPD000523

**Investigative Summary:**

The Internal Affairs Unit was notified that Officer C. T. Benton #2640 was involved in a Use of Force incident resulting in the death of a suspect. An Internal Affairs investigation was conducted into the incident and my investigation revealed the following facts and events:

On August 6, 2015, Officer C. T. Benton #2640, Officer C. M. Franklin #1774, and Officer L. O. Niemann #2047 were conducting patrols in the area of Flat Shoals Road near Vineyard Walk. The patrols were directed by intelligence that indicated that there was a drastic increase in violent crimes and drug related activity in that particular area.

At approximately 7:00 P.M., Officer Benton was parked in the exit of Highlands at East Atlanta Apartments located at 2051 Flat Shoals Road, Atlanta, Georgia 30316. During that time he observed a white GMC Yukon enter the apartment complex. Moments later, the vehicle began to exit the complex. Officer Benton stated that the time frame in which the vehicle was inside the complex was not sufficient, in his opinion, for the occupants to conduct any business. He also stated that he was not able to see who was inside the vehicle at the time.

Officer Benton said that from his experience patrolling the complex that he was aware that this was a high drug activity area. Due to the short time frame the vehicle was inside the complex, he suspected that the occupants were possibly conducting drug activity. As the vehicle passed Officer Benton traveling down Flat Shoals Road, he noticed that the vehicle had a drive out tag and that tag was missing the expiration date.

Officer Benton stated that he began following the vehicle after obtaining probable cause for violating O.C.G.A. 40-2-8, Registration and Licensing of Motor Vehicles. Officer Benton broadcasted his suspicions to Officer Franklin who was also in the area and informed him he was conducting a traffic stop on the vehicle. Officer Benton then conducted a traffic stop on the vehicle in the 1900 block of Flat Shoals Road. The vehicle pulled into the Chevron gas station located at 1981 Flat Shoals Road.

Officer Benton approached the driver side of the vehicle and informed the driver of why he was stopping him. While that was occurring, Officer Franklin pulled in behind Officer Benton's patrol car, exited his patrol car, and walked up to the passenger side of the vehicle. Officer Franklin stated that due to the noise level he could not hear Officer Benton, so he re-positioned himself so that he could see him.

Officer Benton asked the driver, later identified as Mr. Wilford Sims, if he had any drugs or weapons in the vehicle. Officer Benton stated Mr. Sims appeared nervous, looked at the center console, and said, "No." Officer Benton said that due to Mr. Sims' behavior he asked him again and Mr. Sims said, "Yes" and then told him that he had a firearm in the center console. Officer Benton directed Mr. Sims to exit the vehicle so that he could

I.A. Cased # 15-0803                                              Page 4 of 8

Open Records Request DKPD000524

retrieve the weapon. Officer Benton said that due to his suspicions of drug activity, the high volume of violent crimes committed in the area, and the fact that Mr. Sims initially told him he didn't have a weapon he decided to separate Mr. Sims and the passenger from the weapon until he completed his traffic stop.

Once Mr. Sims was out of the vehicle, Officer Benton removed the handgun from the center console, cleared the weapon, and walked back to the rear of the vehicle where he handed the weapon to Officer Franklin. During this time, Officer Niemann pulled up and parked behind Officer Franklin's patrol car. He exited his vehicle and began walking up to Officer Franklin.

Officer Benton returned to Mr. Sims and asked him to sit back in the vehicle. Mr. Sims sat back in the driver seat with his legs hanging out and the door open. Officer Benton then asked the passenger, later known as Mr. Troy Robinson, if he had any identification. He said, "No." Officer Benton began walking around the back of the vehicle to Mr. Robinson to get his name and birthday to check him for any warrants. During this time, two unknown female pedestrians walked up to Officer Benton to ask him a question. Officer Benton stated that he became distracted by the females and told them to keep walking. At this time, Mr. Robinson exited the vehicle and began to flee.

Officer Benton stated that at that time, Mr. Robinson was detained as part of the traffic stop. Mr. Robinson took flight from his seizure which prevented him from checking him for warrants, which was permitted during that stop. Officer Benton said this gave him probable cause that Mr. Robinson was in violation of O.C.G.A. 16-10-24, Obstruction of Officers. Officer Benton stated he chased after Mr. Robinson based on this probable cause in an attempt to apprehend him. Officer Niemann got back into his patrol car and began to follow Officer Benton. Officer Franklin remained with Mr. Sims and the GMC Yukon.

Mr. Robinson ran across Fayetteville Road heading towards the Family Dollar located at 2021 Flat Shoals Road. Once he reached the Family Dollar, he ran behind the store to a small wood line that separated the Family Dollar from the Highlands at East Atlanta. Officer Benton was still in pursuit. Mr. Robinson ran into the wood line and up to a chain linked fence. The fence was approximately 8" tall, but due to heavy ground cover the top of the fence was at chest level to Mr. Robinson. Mr. Robinson grabbed the fence in what appeared to Officer Benton as an attempt to start climbing. Officer Benton stopped at the side walk behind the Family Dollar in direct line of sight of Mr. Robinson.

Office Benton drew his county issued Taser and immediately deployed it against Mr. Robinson, discharging one cartridge. Officer Benton stated that he decided to immediately deploy the Taser to prevent Mr. Robinson from climbing the fence. He also stated that he choose this weapon system due to the fact that he didn't believe he could reach Mr. Robinson before he could have scaled the fence and his other non-lethal use of force options were out of range and therefore would be ineffective. Officer Benton described being approximately 10 feet away from Mr. Robinson when he deployed the Taser.

I.A. Cased # 15-0803                                                    Page 5 of 8

Open Records Request DKPD000525

Officer Benton described Mr. Robinson as standing at the base of the chain link fence when the Taser was deployed. According to Officer Benton, Mr. Robinson immediately cried out in pain after the Taser was fired, but he did not see any signs of neuromuscular incapacitation. When Officer Benton saw that the Taser was ineffective, he turned the Taser off short of the 5 second cycle and dropped the used cartridge on the ground. Mr. Robinson then continued to climb the fence.

During the scene investigation, the Taser cartridge was located between the chain link fence and the concrete sidewalk approximately 2 feet away from the sidewalk. Both Taser wires were stretched from the cartridge over the concrete wall.

As Mr. Robinson climbed the chain link fence, the fence gave way with him on it causing it to fall over onto a nearby 7 to 8 foot concrete wall. The concrete wall is approximately 3 to 4 feet away from the chain link fence and located between the chain link fence and the Highlands at East Atlanta Apartments. Once the chain link fence fell over, Mr. Robinson continued to climb, pulling himself across the fence and on top of the concrete wall. Once he crested the concrete wall, he began shouting.

At this time Officer Niemann had pulled his patrol car near the rear of the Family Dollar, exited his car, and began to head towards Officer Benton. Meanwhile, Mr. Robinson attempted to straddle the wall and fell over it, out of Officer Benton's line of sight. Officer Benton told Officer Niemann that Mr. Robinson had crossed the wall. He then instructed Officer Niemann to drive around, enter the complex, and attempt to relocate him while he stayed there to see if he could observe which direction Mr. Robinson would be running.

Officer Niemann got back in his car and headed for the Highlands at East Atlanta Apartments. Officer Benton stated that after a few seconds he did not see Mr. Robinson run away from the wall, so he believed he was still possibly just on the other side from him or running alongside the wall. A few minutes later, Officer Niemann arrived on the other side of the wall, located Mr. Robinson on the ground where he had crossed over, and noticed that he was unconscious. Officer Niemann yelled out to Officer Benton Mr. Robinson's location and condition and then handcuffed him. EMS was then requested to respond to the scene. Officer Niemann stated that he checked Mr. Robinson at least two times for vital signs and Mr. Robinson showed signs of life on both occasions.

Officer Benton and Office Franklin escorted the Yukon and Mr. Sims to the location. All three officers then secured the area around Mr. Robinson as a crowd formed. The crowd, made up of African Americans, began yelling racist comments and making threats of violence towards the officers who were all white. The officers took no further lifesaving actions towards Mr. Robinson due to having to maintain crowd control for their safety. All three officers stated that in light of recent national events involving police related shootings, they believed the crowd was going to attack them at any moment. The officers maintained crowd control until additional officers and EMS responded to the scene.

I.A. Cased # 15-0803                                                      Page 6 of 8

Upon the arrival of Lieutenant G. T. Vanderpool, he ordered Officer Benton to remove the handcuffs from Mr. Robinson in preparation for EMS's arrival. Upon EMS's arrival, medical personnel requested that the Taser probes be removed so that they could treat Mr. Robinson. Lieutenant Vanderpool removed the Taser darts from Mr. Robinson. Lieutenant Vanderpool described removing one dart, which penetrated his skin, from his upper left back and another dart from Mr. Robinson's shirt, which was located near his waist line. It was reported by Lieutenant Vanderpool that the second dart never penetrated the skin. EMS then began CPR and transported Mr. Robinson to Grady Memorial Hospital where he was later pronounced dead by Doctor Patrick Meloy.

During the investigation, Mr. Bryan Chiles, Technical Compliance Manager with Taser International, was contacted regarding the function of the Taser. Mr. Chiles was asked for technical information regarding why a Taser would not perform to the standards it was designed. Mr. Chiles stated the following, "*If both probes (darts) do not make contact with the skin then the effect of the Taser can be diminished to little or no effect. Also if there is not a proper distance between both darts that enter the skin then the effect can be diminished. If one dart lodges in clothing and does not enter the skin of the individual it is designed to arc approximately 1.5 inches to the skin. The likelihood of the arcing can increase if the target individual is wet. Even more so, if the target individual is wet from sweat as the salt content of sweat helps with arcing.*

*The factors which diminish the ability of arcing are distance from the skin and crossing of wires or wires lying on the ground. If the wires cross or touch the ground this can cause a consumption of energy and decrease the likelihood of the arc jumping the air gap to the skin. If an individual was standing in water it would not change the effect of the Taser. However, if one dart entered the skin of an individual and the second dart touched the water the individual was standing in then the individual could experience some effects of the Taser.*"

Mr. Chiles was asked why the Taser may not complete a full cycle, which is five (5) seconds. Mr. Chiles stated, "*The two (2) main factors include the operator turning the power switch off or a battery disconnect. The battery can become disconnected if the plastic grip becomes cracked and the operator squeezes the grip tightly. This could cause the Taser to lose power and turn off prior to completing a full cycle.*" Mr. Chiles went on to say that he believed the witness to the deployment of the Taser should be able to assist in the determination of the effectiveness of the Taser. In his opinion, if an individual is experiencing the full effects of the Taser it would be very difficult for that person to continue to climb a fence or wall.

The DeKalb County Medical Examiner's Office revealed that Mr. Robinson's cause of death was related to blunt force trauma to the neck and head. The manner of death was ruled accidental. The following was further noted from that report: "This 32 year old male decedent died as the result of lethal head and neck injuries when he fell from a wall in the course of being pursued by law enforcement. He impacted the top of his head and broke his neck when he hit the ground. He appears to have been struck in the back by at

I.A. Cased # 15-0803

Page 7 of 8

Open Records Request DKPD000527

least one of the Taser darts fired at him by police officer, but there is no investigative information available indicating that he was incapacitated at any stage by the Taser electrical discharge. In particular he is reported as moving and verbalizing of his own volition while on the wall itself."

It was also noted on Mr. Robinson's toxicology report that he tested positive for Cannabinoids.

Based on the technical information provided by Mr. Chiles, the medical examiner's report, statements of the witnesses, and the physical evidence at the scene, it is the determination of this investigation that Mr. Robinson did not experience neuromuscular incapacitation. It was also determined from the same evidence that Mr. Robinson was struck by the Taser while at the base of the wall and therefore, the Taser did not assist in the cause of his fall from the wall.

**Findings:**

**\*\*\* To be determined by the Internal Review Board \*\*\***

Open Records Request DKPD000528

# EXHIBIT 4

# TRAFFIC LAW ENFORCEMENT

## 4-3   PURPOSE AND SCOPE

To provide personnel of the DeKalb County Police Department with prescribed procedures for traffic law enforcement.

Traffic law enforcement is the responsibility of all uniformed police personnel regardless of specific assignment.  All officers are charged with observing, detecting and preventing traffic law violations and taking appropriate corrective action.

Enforcement action will be taken without regard for such factors as attitude, intent or excuse. Enforcement not only involves arrest and citations, it includes effective warnings to drivers and pedestrians.

## 4-3.1   TRAFFIC ENFORCEMENT GOALS AND OBJECTIVES

The objective of the DeKalb County Police Department's traffic enforcement program is the reduction of fatalities, personal injuries and property damage as a result of traffic accidents.  To this end, the Department will collect and analyze traffic accident data in order to direct selective enforcement efforts to those areas or conditions that contribute to traffic accidents.

The reduction of the number and severity of traffic accidents will be the sole motivation of the department's traffic enforcement efforts.  The generation of revenue or imposition of quota systems will not be a determining factor.

The goal of each precinct or unit involved in the Department's selective enforcement effort will be a reduction in the number or severity of traffic accidents in areas targeted as a result of accident data analysis.  The progress made by each component in the attainment of its goals in targeted areas will be reported in the components' Goals and Objectives Reports.

## 4-3.2   SPECIAL SERVICES DIVISION RESPONSIBILITIES

Various units and sections within the Special Services Division will be responsible for the planning, analysis, monitoring and coordination of the Police Department's traffic activities. Responsibilities will include, but not be limited to:

1) Operation of speed measuring devices;
2) Evaluation and coordination of enforcement activities resulting from analysis of traffic accident experience;
3) Evaluation and coordination of enforcement activities resulting from citizen complaints;
4) Special events coordination.
5) Follow-up investigation of all traffic related fatalities and all non-traffic fatalities resulting from motor vehicle accidents;
6) Follow-up investigation of all hit and run accidents;
7) Compiling, analyzing and reporting of accident statistics, to include annual review of traffic accident data as it compares to selective enforcement activities;
8) Dissemination of monthly accident and enforcement summaries to each precinct and the Special Operations Section.  These reports will contain location, time, date, day, type of accident and primary cause or, if enforcement activity, the

#### 4-3.12    WARNING CITATIONS/COURTESY WARNINGS

Warning citations may be issued to violators, on the standard ticket form, for minor violations when the officer desires that a permanent record be made of the incident.  The warning citation should contain **all** normal information except a court date.  "WARNING" will be written in the area provided for the court date and the first three copies of the ticket will be forwarded to the Records Section.

Courtesy warnings may be issued for minor violations when the officer does not desire any type of permanent record.  Such instances might be out-of-state violators, warnings during grace periods, etc. Courtesy warnings will be maintained in the precinct or unit commander's office for a period of at least 90 days.

#### 4-3.13    STOPPING AND APPROACHING TRAFFIC VIOLATORS

One of the most dangerous actions initiated by a police officer is to approach a motor vehicle pursuant to a traffic stop.  The following steps are intended to provide maximum safety for the officer, the violator, and other users of the roadway.  Varying conditions such as weather, traffic volume, road design or the urgency to stop the violator (DUI) may dictate adjusting or altering the recommended procedure.  These procedures are to be followed when possible, and are presented from the perspective that ideal conditions exist.

    A.  When the officer has positioned the patrol vehicle behind the violator to begin the stopping procedure, the officer should note the license number of the vehicle on a note pad; to be left inside the patrol vehicle.

    B.  The officer should be thoroughly familiar with the area and anticipate the appropriate location to stop the violator.  Consideration should be given to a location with ample space and appropriate lighting; every effort should be made to avoid stops on hills, curves, intersections, private drives and business locations which have limited parking.

    C.  When the officer has positioned the police vehicle behind the violator, the officer will notify the Communications Center of the location, license number and the number of occupants of the vehicle prior to exiting the police vehicle.

    D. The officer should signal the violator to stop.  This signal should be with the blue light, hand signals, sounding the horn, and if necessary, the siren.

    E.  The violator should be signaled and directed to the right side of the roadway.

    F.  On multi-lane roadways, the officer should insure the safety of the violator during lane changes by gradually changing from lane to lane with the violator.

    G.  Should the violator stop abruptly in the wrong lane or in another undesirable location, they should be promptly directed to move to a safer location.  Officers should use the public address system to instruct violators to move to a safer location if this equipment is available.  If the patrol vehicle is not so equipped and gestures are insufficient to bring understanding, the officer should quickly exit from the patrol vehicle and give verbal instructions to the violator.

H. Once the violator has stopped in an appropriate location, the officer should position the police vehicle approximately one-half to one car length behind and two feet outside and to the left of the violator's vehicle.

I. The officer should exit from the police vehicle and be continuously alert for any suspicious movement or actions on the part of the violator or other occupants in the violator's vehicle.

J. The officer should approach from the rear of the violator's car, looking into the rear seat area, and stop at a point to the rear of the trailing edge of the left front door. This position should be maintained if there are only occupants in the front seat of the vehicle. From this position, the officer can communicate with the violator, keeping them in a slightly awkward position, and at the same time keep all occupants of the vehicle in view.

K. In those cases where the violator's car has occupants in both the front and rear seats, the officer should approach to a point near the leading edge of the left front door, being especially alert for any unusual actions on the part of the occupants and choosing a path so the door cannot be used as a weapon against the officer. From this position, the officer can communicate with the violator and keep all occupants in view.

L. In those traffic stops made by two officer patrol vehicles, the passenger officer should be responsible for all radio communications, writing all notes and messages relayed to or from the Communications Center and, during the traffic stop, should exit from the vehicle and act as an observer and cover for his fellow officer. At no time should the two officers approach the violator's vehicle on the same side of the car.

M. At night, the procedure is basically the same with the additional necessity of exercising caution in selecting an appropriate place for the traffic stop, signaling the violator, and positioning the police vehicle. After the stop, the headlights should be on low beam for the safety of oncoming traffic, and emergency lights should be in use on the patrol vehicle, unless the stop is off the roadway and emergency lights are not needed for safety purposes.

## 4-3.14   STOPPING A KNOWN OR SUSPECTED FELON

A. When a vehicle driven by a known or suspected felon is located, the officer will notify the Communications Center immediately. The officer will inform Communications of the location, thorough description of the vehicle and a description of the occupants.

B. The officer will keep the suspect vehicle in view and request sufficient assistance in making the stop. The officer will keep support units informed of the location and direction of travel to facilitate their approach with minimal use of emergency equipment.

C. The suspect vehicle will not be stopped unless absolutely necessary until adequate support is available and in position. The following procedures will be used in effecting the stop:

1. The officer will plan to stop the suspect vehicle in a location, which provides minimal danger to other citizens.

2. When conditions are appropriate and support units available, the officer will move into position to the rear of the suspect vehicle.

DEKALB COUNTY POLICE DEPARTMENT

A warrantless search is permitted when there is both probable cause and exigent circumstances.  The ultimate test is whether there is such a compelling necessity for immediate action that proceeding without a warrant is justified.

### Exigent Circumstances Defined

Hot pursuit, a fleeing suspect, destruction of evidence, or other situations in which speed is essential to the accomplishment of lawful police action are examples of exigent circumstances.

## STOP AND FRISK

### Grounds for Stop

To lawfully stop an individual, the law enforcement officer must have a reasonable suspicion that the person stopped is involved in criminal activity. In appropriate situations, a criminal activity report should be filled out on all such stops of suspicious persons and forwarded to the appropriate investigative component.  A detailed description of the activity and of the person should be included.

### Grounds for Frisk

To lawfully frisk an individual, the law enforcement officer must have a reasonable belief that the person stopped is armed and dangerous.  In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonable inferred that the individual was armed and dangerous. The frisk must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.  (Terry v. Ohio, 392 U. S. 1) Officers are reminded that a frisk is not a "search".

### Nature of Frisk

The frisk for weapons must be only a limited intrusion of a person (pat down).  Pockets cannot be entered during a pat down unless the officer feels an object which is consistent with a weapon in its size, shape or feel.

### Search After Frisk

Feeling an object which might be a weapon will justify a more extensive intrusion to obtain the suspected weapon.  An officer may enter pockets to dispel the alarm that a weapon is present.

## VEHICLE STOPS

### Significance of Stop

A "seizure" occurs whenever a vehicle is stopped, even though the purpose is generally limited and the detention quite brief; therefore, the Fourth Amendment applies.

# USE OF FORCE

## 4-6   PURPOSE and SCOPE

It is the mission of the DeKalb County Police Department to promote order, protect the public, and deliver the optimum police services through an effective, efficient and professional response in partnership with the entire community.

In fulfilling the Department's mission, its officers have been delegated the ultimate responsibility to protect life and property and apprehend criminal offenders.  The apprehension of criminal offenders and protection must at all times be subservient to the protection of life.  The officer's responsibility for protecting life must include the officer's own life.

It is the responsibility of every member of the department to keep our standards at an adequate level to provide protection and service to the community while at the same time keeping ourselves as safe as possible.

The value of human life is immeasurable.  One of the department's core value statements is the preservation of life.  Officers must exhaust every means available of non-lethal force, prior to utilizing deadly force. When non-lethal force is utilized, officers should only use that force which is minimal and reasonable to effect control of a non-compliant subject.

Litigation resulting from a shooting by a police officer will usually require the Department to prove the individual officer was properly trained in all aspects of the use of force, up to and including the use of firearms.  This type of requirement demands that the Department take a pro-active approach to defending itself long before litigation is filed.

The purpose of this policy is to structure the use of force, including deadly force, by members of the DeKalb County Police Department and to provide a framework whereby the law enforcement duties can be properly and lawfully discharged by police officers.  Since police officers have 24-hour/7 day-a-week law enforcement powers, this policy will be adhered to concerning off-duty conduct as well as on-duty conduct.  This policy also applies to all other employees who may encounter situations with the public where a degree of force is required in order to carry out and complete their job responsibilities.

This policy is for departmental use only and does not apply in any criminal or civil proceeding.  The departmental policy shall not be construed as a creation of a higher-level standard of safety or care in an evidentiary sense with respect to third party claims.  Violations of this policy will form the basis for departmental administrative sanctions only.  Violations of law will form the basis for civil and criminal sanctions in a recognized judicial setting.

## 4-6.1   USE of FORCE

Georgia Statutory Law, under Criminal Code Section 16-3-21 (Use of Force), justifies the threat or use of force.  Ga. O.C.G.A. 16-3-21 reads:

"*A person is justified in threatening or using force against another when and to the extent that he reasonably believes that such threat of force is necessary to defend himself  or a third person against such others' imminent use of unlawful force; however, a person is justified in using force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent death or great bodily harm to himself or a third person, or the commission of a forcible felony*".

Officers are often confronted with situations where control must be exercised to affect arrests and to protect the public safety.  Control may be achieved through advice, warnings, and persuasion or by the use of necessary force.

**USE OF FORCE**

Necessary Force is the use of a reasonable amount of force to achieve a legitimate police objective. Reasonable refers to belief that is supported by facts or circumstances.  Force may be used by a police officer in the performance of police duties:

- A.   When necessary to preserve the peace, prevent commission of offenses, or prevent suicide or self inflicted injury

- B.   When preventing or interrupting a crime or attempted crime against property

- C.   When making lawful arrests and searches, overcoming resistance to such arrests and searches, and preventing escapes from custody

- D.   When in self-defense, or defense of another against unlawful violence to that person.

The amount and degree of force which may be employed are based upon, but not limited to, the following factors:

- A.   The nature of the offense

- B.   The behavior of the subject against whom the force is to be used

- C.   Action by third parties who may be present

- D.   Physical conditions and tactical considerations

- E.   The possibility of creating an unreasonable risk of injury or death to innocent persons

- F.   The feasibility or availability of alternative actions

At times necessary force will include the use of certain tactics or equipment by the officer or specialty team, such as:

- A.   Verbal Skills and Empty Hands

- B.   Physical Strength and Compliance Techniques

- C.   Soft or Hard Hand Techniques

- D.   Handcuffs

- E.   Oleoresin Capsicum (OC)

- F.   ASP  Baton

- G.   Electronic Control Devices (ECDs)

- H.   Patrol-rifles

- I.   Chemical Munitions
- J.   Specialty Impact Munitions

- K.   Distraction Devices

- L.   Approved Weapon and Ammunition

The use of any unauthorized weapon is prohibited unless very unusual, severe, and justifiable circumstances prevail.

In every community, the proper utilization of force is crucial to the definition, design, and delivery of effective police services. We must recognize that the fate of our function directly impacts the lives of those we have sworn to serve and protect.  Officers with the DeKalb County Police Department will be trained in the use of the Federal Integrated Force Management model.  This Use of Force Continuum model is a concept used in incident handling that simultaneously recognizes the level of subject resistance encountered and the level of control and force required for the situation.  This concept does not direct an officer on how much control and/or force to use in a particular incident, but gives the officer direction in dealing with changing situations that might dictate the escalation or de-escalation of the amount and degree of force to be used.

The Integrated Force Management program shifts force focus and function from a pattern of confusion, towards a process of consolidation and coordination, consistent with contemporary management procedures and principles.

It is important to note that this Use of Force Continuum is to be used as a general guide and officers must always factor in objective reasonableness in determining the appropriate level of control and force to be utilized.

Any use of force by an officer must be examined from two perspectives: Resistance (Subject) and Control or Force (Officer).  Both control and resistance can be in the form of verbal directives or physical action.

**Resistance** is a subject's non-compliance to the officer. The amount and type of resistance varies based on a number of factors.

**Control** is the force an officer uses to influence or neutralize a non-compliant subject. Officers are justified in using physical control methods in the following situations:

> To protect the officer or another from injury or death.
> To effect the lawful detention or arrest of a non-compliant subject.
> To stop potentially dangerous and unlawful behavior.
> To protect a subject from self-injury.

The DeKalb County Police Department uses broad standards to measure the justification of an officer's use of force.
> The control methods used were initiated by a subject's resistance, and
> The level of control used was necessary and reasonable considering the subject's resistance.

A ***Show of Control*** (displaying tactical advantage to persuade the subject to comply with verbal commands) can be implemented to influence a subject to make positive decisions.
A *Show of Control*:
> Reduces reaction time;
> Serves as a visual warning of potential use and imparts to a subject that resistance is futile;
> Adds intermediate steps to the Use of Force Continuum; and
> Can be recalled or de-escalated to lower forms of control.
A ***Use of Control*** is an action that can result in tissue damage to a subject and when employed cannot be recalled.

Officers must always be alert and attentive to changing situation which may dictate the escalation or de-escalation of control and/or force to be utilized.  Officers should never abandon verbal communications when seeking compliance.

USE OF FORCE

**Use of Deadly Force:**

If a situation does occur which dictates the use of deadly force, the decision to take another person's life is the most serious decision a police officer can ever be called upon to make. Officers should take great strides in attempting to de-escalate an incident and avoid using deadly force whenever possible.

The protection and preservation of human life is a primary goal of this department; therefore, officers have a responsibility to use only the amount and degree of force necessary and reasonable to protect and preserve life.

**Deadly force is defined as that force which is intended to cause death or great bodily harm or which creates some specified degree of risk that a reasonable and prudent person would consider likely to cause death or great bodily harm.**

According to Georgia State Law, O.C.G.A. 16-3-21, deadly force may be used if:

  A.    There is clear and sufficient reason to believe that the person against whom the force is used is about to kill or grievously injure the officer

  B.    There is clear and sufficient reason to believe that the person against whom the force is used is about to kill or grievously injure another person

  C.    There is clear and sufficient reason to believe that the force must be used to prevent the commission of a forcible felony

Great bodily harm has been generally defined to mean harm that is likely to maim or permanently disable.

O.C.G.A. 17-4-20 (b) addresses the use of deadly force for arrest by peace officers by stating *"…**peace officers…may use deadly force to apprehend a suspected felon only when the officer reasonably believes that the suspect possesses a deadly weapon or any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury; when the officer reasonably believes that the suspect poses an immediate threat of physical violence to the officer or others; or when there is probable cause to believe that the suspect has committed a crime involving the infliction or threatened infliction of serious physical** harm…"*

To reasonably believe is the determination of whether or not the officer's decisions and actions are in fact reasonable and is most commonly decided on the basis of the "reasonable officer doctrine," which is a basic standard of our legal system. In common terms it means that if an officer of common judgment and ordinary prudence, experiencing the same facts and circumstances experienced by the officer, would come to the same general conclusion that the officer reached, and then it is a reasonable belief.

Forcible Felony, as defined in Ga. O.C.G.A. 16-1-3, means, *"any felony which involves the use or threat of physical force or violence against any person".*    From this definition, it is obvious that many crimes that could be technically classified as "forcible felonies" would not be life threatening enough to justify the use of deadly force to prevent them.  It should be noted that Section 16-3-21 does not give the police officer any more authority in using deadly force than any other citizen in the State of Georgia.  The law says, *"a person is…justified in threatening or using force,"* which means that any person may use deadly force under the given circumstances.  Although the courts commonly recognize that officers are frequently involved in the justifiable use of deadly force, technically the law provides no additional authority or latitude to the circumstances under which deadly force may be used by a police officer.

It will be the policy of this Department **NOT to use deadly force in order to prevent the escape of a fleeing felon, unless that suspect continues to pose an immediate danger or serious threat to innocent persons.**

If someone is fleeing or attempting to flee (felon or not; convicted or not), the officer will be allowed to use reasonable force to prevent the escape. The fact that someone is escaping or attempting to escape is not justification in itself to use deadly force. It is important to note again that reasonable grounds must exist to justify the use of deadly force, and again the reasonable officer doctrine is the standard of justification.

Once the officer has determined that the use of deadly force is reasonable, the Department's policy is shoot to stop. An officer shall not discharge a weapon to kill, but rather to stop and incapacitate an assailant from completing a potentially deadly act as described in this policy. For maximum stopping effectiveness and minimal danger to innocent bystanders, the officer should shoot at "center mass," unless extreme circumstances cause for an elevated shot to immediately stop the suspect. Appropriate first aid is to be rendered whenever possible after any use of force (either rendered by the officer, or summoning EMS, etc.).

*Self-defense and imminent threat shall be the only policy guideline for employing deadly force.* The discharge of a firearm is an irreversible action and officers should ensure that their actions do not unreasonably precipitate the use of deadly force by placing themselves or others unnecessarily in jeopardy by engaging in actions that are inconsistent with the officer's training and/or Departmental policies and guidelines.

In all situations, justification for the use of deadly force must be limited to the facts reasonably apparent to the officer at the time the officer decides to use the force.

These considerations are provided to aid officers who decide to utilize deadly force:
1. other methods available to effect an arrest or apprehension
2. whether the suspect is in plain view
3. the need for extreme caution at night as darkness may inhibit vision
4. danger posed to bystanders by the discharge of the firearm, regardless of whether they are in plain view or concealed, such as in a building
5. the direction of fire
6. moving to cover, repositioning and/or waiting for additional responding units to gain and maintain a superior tactical advantage
7. the possibility of collateral injury or death.

Officers should not take undue risks that could result in death or serious bodily injury. Whenever possible, officers should attempt to defuse and stabilize the situation by using communication skills and/or waiting for additional responding officers. Officers are never required to take unreasonable risks and may opt to disengage or withdraw if such action can be safely accomplished without further endangering themselves, other officers or the public. Officers should always be prepared to constantly re-evaluate any situation and de-escalate or escalate as needed or required.

Any threat used to justify the use of deadly force must be immediate and there must be no other possible remedy. Speculation as to what the suspect may or may not do if allowed to escape is not sufficient reason for the use of deadly force.

Deadly force will be used with great restraint, as a last resort, and only when the level of resistance warrants the use of deadly force. The DeKalb County Police Department places a greater value on human life than on the protection of property; therefore, the use of deadly force is not allowed to protect property interests.

USE OF FORCE

No distinction shall be made relative to the age of the intended subject of deadly force.

Officers must make every attempt to identify and isolate a specific subject and then "shoot to stop."

Officers **will not** discharge a firearm as a warning shot.

Officers who are authorized can deploy with patrol rifles when they have reason to believe the suspect(s) is (are):
1. Wearing body armor
2. Armed with firepower that is superior to their sidearm
3. Armed and situated at a distance or fortified position with a tactically superior position requiring accuracy at a greater range
4. When an armed confrontation is imminent or when the officer is engaged in activities that have a high probability that the suspect(s) may be armed and dangerous, such as armed robberies in progress or active shooter situations, or
5. With prior authorization from a supervisor in situations where the tactical environment is such that a rifle would be the most effective way to prevent the death or serious physical injury to officers or the public.

Officers are prohibited from discharging firearms when it appears likely that an innocent person may be injured. Officers **will not** discharge a firearm at or from a moving vehicle except as the ultimate measure of self-defense or defense of another when the suspect is using deadly force. Any threat used to justify the use of deadly force must be immediate and there must be no other possible remedy.  Speculation as to what the suspect may or may not do if allowed to escape is not sufficient reason for the use of deadly force. This policy is intended to be concordant with OCGA Title 17, Chapter 4, Article 2, Section 17-4-20 (b) and (d).

Every time a firearm is discharged (accidentally or not) it is that officer's duty to report the incident to a superior officer(s), who will then report it to Internal Affairs. In addition, officers must also report to the firing range for re-qualification and weapons inspection by a member of the range staff. Officers will not have to re-qualify for shooting an injured animal unless otherwise directed to do so by Internal Affairs. Only Range staff or Internal Affairs are authorized to provide replacement ammunition following a weapon discharge event. Exceptions to this policy are when the weapon is fired during qualification or other training exercises.

Excessive force and brutality on individuals by any member of this Department will not be permitted. When an officer is affecting an arrest, reasonable force may be used as previously mentioned. The use of any piece of equipment, whether county issue or not, (i.e., flashlight, handcuffs, ASP baton, etc) will be used for their intended purposes only and not as a method for inflicting injury except in cases where the officer must defend himself against deadly force or great bodily harm. The use of any type of neck restraint or choke hold is prohibited.

When a person is arrested or placed into custody and resistance by that person has ceased, the officer shall immediately reduce their level of force to control techniques. It shall be the responsibility of the officer to take appropriate behavior or physical contact with the individual. It shall be the responsibility of the officer to take appropriate action without any unnecessary use of force.

Pursuant to Section 519 of Public Law 101-104, the 1990 HUD Appropriations Act, officers are, in addition to the prohibitions previously mentioned, specifically prohibited from using excessive force against any individual engaged in a nonviolent civil rights demonstration.

Officers who are working off-duty jobs and are involved in situations, which require a degree of force, shall report the incident immediately to the area supervisor who shall complete a Use of Force report as if the incident occurred while the officer was on duty.

The killing of an animal is justified: (1) for self-defense; (2) to prevent substantial harm to the officer or another; or (3) when the animal is so badly injured that humanity requires its relief from further suffering.  A seriously wounded or injured animal may be destroyed only after all attempts have been made to request assistance from an agency (humane society, animal control, game warden, etc.) responsible for the disposal of animals.  The destruction of vicious animals shall be guided by the same rules set forth for self-defense and the defense and safety of others.

**Domesticated Animals injured in a use of force incident**
If a domesticated animal is injured during a use of force incident, the animal will be provided medical treatment to the best ability of the officer. This treatment may include;
   A) Allowing the owner, or designee, to transport the animal to a veterinarian unless the animal must remain at the scene related to a crime or investigation.
   B) If the owner cannot be located in a timely manner, DeKalb County Animal Enforcement will be called to transport the animal to a veterinarian.
This policy applies to domesticated animals injured by Department personnel. Officers must always use caution and their best judgment when handling an injured animal.

Except for general maintenance, storage or authorized training, officers shall not draw or exhibit a firearm unless circumstances create strong reasonable cause to believe that it may be necessary to lawfully use the weapon in conformance with other sections of this policy.


### 4-6.2 OLEORESIN CAPSICUM

**PURPOSE**
The purpose of this policy is to establish guidelines for the use of oleoresin capsicum (OC) aerosol restraint spray.

**POLICY**
The department has issued OC aerosol restraint spray to provide officers and non-sworn personnel with additional use-of-force options for gaining compliance of resistant or aggressive individuals in arrest and other enforcement situations. It is the policy of this agency that personnel use OC when warranted, but only in accordance with the guidelines and procedures set forth here and in this agency's use-of-force policy.

 **PROCEDURES**

A.    **AUTHORIZATION**
   1.   All sworn personnel will be required to complete the prescribed course of instruction in the use of OC spray. Only sworn and non-sworn personnel who have completed the prescribed course of instruction on the use of OC are authorized to carry the device. Only Departmental issued 10% oleoresin capsicum cone spray will be carried.

   2.   All on-duty uniformed officers shall be equipped with the Department issued OC spray.

   3.   Sworn and non-sworn personnel whose normal duties/assignments may require them to make arrests or supervise arrestees shall be required to carry departmentally authorized OC while on duty.

USE OF FORCE

4. Uniformed officers shall carry only departmentally authorized OC canisters in the prescribed manner on the duty belt. Non–uniformed personnel may carry OC in alternative devices as authorized by the agency.

**B.**     **USAGE CRITERIA**

1. OC spray is considered a use of force and shall be employed in a manner consistent with this agency's use-of-force policy. OC is a force option following verbal compliance tactics and the use of physical strengths and skills (the "soft or hard hands" approach) when appropriate on the use-of force continuum.

2. OC may be used when a verbal dialogue has failed to bring about the subject's compliance and the subject has signaled his intention to actively resist the officer's efforts to make the arrest.

3. Whenever practical and reasonable, personnel should issue a verbal warning prior to using OC against a suspect.

4. An officer may use deadly force to protect himself from the use or threatened use of OC when the officer reasonably believes that deadly force will be used against him if he becomes incapacitated.

5. Once a suspect is incapacitated or restrained, use of OC is no longer justified except in extreme cases where the suspect still poses a significant threat of injury or danger to the officer(s), or has attempted or succeeded in injuring the officer(s) after being restrained.

**C.**     **USAGE PROCEDURES**

1. Whenever possible, officers should be upwind from the suspect before using OC and should avoid entering the spray area.

2. Personnel should maintain a safe distance from the suspect of between two and 10 feet.

3. A single spray burst of between one half and one second should be directed at the suspect's eyes, nose and mouth. Additional burst(s) may be used if the initial or subsequent burst proves ineffective.

4. Use of OC should be avoided, if possible, under conditions where it may affect innocent bystanders. Caution should be taken during the use of OC in enclosed areas, business, homes, etc.

**D.**     **EFFECTS of OC, OFFICER RESPONSE and MEDICAL AID**

1. Within several seconds of being sprayed by OC, a suspect will normally display symptoms of temporary blindness, have difficulty breathing, burning sensation in the throat, nausea, lung pain and/or impaired thought processes.

2. The effects of OC vary among individuals. Therefore, all suspects will be handcuffed as soon as possible after being sprayed. Personnel should also be prepared to employ other means to control the suspect - to include, if necessary, other force options consistent with the agency policy - if the suspect does not respond sufficiently to the spray and cannot otherwise be subdued.

3. Immediately after spraying a suspect, personnel will be alert to any indications that the individual needs medical care. This includes, but is not necessarily limited to, breathing difficulties, gagging, profuse sweating and loss of consciousness. Upon observing these or other medical problems or if the suspect requests medical assistance, the employee will immediately summon emergency medical aid.

4. Air will normally begin reducing the effects of OC spray within 15 minutes of exposure. How-

ever, once the suspect has been restrained, officers may flush the exposed area with water if the suspect request.

5. Suspects that have been sprayed will be monitored for indications of medical problems and will not be left alone while in police custody. Personnel should provide assurance to suspects who have been sprayed that the effects are temporary and encourage them to relax.

6. Assistance will be offered to any individuals accidentally exposed to OC spray who feel the effects of the agent. All such incidents will be reported as soon as possible to the officer's immediate supervisor and shall be detailed in an incident report. Non-sworn personnel will report any such incident to the nearest police supervisor.

**E.     REPORTING PROCEDURES**
1. An incident report will be submitted. Accidental discharges as well as intentional uses of OC spray against an individual in an enforcement capacity will be reported to the officer's immediate supervisor as soon as possible. All uses of OC spray by non-sworn personnel will immediately be reported to the nearest police supervisor.

2. A use-of-force report will be completed following all discharges of OC spray except during testing, training, malfunction or accidental discharge.

**F.     REPLACEMENT**
1. All OC spray devices will be maintained in an operational and charged state by assigned personnel. Replacements for damaged, inoperable or empty devices are the responsibility of officers to whom they are issued.

2. Unexplained depletion of OC canisters will require an investigation and written report by the officer's supervisor to the Division Commander.

**G.     TRAINING**
1. The Department's OC spray training program will include comprehensive instruction of (1) Departmental policy on use of force, (2) the legal requirements, (3) effects and first aid procedures, and (4) a practical exercise including exposure.

2. All personnel will receive annual In-Service training on the use of OC.  This training will include instruction of the Departmental policy on use of force.

**H.     OFF-DUTY/PART TIME EMPLOYMENT**
1. All authorized part-time employment will be approved as per existing Departmental policy.

2. Officers working part-time in uniform must wear the Department issued OC Spray canisters in the prescribed manner on the duty belt.

3. Officers working part-time employment in plain clothes must carry the Department issued OC spray the alternative device as authorized by the agency.


**4-6.3   ASP BATON**


**PURPOSE**
The purpose of this policy is to establish guidelines for the use of the ASP Tactical Baton expandable defensive impact weapon.

USE OF FORCE

**POLICY**

The department has issued the ASP Baton to provide officers and non-sworn personnel with additional use-of-force options for gaining compliance and control of resistant or aggressive individuals in arrest and other enforcement situations.  It is the policy of this agency that personnel use the ASP Baton when warranted, but only in accordance with the guidelines and procedures set forth here and in this agency's use-of-force policy.

**PROCEDURES**

**A.    AUTHORIZATION**

1.  All on-duty uniform officers shall be equipped with the Department issued ASP Baton or authorized self-purchased ASP Baton unless specifically exempted by the Chief of Police.  All sworn personnel will be required to complete the prescribed course of instruction in the use of the ASP Baton.

2.  Only sworn and non-sworn personnel who have completed the prescribed course of instruction are authorized to carry the device.  The 21" and 26" ASP Batons will be the standard authorized impact weapon issued to employees of the DeKalb County Police Department.  In addition, the Airweight 21" or 26" ASP Baton may be carried (*after completing the prescribed training course*) at the employee's expense.  The Airweight Baton is lighter in weight and more practical for carry by non-uniform personnel and those officers who desire to carry less weight on their duty belt.

Personnel who are authorized to wear plain clothes and Command/Administrative Staff not wearing the duty belt may carry the ASP P12 12" baton or the ASP P16 16" baton. These batons are designed for carry without the Sidebreak Scabbard and are purchased at the expense of the employee.  Any employee in full uniform must carry the 21" or 26" baton.

3.  Any officer whose normal duties/assignments may require them to make arrests or supervise arrestees shall be required to carry a departmentally authorized ASP Baton while on duty.

4.  Uniformed personnel shall carry only departmentally authorized ASP Batons in the issued Sidebreak Scabbard in the prescribed manner on the duty belt.  Non-uniformed personnel may carry the ASP Baton in an alternative manner as authorized by the agency.

5.  "Hindi" (mushroom) or other non-ASP end caps shall not be installed on any ASP Baton, as it voids the manufacturer's warranty.

**B.    USAGE CRITERIA**

1.  The ASP Baton is considered a use of force and shall be employed in a manner consistent with this agency's Use-of-Force policy.  The ASP Baton is an intermediate level of force on the same level with the OC spray and the use of a firearm to control an assailant.

2.  The ASP Baton may be used to establish lawful objectives when:
    a)  verbal dialogue has failed to bring about the subject's compliance

    b)  the use of OC spray has failed to bring about the subject's compliance or the use of OC spray is impractical in the given situation

    c)  the subject has signaled his intention to actively resist the officer's efforts to make the arrest or

    d)  in self-defense, or defense of another against unlawful violence to that person

3.  Whenever practical and reasonable, employees should issue a verbal warning prior to using the ASP Baton against a suspect.

4.  An officer may use deadly force to protect himself from the use or threatened use of an ASP Baton when the officer reasonably believes that deadly force will be used against him if he becomes incapacitated.

5.  Once a suspect is incapacitated, controlled, or restrained, use of the ASP Baton is no longer justified except in extreme cases where the suspect still poses a significant threat of injury or danger to the officer(s), or has attempted or succeeded in injuring the officer(s) after being restrained.

**C.    USAGE PROCEDURES**

1.  All action, relational factors between parties and conditions surrounding the enforcement situation comprise the totality of the situation. These include officer/subject factors and special circumstances. Each relevant condition relates to the confrontation in determining the officer's course of action.

    Officer/Subject Factors may include:
    a.  age
    b.  gender
    c.  size
    d.  fitness
    e.  skill level
    f.  multiple officers
    g.  multiple subjects

It is reasonable that a discrepancy in the age, gender, physical size, fitness, or skill level of individuals involved in the confrontation may mandate that an officer use more or less force to control the situation. In a similar manner, it would be reasonable for a single officer to use more force controlling a situation when confronted by multiple subjects.

Special Circumstances may include:
    a.  close proximity to a firearm/weapon
    b.  special knowledge
    c.  injury or exhaustion
    d.  ground position
    e.  disability
    f.  imminent danger

A subject in close proximity to a firearm or other weapon creates an increased danger to the officer, which must be dealt with immediately. An officer may have special knowledge of a subject's skills that would require the use of increased force. An officer who is injured, exhausted, on the ground, disabled, or is in imminent danger would be justified in escalating through the use-of-force options.

2.  The ASP Tactical Baton is drawn with the weapon hand or drawn with the reaction hand (off-hand) and transferred to the weapon hand.

3.  All basic strikes are delivered with the baton in the weapon hand, unless the weapon hand is incapacitated.

USE OF FORCE

4. There are two modes of the ASP Baton, Open Mode and Closed Mode.  The Baton Mode is determined by the distance to the threat encountered by the employee.

5. When striking a subject, the employee should target those areas of the subject, which are likely to inflict injury to the subject (i.e., center mass of arm, center mass of leg, center mass of body).  These targets are the vehicles, which transport force against the employee.

6. Open Mode strikes are ideally delivered to target areas with the last three inches of the shaft or tip of the ASP Baton.  Closed Mode strikes are delivered to target areas with the end cap or fist.

7. Do not target strikes to the head, neck, spine, sternum, or groin.  Strikes to these areas may produce injuries that could be fatal, while not effectively terminating assailant resistance.

D.     **EFFECTS of the ASP BATON, OFFICER RESPONSE, APPROPRIATE MEDICAL AID**

1. Strikes to the center mass of the extremities effectively disable an assailant's "delivery system."  Strikes to the center mass of the body generate fluid shock waves.  Strikes to the primary "center mass" target areas have a high potential for control and a low potential for fatal injury.

2. If the assailant moves or a strike misses its target, surrounding targets also have a high potential for control and a lesser potential for damage.

3. All suspects will be handcuffed as soon as possible after being controlled.  However, personnel should also be prepared to employ other means to control the suspect – to include, if necessary, other force options consistent with agency policy – if the subject does not respond sufficiently to the strikes and cannot otherwise be subdued.

4. Immediately after employing the ASP Baton, employees should be alert to any indications that the individual needs medical care and if needed, will ensure appropriate medical aid.  This includes, but is not limited to, loss of consciousness, breathing difficulties, and excessive swelling to extremities.  Upon observing these or other medical problems or if the suspect requests medical assistance, the employee will immediately summon emergency medical aid.

5. Suspects on which the ASP Baton has been used will be monitored for indication of medical problems and will not be left alone while in police custody.

6. In order to minimize the stress involved in the use of force, any officer or non-sworn personnel involved in a use of force incident, which results in death or serious injury, will be placed on "administrative leave" directly upon completion of their preliminary report of the incident.  This leave will be without loss of pay or benefits, pending the results of the investigation.  The assignment to administrative leave will not be interpreted or indicate that the employee has acted improperly.

While on administrative leave, the employee will remain available at all times for official departmental interviews and statements regarding the incident and shall be subject to recall at any time.  The employee will not discuss the incident with anyone except the District Attorney, departmental personnel assigned to the investigation, the employee's private attorney, the employee's psychologist, the employee's chosen clergy, and the employee's immediate family.

Upon returning to duty, the employee may be assigned to "administrative duty" for a period of time deemed appropriate by the employee, his psychologist, and the Chief of Police.

**DEKALB COUNTY POLICE DEPARTMENT**

**E.     REPORTING PROCEDURES**

1.  Use of the ASP Baton against an individual in an enforcement capacity will be reported to the officer's immediate supervisor as soon as possible.  If non-sworn personnel employ the baton, the incident will immediately be reported to the nearest police supervisor.

2.  A use-of-force report and an incident report will be completed following all tactical uses of the ASP Baton.

3.  To properly complete the Use of Force Report, it will be necessary to document and photograph the strike area on the suspect's body.

4.  The Department will conduct an annual analysis of reported usage of the ASP Baton, via documented reports conducted by the Internal Affairs Department.

**F.     REPLACEMENT**

1.  Assigned personnel will maintain ASP Batons in an operational state.  Repair or replacements for damaged or inoperable batons are the responsibility of employees to whom they are issued.

2.  Qualified personnel in the Training Division will make all repairs of ASP Batons.  No employee should attempt to repair his or her own baton.  If repair of the baton is not possible, Training Division personnel will recommend the Supply Unit replace the ASP Baton.

**G.     TRAINING**

1.  The Department's ASP Baton 8-hour certification program will include comprehensive instruction of (1) Departmental policy on use of force, (2) the legal requirements, (3) ASP baton skills, and (4) a practical exercise for proficiency.

2.  Once an officer or non-sworn personnel completes the certification class, he/she must annually be re-certified to retain carry authorization.

3.  Those employees failing to re-certify by December 31st of each year, will no longer be authorized to carry the ASP Baton until completion of the 2-hour certification class for ASP re-familiarization.

4.  Should the officer fail to meet certification standards, the authority to carry the weapon shall be IMMEDIATELY REVOKED by the certifying authority and written notification of such revocation shall be forwarded to the officer's Commander, the Training Division, and the Chief of Police.  Officers, whose authority to carry the ASP Baton has been revoked, shall be reassigned to non-uniformed administrative duty for a period of 5 days.  Within the 5 day period, the officer must report to the Training Division for remedial ASP Baton training and certification.  Officers who fail to achieve certification after attending remedial ASP Baton training will be recommended for termination for failing to maintain standards.  A non-sworn employee who, after receiving remedial training fails to meet certification standards, will have the authority to carry the ASP Baton immediately revoked by the certifying authority and written notification of such revocation will be forwarded to the employee's Commander, the Training Division, and the Chief of Police.

5.  Any employee who is absent from duty for any extended period of time and fails because of that absence to re-certify as scheduled will have 10 days to re-certify upon their return to full duty status.  Responsibility for notifying the Training Division will rest with the individual employee.

6.  All sworn personnel will receive annual In-Service training on the use of the ASP baton.  This training will include re-certification and instruction of Departmental policy on use of force.

USE OF FORCE

---

**H.      OFF-DUTY/PART TIME EMPLOYMENT**
1.  All authorized part-time employment will be approved as per existing Departmental policy.

2.  Officers working part-time employment in uniform must wear the Department issued ASP Baton in the issued Sidebreak Scabbard.

3.  Officers working part-time employment in plain clothes must carry the Department issued ASP Baton in the alternative manner as authorized by the agency.


**4-6.4   ELECTRONIC CONTROL DEVICES - TASERS**

**PURPOSE and SCOPE**
The purpose of this policy is to establish guidelines for the DeKalb County Police Department's use of Electronic Control Devices (ECD).

**POLICY**
An ECD may be used to control resistant or aggressive individuals in arrest and other enforcement situations. It is the policy of this agency that officers use an ECD when warranted, but only in accordance with the guidelines set forth here, in training,  and in the use-of-force policy. An ECD is on the same level of force as Oleoresin Capsicum in the non-deadly force category.  **An ECD is a control device.**

The Taser X26 will be the standard authorized electronic control device issued to members of the DeKalb County Police Department.

It shall be the policy of the DeKalb County Police Department to resolve incidents requiring law enforcement intervention in as humane and safe a manner as reasonably possible.

**PROCEDURES**
**A.       AUTHORIZATION**
1.  Only officers who have completed the prescribed course of instruction on the use of the ECD will be authorized to carry the device.
2.  Basic certification for the use of an ECD shall consist of no less than the manufacturer's minimum recommendation.
3.   Re-certification shall be conducted once a year.
4.  Training topics for both the basic certification and annual re-certification should consist of, but are not limited to, the following topics:
    a.  Manufacturer's Recommendations / Maintenance
    b.  Deployment / Use / Documentation
    c.  Response to Resistance Matrix Levels and other Tactical Options
    d.  ECD Retention and Transition Drills
    e.  Scenario Based Training
    f.  Recognition of Symptoms: Excited Delirium, Medical Concerns, etc.

5.  Only current Manufacturer Certified Instructors are eligible to instruct officers in the use of an ECD.
6.  Officers whose normal duties/assignments may require them to make arrests or supervise arrestees shall carry the authorized departmental ECD.
7.  Uniformed Supervisors/Officers shall carry only a departmental authorized ECD in the issued cross-draw holster.  Non-uniformed officers may carry the ECD in alternative devices as authorized by the agency.

**DEKALB COUNTY POLICE DEPARTMENT**

**B.   PRIOR TO DEPLOYMENT**

1.   An officer's response level to subject resistance should always be based upon reasonable objectiveness,  and depending upon subject/officer factors such as age, size, weight, and the subject's apparent ability to physically challenge the officer or do harm to himself or others, balanced against the seriousness of the incident.

2.   An officer's decision to deploy the ECD shall involve an arrest or custodial situation wherein the subject is escalating resistance from passive physical resistance towards active physical resistance.  Passive resistance includes subjects who question an officer's commands in a non-threatening manner and persons who are participating in a non-violent public protest. The ECD shall not be used as a tool of coercion to intimidate an individual into compliance with simple requests or directives by an officer.

3.   The primary purpose in the decision to deploy the ECD is to prevent a continuing escalation of the subject's resistance or violence and to minimize injury to both the officer(s) and subject(s).

4.   Prior to deployment of the ECD, officers must take into consideration environmental factors which may contribute to serious injury. These factors include but are not limited to; subjects standing on or near the edge of a roof, stairwells, next to a window or body of water.

5.   No policy or guideline can anticipate every situation that officers might face, but in general terms, the following deployment procedures are established. An ECD can be utilized under the following circumstances:

   a.   When the subject is exhibiting threatening body language associated with verbal threats or refusing to comply with the officer's instructions, and the subject has the apparent ability to physically challenge the officer. Threatening body language includes, but is not limited to:
        1. blading the body
        2. assuming a "boxer stance"
        3. circling or surrounding the officer
        4. moving the hands from open to closed, forming a fist, etc.

   b.   When a subject makes physically evasive movements to defeat an officer's attempt to control. This may be in the form of:
        1. bracing or tensing of the body
        2. attempts to kick, push, or pull away
        3. not allowing the officer to get close to him

   c.   When a subject makes overt, hostile, attacking movements, which may cause injury, but are not likely to cause death or great bodily harm to the officer or others.

   d.   When subject makes overt, hostile, attacking movements with or without a weapon with the intent and apparent ability to cause death or great bodily harm to the officer or others.

   e.   When lesser force options may be ineffective.

6.   The ECD is a sensitive electronic device (similar to a cell phone) and should be treated with appropriate care.  It should not be dropped or thrown around. When not in use it should remain in an approved holster and should be protected from rain.

7.   The ECD will be turned over to any supervisor or the Internal Affairs Unit upon request to investigate the use of the ECD.

8. Only department issued batteries and cartridges will be used with the Taser. No changes, alterations, modifications or substitutions shall be made to the Taser. All repairs to a Taser shall be completed by an authorized vendor or armorer.

9. At the beginning of each shift the ECD shall be tested to ensure it is functioning properly. It is the responsibility of each officer to test the ECD prior to the shift or part time job, and to immediately report any improperly functioning ECD to their supervisor.

**IMPORTANT:** Make sure to remove the air cartridge prior to testing and replace it afterwards. Defective ECD's and cartridges should be returned to the Training Division as soon as possible and should not be used until repaired or replaced.

10. Personnel issued a Taser shall be issued a minimum of one spare cartridge as a backup in case of cartridge failure or the need for reapplication. The spare cartridges shall be stored and carried in a manner consistent with training and the cartridges replaced by the officer's division. Each division/unit/precinct will maintain an adequate supply and keep a log of the cartridge serial number, date of issue, and the name of the officer to whom cartridge was issued. Always replace the Air Cartridges by the expiration date and use expired cartridges for training purposes only.

11. The Taser shall be pointed at the ground in a safe direction with the safety on during administrative handling procedures.

**C. DEPLOYMENT**

1. The ECD should be deployed at the same level of force as OC spray.

2. Prior to the deployment of the Taser the officers deploying the device have the responsibility to reasonably visually and physically confirm that the use of force tool selected is in fact the Taser and not a firearm.

3. When multiple officers are present and an ECD is to be used on a subject, **only one officer should deploy the ECD on the subject.** In the event the ECD malfunctions or both probes are not in contact with the subject, an additional officer may deploy an ECD if compliance has not been gained. Officers will communicate with each other on which officer will deploy the ECD and which officers will act to take the subject into physical custody.

4. Care should be taken that the ECD not be aimed at the neck or above, and the point of aim for front deployment of the Taser should be lower-center of mass, when possible. The Taser should be aimed at the suspect's back to reduce risk of injury; however, this may not always be possible.

5. When possible, avoid prolonged, extended, uninterrupted discharges or extensive multiple discharges. When activating the ECD the officer should use it for one cycle and stop to evaluate the situation and the subject. Use of the Taser should be combined with physical restraint techniques to minimize the total duration of the struggle and Taser use. **Every attempt should be made to take the subject into custody as quickly as possible after the initial deployment of the ECD in order to reduce the need for subsequent cycles of the ECD. Officers should transition to a different force option if multiple Taser deployments fail to gain compliance.**

6. When reasonable, the ECD should not be used near flammable liquids and fumes. Do not deploy the ECD near suspected meth labs, or after alcohol-based OC spray has been deployed.

7. The ECD will cause most everyone to fall and therefore should not be used when the risk of falling would likely result in death (e.g. on a roof or next to a swimming pool).

8.  The ECD should not be used against handcuffed subjects, pregnant women, juveniles, or the elderly unless exigent circumstances exist.

9.  The ECD is prohibited from being used, or threatened to be used, in questioning or interrogating a suspect.  It is prohibited to use the ECD as a "prod," to awaken a person, to needlessly display the ECD, or to exhibit careless or haphazard muzzle control of the ECD.

10. An officer's decision to deploy the ECD on fleeing person(s) who are subject to arrest, should be predicated upon the totality of the circumstance and the considerations outlined above, along with distance and the difficulty in accurately deploying on a moving subject.  **A subject's flight should not be the sole justification for deploying the ECD.**

11. The ECD should not be deployed on subjects in physical control of a moving motor vehicle while the engine is running, or the vehicle is in gear.

12. If practical, the officer should verbally warn the subject that they will be subjected to a 50,000 volt electrical charge if they do not comply.  Officers should also give verbal warnings of "taser, taser, taser" (this term will be used as long as the department uses the Taser International's M26 or X26 Taser) to let other officers know that an ECD is being deployed. *This is to alert other officers that the ECD is being deployed so that officers do not mistake the "POP" of the ECD for a gunshot.* If possible, any officer on the scene shall broadcast a "Code ECD," via the radio channel. Dispatch shall acknowledge this broadcast and repeat the announcement (note, *the officer does not have to wait for radio to acknowledge before taking action).*

13. The ECD has a built–in 5-second timer.  The electrical current will continue for the full five seconds every time the trigger is depressed.  Unless special circumstances dictate the 5-second cycle should never be stopped early. If needed, pressing the trigger again can extend the cycle.

14. The Taser is an effective tool for stopping the aggressive behavior of wild or potentially dangerous animals.  Reporting procedures should be followed with the completion of an incident report.

15. Often, the mere display of the Taser or the activation of the laser on the subject will gain compliance.  This compliance should be noted in the incident report and on a Taser Use of Force supplemental form.


**D.     AFTER DEPLOYMENT-- REPORTING and APPROPRIATE MEDICAL AID**

Once the subject is subdued, restrained and in custody the arresting officer shall notify the chain of command that the subject has been subject to an ECD discharge. The officer's immediate supervisor will go to the scene. The supervisor will photograph the subject and the probe placement before the probes are removed. After removal the supervisor will photograph any marks left on the subject by the ECD as well as the probes with the cartridge.

1.  Under certain circumstances, Fire Rescue shall be summoned to evaluate and treat the victim. Police officers must provide Fire Rescue personnel with as much information as possible (i.e. history of the original incident, behavior observed, symptoms, etc.). This information would include, but not be limited to:
    a.  Probe embedded in the eyeball or inside the mouth
    b.  Unconscious even for short period
    c.  Visible seizure when ECD is NOT being discharged
    d.  Display of signs consistent with excited delirium
    e.  Obvious significant injury from fall or take-down
    f.  Person volunteers that they are having chest pain or trouble breathing

USE OF FORCE

> g. Persistent confusion or altered mental status more than one minute after application of the ECD
> h. Victim of an ECD used by a member of the public (i.e., non-police use)
> i. If the victim requests EMS
> j. Any use of an ECD on a juvenile (17 years of age or younger), pregnant female or elderly person
> k. If an officer has any doubt as to the health of the person based on:
>> 1. The officer's training
>> 2. The officer's previous use of an ECD
>> 3. The subject exhibits any of the conditions and/or symptoms above
>> 4. The subject exhibits any unusual behavior

2. Fire Rescue will not be responsible for the removal of probes embedded in a subject. It shall be the responsibility of the officer discharging the ECD to remove the probes.

3. Probes embedded in the neck, head, groin area or a woman's breast should only be removed by qualified medical personnel at a hospital. The officer will remove probes in any other location. Probes that have penetrated the body should be placed in "sharps" containers. These containers will be maintained in the trunk of all supervisor vehicles.

4. Immediately after deploying the ECD, employees should be alert to any indications that the individual needs medical care and will ensure appropriate medical aid. The employee will summon emergency medical aid.

5. The following reports will be completed after a deployment of the ECD. Incident report, Use of Force Report and an ECD Report. The Department will conduct an annual analysis of reported usage of the ECD's, via documented reports conducted by the Internal Affairs Unit.

6. In order to minimize the stress involved in the use of any force, any officer or non-sworn personnel involved in a use of force incident, which results in death or serious injury, will be placed on "administrative leave" directly upon completion of their preliminary report of the incident. This leave will be without loss of pay or benefits, pending the results of the investigation. The assignment to administrative leave will not be interpreted or indicate that the employee has acted improperly.

7. While on administrative leave, the employee will remain available at all times for official departmental interviews and statements regarding the incident and shall be subject to recall at any time. The employee will not discuss the incident with anyone except the District Attorney, departmental personnel assigned to the investigation, the employee's private attorney, the employee's psychologist, the employee's chosen clergy, and the employee's immediate family. Upon returning to duty, the employee may be assigned to "administrative duty" for a period of time deemed appropriate by the employee, his psychologist, and the Chief of Police.

**E.     TASER TRACKING CHIP DOWNLOAD AND REVIEW**

Each Taser device is equipped with an internal tracking chip. This chip stores the time and date of the last 1500 firings of the X26 model Taser. Supervisors can retrieve information stored in the data chip by connecting to the data port on the rear of the Taser and downloading the information into the Department's computer system.

The Taser data chip will be downloaded for investigative purposes in reference to any use of force incident, or in reference to a complaint of the use of the Taser that was not reported on a use of force report. The downloaded report will be attached to the use of force report or to any report where the Taser was alleged to have been used. Additionally, the Taser data chip should be downloaded prior to return for repair or return for any other reason.

F.     **OFF-DUTY/PART TIME EMPLOYMENT**
1.   All authorized part-time employment will be approved as per existing Departmental policy.
2.   Officers working part-time employment in uniform must wear the Department issued ECD in the approved holster.
3.   Officers working part-time employment in plain clothes must carry the Department issued ECD in the alternative manner as authorized by the agency.

## 4-6.5   SPECIALITY LETHAL and LESS-LETHAL WEAPONS

## PURPOSE

The purpose of this specific policy in the Use of Force section is to establish guidelines for the use of lethal and less-lethal systems by the S.W.A.T. Team following their deployment.

## POLICY

Use of Force guidelines are no different for the S.W.A.T. Team than for any other officer, with the exception that the team deploys more options as related to less-lethal systems and due to the nature of team deployment, the totality of the operation circumstances and combined information may likely be used in the determination of the need to use reasonable force to defend self and/or third person(s) against unlawful force and/or the use of force likely to cause death or great bodily harm. The use of deadly force in hostage situations will become an option only after there is clear and sufficient reason to believe that the person against whom the force is used is threatening the life of hostages, innocent civilians, or public safety officers or to prevent the commission of a forcible felony.

A.     **AUTHORIZATON**

The S.W.A.T. Team Commander has the authority to determine the force required to complete a tactical situation successfully. Force may include, but is not limited to, the use of chemical agents, direct assault or the use of selective firepower.

Less-Lethal systems include but are not limited to impact projectiles and chemical munitions, which can be fired, launched, placed or otherwise propelled for the purpose of compliance, overcoming resistance, or preventing serious injury without posing a significant potential for causing death.  Authorization for use is located in this section entitled, *Authorization for Use of All Departmental Weapons*.

B.     **USAGE CRITERIA**

The approval of said systems will be for certified S.W.A.T. officers, as later listed, and will be approved by the Less-Lethal and Chemical Munitions supervisor who will forward the requested approval through the Entry Team Leader and the S.W.A.T. command staff.

All current systems and munitions will only be used by trained and certified S.W.A.T. officers, who have received appropriate training via the system manufacturer, P.O.S.T. courses and other approved chemical agents and less-lethal courses, such as the 40-hour course provided by the FBI.

Less-lethal systems and chemical munitions will be deployed according to manufacturers and tactical deployment specialist's recommendations.

C.     **RESPONSE, MEDICAL AID FOLLOWING LESS LETHAL and LETHAL USAGE**

DeKalb Fire and Rescue Department medical personnel currently support the DeKalb Police S.W.A.T. Team.  This group of tactical medics has received additional training, related to supporting a tactical team for emergency medical attention.  In addition, they all have completed the basic DeKalb Police S.W.A.T. course.  This team provides medical support not only to the team, but also to any suspect, victim, civilian and/or other personnel as needed.  This support includes medical aid and/or supportive care for less-lethal and chemical munitions.

USE OF FORCE

**D.      AFTER DEPLOYMENT – REPORTING and REVIEW**
A departmental Use of Force Report, Supervisor's Incident Investigation Report and necessary statements will be completed in accordance to departmental policy 4-1.12 and 4-1.16 located in the *Internal Affairs – Policy and Purpose* section of this manual. If the S.W.A.T. Team and/or any member during a S.W.A.T. operation is involved in an use of force incident, including but not limited to the following:
1. Use of lethal force, including the use of firearms
2. Use of less-lethal options, such as chemical munitions and other impact systems
3. Other use of force as applicable under policy
4. All incidents applicable to investigation

All such investigations are to be forwarded through the chain of command for review and when applicable in policy, will be reviewed by Internal Affairs.

All S.W.A.T. incidents require the completion of the DeKalb Police S.W.A.T. *After-Incident Report*.  This will be forwarded for review and approval, through the S.W.A.T. chain of command.  All such reports will be maintained on record.

If a S.W.A.T. officer is directly involved in a use of deadly force incident, in order to minimize the stress -- the officer will be placed on "administrative leave" directly upon completion of their preliminary report of the incident.  This leave will be without loss of pay or benefits, pending the results of the investigation. The assignment to administrative leave will not be interpreted or indicate that the employee has acted improperly. While on administrative leave, the employee will remain available at all times for official departmental interviews and statements regarding the incident and shall be subject to recall at any time. The employee will not discuss the incident with anyone except the District Attorney, departmental personnel assigned to the investigation, the employee's private attorney, the employee's psychologist, the employee's chosen clergy, and the employee's immediate family. Upon returning to duty, the employee may be assigned to "administrative duty" for a period of time deemed appropriate by the employee, his psychologist, and the Chief of Police.

**E.      APPROVED WEAPONS and SPECIFICATIONS**
Recognizing that the missions of the DeKalb Police S.W.A.T. Team are performed in hazardous environments and recognizing that the safety of citizens, suspects and officers is often jeopardized by these conditions, it is the intent of the team to utilize regular and special equipment and weapons, which are listed and explained, to lessen the risk of injury and/or death to all involved, during said missions.

All S.W.A.T. used firearms are approved for use through the S.W.A.T. chain of command.  Approval is completed only after the weapon(s) has been inspected by a county firearms instructor and/or armorer and the officer has been trained to use and has qualified on the prescribed course for that particular system.   Each weapon is recorded on the S.W.A.T. inventory and when applicable is assigned to individual officers, using the appropriate issue form. All weapon systems are to be maintained according to manufacturers' recommendations. Listed below are approved weapons, along with ammunition:

*Smith and Wesson M&P .40 caliber*:
Approved and issued ammunition; 15-round capacity

*Sig Sauer P220 .45 caliber*:
Approved and issued ammunition.

*H&K .9 mm Sub-guns*:
Federal .9 mm BPLE, 115 jacketed hollow point; 30-round capacity - single, 3-round and full-auto

*.223 cal. Tactical Rifles*
*Colt M4 Carbine, DPMS M4 Carbine, Colt Short Barrel M4 Carbine*
Federal .223 Rem. GM223M 69 grain, Sierra MatchKing BTHP; 30-round capacity - semi-auto and 3-round Burst

*12 gauge Shotgun*
*Remington 879, Benelli Super 90*
Hornady 8 pellet 00 buck

*Sniper/Marksmen Rifles*
- Remington 700 .308 cal Rifle System; Federal .308 Win. GM308M, 168 grain, Sierra MatchKing BTHP
- Remington 700 .223 cal Rifle System; Federal .223 Rem. GM223M 69 grain, Sierra MatchKing BTHP
- .223 cal Tactical Rifle; Federal .223 Rem. GM223M 69 grain, Sierra MatchKing BTHP

**Less-Lethal Delivery Systems and Loads and Chemical Munitions**
1. Remington 12-gauge pump shot gun (Less-Lethal Dedicated); CTS 12ga Super-Sock Cartridge
   - Less Lethal impact munitions
   - Non- chemical
   - Pain compliance
   - Maximum effective range – 30ft

2. Sage SL6 37mm Less Lethal Launcher
   Sage Deuce 37mm Less Lethal Launcher
      Super soft tip baton – Standard Energy
   - Rubber baton impact round
   - Non-chemical
   - Pain compliance
   - Maximum effective range – 60ft
   - Minimum range – 7ft
      CS Crush Nose Chemical Baton – Less Energy
   - Soft impact baton round
   - Contains CS (powder)
   - Can be introduced into an area / building target
   - Can be used as direct fire against persons
   - Maximum effective range – 60ft
   - Minimum range – 7ft
      CS Smoke – long range

3. CS Barricade Penetrator – Regular Penetration
   - Used to introduce CS into an area / building target
   - Specifically designed to penetrate windows
   - Not for direct fire against persons
   - Maximum range – 80ft.
4. JAYCOR Pepperball Launcher –
   1. Powder OC Round
      - Direct Fire against a person to introduce OC
      - Pain compliance
      - Maximum effective range – 30ft
      - Minimum 5ft
   2. Liquid Filled Round
      - Direct fire against person for pain compliance only

USE OF FORCE

- - Maximum effective range – 30ft
- - Minimum range – 5ft
- -
5. CTS Baffled Grenade Smoke Canisters –
  - - Smoke only
  - - Used to mask movement
  - - Hand delivery

6. CTS Jet-Lite Rubber Ball CS Grenade –
  - - Introduce the irritant CS
  - - Hand delivery

7. CTS CS Grenade Canister –
  - Introduces the irritant CS
  - - 5 times more CS smoke that the Rubber Ball Grenade
  - - Hand delivery

8. Omni-Blast 100 Tactical Diversion Device
  - - Produces bright light
  - - Produces a loud sound
  - - Used to distract and overwhelm the suspect's senses
  - - Hand delivery
9. CTS OCV Aerosol Grenade


**F.     TRAINING and CERTIFICATION(s)**

DeKalb County Police Training provides basic use of force training and updates. However, further training and S.W.A.T. specific issues are taught on a monthly basis and as necessary. Furthermore, all S.W.A.T. members receive a basic level S.W.A.T. course, which provides an overview of weapons and use of force issues.

The S.W.A.T. Team requires the following specific training and qualifications:

- Smith and Wesson M&P .40 caliber Pistol:  Qualify Monthly on the County Prescribed Course (92.7%)
- H&K 9 mm Sub-gun: Qualify on the S.W.A.T. Sub-Gun Course (80%)
- .223 Colt M4 and DPMS M4 Tactical Rifle:  Qualify on the S.W.A.T. Tactical Rifle Course (80%)
- .223 Colt Short Barrel M4 Tactical Rifle: Qualify on the S.W.A.T. Rifle Course (90%)
- .223 and .308 Remington Rifles:  Qualify on the S.W.A.T. Sniper Rifle Course (90%)
- 12 Gauge Shotgun:  Qualify Yearly on the County Prescribed Course (70%)
- Less-Lethal Delivery:   Qualify Annually on the S.W.A.T. Less-Lethal-Delivery Courses

If a S.W.A.T. member fails to qualify on a particular weapons system, that member is no longer allowed to carry that system, until a passing score is achieved, within 10 days of the deadline.  In the case of the .40 caliber pistol, that member will not be allowed to participate in a tactical role at S.W.A.T. incidents, until a passing score is achieved, which will be within 10 days of the deadline.  Qualification on the .40 caliber must be completed prior to S.W.A.T. training.  If a S.W.A.T. member is unable to qualify on a weapons system following remedial training, that member's status on the team will be evaluated by the team commander.


**4-6.6     USE of  FORCE REPORT**

It will be the responsibility of the supervisor of any employee involved in any of the below listed incidents to complete the Use of Force Report as soon after the incident as possible. A copy of the preliminary Use

**DEKALB COUNTY POLICE DEPARTMENT**

of Force Report will be immediately (no later than 24 hours) forwarded to the Internal Affairs Unit to be logged as pending.  The completed report, along with supporting documentation, will be submitted through the chain-of-command to the Division Assistant Chief.

After review, the Division Assistant Chief will forward the completed Use of Force Report and all supporting documentation to the Internal Affairs Unit. All Use of Force Reports should be submitted to the Internal Affairs Unit no later than 30 days after the incident unless an extension is approved in writing by the Division Assistant Chief of Police.

A Use of Force report shall be completed for incidents involving:
   A.  Death, hospitalization, or medical treatment of either the officer or the suspect that occurs as a result of any arrest or confrontation

   B.  The use of any chemical agent, such as OC spray

   C.  The striking of a suspect with hands, feet, ASP baton or other such device

   D.  The presence of blood or broken skin on the person of either the officer or suspect, that occurs as a result of an arrest or confrontation

   E.  The discharge of any firearm, whether accidental or not

   F.  Any visible bruises caused by an arrest or confrontation

   G.  A complaint of physical injury caused by an officer, made by a suspect in the presence of any officer, that arose as a result of any arrest or confrontation

   H.  The deployment of the ECD to subdue an individual

For any Use of Force incident not involving a response by the Internal Affairs Unit and the Criminal Investigations Division, it will be the responsibility of every officer witnessing an incident on which a Use of Force Report should be filed to complete a supplemental report.  If any officer's name is listed in a Use of Force Report, it will be the responsibility of the reporting supervisor to ensure that each officer completes the supplemental report.
For any Use of Force incident involving a response by the Internal Affairs Unit and the Criminal Investigations Division, all written statements from involved employees will be obtained only by CID detectives for the incident investigation, followed by Internal Affairs detectives for the administrative investigation. Supervisors of the involved employees will be responsible for completing the Use of Force Report after collecting preliminary information at the incident location.  The involved employees will not complete statements for purposes of the Use of Force Report, the original incident report, or supplemental reports.

The Use of Force Report will be reviewed at each required level of supervision to ensure compliance with the law, policies and procedures.  Internal Affairs will conduct an annual analysis of all Use of Force reports.

### 4-6.7   INJURIES or COMPLAINTS of INJURIES not RELATED to ARREST
Any injuries or complaints of injuries to a suspect, which occurred prior to the officer's arrival, in a confrontation with non-departmental personnel or were self-inflicted, will be fully described in a supplemental report by the officer.

### 4-6.8   IMMEDIATE NOTIFICATION – WEAPONS DISCHARGE AND USE OF DEADLY FORCE
Any time an employee discharges a firearm, with the exception of training and certification, they will notify or cause to be notified the following entities:

USE OF FORCE

1. Internal Affairs
2. CID – Major Crimes
3. Crime Scene Investigation
4. Chain-of-Command (including Chief of Police)
5. DeKalb District Attorney's Office
6. DeKalb Multijurisdictional Monitoring Team
7. DeKalb Medical Examiner's Office (if a fatality is involved)

### 4-6.9    DEPARTMENTAL WEAPONS and TRAINING

The Smith and Wesson M&P.40 caliber handgun will be the standard authorized weapon issued to members of the DeKalb County Police Department, the SWAT and Bomb units will be issued the Sig Sauer P220 .45 caliber pistol. Issued ammunition will be determined by range staff and approved by the Chief of Police.

Personnel issued a Department service pistol must receive training and be certified as mandated before being authorized to carry the weapon.

Command staff, Detectives and other authorized personnel will be allowed to carry personally owned Smith and Wesson, GLOCK, Sig Sauer or Beretta while on duty. Any detective requesting to have their personal Smith and Wesson, GLOCK, Sig Sauer or Beretta as their authorized weapon will have the Firing Range Staff approve the pistol and the detective must meet certification requirements according to departmental policy. The pistol will be registered with the Department by make, model, and serial number and will be loaded only with 9mm or .40 caliber ammunition as approved by the department. All departmental firearms policies apply to authorized, personally owned weapons.

### 4-6.10   DEPARTMENTAL WEAPONS POLICY

The policies listed below will be strictly adhered to:

A. All on-duty officers shall be armed with the Department issued firearm unless specifically exempted by the Chief of Police.

B. All issued .40 caliber pistols must be loaded only with departmentally approved ammunition as issued by the Department. Each issued full-size weapon will contain all 15 rounds of approved ammunition; one round chambered and 14 rounds in the magazine. All extra magazines will be loaded with 15 rounds. Approved revolvers will be fully loaded with departmentally approved ammunition. Semi-Automatic weapons will utilize the original manufactured magazines (NO AFTERMARKET EXTENSIONS MAY BE USED) and will be loaded (WEAPONS WILL NOT BE "TOPPED OFF").

C. No officer will attempt to repair or modify a Department owned weapon.  Any servicing done to a weapon by an officer will be restricted to routine cleaning. Officers are required to immediately report any malfunction or damage to any issued weapon to the Department armorer. For personally owned secondary weapons, the owner of the weapon will be responsible for its upkeep and repair.

D. All firearms must be inspected, fired, and certified safe by the Department armorer prior to issue or authorization to carry.

E. All firearms must be registered with the Department by make, model, and serial number and ballistic sample.

F.   Every police officer, while working in a uniform capacity, on-duty or off-duty, shall wear the Sam Brown belt with the departmental issued holster and all other required county issued uniform items/gear.

G.   The officer must meet "certification" requirements with each approved weapon. This certification will be monitored by a certified firearm instructor of the Training Section.

H.   The Department understands there will be special circumstances or assignments that may dictate the use of a smaller, more concealable firearm. Any on-duty officer who desires to carry a smaller weapon to meet the above need must make a written request, including need and type of weapon. The only acceptable weapon will be a five or six shot, two, three or four inch barreled revolver, 38 or 357 caliber.  The written request will be studied for need, liability and weapon. The request must be forwarded through the chain-of-command and approved by the Chief of Police. A copy of the approval will be sent to the Division Commander and Training. If a request is accepted, then the officer must become certified with the firearm before it can be carried.

I.   The carrying or using of any unauthorized weapon and/or ammunition will result in disciplinary action by the Department and a disclaimer in any criminal or civil litigation.

J.   The only shotgun approved for use is either the Department issued Remington 870, or any personally owned 12 gauge pump-action shotgun. Presently, the only approved ammunition is the Remington 8 pellet 00 buck with reduced recoil, issued by Range personnel; all shotguns must meet certification specifications in this section.

K.   The Patrol Rifle will be the .223 caliber AR-15/M-4 design, including piston operated models that is personally owned. The rifle must be approved by the range staff. Any officer considering the purchase of a rifle to carry on patrol should consult with the range staff to ensure authorization of the particular make and model. It must have iron sights and a sling. Officers may also use approved optic sights and will have to qualify with both. If the officer makes any additions or alterations to the rifle re-qualification is mandatory before the weapon can be carried on duty. Departmental armorers will make inspections and approval of the weapons. Only departmental issued Federal TRU 55 grain Nosler Ballistic Tip ammunition will be carried.

L.   A record of approved ammunition will be kept on file at the range.

**SECONDARY WEAPONS/OFF-DUTY WEAPONS**

A.   Officers are encouraged, but not mandated, to carry a handgun when off duty. An officer who elects not to carry a handgun while off duty shall not be subjected to disciplinary action if an occasion should arise in which he/she could have taken action if he/she were armed.
EXCEPTION: Off-duty officers, while operating a department vehicle, shall be armed with the Department issued handgun.

B.   The secondary (back-up)/off-duty handgun will not be carried in place of or as a substitute for the Department issued firearm when the officer is in uniform or working an approved job in plain clothes.

C.   Authorized secondary/off-duty weapons are:
1.   the Department issued pistol and ammunition
2.   a double action semi-automatic pistol of the following calibers: .380, 9mm, .40 or .45
3.   a revolver with a two or four inch barrel of the following calibers: .38 or .357
Only Department approved, factory loaded jacketed hollow point (JHP) ammunition will be used.

D.  The Firing Range Staff must approve all weapons and the officer must meet "certification" require-ments with each weapon that is approved. Officers must provide ammunition for certification with each non-issued Department approved weapon.

E.  The firearm(s) must be registered with the Department by make, model and serial number.

F.  The firearm must be loaded only with Department approved factory loaded jacketed hollow point (JHP) ammunition.

## 4-6.11  RETIRED OFFICERS - FIREARMS CERTIFICATION

The Law Enforcement Officers Act of 2004 designates provisions for the certification of retired police officers to carry a concealed firearm anywhere in the United States, with proper identification.  In order to meet the standards of this act, the following procedure will be followed to certify DeKalb County Police Department retired officers to carry concealed firearms:

1.  This service will only be provided for officers retired in good standing from the DeKalb County Police Department.

2.  The certification process and qualification will be held at the DeKalb County Outdoor Range. Retired officers requesting to take part in this process will make an appointment with the range staff prior to qualification.

3.  Retired officers who wish to become certified will complete a form stating their eligibility for this program.  The retired officer must present a current valid departmental retired officer identification card prior to attempting qualification. The eligibility form will be available at the outdoor range.

4.  The retired officer will be required to undergo use of force training, provided by the range staff, prior to qualifying on the course of fire.

5.  The retired officer's weapon(s) he wishes to qualify with will meet current DeKalb departmental requirements for a duty or secondary weapon. An approved handgun is the Department issued handgun, or a double action Semi-automatic pistol .380 ACP, 9mm, .40 S/W or 45ACP. Five or six shot, two, three or four inch (2", 3", or 4") barreled revolvers in .38 SPL or .357 magnums are also approved. The ammunition required for qualification will be provided by the retired officer. Training, range time, and targets will be provided by the department.

6.  The retired officer will qualify on a course in accordance with current Georgia P.O.S.T. standards.

7.  The retired officer will be allowed to attempt to qualify on the course of fire a total of three times per day.  If the officer fails to qualify during these attempts, he may make additional attempts on a separate day after making arrangements with the range staff.  The retired officer will be allowed practice time prior to qualification attempts, if desired.

8.  After completing qualification, the retired officer will be issued a certification card by the range staff.  This card is valid for one year from the date of qualification, and is only valid if carried with an official DeKalb County Police photographic identification for a retired officer when carrying a concealed weapon.

9.  All records of retired officer qualifications and firearms certification forms will be kept by the Training Division.

**4-6.13   KNIVES**

Officers are permitted but not required, to carry a folding style pocketknife; the blade shall be no more than three inches.  For safety purposes, the knife will be secured inside the uniform pant pocket or in a holder on the duty belt.  This is a personal item and will not be issued by the county.

This will be used for emergency needs such as cutting seat belts in severe traffic accidents when the victim is trapped, unconscious, or other similar situations. Officers are not permitted to use said knife during any arrest or confrontation and said knife is not part of the use of force continuum.

Knives should also comply with Federal/State Law and Local Ordinances.

**4-6.14   PATROL RIFLE**

Officers who are authorized can deploy with patrol rifles when they have reason to believe the suspect(s) is (are):

1. Wearing body armor
2. Armed with firepower that is superior to their sidearm
3. Armed and situated at a distance or fortified position with a tactically superior position requiring accuracy at a greater range
4. When an armed confrontation is imminent or when the officer is engaged in activities that have a high probability that the suspect(s) may be armed and dangerous, such as armed robberies in progress or active shooter situations, or
5. With prior authorization from a supervisor in situations where the tactical environment is such that a rifle would be the most effective way to prevent the death or serious physical injury to officers or the public.

The Patrol Rifle will be the .223 caliber AR-15/M-4 design, including piston operated models, that is personally owned. The rifle must be approved by the range staff.  Any officer considering the purchase of a rifle to carry on patrol should consult with the range staff to ensure authorization of the particular make and model.  It must have iron sights and a sling. Officers may also use approved optic sights and will have to qualify with both. If the officer makes any additions or alterations to the rifle re-qualification is mandatory before the weapon can be carried on duty. Departmental armorers will make inspections and approval of the weapons. Only departmental issued Federal TRU 55 grain Nosler Ballistic Tip ammunition will be carried.

**4-6.15   OFF-DUTY/PART TIME EMPLOYMENT**

A. All authorized part-time employment will be approved as per existing Departmental policy.

B. Officers working part-time employment in uniform must wear the Department issued safety holster and carry the Department issued weapon and ammunition.

C. Officers working part-time employment in plain clothes must carry the Department issued weapon in an appropriate holster.

**4-6.16   FIREARMS TRAINING**

A. The Department's firearms training program will include comprehensive instruction of (1) departmental policy on use of deadly force, (2) the legal requirements, (3) moral responsibility of carrying a firearm, (4) firearm safety, and (5) firearm proficiency.

B. The firearms proficiency training will, as closely as possible, reflect those circumstances and conditions that our police officers are most likely to confront in real life deadly force situations.

USE OF FORCE

C. All aspects of the firearms training program will include the Department issued weapon, off-duty and secondary, and special approval weapons.

D. Patrol rifle and shotgun training will include legal, moral and ethical issues; specific rifle/shotgun marksmanship, tactical deployment of a rifle/shotgun, and "immediate action drills." Rifle and shotgun qualifications will consist of a static marksmanship course of fire, a dynamic tactical course of fire and a written exam. All officers must successfully complete a minimum 30 hour tactical training course before being authorized to carry a personally owned rifle or shotgun, or a Departmental-issued shotgun. Course requirements may be fulfilled by successful completion of training at the DeKalb Police Training Academy, DeKalb County S.W.A.T. Training, Georgia Public Safety Training Center, or any Georgia P.O.S.T. approved patrol rifle/shotgun course. Personnel completing an approved course outside of DeKalb County must qualify on the DeKalb Police qualification course before final authorization is granted.

## 4-6.17   FIREARMS CERTIFICATION

A. All officers shall be "certified" with their issued, secondary, special approval and off-duty handguns.  "Certification" shall include training regarding the legal, moral, and ethical aspects of firearms use; safety in handling firearms; and proficiency in the use of firearms.  This certification is to be monitored by a member of the range staff.

B. Certification or qualification for departmental approved issued sidearms will be required for all sworn officers (lieutenants and below) every six months at the indoor range.  The qualifying course will be the 30 round stress course.  Captains and above will continue to qualify every 12 months.

Officers may come any time of the year, when the outdoor range is open, to practice.  Each officer will be allowed up to 50 rounds every other week to practice.

Officers may come any day of their qualifying month to either practice or qualify.  If the officer elects to practice, they will be allowed up to 50 rounds every other week.  If the officer elects to shoot the stress course in an attempt to qualify, then the officer must achieve a qualifying score of 80% or greater.  If the officer fails to qualify on the first attempt, he may either immediately attempt to qualify a second time or may shoot some practice rounds and then attempt to qualify a second time. Officers will only be allowed three qualifying attempts per day.  If the officer qualifies on the first, second attempt or third, he will be released to continue his assigned duties.

If an officer fails to qualify after three attempts, their authority to carry the service weapon shall be immediately revoked and verbal and written notification of this revocation shall be forwarded to their commanding officer, the Training Division, the Assistant Chief's Office and the Office of the Chief of Police.

**Officers losing their authority to carry their service weapon shall immediately be reassigned to non-uniformed administrative duties for a period of 10 days.** The 10 day period will consist of the 10 days after the initial qualification attempts that the range is open. During this 10 day period, the officer will report to the range for remedial firearm's training and shoot practice rounds.  They will also be allowed a maximum of three attempts to qualify each day (maximum of 150 rounds for qualification/practice per day).  During this time, the officer will be prohibited from working secondary law enforcement jobs.  If the officer fails to obtain a qualifying score after the 10 day period, they will be recommended for termination.

If an officer obtains a qualifying score prior to the 10 day deadline, the officer will be reinstated to their previous duties and can continue to work secondary jobs.  **This officer shall be required**

DEKALB COUNTY POLICE DEPARTMENT

**to report to the range twice a month for the next six months for remedial firearm's training.** The range training staff will maintain a log on each officer receiving remedial firearm's training and document their progress. If the range staff identify an officer whose shooting proficiency and qualifying scores are marginal, this officer may also be recommended to receive remedial firearm's training. This information will be shared with the officer's commanding officer, the Training Division, the Assistant Chief's Office and the Office of the Chief of Police.

Officers are encouraged to maintain their firearm's skills through practice. Certification or qualification for other departmental approved lethal weapons, such as the shotgun, .223 rifle or a secondary sidearm shall occur on an annual basis. A qualifying score and course shall be determined by the Range Master. Any officer failing to obtain a qualifying score during their annual qualification attempt shall be prohibited from carrying that weapon while on duty or while working secondary law enforcement jobs. Once a qualifying score is made and the officer has demonstrated that they are proficient with that weapon, the range personnel will approve continued use of that handgun for the officer.

Certification or qualification with specialized weapons for S.W.A.T. Team members shall be determined by the S.W.A.T. team commander. Team members shall demonstrate proficiency with each specialized weapon they are assigned. Failure to demonstrate this proficiency will prohibit that team member from continued use of the specialized weapon.

C.   Any officer who is absent from duty for any extended period of time and fails because of that absence to re-qualify as scheduled will have 30 days to re-qualify upon their return to full duty status. Responsibility for notifying the Training Division will rest with the individual officer.

D.   Personnel who are authorized to carry a patrol rifle, shotgun or secondary/off-duty weapon will qualify with that weapon during the first qualification session each calendar year. Failure to qualify with the weapon will result in immediate revocation of authorization to carry. If the weapon is a departmental issued weapon, it will be immediately relinquished to the Range Staff.

## 4-6.18  FIREARMS CERTIFICATION RECORDS

The Department range master shall maintain a permanent certification log for every officer authorized to carry firearms. The log shall consist of the following minimum information:

A.   Officer's name
B.   Certified issued on-duty weapon make, mode, caliber and ammunition, serial number of Weapon, date results of shooting test, and written test result
C.   Certified off-duty weapon (same as #B)
D.   Certified secondary weapon (same as #B)
E.   Certified special approval weapon (same as #B)
F.   Certified shotgun and/or rifle (same as #B)

## 4-6.19  PSYCHOLOGICAL DEBRIEFING

Any officer or other departmental personnel directly involved in a critical incident, which results in death or serious injury, will be placed on administrative leave directly upon completion of their preliminary report of the incident. This leave will be without loss of pay or benefits, pending the results of the investigation. The assignment to administrative leave will not be interpreted to imply or indicate that the employee has acted improperly.

While on administrative leave, the employee will remain available at all times for official departmental interviews and statements regarding the incident and shall be subject to recall at any time. The employee will not discuss the incident with anyone except the District Attorney, departmental personnel assigned to the investigation, or the employee's private attorney, the employee's psychologist, the

**USE OF FORCE**

employee's chosen clergy and the employee's immediate family. Upon returning to duty, the employee may be assigned to "administrative duty" for a period of time deemed appropriate by the employee, his psychologist and the Chief of Police.

In all cases where any person has been injured or killed as a result of firearms discharge by a police officer, the involved officer will be required to undergo an emotional debriefing with a Department-furnished psychologist within two days of the incident. The purpose of this debriefing will be to allow the officer to express his feelings and to deal with the moral, ethical, and/or psychological aftereffects of the incident. The debriefing shall not be related to any Department investigation of the incident and nothing discussed in the debriefing will be reported to the Department. The debriefing session will remain protected by the privileged Professional Psychologist Code of Ethics.

In all cases where any person has been injured or killed as a result of firearms discharge by a police officer, the involved officer will have available the services of a Department-furnished chaplain. The purpose of this offer is to provide the officer with a source of professional consultation to aid them in dealing with the potential moral and ethical aftereffects of a shooting incident. The services shall not be related to any Department investigation of the incident and nothing discussed in the debriefing will be divulged to the Department. The consultation sessions will remain protected by the privileged relationship.

## 4-6.20 AUTHORIZATION for USE of all DEPARTMENTAL WEAPONS

Only employees demonstrating a proficiency in the use of all agency-authorized weapons will be approved to carry such weapons. This applies to all lethal as well as non-lethal weapons to include handguns, shotguns and other firearms, chemical agents, ECDs, impact weapons, handcuffs, or other weapons. This proficiency is demonstrated through the use of periodic training and/or qualifications.

## 4-6.21 POLICE INTERNAL REVIEW BOARD

    A. The DeKalb County Police Department Internal Review Board is hereby established:
        1. to review all cases where there has been a use of deadly force by officers of the Department or the death of a person has occurred while that person was in the custody of the Department, any of its officers, staff, designees or other representatives;
        2. to assist the Chief of Police in holding all members of the Department strictly accountable for the awesome responsibility of protecting life and property;
        3. to ensure that all officers are properly trained in all aspects of the use of force, up to and including the use of firearms; and,
        4. for any other reason deemed necessary by the Chief of Police.

    B. The Internal Review Board will hear, on a periodic and timely basis, those cases involving the use of deadly force or in custody death, which involve DeKalb County Police Department personnel.

    C. ORGANIZATION
      The DeKalb County Police Department Internal Review Board will be appointed by the Chief of Police and will be comprised of the following:
        1. Chairman (the rank of Deputy Chief or above)
        2. Vice Chairman (the rank of Major)
        3. All other Majors within the DeKalb County Police Department.
The Internal Review Board members will represent each Division, Precinct, Section and Unit in the Department to include Uniform, Criminal Investigations, Special Operations, Interactive Community Policing, Support Services, Homeland Security, Training and Office of Professional Standards. The Chairman and Vice Chairman will have dual roles of conducting the formalities of the meetings, forming probing questions to the presenters and the members of the Board, and documenting the outcome of the presentations to the Board.

**DEKALB COUNTY POLICE DEPARTMENT**

D.   DEFINITIONS
1. Necessary Force – the use of a reasonable amount of force to achieve a legitimate police objective.
2. Deadly Force – that force which is intended to cause death or great bodily harm or which creates some specified degree of risk that a reasonable and prudent person would consider likely to cause death or great bodily harm.
3. Police Officer/Law Enforcement action – those acts that a reasonably prudent officer would take, whether on or off duty.
4. Non-police related action – those acts, taken by an off-duty officer, which a reasonably prudent person would take under similar circumstances.
5. Off duty, police related action – those acts that require an off duty officer to assume the role of a certified law enforcement in the State of Georgia, i.e., effecting an arrest, investigating a possible crime (misdemeanor or felony), etc.
6. Physical injury – obvious, apparent or reasonable complaint of injury to the limbs, organs, and/or tissue of a human being, including any unborn fetus.
7. Property damage – an event that results in obvious physical harm to property, including but not limited to real estate, motor vehicles, personal property or animals.
8. Accidental discharge – the discharge of a firearm by an officer that was not intended by the officer.
9. Violation of Department Policy – deviation from established Departmental policies, Rules, regulations or training.
10. Gross Deviation from Department policy, rules, regulations or training – wanton, willful, or reckless disregard for the established policies, rules, regulations, training or accepted practices of the DeKalb County Police Department.

E.   CONDUCT OF THE INTERNAL REVIEW BOARD
All Internal Review Board members should be present to hear and review cases. Any absences must be approved by the Board Chair. A quorum must be present before any official findings are rendered. Meetings will be held quarterly during the year and may be called at the direction of the Chief of Police or Board Chair.

Information for review by the Board will be provided by the Internal Affairs detective who investigated the case, and his/her supervisor(s). The Board retains the right to gather additional information from other sources, such as the DeKalb County Medical Examiner's Office, etc.

It is the purpose of the Internal Review Board to review the investigations of incidents whereby an officer used deadly force or a person died while in custody of the DeKalb County Police Department. The Board will make an informed decision as to whether the use of deadly force was justified or non-justified based on the totality of the circumstances. To determine if an officer was justified in using deadly force, the Board will apply applicable parts of state and federal law regarding use of force, as well as the Department's policies on use of force and use of force training. After that determination is made, the Board will then address, from an administrative perspective, whether any policies, rules, regulations or established training mechanisms were violated and/or whether there is a need for corrective action and/or remedial training in the use of force.

The Board may also determine that other departmental policies may have been violated leading up to and/or during an incident where deadly force was used or someone died in police custody. If any other departmental polices were found to be violated, this information will be forwarded back to the officer's division for appropriate corrective action.

USE OF FORCE

**The Internal Review Board will not consider any violations of state or federal law other than to make a preliminary finding of whether the officer involved was justified in using deadly force.**

> After review, if the Board determines that a use of force was unjustified, the Board will then decide on the appropriate corrective or disciplinary action and make a recommendation to the Chief of Police.

F.    REPORTS
A copy of the Internal Review Board final report and recommendations for corrective or disciplinary action, when warranted, will be drafted and signed by the Internal Review Board Chairman and Vice Chairman, and provided to the Chief of Police.

G.    LETTERS OF NOTIFICATION
Upon final review, and after approval by the Chief of Police, the Chairman of the Board will draft and send a letter to all officers who were found to have been justified in their use of deadly force, or in the event of an in-custody death, there was no wrongdoing on the part of the officer(s) involved.

**4-14.22 REPORTING AND RECOVERY OF STOLEN MOTOR VEHICLES**

Upon recovering a motor vehicle reported as stolen by this or any other law enforcement agency, the following procedures shall be followed:

A.   Use the ORIGINAL DeKalb case number if the vehicle was stolen in DeKalb County.  If the recovered vehicle was stolen from a location outside DeKalb County, use a DeKalb case number for the report and list in the narrative of the recovery report, the ORIGINAL REPORTING AGENCY'S CASE NUMBER, date of theft, agency name and ORI code.  (all of this information should be on the "Hit" on the vehicle)

B.   Describe the condition of the vehicle, listing any damaged sustained (i.e.- broken steering column, etc.) If an arrest is made, list if keys are located with the vehicle.

C.   If the recovery is made and the victim is back in possession of the vehicle, make sure that contact is made with NCIC/GCIC or Major Crimes (Auto Theft) so the vehicle is quickly removed from the system.  Make sure NCIC/GCIC understands that the victim/owner is now back in possession of the vehicle at this time.   Note the NCIC operator's code in the narrative, along with the date and time they were notified.

D.   Note in the narrative of the recovery report any additional NCIC/GCIC "Hits" such as, "Hold for Latent Prints", or "Use Caution".   If a victim is notified of the recovery, list this information in the narrative. (Name, Address, Telephone number, etc.)

E.   In cases such as Burglary in which more than one vehicle is stolen, a separate case number must be used for each vehicle.   Cross reference, the case numbers in each companion case

F.   If the victim knows the perpetrator, DO NOT place the vehicle on NCIC/GCIC.  Advise the victim to contact Major Crimes ( Auto Theft) to make an appointment with them. Generally, the victim will have to sign the warrant on the suspect prior to the vehicle being placed on NCIC/GCIC

G.   If the perpetrator is not known and the vehicle is placed on the system, note the NCIC/GCIC operator's code; example: CH05, etc. in the narrative

H.   Write the incident report, even if the victim has very limited information on the vehicle at that time, such as no tag or VIN.  List as much information as possible and advise the victim to call back with all the required information as soon as possible.  Advise the victim of the case number and to use the same case number when they call back

**4-14.23 FOOT PURSUIT**

A.   PURPOSE

    The purpose of this policy is to establish the guidelines for conducting foot pursuits of suspects.

B.   SCOPE

    This directive shall apply to all Department members.

C.   REASONABLE SUSPICION

    While "reasonable suspicion" is a less demanding standard than probable cause, there must be at least a minimal level of objective justification for the stop.  An individual's presence in a "high

**UNIFORM DIVISION**

crime area" standing alone, is not enough to support a reasonable, particularized suspicion of criminal activity.

The Courts have upheld that an individual, when approached, has a right to ignore the police and to go about his business, where an officer lacks a reasonable articulable suspicion.

Unprovoked flight is the exact opposite of "going about one's business." While flight is not necessarily indicative of ongoing criminal activity, the court recognized that officers can detain individuals to resolve ambiguities in their conduct, and thus accepts the risk that officers may stop innocent people. Prior to initiating a foot pursuit an officer should weigh the totality of the circumstances.

D.      FOOT PURSUIT PROCEDURES

1.  Immediately radio for assistance and direct responding units to various locations to contain the fleeing suspect within a given area. Keep radio advised of your location at all times.

2.  Attempt to gain visual advantage so that the suspect's direction of travel can be effectively monitored and/or locations where responding units should be directed can be identified. Once the perimeter is established, K-9 or other designated teams of officers can systematically search the area.

3.  If the terrain dictates and you can anticipate the area toward which the suspect is heading, you can drive there and wait for the suspect when he emerges. Though effective, this technique is not always possible.

4.  Pace and Charge: If the suspect has plenty of open ground to cover, and you have already searched him, the pace-and-charge technique may work. If you can't catch the suspect with a quick dash that lasts no more than about twenty seconds, ease off and pace yourself. As the suspect starts running, he will undoubtedly expend maximum energy to get away. While the suspect is running as fast as he can, you should pace yourself, exerting about 60-80 percent effort – just fast enough to keep the suspect in sight and prevent him from getting too far ahead**.** As the suspect tires and slows down, you can accelerate to 100 percent of your speed and overtake him. If the suspect is tired and begins to slow down or stops and surrenders, you should slow down so that the suspect can be approached in a "balanced and controlled manner."

5.  Parallel the suspect: Don't try to follow the suspect's exact route. If you do, the suspect can conceal himself and set up an ambush. Instead, try to parallel the suspect.
    Example:
    a. if he is running down the sidewalk, you should run down the street (traffic conditions permitting)
    b. keep barriers like parked cars and other objects between you and the suspect
    c. if the suspect(s) disappears behind a building, DON'T try to follow him; instead try to anticipate the suspect's route and head around a different corner or down a different side of the building
    d. if the suspect jumps a fence (where visibility is impaired), you should jump the fence at a different point, as far away from where the suspect went over as possible

6.   You will have to secure your patrol vehicle if you engage in a foot pursuit, so no one (including the fleeing suspect) can access your equipment or steal your patrol unit.

7.   Don't abandon unsecured subject(s) or run past a suspect's vehicle that has not been cleared where an armed occupant could ambush you.  Always clear the suspect's vehicle first.

8.   As you run, scan.  Look up and back from where you are to where the suspect is, as well as scanning from side to side, just as you do in a vehicle pursuit.

9.   Try to move from cover to cover when chasing a suspect, especially if you have lost sight of him.  This may increase the overall distance between the two of you, but it will increase the margin of safety.

E.   EVALUATION AND PRECAUTIONS TO USE DURING FOOT PURSUITS

1.   Keep your sidearm controlled at all times.  Don't run with it in your hand; the risk of unintentional discharge or disarming is too high.  Don't try to shoot while you are running; the risk of wild shots and unintentional hits is too high.  Warning shots are prohibited by this department.

2.   Don't split your forces.  If there are other officers at the location, and there are multiple runners, both of you should stay together even if the suspects split in different directions.  Pick your best target and stick with him.

3.   Watch for movement toward common weapon areas.  A suspect's hands are just as dangerous when he's in flight as any other time.

4.   Don't hypnotically follow the suspect's exact path of flight.  This behavioral form of tunnel vision makes you dangerously predictable.

5.   Be alert for discarded contraband.

6.   If a suspect disappears down an area which has no cover or escape routes and which restricts your movement to "forward" and "backward," you should stop and NOT follow the suspect into this kind of area.

F.   FINAL APPROACH

1.   Use extreme caution in your final approach.  Slow down before you actually reach the suspect and approach in a balanced and controlled manner, ready to apply any necessary defensive and/or arrest control techniques.

2.   Be psychologically prepared for a deadly force encounter.  Unpredictability is often a core ingredient of foot pursuits.

3.   When a foot pursuit suspect is seized, don't assume the danger is over.

G.   WHEN TO CONSIDER ABANDONING A FOOT PURSUIT

**UNIFORM DIVISION**

1. If you lose sight of a suspect during a foot pursuit or the suspect gains enough distance on you to be able to stop and hide.  If the suspect is going to set up a hasty ambush, he is likely to do it at this time.  Consider stopping immediately upon losing sight of the suspect, call for backup, establish a perimeter, and call for a K-9 unit and aerial support.  (i.e., wooded area, dense areas or large apartment complexes. etc)

2. If you are unable to make verbal contact with radio in the beginning of the foot pursuit, to give your location, direction of travel, description of suspect (s) etc.

3. If at any anytime you lose contact with radio during the foot pursuit.

4. If at anytime either in the beginning or during the foot pursuit you become unfamiliar with your location.

**4-14.24         CITIZEN  RIDE-A-LONG PROGRAM**

At times the Department receives requests from the public to ride with an on-duty Police Officer during their tour-of-duty.  Some of these requests are related to college programs while others are directly related to crime awareness and community concerns.  In addition, officers may receive request by citizens to have someone ride with them because of an interest the person has shown in law enforcement or through a contact the officer has made in the community.  The DeKalb Police Department will allow civilians the opportunity to ride with our police officers on a limited basis.  The Department's image and professionalism can be observed first-hand by allowing the public to participate in our efforts.  This program will also assist with our on-going recruiting programs. Therefore, it will be the policy of this Department to grant these requests as long as they do not interfere with our service.

Any citizen desiring to participate in the Ride-a-Long Program must successfully complete an investigation of their moral character, reputation and honesty by submitting to a review of their criminal history information.  The citizen should be directed to the Central Records Section where they must present a valid state-issued photo-identification card.

Central records personnel will conduct a query through the Criminal Justice Information System and complete the appropriate form.  Participants in the program must meet the following minimum acceptable standards:

CITIZEN REQUIREMENTS (RIDER)

1. The citizen must sign a "Rider Waiver" form that absolves the Department from liability in the event of an injury, accident, or death.
2. The citizen must be at least 18 years of age.
3. The citizen must be recommended to ride by Department Personnel.
4. The citizen must be in good health.  No physical limitations that would prevent quick and unassisted entering and exiting of a police vehicle.
5. The citizen will dress in appropriate attire. (Casual business, i.e.; casual slacks, pants, shirt with collar)
6. The citizen must not have a conviction for any felony, any crime of domestic violence, or any crime of serious moral turpitude, unless otherwise provided by state law.

# EXHIBIT 5

**DeKalb County Police Department**
1960 West Exchange Place
Tucker, Georgia 30084
770-724-7666

SEP 0 2 2010

INTERNAL
AFFAIRS

# DEKALB COUNTY POLICE INTERNAL REVIEW BOARD

| | | |
|---|---|---|
| Deputy Chief L.A. Gassner<br>Chair<br>************************<br>Major J. W. Conroy<br>Vice Chair | **Board Members Present**<br>Major J.W. Conroy<br>Major S. J. Stathis<br>Major S. Fore<br>Major L.G. Higdon<br>Major M.P. Yarbrough | **Board Members Absent**<br>Major K.A. Anderson<br>Major T.D. Williams |

**August 18, 2010**

**To:**              Chief W. O'Brien

**From:**          Deputy Chief L.A. Gassner

**Subject:**       Internal Review Board Findings report

**Incident:**      In Custody Death

**IA Case #:**    10-0502

**Incident Date:**    May 9, 2010

**Incident Location(s):**    Budegtel Inn and Suites
3585 Chamblee Tucker Rd
Room #130

**Employee(s):**    Assistant Chief F.J. Kliesrath # 1242
Field Operations Bureau

Sergeant B.A. Gailes # 1665
Field Operations Bureau / District 1 / North Precinct

Officer C.M. Delon # 2673
Field Operations Bureau / District 1 / North Precinct

Officer K. Cintron # 2641
Field Operations Bureau / District 1 / North Precinct

Officer C. Poythress # 2370
Field Operations Bureau / District 1 / North Precinct

Officer K. Jones # 2618
Field Operations Bureau / District 1 / North Precinct

Officer M.S. Bailey # 3010
Field Operations Bureau / District 1 / North Precinct

Officer A. Gibson # 2709
Field Operations Bureau / District 1 / North Precinct

Officer T. Lindsey # 2452
Field Operations Bureau / District 1 / North Precinct

**IA Case Detective:**       Detective J.D. Spencer #2548

All investigatory reports and statements are maintained in Internal Affairs.

---

## Internal Review Board Findings

*On July 22, 2010 the DeKalb County Internal Review Board convened to review the above mentioned DeKalb County Police Case. After reviewing the Internal Affairs report, the incident report, the statement of witnesses, the presentation of facts and evidence by Internal Affairs, and after thorough discussion, the Internal Review Board concluded by a vote the following:*

**Was the Officer(s) acting in the capacity of a law enforcement officer?**

**Vote: 5-0, yes.**

Yes. By a vote of 5-0, the Board did find all nine (9) officers on scene were acting in the capacity of a law enforcement officer.

**Was the use of force justified?**

**Vote: 5-0, justified.**

A 5-0 vote, concluded that Officer Cintron and Officer Delon as well as the other seven (7) officers were justified in their use of force.

**Was any policy, rule or regulation violated?**

**Vote: 5-0, no.**

The Board did not find violations of policy.

**Were there any safety or training concerns?**

**Vote: 5-0, no.**

The Board did not find safety or training concerns.

**Recommendations:**

*It is the Board's finding that the use of deadly force in this incident was justified and no further action be taken with regards to the use of force.*

**Follow-up:**

None required

The results of the Internal Review Board are consistent with the stated purposes of the Board. The Chairman of the Board attests by the signing of this document that all procedures of the Board were followed and the results are the accurate and true findings of the Board.

Deputy Chief L.A. Gassner, Chairman                Major J.W. Conroy, Vice Chairman

Date:  8/16/10                                     Date:  8/17/10

**Reviewed and approved by:**

Chief W. O'Brien

Date:  8-19-10

Lag/lag

3

# DeKalb County Police Department
# Internal Affairs Unit



RECEIVED

SEP 0 2 2010

INTERNAL
AFFAIRS

## Confidential Investigative Report

**IA Case #:**  10-0502

**Employee(s):**
Assistant Chief F.J. Kliesrath # 1242
Sergeant B.A. Gailes # 1665
Officer C.M. Delon # 2673
Officer K.Cintron # 2641
Officer C. Poythress # 2370
Officer K. Jones # 2618
Officer M.S. Bailey # 3010
Officer A. Gibson # 2709
Officer T. Lindsey # 2452

## Return to Internal Affairs After Final Review

Captain T. S. Hunt
Commander
Internal Affairs Unit



# DeKalb County Police Department
## Internal Affairs Unit
1960 West Exchange Place
Tucker, Georgia 30084
(Main 770.724.7910 - Fax 770.724.7916)

## *CONFIDENTIAL*
## INVESTIGATIVE REPORT #10-0502
(PLEASE INITIAL AND FORWARD THROUGH THE CHAIN OF COMMAND)

[X] W. O'Brien, Chief of Police     (Review Date/Initial 9/1/10 WoBar)

[X] T. S. Hunt, Captain     (Review Date/Initial 8-27-10 TS )

[ ] Director of Public Safety     (Review Date/Initial_____)

     [ ] ____ Communications

     [ ] ____ Code Enforcement

     [ ] ____ Animal Services

[ ] Supervisor completing DAR if required     (Print Name/Badge#_____)

[ ] Assistant Chief Field Operations Bureau     (Review Date/Initial_____)

     [ ] ____ Uniform Division District One

     [ ] ____ Uniform Division District Two

     [ ] ____ Special Operations

[ ] Supervisor completing DAR if required     (Print Name/Badge#_____)

[ ] Assistant Chief Investigations Bureau     (Review Date/Initial_____)

     [ ] ____ Criminal Investigation Division

     [ ] ____ Support Services Division

[ ] Supervisor completing DAR if required     (Print Name/Badge#_____)

IA Sergeant A.B. Catlin     (Review Date/Initial 07/12/10 )
IA Sergeant D.M. Bradbury     (Review Date/Initial_____)

Upon final review, this investigative report must be returned to the Internal Affairs Unit.

# DEKALB COUNTY POLICE DEPARTMENT
# INTERNAL AFFAIRS UNIT



## CONFIDENTIAL INVESTIGATIVE REPORT

**I. A. Case #:**        10-0502

**Employee(s):**        Assistant Chief F.J. Kliesrath # 1242
Field Operations Bureau

Sergeant B.A. Gailes # 1665
Field Operations Bureau / District 1 / North Precinct

Officer C.M. Delon # 2673
Field Operations Bureau / District 1 / North Precinct

Officer K. Cintron # 2641
Field Operations Bureau / District 1 / North Precinct

Officer C. Poythress # 2370
Field Operations Bureau / District 1 / North Precinct

Officer K. Jones # 2618
Field Operations Bureau / District 1 / North Precinct

Officer M.S. Bailey # 3010
Field Operations Bureau / District 1 / North Precinct

Officer A. Gibson # 2709
Field Operations Bureau / District 1 / North Precinct

Officer T. Lindsey # 2452
Field Operations Bureau / District 1 / North Precinct

**Findings:**        "To be determined by the Internal Review Board"
**Report prepared by:** Detective J.D. Spencer # 2548
**Date Completed:**    May 19, 2010

**Complainant(s):**   DeKalb County Police Department

---

**Departmental Rules and Regulations investigated:**

Use of Force 2-2.66

---

**Witnesses:**

Captain A.S. Dobson
DeKalb County Fire Department / 19-B

S.T. Ahlenius
DeKalb County Fire Department / 19-B

M.L. Price
DeKalb County Fire Department / 19-B

A.D. Connelly
DeKalb County Fire Department / 19-B

J. Carter
DeKalb County Fire Department / 19-B

K.J. Bunn
DeKalb County Fire Department / 19-B

Milton Ashiru
Ashiru Security Services
678-662-3269

Walter Hermann
3302 Santa Fe Parkway
Sandy Springs, Georgia, 30350
404-225-5343

---

**Exhibits:**

A.  DeKalb County Police Incident Report #10-054645
B.  Copy of Use of Force report
C.  Employee Rights form and statement of Sergeant. B.A. Gailes
D.  Employee Rights form and statement of Officer C.M. Delon
E.  Employee Rights form and statement of Officer K. Cintron
F.  Employee Rights form and statement of Officer C. Poythress
G.  Employee Rights form and statement of Officer K. Jones
H.  Employee Rights form and statement of Officer M.S. Bailey
I.   Employee Rights form and statement of Officer A. Gibson

**I. A. Case #:** 10-0502

J.   Employee Rights form and statement of Officer T. Linsey
K.   Employee Rights form and statement of Asst. Chief Kliesrath
L.   Employee Rights form and statement of Captain A.S. Dobson
M.   Employee Rights form and statement of S.T. Aglenius
N.   Employee Rights form and statement of M.L. Price
O.   Employee Rights form and statement of A.D. Connelly
P.   Employee Rights form and statement of J.Carter
Q.   Employee Rights form and statement of K.J. Bunn
R.   Employee Rights form and statement of R. Gorton
S.   Statement of Milton Ashiru
T.   Gwinnett County Incident Report #06-016150
U.   Medical Examiner Inquiry
V.   DeKalb Fire/Rescue Patient Care Report DF1000031431
W.   CD containing surveillance photographs and audio
     interviews(RIF)
     a.   Audio statement of Officer Delon
     b.   Audio statement of Officer Cintron
     c.   Audio statement of Officer Jones
     d.   Audio statement of Officer Poythress
     e.   Audio statement of Officer Bailey
     f.   Audio statement of Officer Gibson
     g.   Audio statement of Officer Linsey
     h.   Audio statement of Sergeant Gailes
     i.   Audio statement of Fire/Rescue Bunn
     j.   Audio statement of Fire/Rescue Gorton
     k.   Phone interview of Walter Hermann

**Narrative:**

On May 9, 2010, at 1830 hours, the Internal Affairs Unit was notified by DeKalb Police Communications that DeKalb Police and Fire/Rescue Personnel were out on a scene, at 3585 Chamblee Tucker Road (Budgetel Inn and Suites) where a subject had died while in their custody.

The Fire/Rescue personnel, who consisted of **Capt. A.S. Dobson, J. Carter, A.D. Connel ly, S.T. Ahlenius, M. Price, and K.J. Bunn,** responded to the initial call of a medical emergency. They were all interviewed by Internal Affairs and provided a written statement. The following is a synopsis of their statements.

Fire/Rescue unit #19 was dispatched to 3585 Chamblee Tucker Road room #130 in reference to a person having convulsions and possible seizures. Upon responding to the location, the patient was observed on the bed farthest from the door with feces covering the sheets, blanket, and his tee shirt. The patient's vitals were checked, however the patient did not respond to questions.  Additional Fire/Rescue units were requested to assist with the patient due to his size and weight of approximately 400 lbs. Fire/Rescue

**I. A. Case #:** 10-0502

Page 3 of 10

used a smelling solution in an attempt to wake the patient. The patient looked at them and then went back to sleep. Fire/Rescue attempted to put the patient on a backboard, at which time the patient became combative, broke free of the restraints and went into a kneeling positing between two beds. Fire/Rescue contacted communications and requested DeKalb County Police to assist with restraining the patient.

DeKalb County Police officers arrived and attempted to convince the patient to come out of the room but the patient was unresponsive. At the instructions of Doctor Spaulding with DeKalb Medical Center, the patient was given a 5mg shot of valium by Fire/Rescue personnel J. Carter.

DeKalb County Police Officers were then able to convince the patient to leave the room, but when the patient was escorted to the stretcher, he became combative and began to fight with the officers. The officers attempted to restrain the patient but he continued to fight and one of the officers used a taser on the patient.

The patient briefly began to comply with the officers but then continued to fight when the officers attempted to handcuff him. The officers were unable to restrain the patient and the patient had to be tased again by one of the officers. J. Carter of Fire and Rescue stated he gave the patient another 5mg shot of valium but the patient was still able to fight the officers off and get to his feet.

The officers were finally able to restrain the patient and get him handcuffed. When the patient was placed on the stretcher, J. Carter of Rescue 19 noticed that the patient's breathing was shallow. The patient (Audrecus Dione Davis) was then immediately transported to DeKalb Medical Center where he was pronounced dead by Doctor Callahan at 1645 hours.

The statements of the Fire/Rescue personnel were consistent with one another.

On May 9, 2010, this detective received a typed statement from Milton Ashiru of Ashiru Security Services.  The following is a synopsis of his statement:

- Security Officer Ashiru was working at the Budget Inn and was notified that the guest in room 130 failed to check out at the scheduled time of 1200 hours.

- At 1455 hours Mr. Ashiru went to room 130 and knocked on the door several times but did not receive a response.

- At 1305 hours Mr. Ashiru made entry into the room with a key obtained from the front desk and observed a heavy set African American male on the bed.

- Mr. Ashiru stated the subject was covered in his own feces and foaming at the mouth and was unresponsive to him.

- Mr. Ashiru stated he went to the management office and the manager called 911.

**I. A. Case #:** 10-0502

- Mr. Ashiru stated EMS arrived at approximately 1524 hours and he escorted them to room 130 and let them in with the key.

- Mr. Ashiru stated after EMS checked the subject they attempted to put him on a stretcher and the subject became combative.

- Mr. Ashiru stated EMS backed out of the room and called for Dekalb Police for assistance.

- Mr. Ashiru stated the police attempted to escort the subject out of the room with a sheet covering him and the subject became violently combative to the officer and EMS.

- Mr. Ashiru stated the subject was tased by a police officer but continued to be combative and was given an injection in an attempt to sedate him.

- Mr. Ashiru stated the subject was tased again and the officers were able to get him handcuffed behind his back.

- Mr. Ashiru stated the subject was taken to an ambulance and then transported away and the incident was over just before 1630 hours.

On May 10, 2010 and May 11, 2010, this detective, with the assistance of Sergeant Catlin, Detective Norman, and Detective Toney obtained written statements from the DeKalb County Police Officers who responded to the initial call. The following DeKalb County Police Officers responded to the location, **Assistant Chief F.J. Kliesrath, Sergeant B.A. Gailes, Officer C.M. Delon, Officer K. Cintron, Officer C. Poythress, Officer K. Jones, Officer M.S. Bailey, Officer A. Gibson, and Officer T. Lindsey.** The following is a synopsis of their statements.

- Dekalb County Police Officers were dispatched to 3585 Chamblee Tucker Road (Budgetel Inn & Suite) in reference to a person down. Radio advised that officers would need to expedite their response per Fire/Rescue.

- Sergeant Gailes, Officer Delon, and Officer Poythress were the first officers to respond and met with Fire/Rescue and were briefed on the situation.

- After the briefing, the officers entered the room and observed what was believed to be crack cocaine on a table.

- The officers observed a large male kneeling on the floor between two beds with his arms resting on the night stand.

- Sergeant Gailes noted that the subject was foaming at the mouth and had feces on his legs.

**I. A. Case #:** 10-0502

- Sergeant Gailes contacted the radio operator and requested additional units to assist due to the size of the subject.

- Sergeant Gailes attempted to speak with the subject who was unresponsive to Sergeant Gailes' verbal commands.

- Fire/Rescue personnel administered an injection in the subject's buttocks.

- Sergeant Gailes continued attempting to verbally convince the subject to allow Fire/Rescue to transport him to the hospital, but the subject remained unresponsive.

- The subject suddenly got up and walked to the bathroom and began to urinate and vomit on himself while standing in the doorway of the bathroom.

- Sergeant Gailes covered the subject with a sheet and began to escort him out of the room and to the waiting stretcher with the assistance of Officer Gibson.

- Upon attempting to get the subject on the stretcher, he became agitated and jumped off of the stretcher and began flailing his arms in the direction of the officers.

- Officer Cintron was instructed by Assistant Chief Kliesrath to drive stun the subject with his (ECD) taser because he was actively resisting.

- Officer Cintron drive stunned the subject on the shoulder, and the subject knocked the taser off and sat on the ground and said, "okay, okay."

- Sergeant Gailes continued to give the subject verbal commands to stay on the ground for his safety.

- The subject ignored Sergeants Gailes' commands and abruptly stood up and moved towards Sergeant Gailes in an aggressive manner.

- Sergeant Gailes instructed Officer Delon to deploy his taser.

- When the subject was tased, he fell to the ground and the officers again attempted to restrain the subject with handcuffs.

- Sergeant Gailes requested leg restraints but the subject's legs were too large for them.

- The officers continued to struggle with the subject to keep him on the ground for his safety.

**I. A. Case #:** 10-0502

- Sergeant Gailes was advised by Officer Delon that he had completed four to five cycles with the taser.

- Sergeant Gailes advised Officer Delon to discontinue the use of the taser due to its ineffectiveness.

- Sergeant Gailes was later advised that the subject had removed one of the taser prongs from his body.

- The subject got to his feet and the officers were able to place him against a fence and place restraints on him.

- The subject continued to struggle while in the restraints and Sergeant Gailes was able to take the subject to the ground by putting his foot in the bend of the subject's knee and pulling him back.

- The subject continued to struggle while on the ground and Sergeant Gailes instructed Fire/Rescue to bring a backboard to transport the subject to a stretcher.

- Sergeant Gailes maintained control of the subject's head while he was rolled onto the backboard.

- Once the subject was on the backboard, Fire/Rescue noticed that he was unresponsive and began emergency medical treatment.

- The statements of the DeKalb County Police officers were consistent with one another.

Sergeant Gailes was asked if the officers had any criminal charges against the subject and he stated Criminal Trespass, Obstruction and Violation of Georgia's Controlled Substances Act (VGCSA). Sergeant Gailes stated that the subject advance towards him abruptly, but did not strike him. Sergeant Gailes also stated that he did feel the subject was a threat to anyone stated due to the subjects size and mental state, and that he would have been able to over power the majority of people who came in contact with him, causing severe bodily harm or possibly death.

Major Felony Detective S.M. Bailey obtained a statement from Walter Hermann who witnessed the incident. The following is a synopsis of his statement.

- Mr. Hermann stated at approximately 1600 hours he was in his room at the Budgetel Inn & Suite when he heard yelling outside.

- Mr. Hermann stated he could hear the officers giving commands that they were going to tase someone.

**I. A. Case #:** 10-0502

- Mr. Hermann stated that he could hear someone screaming and assumed that someone was being combative.

- Mr. Hermann stated from where he was standing it was difficult for him to see who was being combative but that he saw several police officer and fire and rescue personnel.

- Mr. Hermann stated he saw a guy sitting "Indian Style" on the ground and then the officers placed him on his chest.

- Mr. Hermann stated he believes someone with fire and rescue gave the subject an injection because he saw him walking with a syringe.

- Mr. Hermann stated he then left the location but observed that the subject was still alive.

On May 12, 2010, this detective obtained a copy of Major Felony's case file regarding the death of Audrecas Davis. In the case file it was listed that the room that Mr. Davis was occupying was rented by Veronice Morrison of ▮▮▮▮▮▮▮ Drive Decatur, Georgia 30032. Major Felony Detectives went to Ms. Morrison's address but did not make contact with her. There was no phone number listed for Ms. Morrison in the case file.

Also in the case file was in incident report from Gwinnett County involving Audrecas Davis (case # 06046075), which occurred on February 15, 2006, and is similar to this current incident. In the report it stated that Gwinnett County Police were dispatched to assist the fire department with an involuntary transport. The officers were advised that the subject, Audrecas Davis, had possibly been using cocaine and could also be under the influence of other drugs. When the officers attempted to walk the subject to the police car he became violent and started yelling. The subject pulled away from the officers and took an aggressive stance. The officers attempted to gain control of the subject, but due to his large size they were unable to get his hands behind his back. The subject was drive stunned with a taser in his lower back, but knocked the officer off of him, got up and began to run. The subject stopped and squared off with one of the officers who had loaded another cartridge into his taser. The subject was tased again and when he fell to the ground the officers were able to gain control of and handcuff the subject. The report also noted that the subject had defecated on himself and was completely naked prior to the arrival of the police officers.

On May 14, 2010, this detective searched RMS and located a phone number for Brenda Dawsey ▮▮▮▮▮▮▮▮ who also resides at ▮▮▮▮▮▮ Drive, Decatur, Georgia. I spoke with Ms. Dawsey who stated that her daughter is Veronica Morrison but that she does not live at that location anymore. Ms. Dawsey provided me with Veronica Morrison's phone number (▮▮▮▮▮▮▮). I called Ms. Morrison and attempted to set up a time where I could obtain a statement from her. Ms. Morrison stated that she would call me back and advise me when she would be available.

**I. A. Case #:** 10-0502

On May 18, 2010, this detective called Veronica Morrison to set up an appointment to obtain a statement from her. Ms. Morrison was uncooperative and stated that she would not be available until Friday. I explained the importance of the case to Ms. Morrison but she disconnected the line. I then attempted to call Ms. Dawsey, the mother of Veronica Morrison, in an attempt to have her convince her daughter to meeting with me. When I called her phone number I got a recording stating that the line had been disconnected. Detective McLendon and I then went to ███████ Drive and made contact with Brenda Dawsey. I explained to Ms. Dawsey that I needed to obtain a statement from Ms. Morrison and she stated that she would get in contact with her and bring her to Headquarters to provide a statement.

On May 19, 2010, this detective attempted to call Veronica Morrison to set up an appointment for an interview. There was a recording on her phone stating her voicemail was full and I was unable to leave a message. I then called Brenda Dawsey to find out if she had spoke to her daughter and would be able to bring her to Headquarters. Ms. Dawsey stated she spoke with Veronica Morrison but she refused to meet with me, stating that she believed the police thought she was involved with what happened to Audrecas Davis. I was unable to obtain a statement from Veronica Morrison.

On July 7, 2010, I attended a meeting at the Medical Examiner's office to discuss the cause of Mr. Davis' death. Dr. Gerald T. Gowitt, Chief Medical Examiner, stated that Mr. Davis only had superficial injuries resulting from the altercation with the police officers. Dr. Gowitt stated Mr. Davis had an enlarged heart, blockages in his arteries, scaring on his heart and sickle cell trait. Dr. Gowitt also stated that Mr. Davis had a history of high blood pressure and drug abuse. Dr. Gowitt stated Mr. Davis' blood tested negative for illegal narcotics. Dr. Gowitt's conclusion was that the taser did not directly cause the death of Mr. Davis.

**Note:** Listed below are the Taser cycle times and durations for Officers Delon and Cintron for May 9, 2010.

### Officer Cintron:

| Time | Time between cycles | Cycle number | | Duration |
|------|---------------------|--------------|---|----------|
| 16:09:11 hours | --------------- | Drive Stun | - | 5 seconds |

### Officer Delon:

| Time | Time between cycles | Cycle number | | Duration |
|------|---------------------|--------------|---|----------|
| 16:12:05 | --------------- | Initial deployment | - | 5 seconds |
| 16:12:17 | +12 seconds | 2nd cycle | - | 5 seconds |
| 16:12:26 | +09 seconds | 3rd cycle | - | 5 seconds |
| 16:12:40 | +14 seconds | 4th cycle | - | 5 seconds |
| 16:12:47 | +07 seconds | 5th cycle | - | 5 seconds |

**I. A. Case #:** 10-0502

**Note:** During the altercation with Mr. Davis, one of the taser prongs was dislodged, and as a result, it is unknown exactly how many of the taser cycles were effective.

**Note:** Listed below is a timeline of the events which occurred on May 9, 2010.

    A.  15:15:15 hours: Fire/Rescue is dispatched to the location.
    B.  15:20:22 hours: Fire/Rescue arrived on scene.
    C.  15:41:59 hours: Dekalb County Police dispatched to incident location.
    D.  15:50:13 hours: First officer arrives on scene/first contact with subject.
    E.  16:09:11 hours: Drive stun attempted on subject.
    F.  16:12:05 hours: Taser deployed on subject.
    G.  16:30:15 hours: Subject transported to DeKalb Medical Center.
    H.  16:45:00 hours: Subject pronounced dead at DeKalb Medical Center.

**Conclusion:**

**To be determined by the Internal Review Board.**

**I. A. Case #:** 10-0502

# EXHIBIT 6

**RECEIVED**
BENJAMIN
DEC 0 3 2014
**INTERNAL AFFAIRS**

# DeKalb County Police

| REPORT TYPE: | ☒ USE OF FORCE | ☐ ACCIDENTAL DISCHARGE | ☐ ATTACHMENTS |
|---|---|---|---|

*USE AS A SUPPLEMENTAL REPORT ONLY - NOT ACCEPTED AS A STAND ALONE REPORT*

| Case Number: 14-112723 | Division: SOD | Precinct: Burgess Building | Watch: Evening | Date of Incident: 11/08/2014 | Time of Incident: 10:14:00 |
|---|---|---|---|---|---|

Location of Incident: 5848 Memorial Dr Stone Mountain Georgia 30084

| Location Type: Street | Weather: Clear | Lighting: Day Light |
|---|---|---|

| Officer #1 First Name: | MI: | Last Name: | Badge: | Race: | Sex: | Age: | Total Officers | Other Officers Involved |
|---|---|---|---|---|---|---|---|---|
| Casey | T | Benton | 2640 | WHITE | MALE | 33 | 1 | |

| Supervisor Notified: YES | Name of Supervisor Notified: Sgt LN Westmoreland #2057 | Name of Supervisor on Scene: Sgt LN Westmoreland #2057 |
|---|---|---|

## Subject's Information    Subject's Number:    1

| Subject Name: Kinlocke, Kent | D. O. B. ▮1982 | Race: BLACK | Sex: MALE | Subject Arrested: YES | Arresting Officer: CT Benton #2640 |
|---|---|---|---|---|---|

| Did Subject Allege Injuries Occurred Because of Officer's Response: YES | Did Injuries Occur to Subject Because of Officer's Response:    YES |
|---|---|

| Subject Injury: | ☐ No Injury | ☐ Claimed Injury (If checked, explain) | ☒ Visible Injury (If checked, explain) | ☐ Fatality (If checked, explain) |
|---|---|---|---|---|

Description/Explanation of Subject Injury: The suspect was tased by Officer Benton with one prong striking the suspect in the left bicep and the second prong hitting the suspect near his left elbow but did not penetrate to the skin

| Photographs Taken of Subject: YES | Medical Treatment: YES | First Aid Administered: YES | Decontamination Provided: NO |
|---|---|---|---|

## Subject's Actions    (Check all actions that apply)

| ☐ Safety Risk to Self / Others | ☐ Aggressively Resisted | ☐ Possessed Weapon |
|---|---|---|
| ☒ Ignored Verbal Direction / Passively Resisted | ☐ Attempted Harm to Self, Others, or Property | ☐ Life Threatening Attack |
| ☐ Displayed Physical Danger Cues | ☐ Caused Harm to Self, Others, or Property | ☐ Vicious/ Injured Animal |

### Officer #1 Response    (Check your actions only)

| ☒ Issued Verbal Command | ☐ Applied Strike(s) With Hand | ☒ Deployed Taser | ☐ Deployed Less-Lethal Round | ☐ K-9 Bite |
|---|---|---|---|---|
| ☒ Applied Control Hold | ☐ Applied Strike(s) With ASP | ☒ Displayed Taser | ☐ Fired Firearm | ☒ Handcuff |
| ☐ Applied Pressure Points / Joint Manipulation | ☐ Performed Take Down / Balance Displacement | ☐ Deployed Chemical Agent | ☐ Other: | |

| Witnesses Listed on Incident Report ☒Yes ☐No | **APPLICATION AREAS** |
|---|---|
| Witnesses Statements Obtained ☒Yes ☐No | Place "X's" where probes hit Subject AND "O's" for Drive Stun & Other Strikes |

**Electronic Control Device**

--Complete this Section Only if TASER was Deployed--

TASER Serial Number:  XOO-504758

Number of Cartridges Used:    1

CARTRIDGE SERIAL NUMBER(s):  C4101M2TX

Subject: ☒ Human  ☐ Animal

Drive Stun Used: ☐ Yes ☒ No

TASER Use: ☒ Success ☐ Failure

Number of Cycles Applied:    1

Approximate Target Distance at Time of Deployment:  2-3 feet

Did Darts Penetrate Subject's Skin: ☒ Yes ☐ No

Distance Between the Two Probes:    8    Inches

Probes Removed on Scene: ☒Yes ☐ No

Did TASER Application Cause Injury: ☒ Yes ☐ No

Medical Exam: ☒ Yes ☐ No

Front     Back

**INVESTIGATING SUPERVISOR SECTION**

Officer Injury:  ☑ No Injury   ○ Claimed Injury   ○ Visible Injury   ○ Medical Treatment   ○ Refused Medical Treatment

Description/Explanation of Injury:

| Photographs Taken of Officer: | Photographed By: | Supervisor Responded to Scene: | Supervisor Arrival Time: |
|---|---|---|---|
| YES | Sgt LN Westmoreland #2057 | YES | 10:20:00 |

**Investigating Supervisor**   ☑ Meets Policy   ☐ Does Not Meet Policy   ☐ Further Review by IA

Comments: Officer Benton observed Mr. Kent Kinlocke walking in the median at 5848 Memorial Dr. As Officer Benton turned around, Mr Kinlocke crossed Memorial Dr not at a cross walk. Officer Benton then attempted to make contact with the suspect by calling out to him. Mr. Kinlocke ignored all of Officer Benton's commands and when Officer Benton reached out and grabbed Mr Kinlocke's right arm, Mr Kinlocke pulled away from him. Officer Benton continued to give Mr. Kinlocke verbal commands and Mr. Kinlocke continued to refuse to comply. As Mr. Kinlocke attempted to walk away from Officer Benton, Officer Benton displayed his taser and ordered him to stop. Officer Benton again tried to grabbed Mr. Kinlocke by the arm and again Mr. Kinlocke pulled away. As Mr. Kinlocke walked out onto Memorial Dr, Officer Benton deployed his taser, striking Mr. Kinlocke on his left arm (bicep area and elbow), delivering one cycle (5 seconds). The second prong hitting the suspect near his left elbow did not penetrate to the skin. Mr. Kinlocke was then placed into handcuffs without further incident.

| Sgt LN Westmoreland 2057 | *Digitally signed by Sgt LN Westmoreland 2057* | 11/08/2014 | ☐ See Memo |
|---|---|---|---|
| Signature | | Date | |

**Next Level Supervisor:**   ☑ Meets Policy   ☐ Does Not Meet Policy   ☐ Further Review by IA

Comments:

| Lt. G.T. Vanderpool #1736 | *Digitally signed by Lt G.T. Vanderpool #736* | 11/12/2014 | ☐ See Memo |
|---|---|---|---|
| Signature | | Date | |

**Next Level Supervisor:**   ☑ Meets Policy   ☐ Does Not Meet Policy   ☐ Further Review by IA

Comments:

| Maj. S.J. Gassner | *Digitally signed by Maj S.J Gassner* | 11/21/2014 | ☐ See Memo |
|---|---|---|---|
| Signature | | Date | |

**Next Level Supervisor:**   ☐ Meets Policy   ☐ Does Not Meet Policy   ☐ Further Review by IA

Comments:

| | | | ☐ See Memo |
|---|---|---|---|
| Signature | | Date | |

**Assistant Chief:**   ☑ Meets Policy   ☐ Does Not Meet Policy   ☐ Further Review by IA

Comments:

| Asst. Chief B.C. Harris 1619 | *Digitally signed by Asst. Chief B.C. Harris 1619* | 11/24/2014 | ☐ See Memo |
|---|---|---|---|
| Signature | | Date | |

**Chief:**   ☐ Meets Policy   ☐ Does Not Meet Policy   ☐ Further Review by IA

Comments:

| | | | ☐ See Memo |
|---|---|---|---|
| Signature | | Date | |

**Internal Affairs Review:**   ☑ Meets Policy   ☐ Does Not Meet Policy

Comments: D.J. BENJAMIN #1708   12/4/2014