Case 1:18-cv-01518-CAP   Document 50   Filed 07/31/19   Page 1 of 64

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton                                          June 22, 2017

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF GEORGIA
 2                  ATLANTA DIVISION

 3
    MARY JO BRADLEY, as
 4  Administratrix of the Estate of
    Troy Robinson; R.B., R.B, T.B.,
 5  J.B., and G.B., through their
    mother and next friend, RAKISHA
 6  BANDY; A.D., A.D., and A.D.,
    through their mother and next
 7  friend, D'ROSA DAVIS; and T.D.,
    through their mother and next
 8  friend, TAKITA DODSON,
 9       Plaintiffs,        CIVIL ACTION FILE
10    vs.                   NO. 1:16-cv-03757-WSD
11  OFFICER CASEY BENTON,
    OFFICER C.M. FRANKLIN,
12  OFFICER L.O. NIEMANN and
    DEKALB COUNTY, GEORGIA,
13
            Defendants.
14                     - - -
15
16
17            VIDEOTAPE DEPOSITION OF
              OFFICER CASEY BENTON
18
19
                    June 22, 2017
20                   9:55 a.m.
21
22
23        1300 Commerce Drive, Fifth Floor
            Decatur, Georgia  30097
24
25
           Michelle J. Ruiz, CCR, B-1397
```

Page 2

```
 1  APPEARANCES OF COUNSEL:
 2  For the Plaintiffs:
 3    LEIGHTON MOORE, Esq.
      The Moore Law Firm, PC
 4    100 Peachtree Street, Suite 2600
      Atlanta, Georgia  30303
 5    phone:  678-237-0330
      email:  Leighton@moorefirmpc.com
 6
      HAROLD W. SPENCE, Esq.
 7    Davis Bozeman Law, PC
      4153C Flat Shoals Parkway, Suite 332
 8    Decatur, Georgia  30034
      phone:  404-244-2004
 9    email:  Hspence@davisbozemanlaw.com
10  For the Defendants:
11    AARON J. ROSS, Esq.
      DeKalb County Law Department
12    1300 Commerce Drive, 5th Floor
      Decatur, Georgia  30030
13    phone:  404-371-3011
      email:  Ajross@dekalbcountyga.gov
14
    Also present:  Henry Howard, video specialist
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              C O N T E N T S
 2  WITNESS      EXAMINATION   FURTHER EXAMINATION
 3  OFFICER CASEY BENTON
 4  BY MR. MOORE       PAGE 4
 5
 6              E X H I B I T S
 7  EXHIBIT       IDENTIFICATION        PAGE
 8  EXHIBIT 13    NOTICE OF DEPOSITION      5
    EXHIBIT 14    TRAINING TRANSCRIPT      12
 9  EXHIBIT 15    POLICY/PROCEDURES        72
    EXHIBIT 16    INCIDENT REPORT          95
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1          P R O C E E D I N G S
 2      THE VIDEOGRAPHER:  Good morning.  My name
 3  is Henry Howard.  I'm present on behalf
 4  Elizabeth Gallo Court Reporting.  Today's date
 5  is June 22nd, 2017.  The time on the video
 6  monitor is 9:55 a.m.
 7      The caption of this case is Mary Jo
 8  Bradbury, as administratrix of the Estate of
 9  Troy Robinson, R.B., R.B., T.B., J.B. and G.B.
10  through their mother and next friend, Rakisha
11  Bandy; A.D., A.D. and A.D. through their mother
12  and next friend, D'Rosa Davis; and T.D. through
13  their mother and next friend, Takita Dodson
14  versus Officer Casey Benson, Officer C.M.
15  Franklin, Officer L.O. Niemann, and DeKalb
16  County, Georgia.  The name of the witness is
17  Officer Casey Benson.
18      Would counsel present please state their
19  name and who they represent on the record after
20  which would the court reporter please swear in
21  the witness.
22      MR. MOORE:  This is Leighton Moore and
23  Harold Spence for the plaintiff.
24      MR. ROSS:  Aaron Ross for defendants.
25          OFFICER CASEY BENTON,
```

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton                                                    June 22, 2017

Page 5

1   being first duly sworn, was examined and
2   testified as follows:
3        MR. MOORE:  I think before we get started,
4   Mr. Ross wanted to state an objection on the
5   record.
6        MR. ROSS:  Yes.  Defendants object to the
7   videotaping of this deposition because it was
8   noticed only by stenographic means.  I would
9   ask that plaintiffs' counsel agree to make as
10  the first exhibit to this deposition the notice
11  of deposition, which was not filed with the
12  Court, but served upon us.
13       MR. MOORE:  That's fine.  That will be
14  Benton 13, so marked.
15            (BENTON 13 WAS MARKED FOR THE
16            PURPOSES OF IDENTIFICATION.)
17       MR. MOORE:  Let me review and make sure
18  that all pages are there.  And I would like to
19  state for the record that Mr. Ross and I
20  discussed the videotaping of the deposition.
21  He has graciously agreed to let the deposition
22  go forward on video subject to his objection.
23  And I would also like to note for the record
24  that plaintiffs offered defendant up to 10:30
25  this morning to prepare for a video-graphic

Page 6

1        deposition if additional preparation was needed
2        and defendant has declined that additional
3        time, and we're beginning actually a little
4        early.
5             MR. ROSS:  That is correct.
6             MR. MOORE:  All right.  This will be the
7        deposition of Officer Casey Benton.  Aaron,
8        shall we reserve objections as we did on
9        Tuesday?
10            MR. ROSS:  Yes.
11            MR. MOORE:  The witness has been sworn.
12                 EXAMINATION
13       BY MR. MOORE:
14       Q    Officer Benton, would you please state
15  your full legal name for the record.
16       A    Casey Tanner Benton.
17       Q    And what county do you live in?
18       A    Henry County.
19       Q    Okay.  Do you have any adult relatives in
20  the Atlanta area?
21       A    None in Atlanta, no.
22       Q    Okay.  And not just the City of Atlanta,
23  but --
24       A    Metro Atlanta?  Yes.  Most of my family is
25  from metro Atlanta area.

Page 7

1        Q    And what counties do they live in?
2        A    My parents live in Butts County.  My
3   brother lives in I believe it's Clarke County.  And
4   my sister lives in Butts County.
5        Q    I don't think any of those are in the
6   Atlanta division.  The reason we ask is if you have
7   an adult relative who might turn up on a jury panel,
8   we need to know their name.
9        A    We are all pretty far outside of Atlanta.
10       Q    I think so.
11            Have you been deposed before?
12       A    Yes, I have.
13       Q    Okay.  When was that?
14       A    2009, I believe.
15       Q    What was the context?
16       A    It was a case involving an incident here
17  at work.
18       Q    What type of incident?
19       A    One of our officers had a suspect fleeing
20  from him on foot after a hit and run in a DUI stop.
21  I observed the suspect running through a parking
22  lot.  I pulled in behind him to try to close the
23  distance before I got out and started chasing him on
24  foot.  The suspect went from a full sprint to a
25  complete stop and the vehicle bumped him, so.

Page 8

1        Q    Did he claim injuries?
2        A    I don't recall if -- he had injuries, but
3   I don't recall if they were sustained or if he
4   claimed they were sustained from me hitting him or
5   from the hit and run prior to the stop.
6        Q    What was the outcome of the lawsuit?
7        A    It was resolved.  I don't know exactly
8   what the outcome.  I believe it got transferred to
9   like the auto insurance or something like that.
10       Q    So since you have been deposed before, you
11  understand that you're under oath?
12       A    Yes, I do.
13       Q    And that your statements here today, your
14  answers to my questions, will be testimony just as
15  if you were in court?
16       A    Yes, I do.
17       Q    Okay.  You understand that there is a
18  court reporter here -- in addition to our
19  videographer, there is a court reporter
20  stenographically taking everything down?
21       A    Yes, I do.
22       Q    Okay.  And to make things easier for her,
23  it's important that we not resort to nodding our
24  head, shaking our head, things like that, which are
25  difficult for the court reporter to take down.  But

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton

June 22, 2017

Page 9

1    that we need to give each other verbal responses.
2        A   I understand.
3        Q   And you have been doing a good job with
4    this, but it's also important that we take turns
5    talking and not talk over each other as sometimes
6    people do in conversation because it makes it very
7    difficult for the court reporter to take the record.
8    Do you understand?
9        A   I understand.
10       Q   Great.  Thank you.  From time to time,
11   your counsel may object to one of my questions.
12   Those objections are primarily just for the record.
13   We've reserved a lot of the objections that might be
14   made in court.  The other function of your counsel's
15   objections is sometimes to tip me off that I may
16   have asked a question that he thinks is confusing.
17   If you understand the question, you may go ahead and
18   answer it.  If you don't understand the question,
19   you can ask me to rephrase it.  And even if your
20   counsel doesn't object, if you don't understand one
21   of my questions, please ask me to rephrase it.
22       A   Okay.  I understand.
23       Q   If you don't ask me to rephrase it, I
24   won't know you didn't understand it, so I will
25   assume you did.  Fair?

Page 10

1        A   Fair.  I understand.
2        Q   If you need a break for the restroom or
3    something, we can take one as long as there is not a
4    question pending.  And pending means I have asked
5    it, but you haven't yet answered it.  If there is a
6    question pending, I will need you to give me an
7    answer first and then we can take a break.  Is that
8    all right?
9        A   I understand.
10       Q   What did you do to prepare for your
11   deposition today?
12       A   I met with Mr. Ross.
13       Q   Okay.  Did you review anything that
14   refreshed your memory about the facts?
15       A   Yes, I did.
16       Q   What was that?
17       A   My statement from -- I guess it was the
18   statement I gave to internal affairs.
19       Q   Okay.  Tell me what statements you have
20   made previously with regard to the incident this
21   lawsuit concerns.
22       A   I gave a written statement to internal
23   affairs.  I gave a statement to the GBI.  I believe
24   it was not a written statement, it was a verbal
25   statement, on the night of the incident.  And then

Page 11

1    also some follow-up questions for the GBI a few
2    weeks later -- a couple of weeks later.
3        Q   Did you review the statements you gave to
4    the GBI?
5        A   No, I did not.
6        Q   Did you talk to anyone other than your
7    counsel?
8        A   No, I have not.
9        Q   Did you review any video or audio
10   recordings?
11       A   No.
12       Q   Did you look at anything online or do any
13   research?
14       A   No.
15       Q   Anything else?
16       A   No.  I reviewed my training transcript.  I
17   think that was it.
18       Q   Is that your POST transcripts?
19       A   Yes, yes.
20       Q   How did you review your training
21   transcript?
22       A   I looked at a copy of it.
23       Q   A printed copy?
24       A   Yes.
25       Q   Where did you get the printed copy?

Page 12

1        A   Mr. Ross had it.
2                (BENTON 14 WAS MARKED FOR THE
3                PURPOSES OF IDENTIFICATION.)
4    BY MR. MOORE:
5        Q   Okay.  Let me show you what I have marked
6    as Exhibit 14.  Does that appear to be a copy of
7    your training transcript?
8        A   Yes, it does.
9        Q   Do you see the date on which this report
10   was created?
11       A   August the 25th, 2015.
12       Q   Okay.  What was the date on the document
13   you reviewed?
14       A   I don't recall what it was.
15       Q   Was it after August?
16       A   I believe I saw this one and a more
17   current one, as well.  But, I don't know what the
18   date on the more current one was.
19       Q   If you look down in the bottom right-hand
20   corner of the document, you will see a control
21   number that lawyers use to mark a document as an
22   individual document in litigation.  This one says --
23   it's called a Bates number.  This one says Cbenton
24   Post 001.  Do you see that?
25       A   Yes, I do.

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton                                                                    June 22, 2017

Page 13

1    Q    And then the subsequent pages have the
2  same mark, but sequential numbers?
3    A    Yes, I see.
4    Q    Did the copy you reviewed have that mark
5  on it?
6    A    I don't recall.
7    Q    Fair enough.  Other than the written
8  statement, what other types of documents have you
9  created with regard to the incident that this
10 lawsuit concerns?  And when I say documents, that's
11 a very broad term in the context of a lawsuit.  It
12 could include e-mails, voice mails, text messages,
13 basically any form of written or recorded
14 communication.
15   A    I don't believe I have created any other
16 than my internal affairs statement, statement to the
17 GBI.  I believe that's all.
18   Q    Have you ever sent or received an e-mail
19 that had anything to do with this incident?
20   A    I don't believe so.
21   Q    Text messages?
22   A    No.
23   Q    Voice mails?
24   A    No.
25   Q    Social media, like Facebook?

Page 14

1    A    No.
2    Q    Okay.  Tell me about your background.
3  Where were you born?
4    A    I was born here in Decatur and grew up in
5  Jonesboro.
6    Q    Okay.  In the City of Decatur?
7    A    Yes.  Well, I was born, I guess, DeKalb
8  Medical Center.  I don't know if that's in the city
9  limits or not.
10   Q    Was it DeKalb General at that time?
11   A    I don't have any idea.
12   Q    I guess you were too young to know?
13   A    I don't remember, yes.
14   Q    I don't remember when I was born either.
15        And you grew up in Jonesboro.  Did you go
16 to high school down there?
17   A    Yes.  Graduated from Jonesboro High
18 School.
19   Q    And then did you go to college?
20   A    Some college, yes.
21   Q    Where did you go?
22   A    Columbus State University and also Clayton
23 State University.
24   Q    And then did you go -- where -- what did
25 you do after that?

Page 15

1    A    I worked for a truck line called
2  Transportation Truck Line called AAA Cooper
3  Transportation.
4    Q    You were driving?
5    A    I worked the dock mostly, the loading
6  dock.  And I left there and came to the police
7  department in 2006.
8    Q    2006?
9    A    Yes.
10   Q    So you began police academy in what month?
11   A    August, I believe, of 2006.
12   Q    Okay.  And that takes a couple of months
13 to complete?
14   A    It's about six months.
15   Q    Six months.  You mentioned having been a
16 party to one lawsuit involving your police work.
17 Have you ever been a party to any other lawsuits?
18   A    Yes.
19   Q    Tell me where they were.
20   A    It was here in the county, in DeKalb
21 County.  It's actually ongoing in reference to an
22 incident with a pedestrian I stopped.
23   Q    Was that a car accident case?
24   A    No.  I stopped -- it wasn't a car
25 accident, no.  It was a -- I stopped a pedestrian

Page 16

1  for walking up the center median on Memorial Drive
2  and he refused to stop when I was trying to stop him
3  and ended up trying to pull away and I guess flee
4  the location.  And I tased him and he sued the
5  county.
6    Q    When was that?
7    A    He filed a lawsuit against the county.
8  You asked when.
9    Q    Well, let me back up.  Did he sue you
10 individually, as well?
11   A    I guess the same type thing as this.  I'm
12 named, I guess, as a party to the lawsuit, right.
13   Q    When did that incident occur?
14   A    That occurred in 2014.  I don't recall the
15 month.
16   Q    What's that pedestrian's name?
17   A    I don't remember.  I have no idea.
18   Q    Is the case pending in DeKalb County
19 courthouse?
20   A    Yes.
21   Q    Not in federal court?
22   A    I don't know.  I don't know.  The last I
23 heard was there -- I don't know a whole lot about
24 what's happening with it.  I was just served with it
25 not too long ago.  Well, I guess nearly a year ago

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton                                     June 22, 2017

---

Page 17

1  now, but I haven't heard a whole lot about what's
2  going on with it.  I don't know if it's been moved
3  to federal court or not.
4      Q    Have you given a deposition in that case?
5      A    No, I have not.
6      Q    Have you had to produce documents or give
7  answers to interrogatories in that case?
8      A    Yes.
9      Q    Who is representing you in this case?
10     A    It was Ms. Raspberry.  I don't -- it got
11  moved to another attorney and I don't remember his
12  name.
13     Q    Is it the DeKalb County law department?
14     A    Yes.
15     Q    Have you ever been a party to any other
16  lawsuits?
17     A    No.
18     Q    Have you ever been convicted of a crime?
19     A    No.
20     Q    Take me through your work history.  You
21  said began at the police department in 2006?
22     A    Yes.  I started with the police
23  department, went to the academy in 2006, graduated
24  in February 2007.  When I finished my FTO training,
25  which was eight weeks shortly after I finished that,

---

Page 18

1  I moved to morning watch at south precinct which is
2  an overnight shift.  2000 and -- I believe it was
3  2010 -- 2009 or 2010, I moved to special operations
4  division to a commercial vehicle enforcement unit.
5  2011, 2012, something like that, they combined the
6  commercial vehicle unit with another traffic unit,
7  still in special operations, basically the same
8  unit, just changed the named.  I stayed there until
9  August of last year when I went to our criminal
10  investigations division in our special victims unit.
11     Q    Do you have any specialized training or
12  certificates in the law enforcement field?
13     A    As far as -- I have got -- I have had a
14  lot of training.  In the commercial vehicle
15  enforcement unit, we had specialized training to do
16  safety inspections on trucks or on large commercial
17  vehicles.  I have got instructor certifications,
18  both general and firearms instructor certifications.
19  Advanced certification through POST and quite a bit
20  of training beyond that.  I don't know of any other
21  specialized certifications.
22     Q    Are you taser certified?
23     A    Yes, I am.
24     Q    How long have you been?
25     A    I believe they issued them in 2000 -- 2008

---

Page 19

1  I believe is when they were issued to us.
2      Q    Okay.  Then you have to renew that
3  certification every 12 months?
4      A    Annually, yes.
5      Q    Do you have training in performing traffic
6  stops?
7      A    Yes, I do.
8      Q    You received that training from DeKalb
9  County?
10     A    Yes.
11     Q    And all your training in taser use was
12  also received from DeKalb County?
13     A    That's correct.
14     Q    On August 6th, 2015 at about 7:00 p.m.,
15  did you perform a traffic stop on a white SUV?
16     A    Yes, I did.
17     Q    All right.  What was the weather like that
18  day?
19     A    I believe it was clear.
20     Q    It was August, so it was still light at
21  7:00 o'clock?
22     A    Yes.
23     Q    Did you have any type of audio or video
24  recording device, like a body mike or a dash cam or
25  a body cam?

---

Page 20

1      A    No.
2      Q    Was your vehicle equipped with a dash cam?
3      A    There was one mounted in the car, but it
4  didn't work.  It had been broken for quite some
5  time.
6      Q    Had you reported to anyone that it was not
7  working?
8      A    Yes.  It was clear that it wasn't working,
9  yes.
10     Q    Well, whether it's or not --
11     A    My supervisors knew it wasn't working,
12  yes.
13     Q    Because you told them?
14     A    Yes.
15     Q    Did you ask for one that was working?
16     A    No.  Most of the units -- as a matter of
17  fact, my car was the only one that had one and
18  that's because I believe it was initially a DUI task
19  force car.  The units -- the normal units that we
20  have aren't equipped with them, but the DUI task
21  force is, so.  Since I wasn't on DUI task force, it
22  didn't get fixed or replaced, I assume.
23     Q    You didn't have a body cam that night?
24     A    No.
25     Q    Why were you in the area at the time?

---

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton

June 22, 2017

Page 21

1     A     We had been assigned to patrol Highlands
2  of East Atlanta Apartments as well as a couple of
3  other apartments in the area in reference to the
4  volume of I guess violent crimes, part one crimes,
5  in the area.  My team had been tasked with
6  patrolling those areas in reference to the crime
7  volume.
8        Q     What were you supposed to do?
9        A     What were we supposed to do?
10       Q     Right.
11       A     We patrolled the area, we make traffic
12  stops, we stop suspicious persons.  We're basically
13  in the area being visible.
14       Q     Was there an operations plan?
15       A     I believe eventually there was, but I
16  don't know if there was on this date or not.  It was
17  kind of just this is what we are going to be doing
18  for a while.
19       Q     How did you receive those orders?
20       A     Through my supervisor.
21       Q     Who was your supervisor?
22       A     At the time it was a sergeant named Jerry
23  Caruth.
24       Q     So Sergeant Caruth told you to patrol that
25  area?

Page 22

1     A     Yes.  Not just me, but the team was to
2  patrol the area, yes.
3        Q     Who was on the team?
4        A     Let's see, it was myself, Officer
5  Franklin, Officer Niemann, Officer White, Officer
6  Hudson, Officer Penney, Officer Sandiford, Officer
7  Frazier.  I think that's most of us.  I don't
8  remember.  I think that was pretty much everybody.
9        Q     Did you, Officer Niemann and Officer
10  Franklin sort of travel together?
11       A     We were assigned to the same -- they
12  divided the team to work two different complexes.
13  We were assigned to be at this one particular
14  complex, the three of us.
15       Q     What was that complex?
16       A     Highlands of East Atlanta Apartments.
17       Q     Okay.  Did you have anything specific that
18  you were supposed to be looking for?
19       A     No.  We were in the area to be visible.
20       Q     Okay.  What was it about the SUV that
21  first caught your attention?
22       A     I was sitting inside Highlands of East
23  Atlanta Apartments in my marked patrol unit, sitting
24  near the exit gate.  You can see the entrance and
25  the exit from where I was sitting.  I happened -- I

Page 23

1  just saw the vehicle come in and then just a couple
2  of seconds later, a very, very short time later, I
3  saw the vehicle exiting the complex.  So, it caught
4  my attention.  I saw them enter and exit in a very
5  short period of time.
6        Q     Did you follow the vehicle within the
7  complex?
8        A     No, no.  I was sitting at the exit gate.
9        Q     When did you determine that you were going
10  to stop the SUV?
11       A     When he passed me at the exit gate, I saw
12  that he had a drive-out tag or a temporary tag on
13  the car and I didn't see a expiration on that tag,
14  so I then pulled behind him.  When he turned on Flat
15  Shoals Road, I started giving radio traffic to
16  initiate the traffic stop.
17       Q     Did you say anything on your radio about
18  the SUV before you pulled out of the complex?
19       A     I don't -- I remember telling Officer
20  Franklin that I was going to stop the car, but I
21  don't recall -- we have -- I don't recall if I told
22  him over our little -- we have like a short-range
23  radio in the car.  I don't recall if I told him over
24  that radio or if he was close enough, I told him
25  through the windows of the car.  I told him I was

Page 24

1  going to stop the car, yes.
2        Q     Where was Officer Franklin at the time?
3        A     He was in the complex, but I don't
4  remember exactly where he was.  I don't remember if
5  he was sitting there with me or if he was patrolling
6  other parts of the complex.
7        Q     So when you pulled into the complex, where
8  did you -- I'm backing up a little bit.  When you
9  pulled into the complex, where did you go?
10       A     I went straight into the complex.  I don't
11  remember if I rode all the way through it or not it.
12  There is kind of a cut through that goes to --
13  closer to the exit.  So, I don't know if I rode all
14  the way around or if I went through that little cut
15  but I went through the exit gate to sit near the
16  exit gate.
17       Q     Okay.  Your testimony is you didn't see
18  the white SUV until you were stopped at the exit
19  gate?
20       A     I saw him -- I was at the exit gate and I
21  saw the truck enter the complex, yes, from where I
22  was sitting.
23       Q     In your mind, at the time you pulled over
24  the SUV, what was the probable cause for the stop?
25       A     He had a temporary drive-out tag and I did

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton                                                      June 22, 2017

Page 25

1   not see an expiration date on that tag.
2       Q    How long did you follow the SUV before it
3   stopped?
4       A    From the -- it may be a quarter mile.  I
5   was behind it.  I hadn't -- I didn't initiate, like
6   turn my emergency equipment on through that entire
7   time.  But, I was behind it for maybe a quarter
8   mile.
9       Q    When did you turn your emergency equipment
10  on?
11      A    When the driver -- when the vehicle turned
12  from Flat Shoals Road onto Fayetteville Road.
13      Q    And in terms of minutes, how long had you
14  been following the SUV at that time?
15      A    Maybe two minutes with the traffic and
16  things like that.
17      Q    Did you see a license number on the tag?
18      A    Yes, I believe I remember seeing a license
19  number on the SUV.  You talking about --
20      Q    Did you --
21      A    -- the number on the tag itself?
22      Q    Right.
23      A    Yes.
24      Q    Did you run that number?
25      A    I believe I did, yes.

Page 26

1       Q    What information did you get?
2       A    I don't recall exactly.  The stuff we
3   usually get back is registration or registered
4   owner's information, registration information.  That
5   kind of thing.  But, I don't recall exactly on that
6   tag.
7       Q    Do you usually get the date it was issued?
8       A    It's -- it is on the information, but it's
9   kind of buried in the information.  You kind of have
10  to hunt for it.
11      Q    But that was what you were concerned
12  about, right, is that you didn't see an expiration
13  date?
14      A    Yes, I didn't see an expiration date.
15      Q    But you knew that this was a tag that had
16  been issued by a dealer?
17      A    I knew it was a temporary drive-out tag,
18  yes.
19      Q    But you had run that number and you knew
20  that was a number that had been issued by a dealer?
21      A    I remember the tag came back.  I don't
22  remember all the information that came back.
23      Q    Did you chack to see whether it was
24  expired or not?
25      A    No, I don't believe I did.  That wasn't --

Page 27

1   I didn't stop him because it was expired.
2       Q    Did you take any pictures of the tag?
3       A    No, I did not.
4       Q    Walk me through the stop.  What did you
5   do?
6       A    Just the specific stop after he was
7   already pulled over?
8       Q    No.  Just I mean --
9       A    So, he pulled out of the complex, I pulled
10  in behind him.  He turned left onto Flat Shoals
11  Road.  I pulled in behind him.  I began giving the
12  radio traffic that I was going to stop this vehicle.
13  Description of the vehicle.  He continued onto the
14  Fayette -- Flat Shoals Road to Fayetteville Road.
15  When he turned left onto Fayetteville Road, I turned
16  on my emergency equipment to initiate the stop.  He
17  then turned right into the Chevron gas station at
18  the corner of Fayetteville Road and Flat Shoals
19  Road.  I got out of my vehicle, made an approach to
20  the vehicle on the driver's side.  I could see that
21  there were two occupants in the car.  I approached
22  the driver -- excuse me.  I approached the driver,
23  advised him of the reason for the stop and requested
24  his driver's license.  While I was speaking with
25  him, I smelled the odor of marijuana coming from the

Page 28

1   car.  I then asked the driver if he had any weapons
2   in the car.  It's something I ask everybody on every
3   stop.  When I asked that, the driver in kind of a
4   quiet voice said no, turned his head down and to the
5   right, and began reaching into the center console of
6   the car.  I stopped him from doing that just by
7   telling him to stop.  I asked him again if he had
8   any weapons in the car and he replied I may have one
9   weapon.  I asked him where that weapon was and he
10  said it's in the center console.  I then asked him
11  to step out of the car and had him stand at the
12  driver's side front wheel.  Officer Franklin had
13  arrived at some point during this conversation.  I
14  don't know exactly when he pulled up, but at some
15  point during the conversation Officer Franklin had
16  arrived as a back-up officer.  So, I had asked the
17  driver to step out, he stood next to the driver's
18  side front wheel.  I then advised him that I was
19  going to secure the handgun during the traffic stop
20  just for safety.  I reached in the console, found a
21  handgun in the center console -- in the bottom of
22  the center console.  I handed that handgun to
23  Officer Franklin and -- so he could secure it in one
24  of our patrol units.  I then told the driver he
25  could sit back in his car and he sat -- with the

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton                                              June 22, 2017

Page 29

```
 1  driver's door open, he sat sideways in the driver's
 2  seat with his feet kind of hanging out of the truck.
 3      Q     You testified that you smelled marijuana
 4  in the car?
 5      A     Yes, I did.
 6      Q     Did you talk to the driver about that?
 7      A     No.  I never got a chance to.
 8      Q     Well, you were talking to him, right?
 9      A     Yes.
10      Q     Did you ask him if there was marijuana in
11  the car?
12      A     No.  I never got a chance to.
13      Q     You were in the middle of talking to him?
14      A     I was in the middle of talking to him
15  about weapons.
16      Q     When you got into the car, did you see any
17  marijuana?
18      A     No, I did not.
19      Q     Did you say anything to the passenger?
20      A     After the driver sat back in the car, I
21  asked the passenger if he had ID with him.  He said
22  no.  And then Officer Niemann, who also arrived -- I
23  don't know exactly when -- excuse me.  Officer
24  Niemann began -- I saw Officer Niemann begin walking
25  around to the passenger side of the car.  I believe
```

Page 30

```
 1  he was going to get the passenger's information,
 2  just write down his name and birthday and that kind
 3  of thing.  And, that's the only conversation I had
 4  with the passenger.
 5      Q     Did you search the car before you let the
 6  driver get back in it?
 7      A     No, I did not.
 8      Q     You knew there was at least one weapon in
 9  the car?
10      A     Yes, I did.
11      Q     And yet you left both of the occupants in
12  the car?
13      A     The driver was sitting with his feet
14  hanging out facing me.
15      Q     Did you feel that you were -- that there
16  was a threat to your safety at that time?
17      A     At that point?
18      Q     Right.
19      A     No.
20      Q     If you believed there was marijuana in the
21  car, why did you let both occupants stay in the car?
22      A     I allowed the driver to sit back in the
23  car where I could see him and he was basically under
24  control.  He wasn't digging around in the car.  I
25  was attempting to ID the passenger and then move
```

Page 31

```
 1  forward in the traffic stop to investigate the odor
 2  of marijuana, which I never got around to doing.
 3      Q     So let me get this straight.  You left
 4  both occupants in the car and walked back to Officer
 5  Niemann to hand him the firearm?
 6      A     No.  No.
 7      Q     Tell how that happened.
 8      A     I retrieved the firearm from the car.
 9  Officer Franklin was standing at the rear driver's
10  side of the vehicle -- of the vehicle I had stopped.
11  When I retrieved the firearm, I reached back and
12  handed it to Officer Franklin.
13      Q     Did you keep your eyes on the driver and
14  the passenger at all times?
15      A     When I was reaching for the weapon, I
16  could not see the driver.  But, Officer Franklin, I
17  knew was there, and had his eyes on the driver.  And
18  I could see the passenger the entire time.
19      Q     Did you tell anyone at the scene that you
20  thought there might be marijuana in the car?
21      A     No, I don't believe I did.
22      Q     Did you search the car for drugs?
23      A     No, I did not.
24      Q     Did anyone search the car for drugs?
25      A     I don't know.
```

Page 32

```
 1      Q     Did you search any of the occupants of the
 2  car for drugs?
 3      A     No.
 4      Q     Do you know if anyone searched any of the
 5  occupants of the car for drugs?
 6      A     I don't know.
 7      Q     Did you ever ask anyone to search the car
 8  for drugs?
 9      A     No, I didn't.
10      Q     Did you ever ask anyone to search any of
11  the occupants for drugs?
12      A     No, I didn't.
13      Q     Did you ever ask the passenger to exit the
14  vehicle?
15      A     No, I did not.
16      Q     If you had believed that the passenger was
17  a threat, would you have gotten into the SUV with
18  him knowing that there was a weapon in the car?
19      A     I could see the passenger's hands the
20  whole time.  I did not believe that he -- he wasn't
21  reaching for anything.  He appeared, I guess -- I
22  could see his hands the whole time.  He was pretty
23  much looking straight ahead.
24      Q     What else did you do at the stop?  Is
25  there anything you haven't told me?
```

Case 1:18-cv-01518-CAP   Document 50   Filed 07/31/19   Page 9 of 64

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton                                                    June 22, 2017

Page 33

```
 1       A    At the stop?
 2       Q    Right.
 3       A    No.
 4       Q    So you have told me everything you
 5   witnessed, everything you did, everything you saw,
 6   heard, smelled, at the stop up the point when Troy
 7   Robinson exited the vehicle?
 8       A    I believe so, yes.
 9       Q    Okay.  Other than what you yourself
10   witnessed, have you talked with anyone else about
11   the stop since the date of the incident?
12       A    Internal affairs and GBI.
13       Q    Okay.  Is that all?
14       A    Yes.
15       Q    Did you issue a citation to the driver of
16   the Yukon?
17       A    No, I did not.
18       Q    Has anyone else told you that he was
19   charged with anything?
20       A    No, nobody has told me.
21       Q    When you pulled him over, did you look at
22   the tag again to see if there was an expiration date
23   on it?
24       A    No, I didn't.
25       Q    Do you know if you were right about
```

Page 34

```
 1   whether there was an expiration date on the tag?
 2       A    I learned later that there was an
 3   expiration date on it.
 4       Q    When Troy Robinson exited the vehicle,
 5   what happened then?
 6       A    He exited the vehicle.  He ran across
 7   Fayetteville Road.  I immediately began chasing him
 8   on foot.  Officer Franklin stayed with the driver
 9   and the vehicle.  Officer Niemann, after he -- after
10   I started chasing the -- Mr. Robinson, Officer
11   Niemann began -- or got in his car and began kind of
12   following us on the roadway, but in his car.  As I
13   was chasing, Officer Franklin told me over the
14   radio, police radio, he used a 10 code.  He said use
15   10-0.  Use caution is what it means, because he
16   observed Mr. Robinson holding his waistband.
17       Q    Did he say that he observed Mr. Robinson
18   holding his waistband?
19       A    Yes, he did.
20       Q    He said that on the radio?
21       A    He said use 10-0, he's holding his
22   waistband, yes.  After he said that, I also observed
23   Mr. Robinson was holding his waistband with his left
24   hand.  I continued the chase.  Mr. Robinson ran --
25   like I said, he had run across Fayetteville Road.
```

Page 35

```
 1   He ran through a strip shopping center that was on
 2   the corner of Fayetteville Road and Flat Shoals
 3   Road.  He then ran into the parking lot of the
 4   Family Dollar, which is on Flat Shoals Road.  Once
 5   he got in that parking lot, he turned toward the
 6   back of the store running through the parking lot.
 7   The Family Dollar backs up to the apartment complex,
 8   Highlands of East Atlanta Apartment Complex, so he
 9   was running back toward the apartment complex.  I
10   continued to give chase.  Mr. Robinson ran through
11   the Family Dollar parking lot, exited the parking
12   lot into like a grassy dirt area, kind of a wood
13   line between the Family Dollar and the apartment
14   complex.  I continued chasing him.  He ran down to a
15   chain link fence.  Kind of a standard height,
16   three-and-a-half, four foot, something like that,
17   chain link fence.  As he got to that fence, I saw
18   that he was going to -- or he appeared that he was
19   going to continue going into the apartment complex
20   over the fence and then over a wall that was just
21   beyond that fence.  I drew my taser.  I was not
22   within arms reach of him.  I couldn't -- I didn't
23   believe I had a chance of catching up to him.  I
24   drew my taser.  As he reached the chain link fence
25   and was still on the ground, I drew my taser and
```

Page 36

```
 1   deployed the taser.  As soon as I deployed the
 2   taser, I noticed that it appeared to have no effect
 3   on Mr. Robinson.  He continued fleeing by beginning
 4   to climb the chain link fence.  He stood on top of
 5   the chain link fence, reached both hands over his
 6   head, leaned forward and grabbed the concrete block
 7   wall or the concrete wall with both hands, threw his
 8   right leg over the wall and then went over the wall
 9   completely out of my line of sight.  I could not see
10   him anymore.
11       Q    Let's stop there.  Other than the fact
12   that he ran from you, did you have any reason to
13   believe that Troy Robinson had committed any crime?
14       A    Based on those -- on the totality of
15   everything that had happened, with the odor of
16   marijuana, the driver initially lying about a
17   weapon, locating a loaded weapon in the car, Mr.
18   Robinson not being able to identify himself, Mr.
19   Robinson fleeing from the vehicle, Mr. Robinson
20   holding his waistband as if he may be concealing
21   something, whether -- something, whether it be a
22   weapon or some type of contraband, I believed that,
23   yes, he may have committed a crime.
24       Q    What crime?
25       A    I didn't know at the time.  Possibly,
```

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton                                          June 22, 2017

Page 37

1  based on the odor or marijuana, possibly a narcotics
2  crime.
3      Q    Anything else?
4      A    No.
5      Q    Did you have reason to believe that he was
6  a threat to anyone?
7      A    I believed with him running back into a
8  residential area, possibly with a weapon, that he
9  could have been a danger, yes.
10     Q    Well, he was just running because of you,
11 right?
12     A    I didn't know why he was running.
13     Q    Other than the fact that he was holding
14 his waistband, did you have any reason to believe he
15 was armed?
16     A    I had found one weapon in the car.  I felt
17 there was a pretty good chance he may also be armed.
18     Q    Did you have your -- you had your radio
19 on?
20     A    Yes.
21     Q    Okay.  Did you say anything on the radio?
22     A    When he started running, I gave a -- I
23 advised over the radio that he was running on foot.
24 I believe I gave a description and a direction of
25 travel.

Page 38

1      Q    Okay.  Could you see him during the entire
2  chase?
3      A    Yes.
4      Q    And you saw Troy run behind the Family
5  Dollar on Flat Shoals?
6      A    Yes.
7      Q    How far behind him were you?
8      A    Initially, I was pretty far back because I
9  had to go around the vehicle to start the chase.  In
10 number of feet, I don't know, he was -- I believe he
11 was already across Fayetteville Road before I even
12 got to Fayetteville Road, so 30 or 40 feet to start
13 with.  So, a similar distance through most of the
14 foot chase.
15     Q    Do you feel like you were gaining on him,
16 keeping pace with him or losing ground?
17     A    As he began -- as he approached the chain
18 link fence and had to slow down to maneuver that
19 fence, I gained distance on him there.  I believe
20 that was about the only time I gained distance on
21 him.
22     Q    So before that, you were basically just
23 keeping pace with him?
24     A    Yes.
25     Q    What was he wearing?

Page 39

1      A    I believe he was wearing blue jeans and a
2  tee-shirt, I think it was white, but I don't
3  remember specifically.
4      Q    Do you remember if the blue jeans were
5  loose?
6      A    I don't recall.
7      Q    Were you aware that Officer Niemann was
8  following?
9      A    Yes.  I had seen his unit going down the
10 street so I knew he had gotten in the car to kind of
11 parallel where we were going.  But, that was about
12 the extent to what I knew he was following.
13     Q    So you followed Troy to a wooded area
14 behind the Family Dollar Store?
15     A    Yes.
16     Q    There is a little path there?
17     A    Yes.  It's a wood line that backs up to
18 the apartment complex.
19     Q    Did he just run into the woods or was
20 there a little cut-through?
21     A    It wasn't some thick area of woods.  I
22 don't recall if there is a cut there or not.
23     Q    Did you lose sight of him when he ran into
24 that area?
25     A    No.

Page 40

1      Q    Ever?
2      A    No.
3      Q    After he entered the wooded area, how many
4  seconds did it take before you came to that same
5  spot?
6      A    I don't know.  Just a few seconds.  I
7  don't really know.
8      Q    Would you say a few?
9      A    I don't know.
10     Q    Five, seven, 10?
11     A    I don't know.
12     Q    30?
13     A    I don't know.  I really don't know.
14     Q    Okay.  Did you stop when you got there?
15     A    Did I stop running?
16     Q    Yes.
17     A    When he began to -- when he began to --
18 when he got to the fence and I realized he was going
19 to be continuing over the fence, I had decided I was
20 not going to attempt to scale the fence and the
21 wall.  I didn't feel it was safe to do.
22     Q    You said the fence was about three or four
23 feet high?
24     A    I believe.  It was a pretty standard chain
25 link fence.

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton                                                    June 22, 2017

Page 41

```
1       Q    Where did you stop?
2       A    Just off the parking lot, inside the -- or
3  in the grassy dirt area, I believe.  Just a few
4  steps in.
5       Q    At the edge of the parking lot?
6       A    Yes.  Just a few steps off the edge of the
7  parking lot, I believe.
8       Q    How far away were you from the fence?
9       A    Maybe 15 feet.  Maybe.
10      Q    Did the ground slope down from where you
11 were standing to the fence?
12      A    Yes, it did.
13      Q    How far -- what kind of change of
14 elevation do you think there was?
15      A    A few feet.  A couple of feet.  I don't
16 know.
17      Q    Was Mr. Robinson standing up by the fence?
18      A    Yes, he was standing at the fence.
19      Q    He was on his feet?
20      A    Yes.
21      Q    Did he ever fall to the ground on the near
22 side of the fence?
23      A    No.
24      Q    Okay.  When he was standing on foot by the
25 fence, was his head level with your feet, with your
```

Page 42

```
1  knee, with your waist, with your shoulder, what do
2  you think?
3       A    I would say it was probably above my knee,
4  but probably below my chest, I would say.
5       Q    So his head was about at your waist
6  height?
7       A    Maybe something like that.
8       Q    Roughly?
9       A    Yes.  I don't recall specifically, but.
10      Q    At some point did Officer Niemann catch up
11 to you?
12      A    He was paralleling us in his car.  And to
13 the best of my knowledge, he had -- I thought he was
14 going in the complex because he saw where we were
15 running.
16      Q    Did you hear his siren?
17      A    I don't recall a siren.
18      Q    Did you see -- did he exit his vehicle on
19 the Family Dollar side of the fence?
20      A    No.  I never saw him get out of his
21 vehicle.
22      Q    So he didn't come on foot to where you
23 were?
24      A    Not to my knowledge.
25      Q    And you didn't say anything to him on the
```

Page 43

```
1  Family Dollar side of the fence?
2       A    To Officer Niemann?
3       Q    Right.
4       A    No, I don't believe so.
5       Q    Were you armed with a Taser X-26?
6       A    Yes.
7       Q    When was that taser issued to you?
8       A    I believe that was the one I got in 2008.
9  I don't think it had been swapped out.
10      Q    Had it been tested recently?
11      A    At the very minimum.  It's annually that
12 we do a re-cert and that's part of it.  But we test
13 them periodically, yes, just to -- I don't know what
14 you call it now.  Spark test, I guess.
15      Q    Do you know the last time that was done
16 before this incident?
17      A    No, I don't recall.
18      Q    Okay.  Would that have been something that
19 you did, the spark test; would you perform that
20 yourself?
21      A    Yes.
22      Q    Is there anyone else who tests these units
23 to make sure they are in working order?
24      A    No.
25      Q    The last time you had used it, when was
```

Page 44

```
1  that?
2       A    The night before.
3       Q    What did you use it for?
4       A    One of our units on our same team was
5  chasing what he believed was a robbery suspect.
6  That suspect fled from one of our units and then
7  threw some type of object at one of our cars -- one
8  of our officers that was in his unit, so I got in a
9  foot chase with him.  As I was chasing him, he
10 stopped running, turned around, raised his fists as
11 if he was ready to fight.  I drew my taser and tased
12 him.
13      Q    And it worked?
14      A    Yes.
15      Q    What happened to him?
16      A    He fell.
17      Q    Where was he standing when you tased him?
18      A    On the sidewalk.
19      Q    And he just fell on the sidewalk?
20      A    Fell kind of on the edge of the sidewalk
21 into the edge of the roadway.
22      Q    What road was that?
23      A    Boulder Crest Road.
24      Q    What time of day?
25      A    It was dark.  I don't recall exactly what
```

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton

June 22, 2017

Page 45

1  time it was.
2      Q    Was there an internal affairs
3  investigation of that incident?
4      A    A use of force report was done.  And from
5  the way I understand it, that report gets forwarded
6  to internal affairs.  That was the extent of the
7  investigation.
8      Q    Are there different types of cartridges
9  that can be installed in the Taser X-26?
10     A    I'm sure there are, but I don't -- we only
11  use one type.
12     Q    What type is that?
13     A    I don't know what it's called.  It's
14  whatever they issue us.
15     Q    Do you know how long the wires are?
16     A    I believe they're 25 feet, I think.
17     Q    What color are the blast orders?
18     A    They are green, I believe.
19     Q    So let's go back to August 6th of 2015.
20  At some point you're chasing Troy Robinson on foot.
21  At some point did you draw your taser?
22     A    Yes.
23     Q    When?
24     A    As he approached the chain link fence.
25     Q    Where were you standing at that time?

Page 46

1      A    I was about, like I said earlier, about
2  15 feet behind him in the grassy dirt area, just off
3  the parking lot of Family Dollar.
4      Q    With which hand did you draw the taser?
5      A    My right hand.
6      Q    Okay.  Do you carry the taser on the same
7  side as your drawing hand or on the opposite side?
8      A    Opposite side of my drawing hand.
9      Q    And you carry your side arm on the same
10  side as your drawing hand?
11     A    Correct.
12     Q    Why did you draw your taser and not your
13  side arm?
14     A    Because he wasn't an immediate threat to
15  me as far as -- or he wasn't posing a threat of
16  great bodily injury or death to me.
17     Q    If you had believed that Troy was armed,
18  you would have drawn your sidearm, wouldn't you?
19     A    If I believed he was posing a threat to me
20  of great bodily harm or death.
21     Q    Well, if you thought someone had a weapon,
22  had a pistol, would you draw your taser to apprehend
23  them?
24     A    Well, there's a big difference between
25  simply having a weapon on your person somewhere and

Page 47

1  actually pulling that weapon out and attempting to
2  use it.
3      Q    Sure.  But if you draw a taser and someone
4  else has a pistol, don't they have the drop on
5  you -- don't they have an advantage in that
6  encounter?
7      A    If I believed that he was a threat of
8  great bodily harm, or danger to me, or death to me,
9  I would have drawn my sidearm, yes.
10     Q    Did you have an ASP baton?
11     A    Yes, I did.
12     Q    A-S-P; capital A, capital S, capital P.
13  Why did you draw your taser and not your
14  ASP baton?
15     A    He was 15 feet away from me.
16     Q    He was -- had to stop to go over the
17  fence, right?
18     A    He slowed down greatly.  He didn't come to
19  a complete stop, I don't believe.
20     Q    Did you have pepper spray?
21     A    Yes.
22     Q    Why did you draw your taser and not your
23  pepper spray?
24     A    Because he was 15 feet away from me.
25     Q    Was he facing you?

Page 48

1      A    No, he was not.
2      Q    Was he in fact armed?
3      A    I never learned that he was armed.
4      Q    You never learned that he was?
5      A    Yes.  I never heard whether he was or was
6  not.
7      Q    Was he making any threatening movements
8  toward you?
9      A    Not directly toward me, no.
10     Q    Toward anybody?
11     A    No.
12     Q    Did he ever make any threatening movements
13  toward anybody?
14     A    No.
15     Q    Did you say anything?
16     A    No.
17     Q    So he was on the near side of the chain
18  link fence, a few feet below you, when you fired
19  your taser?
20     A    Correct.  By near side, you mean the same
21  side I was on?
22     Q    Same side you were on.
23     A    Correct, yes.
24     Q    So there is a chain link fence that was
25  three to four feet, and then beyond that you said

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton                                                June 22, 2017

Page 49

1   there is a concrete wall?
2       A    Yes.
3       Q    How high was the concrete wall?
4       A    On my side, maybe -- maybe six feet or so.
5   Six, something like that.
6       Q    Okay.  Where did the top of the wall come
7   to on you when you were standing at the point where
8   you deployed the taser?
9       A    Honestly, I don't know.  I never gauged it
10  in that way.
11      Q    Was the top of the wall higher or lower
12  than the top of the chain link fence?
13      A    Higher.
14      Q    Several feet higher?
15      A    A couple of feet higher.
16      Q    How far is the wall from the fence?
17      A    Just a couple of feet.  Maybe three feet.
18      Q    So, you're at the top of the embankment at
19  the back of the Family Dollar, Troy is down in the
20  -- on the lower ground by the chain link fence on
21  the same side?
22      A    Yes.
23      Q    You fired your taser?
24      A    Yes.
25      Q    No one else is there?

Page 50

1       A    Not to my knowledge.
2       Q    Okay.  Taser goes pop?
3       A    Yes.
4       Q    It pops like a pistol shot?
5       A    It's much quieter than a pistol shot, but
6   it does have a pop, yes.
7       Q    So your testimony is that the pop of the
8   taser occurred before Troy even climbed the chain
9   link fence?
10      A    Yes.
11      Q    And certainly before he climbed the wall?
12      A    Yes.
13      Q    You aren't aware of any other taser or
14  weapon being discharged at that time?
15      A    No, I'm not aware of any other taser or
16  weapon.
17      Q    Okay.  So if somebody inside the apartment
18  complex stated that they saw Troy on top of the wall
19  and then heard the pop, you would dispute that?
20      A    Yes, I would.
21      Q    When you fired the taser, you were
22  pointing it at a downward angle?
23      A    Yes.
24      Q    Okay.  What part of Troy's body were you
25  aiming at?

Page 51

1       A    His back.
2       Q    Did you see where the taser probes went?
3       A    When I fired them, no.
4       Q    Did you see where the blast door went?
5       A    No.
6       Q    Did you see or hear anything else?
7       A    No.
8       Q    How much time did all that take from the
9   point when you arrived behind the Family Dollar to
10  the point when you fired your taser?
11      A    Only just a few seconds.
12      Q    You saw Mr. Robinson go over the wall?
13      A    Yes, I did.
14      Q    How did he go over the wall?
15      A    He stood on top of the chain link fence,
16  reached out to the wall with both his hands
17  over his head.  Threw his right leg up onto the wall
18  and then over the wall and I completely lost sight
19  of him.
20      Q    So he was -- is the top -- is there a bar
21  at the top of the chain link fence?
22      A    I don't recall.
23      Q    He stood on top of the fence?
24      A    Yes.
25      Q    Did the fence collapse under his weight?

Page 52

1       A    I don't recall.
2       Q    Did you hear him say anything?
3       A    No, I did not.
4       Q    Did you know he fell?
5       A    No, I did not.
6       Q    Did you know he was injured?
7       A    Not at that time, no.
8       Q    Did you say anything to anybody before you
9   left the rear of the Family Dollar?
10      A    I don't believe so.
11      Q    Including on the radio?
12      A    I gave out, like I said earlier, a
13  description, direction of travel, that kind of
14  thing.
15      Q    Where were you standing when you did that?
16      A    I was running, so it was during the foot
17  chase -- at the beginning of the foot chase.
18      Q    Right.  And I'm just talking about after
19  you deployed the taser.
20      A    Oh, I apologize.  After I deployed the
21  taser.  Yes, I began giving Officer Niemann
22  instructions over the radio on how to get into the
23  complex to where Mr. Robinson had gone over the
24  wall.  I believe I told him that -- I gave him
25  directions on how to get there and I told him I

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton                                                    June 22, 2017

Page 53

1  believed he was running along the base of the wall
2  towards the buildings out of my line of sight.
3      Q    What did you do then?
4      A    I notified again over the radio that -- to
5  my supervisor that I deployed the taser. And, I
6  stood and waited to see that Officer Niemann had
7  arrived at the location.
8      Q    Where did you stand?
9      A    I didn't move from where I deployed the
10 taser. I was still in the same place.
11     Q    So you stood in that same spot until you
12 saw Officer Niemann arrive on the other side of the
13 wall?
14     A    Correct.
15     Q    How long did that take?
16     A    Probably less than a minute.
17     Q    Okay. How did you know he was over there?
18 What could you see?
19     A    I could see his patrol car. I could see
20 the roadway that goes through the complex and I
21 could see his patrol car pulling in.
22     Q    Did he have his lights on?
23     A    I don't recall. Probably, but I don't
24 recall.
25     Q    Siren?

Page 54

1      A    I don't recall a siren.
2      Q    How fast was he going?
3      A    I have no idea.
4      Q    Was he moving fast like he was trying to
5  catch a fleeing suspect?
6      A    He was moving quickly, yes.
7      Q    After you saw him, did -- so you didn't
8  move from that spot where you fired the taser until
9  after you saw him?
10     A    Correct.
11     Q    And then what did you do?
12     A    I went back to the -- I heard Officer
13 Niemann advise that he had located the suspect. He
14 advised that he was unconscious. I heard him ask
15 for EMS over the radio. He advised that he was
16 breathing and had a pulse. I then went back to the
17 traffic stop location and spoke to Officer Franklin,
18 advised him what was going on. And we made a
19 decision to escort the driver and that vehicle into
20 the complex with one of us leading and the other
21 following, so that we could kind of consolidate
22 everything.
23     Q    Did you walk out from the spot where you
24 had deployed the taser into the Family Dollar
25 parking lot and then return to the scene where you

Page 55

1  had deployed the taser?
2      A    I don't believe so.
3      Q    You just went straight to the scene of the
4  traffic stop?
5      A    Yes, I believe so.
6      Q    Who was there?
7      A    At the traffic stop scene?
8      Q    Yes.
9      A    Officer Franklin and the driver.
10     Q    Did you say anything to Officer Franklin?
11     A    I told him what was going on.
12     Q    What did you tell him?
13     A    I told him that Mr. Robinson fled from me,
14 had gone over the wall. Officer Niemann said he
15 found him unconscious on the other side of the wall.
16     Q    What did Officer Franklin say?
17     A    We began talking about what we were going
18 to do with the driver and that vehicle. And we
19 decided to escort him into the complex.
20     Q    So you then spoke to the driver and
21 communicated to him that you were going to escort
22 him into the complex?
23     A    I don't recall if I told him that or if
24 Officer Franklin told him that; one of us told him
25 what was going on, that we were going to move him to

Page 56

1  the complex.
2      Q    How did you escort him into the complex?
3      A    I lead and Officer Franklin followed.
4      Q    Other than running from the police, did
5  you see Troy Robinson commit any crime?
6      A    Again, based on -- no, I did not see him.
7  But, based on the totality of the circumstances, I
8  believe that a crime may have been occurring.
9      Q    Did you see him threaten anybody?
10     A    No.
11     Q    What did you expect to see when you got to
12 the other side of the wall?
13     A    Based on what Officer Niemann said about
14 Mr. Robinson being unconscious, I expected to see
15 Mr. Robinson unconscious. I hadn't heard any
16 updates that said anything different.
17     Q    What did you see when you arrived at the
18 scene?
19     A    I saw Mr. Robinson unconscious,
20 handcuffed. I believe my lieutenant was actually
21 kneeling next to Mr. Robinson. There was a crowd of
22 people gathering and there were other officers in
23 the complex by the time we got back, too, they were
24 from different precincts and other units that had
25 responded.

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton                                            June 22, 2017

Page 57

1     Q    Did anyone say anything to you?
2     A    Officer Penney, who was on our team, asked
3   me to have Officer Franklin go to the entrance to
4   meet EMS so they could guide him in.  One of the
5   sergeants, I don't remember if it was sergeant -- I
6   believe it was Sergeant Westmorland, took some
7   photos of me for the use of force report, and then I
8   sat in my marked unit for a while.  And then they
9   moved me to an, I guess, unmarked CID unit,
10  investigative division.
11    Q    Did you examine Mr. Robinson?
12    A    I did not examine him.  When I saw the
13  lieutenant -- my lieutenant kneeling next to him and
14  I saw he was in handcuffs, I approached the
15  lieutenant and asked him if he wanted me to take the
16  handcuffs off of him because I knew EMS would want
17  them off of him before they would transport him.  He
18  advised me to take them off.  And while I was doing
19  that, I saw that he had a taser -- I saw one taser
20  probe in his back.
21    Q    Where was it?
22    A    In his -- I believe his lower back, I
23  believe.
24    Q    You saw one in his lower back?
25    A    I believe his lower back.  I don't

Page 58

1   specifically recall.  I remember seeing one in his
2   back.
3     Q    Had it pierced the skin?
4     A    I don't recall.  I didn't examine him.
5     Q    Well, did you see it sticking out of his
6   back or did you see it in his clothes?
7     A    I saw it in his back, but he was wearing
8   clothes.  I don't know if it was through the skin or
9   not.
10    Q    Was the wire attached to it?
11    A    I believe so.
12    Q    Do you know where the wire led?
13    A    No, I don't know.
14    Q    Did you talk with anyone else at the time
15  you were in proximity to Mr. Robinson?
16    A    No, I don't believe so.
17    Q    Did you check his vital signs?
18    A    No, I did not.
19    Q    At some point were you given the order to
20  segregate yourself and not talk to anyone about the
21  incident?
22    A    Yes.  I went to my patrol unit and they
23  later moved me to a CID car.
24    Q    Okay.  Who gave you that order?
25    A    I really don't remember.  There were

Page 59

1   several sergeants and several lieutenants on the
2   scene.  I don't know who specifically told me to
3   move to the CID car.
4     Q    How long was it before you received that
5   order?
6     A    Several minutes; maybe 10 or 15 minutes
7   before -- or until they moved into a CID car.
8     Q    Okay.  So you arrived at the scene, moved
9   around the scene for 10 or 15 minutes, and at that
10  point you received an order to go sit in the CID car
11  and not talk to anyone?
12    A    Not quite.  I arrived on the scene, saw my
13  lieutenant, asked about the handcuffs, went back to
14  my patrol unit, stayed in my patrol unit.  I didn't
15  meander through the scene until somebody moved me to
16  a CID car.
17    Q    And all that took about 10 or 15 minutes?
18    A    I believe.  That's a rough estimate.
19    Q    Okay.  Before you received that order, did
20  you say anything to anyone at the scene about the
21  incident?
22    A    I believe I told the sergeant who was
23  asking me for the use of force report, I gave him a
24  very general description what had happened.  I had
25  talked to Officer Franklin and told him what

Page 60

1   happened prior to us moving the driver into the
2   complex.  And I believe those are the only people I
3   spoke with.
4     Q    Did you speak to anyone about the reason
5   for the traffic stop?
6     A    I believe Officer Franklin -- yes, I
7   believe Officer Franklin asked me why I stopped him
8   and I told him.
9     Q    What did you tell him?
10    A    I didn't see an expiration date on the
11  tag.
12    Q    Who was the sergeant who took the photos
13  from you?
14    A    I believe it was Sergeant Westmorland.
15    Q    Was that the same sergeant that you gave
16  the statement to?
17    A    About the use of force?
18    Q    Correct.
19    A    Yes, I believe it was.
20    MR. MOORE:  How much time do we have left
21  on the tape?
22    THE VIDEOGRAPHER:  55 minutes.
23    MR. ROSS:  Are you near a stopping point
24  for a break?
25    MR. MOORE:  We can take five minutes.

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton                                                    June 22, 2017

Page 61

1        MR. ROSS:  Let's do that.
2        THE VIDEOGRAPHER:  Off the record at
3    11:01.
4        (WHEREUPON, A SHORT BREAK WAS HAD
5    IN THE DEPOSITION.)
6        THE VIDEOGRAPHER:  Standby.  Back on the
7    record at 11:12.
8    BY MR. MOORE:
9        Q    Officer Benton, you understand you're
10   still under oath?
11       A    Yes, I do.
12       Q    Did you hear or review anything during the
13   break that refreshed your recollection about any of
14   the facts that you have testified to?
15       A    No.
16       Q    I have got a few follow-up questions about
17   the traffic stop.
18       THE VIDEOGRAPHER:  Your microphone, Mr.
19   Moore.
20       MR. MOORE:  Oh, yes.  Thank you.
21       THE VIDEOGRAPHER:  Thank you.
22   BY MR. MOORE:
23       Q    I have got a few follow-up questions about
24   the traffic stop.  From the time you saw the
25   vehicle, the SUV, up until the time you stopped it,

Page 62

1    was there any rule of the road that you saw the
2    driver violate?
3        A    I did not see an expiration date on the
4    tag which is a violation.
5        Q    Well, it's not an expiration date -- it's
6    not a violation for you not to see it, right?
7        A    It's a violation to not have an expiration
8    date on the tag.
9        Q    But it did have an expiration date?
10       A    But I didn't see it.
11       Q    Right.  Apart from the expiration date
12   issue that you just mentioned, was there any other
13   rule of the road that you saw the driver violate?
14       A    No.
15       Q    Okay.  Apart from not being able to see
16   the expiration date on the tag, was there any other
17   reason why you followed the white SUV?
18       A    No.
19       Q    After stopping the SUV, did you walk up to
20   the SUV from behind?
21       A    Yes.
22       Q    Did you look at the tag?
23       A    No.
24       Q    You later learned that there was an
25   expiration date on the tag?

Page 63

1        A    Yes.
2        Q    How did you learn that?
3        A    Officer Franklin told me.
4        Q    When?
5        A    Sometime after we got into the complex.
6        Q    So he told you that on the date of the
7    incident?
8        A    Yes.
9        Q    Was that when you and he had the
10   conversation about why you had pulled the SUV over?
11       A    Yes.  That's what I said earlier was he
12   asked me why I stopped it and I told him, and he
13   advised me it did have an expiration date on it.
14       Q    Did you ever look at the information you
15   received when you called in the tag to see if it
16   indicated the tag's expiration date?
17       A    I don't recall.
18       Q    Was it ever determined, to your knowledge,
19   whether Mr. Simms was in lawful possession of the
20   weapon?
21       A    It was not.  To my knowledge, it was never
22   determined.
23       Q    Was the weapon confiscated?
24       A    I don't know.
25       Q    It was your traffic stop, right?

Page 64

1        A    Yes, it was.
2        Q    Is there a reason why you wouldn't know?
3        A    Because, based on the circumstances, the
4    GBI took over the investigation.  The traffic stop
5    was part of that investigation.
6        Q    When you escorted Mr. Simms to the
7    apartment complex, you and Officer Franklin, did you
8    let him drive the SUV?
9        A    Yes.
10       Q    Did you ask him if he had been smoking
11   marijuana?
12       A    No, I did not.
13       Q    If the expiration date on the tag was the
14   reason that you followed the SUV in the first place,
15   why didn't you look to see if there was an
16   expiration date on the tag?
17       A    I'm sorry.  Rephrase your question.
18       Q    Okay.  You testified that you followed the
19   SUV just because you didn't see an expiration date
20   on the tag.
21       A    Yes.
22       Q    Officer Franklin apparently saw the
23   expiration date on the tag.
24       A    Yes.
25       Q    Once you had the car pulled over, why

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton                                                          June 22, 2017

Page 65

1  didn't you examine the tag more closely to see if
2  you could see the expiration date on it?
3       A    Once I had the car pulled over, my focus
4  was on the occupants on the vehicle.  My focus was
5  no longer on the tag or the violation.
6       Q    If you had seen the tag having a valid
7  expiration date when it drove passed you as you were
8  parked at the gate at Highlands of East Atlanta,
9  would you have simply let the driver go about his
10 business?
11      A    I probably would not have stopped the car.
12      Q    Does DeKalb County provide officers with
13 training in the proper use of force?
14      A    Yes.
15      Q    Does that include the use of force against
16 fleeing subjects?
17      A    Yes.
18      Q    Does that include taser use?
19      A    Yes.
20      Q    Are officers required to undergo that
21 training periodically to keep their knowledge fresh?
22      A    Yes.
23      Q    How often do you -- are you required to
24 undergo use of force training?
25      A    Use of force training is required

Page 66

1  annually.
2       Q    And how often is taser use training
3  required?
4       A    Annually.
5       Q    When is the last time you had use of force
6  training?
7       A    I believe I did it online just a few weeks
8  ago.
9       Q    What did it cover?
10      A    It covers all levels of use of force,
11 including OC spray, taser, ASP baton.  I believe ASP
12 baton is included as well as the different firearms
13 that we carry.
14      Q    How long is that session?
15      A    I believe it's one hour.
16      Q    What about the taser training, when is the
17 last time you had that?
18      A    I had it in my in-service.  I believe that
19 was in April, this year.
20      Q    April of this year?
21      A    I believe it was April, yes.
22      Q    Okay.  What does that cover?
23      A    It's recertification.  It's -- typically
24 there is a -- like a practical drill, deploying the
25 taser, reloading the taser, things of that nature.

Page 67

1       Q    Okay.  You said you had just reviewed your
2  POST training record --
3       A    Yes.
4       Q    -- in preparation for this deposition?
5       A    Yes.
6       Q    So in the past day or two?
7       A    Yes.
8       Q    Are the trainings you just described to me
9  both reflected on that POST training log?
10      A    I don't know if it was that current or
11 not.  I didn't look at all the details of it.
12      Q    When was that POST training report pulled?
13      A    I don't know.
14      Q    You don't know?
15      A    No.                          .
16      Q    Okay.  Do you have any reason to think it
17 wouldn't be on there?
18      A    If it was pulled prior to April, it
19 wouldn't be on there.
20      Q    If it was pulled in the last couple of
21 days, they should both be on there?
22      A    Yes.
23      Q    You're assigned to traffic enforcement,
24 right, or not anymore, you're in special victims?
25      A    Yes.

Page 68

1       Q    Previously you were?
2       A    Yes.
3       Q    Does DeKalb County provide officers with
4  training on how to perform traffic stops?
5       A    Yes, they do.
6       Q    Is that training mandatory?
7       A    Yes.
8       Q    How often is it required?
9       A    I don't believe it's required continually.
10 It's -- we do it in the academy.  Then usually,
11 every couple of years we do different trainings on
12 making traffic stops.  I don't believe it's
13 required.  It's just part of the in-service training
14 we receive.
15      Q    The taser incident in 2014 that's the
16 subject of your other lawsuit, was that use of force
17 investigated?
18      A    A use of force report was done.  I believe
19 that's forwarded to internal affairs and they look
20 at it.  I believe that was the extent of the
21 investigation.
22      Q    Okay.  Were you disciplined as a result of
23 that incident?
24      A    No, I was not.
25      Q    Did you receive any taser retraining?

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton                                                June 22, 2017

Page 69

1     A    No, I was not -- did not.
2     Q    Have you ever been the subject of an
3   internal affairs investigation for excessive force?
4     A    The incident in 2009, it may have began
5   as -- the complaint may have been an excessive
6   force.  I don't recall exactly.
7     Q    The incident in 2009 is the one that found
8   that you had struck --
9     A    Yes.
10    Q    -- the complaining party with your police
11  car?
12    A    Yes.
13    Q    Were you disciplined as a result of that
14  incident?
15    A    I believe I received a written counseling
16  for failure to obey common safety practices.
17    Q    Have you ever been disciplined at work on
18  any other occasions?
19    A    Yes.
20    Q    And I'm just talking about your work as a
21  police officer.
22    A    Yes.
23    Q    You been disciplined for conduct
24  unbecoming an officer?
25    A    Yes.

Page 70

1     Q    Tell me about that.
2     A    It was a verbal counseling.  I was a
3   backup officer on a traffic stop while I was in the
4   traffic unit.  The officer that made the traffic
5   stop was attempting to issue citations to the
6   driver.  She, prior to being released from the
7   traffic stop, attempted to roll her windows up.  We
8   were on the side of I-20, on the shoulder of I-20.
9   She attempted to roll her windows up and put the
10  vehicle in drive as if she was going to pull away.
11  I grabbed her window and told her if she didn't
12  stop, I was going to break her window.  She
13  complained and I was given a verbal counseling for
14  conduct unbecoming.
15    Q    What were the allegations against you?
16    A    I don't specifically remember what she
17  listed as the allegations.
18    Q    Was there video of the incident?
19    A    Yes, I believe she videoed it.
20    Q    Did internal affairs find that your
21  account of the incident was not consistent with what
22  they saw on the video?
23    A    I don't know.
24    Q    That would be reflected in your personnel
25  file if they made such a finding?

Page 71

1     A    I don't know.
2     Q    Okay.  Have you ever seen a copy of your
3   personnel file?
4     A    No.
5     Q    What discipline resulted from that
6   incident?
7     A    A verbal counseling.
8     Q    What does that involve?
9     A    I was counseled verbally by a supervisor.
10    Q    Face to face?
11    A    Yes.
12    Q    Have you ever been disciplined by DeKalb
13  County on any other occasions?
14    A    I believe for traffic accidents, just
15  regular accidents.
16    Q    Okay.  Anything else involving
17  interactions with the public?
18    A    No.
19    Q    Or with the subject of an arrest?
20    A    I don't believe so.
21    Q    Have you ever been the subject of an
22  internal affairs investigation that did not result
23  in discipline?
24    A    Yes.
25    Q    Tell me about that.

Page 72

1     A    I had a person complain that I had
2   arrested him on a -- I forget what the charges were,
3   but I arrested him and he complained that his money
4   was missing and filed a complaint with internal
5   affairs.
6     Q    Did he also complain that you had planted
7   marijuana on him?
8     A    Yes, I believe he did.
9     Q    Do you contend that he was lying?
10    A    Absolutely he was lying.
11    Q    Are you aware that internal affairs gave
12  him a polygraph test?
13    A    No.
14    Q    You didn't know that?
15    A    No, didn't know.
16    Q    Did they give you a polygraph test?
17    A    No.
18    Q    Are there any other occasions that you
19  have been the subject of an internal affairs
20  investigation that did not result in discipline?
21    A    I don't believe so.
22    Q    Would you take a look at Exhibit 14, just
23  to clean-up the whole POST training thing, and tell
24  me if you have any reason to believe that that
25  wouldn't reflect the training that you had as of

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton                                                                    June 22, 2017

Page 73

1   that date?
2        A    It appears to be accurate up to that date.
3             (BENTON NUMBER 15 WAS
4             MARKED FOR IDENTIFICATION.)
5   BY MR. MOORE:
6        Q    Okay.  I will hand you what I have marked
7   Exhibit 15.  Here is a copy for you.  It's the same
8   one we have used before.  I'd ask you if you
9   recognize that document?
10       A    I do.
11       Q    Tell me what it is.
12       A    It is the -- appears to be the county
13  policy on the use of tasers.
14       Q    Do you see the date on the bottom
15  left-hand corner?
16       A    Yes.
17       Q    10-2014?
18       A    Yes.
19       Q    Would that be the version of the policy
20  that was current as of August the 6th of 2015?
21       A    To the best of my knowledge.
22       Q    As we go through it, if you see anything
23  that you're aware changed between 10-2014 and
24  August the 6th, 2015, will you let me know?
25       A    Yes.

Page 74

1        Q    I'd like you to look at the first page of
2   the exhibit under the heading policy.  Do you see
3   that?
4        A    Yes.
5        Q    Do you see where it says ECD?  That stands
6   for electronic control device; is that right?
7        A    Yes, that's correct.
8        Q    That's the same as the taser?
9        A    Yes.
10       Q    May be used to control resistant or
11  aggressive individuals in arrest or other
12  enforcement situations.
13            Was Troy Robinson a resistant or
14  aggressive individual?
15       A    Yes, he was.
16       Q    In what way?
17       A    Fleeing.
18       Q    So fleeing constitutes not aggression, I
19  suppose, but resistance in your view?
20       A    Active resistance, yes.
21       Q    It is the policy of this agency that
22  officers use an ECD when warranted, but only in
23  accordance with the guidelines set forth here, in
24  training, and in the use of force policy.  Do you
25  see that?  The second sentence.

Page 75

1        A    Yes.
2        Q    Is that your understanding of your
3   responsibilities as a taser carrying officer on
4   August the 6th of 2015?
5        A    Yes.
6        Q    That you had to adhere to the guidelines
7   set forth in this policy?
8        A    Yes.
9        Q    Under procedures, do you see where it says
10  that?
11       A    Yes, I do.
12       Q    Do you see the subheading authorization?
13       A    Yes, I do.
14       Q    And sentence one under authorization
15  reads, only officers who have completed the
16  prescribed course of instruction on the use of the
17  ECD will be authorized to carry the device?
18       A    Yes, I see that.
19       Q    Okay.  And the second sentence there
20  refers to the basic certification.
21       A    Yes.
22       Q    Is that the certification course that you
23  took when you were first issued the taser?
24       A    Yes, I believe so.  I believe that's what
25  that was.

Page 76

1        Q    What year would that have been?
2        A    Again, I think it was 2008.  I'm not
3   exactly sure.
4        Q    And then sentence three here says
5   recertification shall be conducted once a year.
6        A    Yes.
7        Q    12 months in a year?
8        A    Yes, there are 12 months in a year.
9        Q    On August the 6th of 2015, when was the
10  most recent taser recertification that you had
11  taken?  You can look at the exhibit if you need to
12  refresh your recollection.
13       A    It appears that the most recent one was
14  April of 2014.
15       Q    So it's about 16 months prior to the
16  incident?
17       A    Yes.  It was 2014.
18       Q    So you had not conducted an annual
19  recertification in 2015?
20       A    I was recertified in 2015, October, I
21  believe; once per year.
22       Q    So is it your understanding that once per
23  year would allow you to do a recertification in
24  January of one calendar year and then not do another
25  one until December of the following calendar year?

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton                                                    June 22, 2017

Page 77

1      A     I understand it as meaning once per year.
2  Once each calendar year.
3      Q     Not once every 12 months?
4      A     No.  It reads once per year.
5      Q     So if every other officer who has
6  testified in depositions in this case were to say
7  that they were required to be recertified once every
8  12 months, you would disagree with that?
9      A     I would say they were mistaken.
10     Q     Including your supervisors?
11     A     I would say they were mistaken.
12     Q     That recertification course that you
13  hadn't yet taken in 2015 would have covered this
14  policy, wouldn't it?
15     A     Yes.
16     Q     Turn to the next page of Exhibit 15,
17  please?
18     A     (Witness complies).
19     Q     Do you see at the top of the page where it
20  says prior to deployment?
21     A     Yes, I see that.
22     Q     Okay.  And is it your understanding that
23  this section of the use of force policy sets forth
24  factors that are to be considered before you deploy
25  your taser?

Page 78

1      A     Yes.
2      Q     So let's look at paragraph one.  An
3  officer's response level to subject resistance
4  should always be based upon reasonable
5  objectiveness.  What do you think that means?
6      A     It means that I should make a reasonable
7  decision based on the circumstances that I have.
8      Q     I will keep reading.  And depending upon
9  subject slash officer factors, such as age, size,
10  weight, and the subject's apparent ability to
11  physically challenge the officer or do harm to
12  himself or others, comma, balanced against the
13  seriousness of the incident.  Do you have an
14  understanding of what that means?
15     A     Yes.
16     Q     Tell me.
17     A     It means I have to weigh all those things
18  in my decision.
19     Q     Okay.  So you have to weigh the age, size,
20  and weight of the subject, and his or her apparent
21  ability to physically challenge the officer, that's
22  you, or to do harm to himself or others, right?
23     A     Yes.
24     Q     And you have to weigh all that against the
25  seriousness of the incident?

Page 79

1      A     Against the totality of the circumstances,
2  yes.
3      Q     That's not what it says, is it?
4      A     Well, it says reasonable objectiveness.  I
5  believe that would include the totality of the
6  circumstances.
7      Q     What do you understand the phrase
8  seriousness of the incident to mean?
9      A     I don't know how to define it other than
10  seriousness of the incident.  How serious the
11  incident is.
12     Q     What incident?
13     A     Whatever incident you're responding to.
14     Q     Well, in the case of Troy Robinson, what
15  would the incident be?
16     A     It began as a traffic stop.  Based on the
17  totality of the circumstances with the odor of
18  marijuana, with the driver lying about a gun,
19  locating a gun, the passenger fleeing after refusing
20  to -- after not identifying himself.  The passenger
21  holding his waistband as if possibly concealing
22  something, running into a residential area.  Based
23  on the totality of the circumstances, all of those,
24  is considered to the seriousness of the event.
25     Q     Did Troy Robinson ever physically

Page 80

1  challenge you?
2      A     No.
3      Q     Or anyone else?
4      A     No.
5      Q     Let's look at paragraph two.  An officer's
6  decision to deploy the ECD shall involve an arrest
7  or a custodial situation.  Let's stop there.  Did
8  you have probable cause to arrest Troy Robinson?
9      A     Based on the odor of marijuana, I had
10  reason to detain the driver and the passenger of the
11  vehicle.
12     Q     That's not exactly responsive to my
13  question.  My question was whether you had probable
14  cause to arrest Troy Robinson?
15     A     Based on the odor of marijuana, I would
16  say that, yes, I could temporarily detain him which
17  would be considered an arrest, I suppose.
18     Q     Wherein, the subject is escalating
19  resistance from passive physical resistance towards
20  active physical resistance.  Do you have an
21  understanding of what those terms mean?
22     A     Yes, I do.
23     Q     Tell me what your understanding is.
24     A     Passive physical resistance would mean
25  simply just kind of being uncooperative, maybe

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton                                                    June 22, 2017

Page 81

1   moving away.  Active physical resistance could be --
2   the way I would define it, would be engaging in some
3   type of -- the best evidence shows, engaging muscle
4   groups to actively resist an arrest or the
5   situation.  Fleeing, running, would be included in
6   that.
7        Q     What else would be included in that?
8        A     Fighting, physically pulling away.  Things
9   of that nature.
10       Q     Paragraph three says the primary purpose
11  in the decision to deploy the ECD is to prevent a
12  continuing escalation of the subject's resistance or
13  violence and to minimize injury to both the officer
14  and the subject.  Do you believe that -- do you have
15  an understanding of what that language means?
16       A     Yes, I believe I do.
17       Q     Can you explain it?
18       A     It means the purpose of deploying the
19  taser, the ECD.  Exactly what it says, to prevent
20  the continuing escalation, prevent the resistance
21  from continuing.
22       Q     Well, the word escalation means something
23  different from just continuing, right?
24       A     The resistance escalated from a traffic
25  stop to fleeing, so it was escalating already.

Page 82

1        Q     Okay.  So if someone is fleeing, is it
2   your understanding that that is sufficient ground to
3   use a taser to stop them?
4        A     Not in and of itself, no.
5        Q     So I go back to escalation of the
6   subject's resistance.  Does that mean anything other
7   than keeping on running?
8        A     I'm sorry.  Rephrase your question.
9        Q     Okay.  Escalation seems to mean something
10  is getting worse.  He was already running before you
11  used the taser?
12       A     Uh-huh.
13       Q     Continuing to run.  Is that an escalation
14  to you?
15       A     No.  The effort is to prevent escalation.
16  If I had been able to, if I was close enough to, to
17  actually use just my hands, that could have resulted
18  in escalation of the use of force.  The goal is to
19  prevent that escalation.
20       Q     It says or violence.  Troy Robinson didn't
21  use any violence against anyone, did he?
22       A     No.
23       Q     And then it says, and to minimize the
24  injury to both the officers and subjects.  You
25  weren't at risk of any injury, were you?

Page 83

1        A     No.
2        Q     And using the taser on Troy Robinson
3   didn't minimize his risk of injury, did it?
4        A     I believe if it would have been effective
5   it would have.
6        Q     Let's look at paragraph four.  Prior to
7   deployment of the ECD, officers must take into
8   consideration environmental factors which may
9   contribute to serious injury.  These factors
10  include, but are not limited to, subjects standing
11  on or near the edge of a roof, stairwells, next to a
12  window, or body of water.
13       If Troy Robinson were at the top of the
14  concrete wall at the time you deployed the taser,
15  and I understand that was not your testimony, but if
16  he had been, this policy would have required you to
17  consider that fact before deploying the taser,
18  right?
19       A     Yes.  Hypothetically, if he was on top of
20  the wall, yes.
21       Q     Okay.  If he was in a position where a
22  fall could cause him serious injury or death, it
23  would not have been proper for you to use the taser
24  on him?
25       A     If he was in that position, yes.

Page 84

1        Q     Look at paragraph five.  It gives some
2   guidelines for deployment.  Do you agree with that?
3        A     Yes, it does.
4        Q     It says an ECD can be utilized under the
5   following circumstances.  A, when the subject is
6   exhibiting threatening body language associated with
7   verbal threats or refusing to comply with the
8   officer's instructions and the subject has the
9   apparent ability to physically challenge the
10  officer.  Threatening body language includes, but is
11  not limited to, one, blading the body, two, assuming
12  a boxer stance, three, circling or surrounding the
13  officer, four, moving the hands from open to closed
14  forming a first, et cetera.  Troy Robinson didn't do
15  anything described in that section of the policy,
16  did he?
17       A     No.  I believe he had the ability to, but
18  no, he did not blade his body or assume a boxer
19  stance or any of those things.
20       Q     He didn't physically challenge you in any
21  way?
22       A     No, not with violence.
23       Q     Well, okay, I want to be clear.  Do you
24  think he physically challenged you in some way?
25       A     No, that's what I'm saying.  He didn't

Page 85

1  physically challenge me with any type of violence
2  listed here, blading the body, assuming the boxer
3  stance or anything.
4      Q    Okay.  Do you understand physically
5  challenging you to understand to include anything
6  that he did?
7      A    No.
8      Q    Let's look at Subsection D.  When a
9  subject makes physically evasive movements to defeat
10 an officer's attempts to control.  This may be in
11 the form of bracing or tensing of the body, attempts
12 to kick, push or pull away.  Three, not allowing the
13 officer to get close to him.  Do you think that Troy
14 Robinson did any of those things?
15     A    Yes.
16     Q    What?
17     A    He did not allow me to get close to him.
18     Q    And that's because he ran?
19     A    Yes.
20     Q    Okay.  So when you say that he did
21 something listed in Subsection B here, you're just
22 talking about him running away?
23     A    Yes.
24     Q    Let's look at Subsection C.  When a
25 subject makes overt, hostile attacking movements,

Page 86

1  which may cause injury, but are not likely to cause
2  death or great bodily harm to the officer or others.
3  Troy Robinson didn't do that, did he?
4      A    No.
5      Q    D, when a subject makes overt, hostile
6  attacking movements with or without a weapon, with
7  the intent and apparent ability to cause death or
8  great bodily harm to the officer or others.  He
9  didn't do that either, did he?
10     A    No.
11     Q    Then E, when lesser force options may be
12 ineffective.  Do you believe that applied?
13     A    Yes.
14     Q    Why?
15     A    Because I didn't have an option of using a
16 lesser level of force.  I wasn't close enough to
17 touch him.  You mentioned the ASP baton which would
18 have been impractical.  You mentioned OC spray which
19 would have been impractical based on the distance.
20 So, lesser force options would not have been
21 effective.
22     Q    Effective to stop him from running away?
23     A    Yes, to apprehend him.
24     Q    Turn to the next page.  The top of the
25 page, paragraph nine.  Do you see that?

Page 87

1      A    Yes.
2      Q    It says at the beginning of each shift,
3  the ECD shall be tested to insure it is functioning
4  properly.  It is the responsibility of each officer
5  to test the ECD prior to the shift or part-time job
6  to immediately report any improperly functioning ECD
7  to their supervisor.  Did you comply with that
8  paragraph?
9      A    I don't believe I tested it at the
10 beginning of the shift, no.
11     Q    Do you habitually test your ECD at the
12 beginning of each shift?
13     A    Probably not at the beginning of each
14 shift.
15     Q    How often do you test it?
16     A    I don't know.
17     Q    Roughly?
18     A    I don't know.  Maybe once a week.  Maybe
19 more than that.  Less than that.  I don't know.
20     Q    Let's look at Section C, deployment.  Do
21 you see that?
22     A    Yes.
23     Q    Paragraph one, the ECD should be deployed
24 at the same level of force as OC spray.  What's OC
25 spray?

Page 88

1      A    Pepper spray.
2      Q    So pepper spray is not a lethal level of
3  force, is it?
4      A    No, it is not.
5      Q    And usually the taser is not?
6      A    The taser is not a lethal level of force.
7      Q    When I say -- to be clear, when I say a
8  lethal level of force, I mean a level of force that
9  can cause someone's death.  Is that what you
10 understand it to mean?
11     A    I understand it to mean that the taser is
12 not a lethal level of force.
13     Q    Okay.  So if someone is sitting in a
14 window on a second story building, or if someone is
15 standing at the edge of a highway overpass, or at
16 the edge of a swimming pool, or lying in a public
17 gasoline, if you use a taser on a person in those
18 circumstances, it could kill them, right?
19     A    The result could, but the taser is still
20 classified as a not lethal -- non-lethal level of
21 force.
22     Q    Okay.  But just standing on the edge of a
23 highway overpass doesn't kill anybody, does it?
24     A    No.
25     Q    Okay.  If you taser a person who is

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton                                                    June 22, 2017

Page 89

1   standing at the edge of a highway overpass, that is
2   likely to result in their death because they will
3   fall, right?
4       A    They will probably fall, yes.
5       Q    Most people fall when they're hit with a
6   taser?
7       A    Yes.
8       Q    Same if they're standing at the edge of a
9   swimming pool, right?
10      A    Yes.
11      Q    They're likely to fall into the pool?
12      A    Yes.
13      Q    And their muscles will be locked up and
14  they won't be able to swim?
15      A    That's correct.
16      Q    Okay.  And the same would apply to a
17  person who is at the top of an eight foot wall,
18  right?
19      A    Elevated position, yes.
20      Q    Paragraph four states that the point of
21  aim for front deployment of the taser should be
22  lower center of mass when possible.  The taser
23  should be aimed at the suspect's back to reduce risk
24  of injury.  Is that your practice when you're
25  deploying your taser?

Page 90

1       A    Yes.
2       Q    Is that what you did with Troy Robinson?
3       A    Yes.
4       Q    Look at paragraph seven down at the bottom
5   of the page.  It reads, the ECD will cause most
6   everyone to fall and therefore should not be used
7   when the risk of falling would likely result in
8   death, for example, on a roof or next to a swimming
9   pool.  That's your understanding of DeKalb County
10  policy?
11      A    Yes.
12      Q    And so, if someone is at an elevated
13  height, you would agree it's not appropriate to use
14  the taser on the subject?
15      A    I agree.
16      Q    Turn the page, let's look at paragraph 12.
17  It reads, if practical, the officer should verbally
18  warn the subject that they will be subjected to a
19  50,000 volt electrical charge if they do not comply.
20  Did you say that to Troy Robinson?
21      A    No, I did not.
22      Q    Why not?
23      A    I had been running for quite some
24  distance.  It was trying to get radio traffic out,
25  so I did not say anything to him.

Page 91

1       Q    Officers should also give verbal warnings
2   of taser, taser, taser.  Did you do that?
3       A    No, I did not.
4       Q    Did you broadcast a code ECD via the radio
5   channel?
6       A    I don't see the code ECD here.
7       Q    Toward the end of paragraph 12, last --
8   second to last sentence.
9       A    No, I did not.
10      Q    Okay.
11      A    That warning is for other officers.  It's
12  not for the suspect.
13      Q    Paragraph 13 states that the ECD has a
14  built-in five second timer.  Is that your experience
15  in using the ECD?
16      A    Yes.
17      Q    What does the timer do?
18      A    At the end of five seconds, the taser
19  turns -- the taser doesn't turn off, but the shock
20  stops.
21      Q    Do you have to hold the trigger for five
22  seconds?
23      A    No.
24      Q    The second sentence states.  The
25  electrical current will continue for the full five

Page 92

1   seconds every time the trigger is depressed.  Is
2   that your experience as a taser user?
3       A    That's the way I understand it, yes.
4       Q    Is that your experience from personally
5   using a taser on subjects?
6       A    I have never used a taser for more than
7   one cycle.
8       Q    And one cycle is five seconds, right?
9       A    Yes.
10      Q    And the electrical shock continues for the
11  full five seconds?
12      A    Yes.
13      Q    Unless special circumstances dictate, the
14  five second cycle should never be stopped early.
15  How would you stop the five second cycle early?
16      A    Turn the taser off.
17      Q    How do you turn it off?
18      A    Thumb switch on the side.
19      Q    Section D talks about what has to happen
20  after deployment of a taser, correct?
21      A    Yes.
22      Q    Is it your understanding from this policy
23  and your training with DeKalb County that your
24  immediate supervisor is to go to the scene when an
25  ECD is deployed?

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton                                    June 22, 2017

Page 93

```
 1      A   Yes, I believe so.  Can I read this
 2  paragraph?
 3      Q   Absolutely.  Go ahead.
 4      A   Yes.  That's my understanding.
 5      Q   Okay.  And that the supervisor is to
 6  photograph the subject and the probe placement
 7  before the probes are removed?
 8      A   Yes, that's what I understand.
 9      Q   Okay.  And that after removal, the
10  supervisor is to photograph any marks left on the
11  subject by the ECD as well as the probes with the
12  cartridge?
13      A   Yes, that's what I understand.
14      Q   When it says with the cartilage, what part
15  of the taser is the cartridge?
16      A   It's the part that physically attaches to
17  the front of the taser that holds the wire and the
18  probes.
19      Q   After you fire the taser, do the wires
20  remain attached to the cartridge?
21      A   They should, unless they break, yes.
22      Q   Okay.  And they remain attached to the
23  probes at the other end?
24      A   Yes.
25      Q   And that's how the circuit is completed to
```

Page 94

```
 1  deliver the charge?
 2      A   Correct.
 3      Q   After you deployed your taser on the
 4  Family Dollar side of the wall, did you remove the
 5  cartridge from the taser?
 6      A   Yes, I did.
 7      Q   What did you do with the cartridge?
 8      A   I dropped it on the ground.
 9      Q   Why did you do that?
10      A   To reload another cartridge.
11      Q   You carry a spare cartridge in the handle
12  of the taser?
13      A   Yes.
14      Q   How many spare cartridges do you carry?
15      A   One spare.
16      Q   Where did the cartridge go?
17      A   I dropped it on the ground.  I didn't look
18  to see where it went after that.
19      Q   Where were you standing?
20      A   Just off the parking lot where I deployed
21  the taser.
22      Q   Same spot?
23      A   Yes.
24      Q   Did you notice if the wires were attached
25  to the cartridge when you dropped it?
```

Page 95

```
 1      A   I don't know.
 2      Q   Did you see where it fell?
 3      A   No.  I dropped it on ground.
 4              (BENTON NUMBER 16 WAS
 5              MARKED FOR IDENTIFICATION.)
 6  BY MR. MOORE:
 7      Q   I will hand you Exhibit 16 and a copy to
 8  counsel.  I will ask you if you recognize this
 9  document?
10      A   It appears to be the incident report.
11      Q   Have you ever seen it before?
12      A   No, I have not.
13      Q   Can you tell from the document who
14  prepared it?
15      A   Officer C. M. Franklin.
16      Q   I'd like you to read the narrative on the
17  second to last page.  Read over that, please, and
18  tell me if you see anything that is not accurate?
19          MR. ROSS:  I'm going to object to the
20      extent it calls for Officer Benton to
21      speculate.
22  BY MR. MOORE:
23      Q   I'm not asking you to speculate.  When I
24  say accurate, I'm asking if you see anything that's
25  inconsistent with your understanding of what
```

Page 96

```
 1  happened.
 2      A   I didn't know that Officer Franklin had
 3  handed the weapon off to Officer Niemann.  And I
 4  thought it was Officer Niemann that was walking
 5  around to obtain the passenger's information.
 6      Q   Do you see at the bottom of the second to
 7  last paragraph it says, I heard over the radio that
 8  Officer Benton confronted John Doe behind the Family
 9  Dollar Store and deployed his taser?
10      A   Yes.
11      Q   Is John Doe Troy Robinson, to your
12  understanding?
13      A   To my understanding, yes.
14      Q   That's the only person you --
15      A   Yes.
16      Q   -- deployed a taser on?
17      A   Yes.
18      Q   The word confronted, that seems to imply
19  that he was facing you.  If it implies that, that's
20  not accurate, is it?
21      A   He was not facing me.
22      Q   Would this radio report have been made by
23  you?
24      A   I would assume he's referring to when I
25  advised my supervisor over the radio when I deployed
```

Case 1:18-cv-01518-CAP   Document 50   Filed 07/31/19   Page 25 of 64

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton                                    June 22, 2017

Page 97

1   the taser.
2       Q    So confronted there would just be
3   presumably Officer Franklin's choice of words,
4   that's not what you said on the radio?
5       A    No, that is not what I said over the
6   radio.
7       Q    Look at the last page, please.
8       A    Okay.
9       Q    Can you read that narrative?  I will read
10  it out loud.  While patrolling the Highlands East --
11  while patrolling in the Highland East Apartments --
12  that's not accurately the name of the apartment
13  complex, is it?
14      A    I believe it's The Highlands of East
15  Atlanta.
16      Q    At 2151 Flat Shoals Road.  In the parking
17  lot near Building N.  Now, is that the area where
18  Mr. Robinson fell when he went over the wall?
19      A    I don't know what building it is, where he
20  was.
21      Q    Okay.  I observed a green item on the
22  ground.  Upon looking at the item, I noticed that
23  the item was the door to a taser cartridge.  I
24  notified supervisor in reference to the door being
25  evidence from the incident that occurred on last

Page 98

1   week.  He noted that the report date on this
2   supplemental report is 8-12-2015.
3       A    (Witness nods head up and down).
4       Q    See original case report.  The door was
5   collected and transported to CID and property sheet
6   was made out and relinquished over to CID Commander
7   Captain Rutland.  Badge Number 1849.  The evidence
8   was placed on her desk per Captain Rutland's
9   request.  If this taser cartridge door came from
10  your taser, do you have any explanation for how it
11  got on the other side of the wall?
12      A    No.
13          MR. MOORE:  Let's take a break.
14          THE VIDEOGRAPHER:  This concludes video
15      unit number one of the deposition.  We'll be
16      off the record at 12 noon.
17          (WHEREUPON, A SHORT BREAK WAS HAD
18      IN THE DEPOSITION.)
19          THE VIDEOGRAPHER:  This is the beginning
20      of video unit number two of the deposition of
21      Officer Casey Benton.  The time is 12:08.
22      We're on the record.
23  BY MR. MOORE:
24      Q    Officer Benton, you understand you're
25  still under oath?

Page 99

1       A    Yes, I do.
2       Q    Did anything that happened during the
3   break refresh your memory about any of the facts of
4   the case?
5       A    No.
6       Q    When you were chasing Troy Robinson from
7   the traffic stop to the spot behind the Family
8   Dollar, were you running flatout, fast as you could?
9       A    I believe I was, yes.
10      Q    Okay.  Have you ever timed yourself
11  running?
12      A    No.
13      Q    Or been timed as part of a physical test
14  with DeKalb County?
15      A    We get timed in the academy, yes.
16      Q    But not since then?
17      A    I don't believe so.
18      Q    Do you have any idea how long it takes you
19  to run 100 yards?
20      A    I have no idea.
21      Q    How long it takes you to run 15 feet?
22      A    I have no idea.
23      Q    And you and Troy Robinson were running
24  about the same speed, you said, until he slowed
25  down?

Page 100

1       A    I don't believe I was gaining or losing
2   distance on him, so yes.
3       Q    In August 2015, did you know where to look
4   on a drive-out tag for its expiration date?
5       A    Yes.
6       Q    How long would it have taken you to
7   examine the tag to determine whether it contained a
8   tag expiration date?
9       A    Rephrase your question.
10      Q    Well, if you wanted to locate an
11  expiration date on the drive-out tag, how long would
12  it take you to do that?
13      A    Just a second.  It's labeled expiration
14  date, I believe.
15      Q    It's right there on the tag?
16      A    Yes.
17      Q    It's printed?
18      A    The date or the word expiration date?
19      Q    The date itself.
20      A    Yes, typically.
21      Q    Do you believe that taking a second to
22  examine the tag after you stopped the vehicle would
23  have violated any DeKalb County procedures?
24      A    No.
25      Q    Do you believe that it would have placed

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton
June 22, 2017

Page 101

1  you in danger to take that time?
2      A   No, not necessarily.  But, my focus was on
3  the occupants of the vehicle.
4      Q   If you had seen the tag having a valid
5  expiration date when you approached the SUV from
6  behind after stopping it, would you have terminated
7  the stop and simply let the driver proceed on?
8      A   Probably.
9      Q   If you had been able to confirm -- let me
10  rephrase.
11          If you had confirmed as you walked toward
12  the rear of the white SUV that it had a valid
13  expiration date, would DeKalb County police
14  procedures then in force and effect have allowed you
15  to ask the occupants for ID and registration
16  documents?
17      A   Yes, I believe they would have.  Because,
18  as I was speaking with the driver initially, I
19  detected the odor of marijuana.
20      Q   So is your answer predicated on the
21  assumption that you see the valid expiration date on
22  the tag and then walk up to the window preparing to
23  let the driver go, but then smell marijuana and that
24  gives reason to ask for ID and registration?
25          MR. ROSS:  Objection.  I think the

Page 102

1      question is ambiguous.
2  BY MR. MOORE:
3      Q   I'll rephrase.  Apart from the smell of
4  marijuana which you have testified about, if you had
5  not smelled that, if you had confirmed that there
6  was a valid expiration date on the tag, would DeKalb
7  County police procedures have allowed you to
8  continue to detain the occupants of the vehicle?
9      A   No.
10      Q   If you had seen the tag having a valid
11  expiration date as you approached it from the rear,
12  would you have had arguable probable cause to
13  conduct any further investigation related to the
14  occupants of the white SUV?
15          MR. ROSS:  Objection.  Calls for a legal
16      conclusion.
17  BY MR. MOORE:
18      Q   Your understanding --
19      A   I want to clarify something, if I could.
20  So the expiration date is required to be written at
21  a certain size and a certain location on the tag.
22  So the fact that it wasn't written at a certain size
23  clearly legible is still a violation even if it is
24  written on the tag.  So, let me go back to that
25  previous question.  I believe I still would have had

Page 103

1  cause to issue a citation because it's required to
2  be written legibly at a certain -- and the letters
3  to be a certain size, I believe.
4      Q   Have you examined the tag?
5      A   I have seen pictures of it.
6      Q   When did you see pictures of it?
7      A   Mr. Ross showed me a picture of it and I
8  believe internal affairs showed me a picture of it.
9      Q   Did you tell internal affairs that you
10  thought the tag violated Georgia law?
11      A   I believe in my written statement, I put
12  in there that the tag is required to have letters
13  written at a certain height -- in my written
14  statement to internal affairs.
15      Q   Did you measure the letters?
16      A   No, I didn't.  Clearly legible at a
17  certain height.
18      Q   So you think the letters were not clearly
19  legible in the date?
20      A   Yes.  I believe if they were clearly
21  legible I would have seen them.
22      Q   Well, you did see them when you examined
23  the picture of the tag, right?
24      A   Yes, after the fact.
25      Q   So from that examination, you think the

Page 104

1  date was not clearly legible?
2      A   Yes.
3      Q   Yes, it was not legible?
4      A   It was not clearly written or clearly
5  legible, yes.
6      Q   Is that phrase clearly legible a legal
7  standard, to your understanding?
8      A   I don't know if that's the direct phrasing
9  of the code section or not, but that's my
10  understanding of it.
11      Q   So you think that the tag violated a
12  provision of the Official Code of Georgia?
13      A   Yes.
14      Q   I don't suppose you know the code section
15  off the top of your head?
16      A   Not off the top of my head, no.
17      Q   How serious an incident is marijuana use
18  under your understanding of the DeKalb County use of
19  force policy?
20          MR. ROSS:  Objection; calls for
21      speculation.
22  BY MR. MOORE:
23      Q   I will rephrase the question.  Do you
24  remember when we looked at the DeKalb County use of
25  force policy together, one of the factors you were

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton                                              June 22, 2017

Page 105

1  to consider before deploying your taser was the
2  seriousness of the incident?
3       A    Yes.
4       Q    In the range of incidents that you might
5  be considering using a taser to apprehend someone
6  for, how serious is smoking marijuana?
7       A    Well, I didn't deploy the taser because I
8  smelled marijuana.  What I said was it was the
9  totality of the circumstances that I took into
10 consideration.
11      Q    Okay.  You deployed the taser because you
12 didn't want to let Mr. Robinson get away, right?
13      A    Yes.  I was attempting to apprehend him,
14 yes.
15      Q    And you weren't trying to apprehend him
16 because of a tag violation, right?
17      A    I was giving chase based on the totality
18 of the circumstances; everything that we had, that
19 was going on at the time.
20      Q    Including the tag violation, that was part
21 of it?
22      A    Yes, that's what initiated the traffic
23 stop; totality of the circumstances.
24      Q    Okay.  Well, Mr. Robinson wasn't even the
25 driver, right?

Page 106

1       A    No, he was not.
2       Q    Okay.  So, I don't understand how the tag
3  violation could factor into your decision to use a
4  taser on Mr. Robinson.
5       A    The tag violation was the reason for the
6  traffic stop.  So, I weigh in the totality of the
7  circumstances, the reason for the traffic, the
8  weapon, the lying about a weapon, Mr. Robinson not
9  identifying himself, the odor of marijuana, holding
10 his waist band as if possibly concealing a weapon;
11 the totality of the circumstances.
12      Q    Mr. Robinson didn't lie about a weapon,
13 did he?
14      A    I never asked Mr. Robinson.
15      Q    So the answer is no?
16      A    No.
17      Q    Mr. Robinson didn't have a weapon, did he?
18      A    Not to my knowledge.  I never heard after
19 the fact.
20      Q    You don't know of any evidence that he had
21 a weapon?
22      A    No, I don't.
23      Q    So I'm trying to figure out what
24 specifically you're referring to when you use this
25 phrase totality of the circumstances.  I want to try

Page 107

1  to get away from that phrase because I don't -- it's
2  too broad for me to understand it.  I want to
3  understand what the specific circumstances were that
4  add up to that totality.  And specifically, I want
5  to ask you which ones are relevant to your decision
6  to use a taser to apprehend Mr. Robinson.  You
7  wouldn't use a taser to apprehend someone to keep
8  them from leaving the scene of somebody else's
9  traffic violation, right?
10      A    No, not necessarily.
11      Q    Okay.  If someone is running away from you
12 because -- if you walked up to someone and you
13 smelled marijuana, and you walked up to them to
14 confront them about that and they ran away from you,
15 would that be enough, in your view, to use the taser
16 to apprehend them?
17      A    I believe if I had reason to make a
18 custodial stop, then yes.
19      Q    Because you smelled marijuana?
20      A    Yes.
21      Q    In the vicinity of that person?
22      A    Yes.  Well, coming from that person --
23 from their person.
24      Q    Well, now, you never smelled marijuana
25 coming from Mr. Robinson's person specifically, did

Page 108

1  you?
2       A    No.  I smelled marijuana in the vehicle.
3  You were asking about a different situation a second
4  ago.
5       Q    True.  In the realm of incidents for which
6  you might use a taser to keep someone from leaving,
7  how serious is having a drive-out tag with no
8  expiration date?
9       A    I'm still not sure I understand your
10 question.  A drive-out tag with no expiration date
11 is a misdemeanor offense.
12      Q    So is possession of less than an ounce of
13 marijuana, right?
14      A    Yes, it is.
15      Q    So is smoking marijuana?
16      A    Yes.  Possession is.
17      Q    Which is essentially possession?
18      A    Yes.
19      Q    Misdemeanor is punishable by less than a
20 year?
21      A    Yes.
22      Q    If someone is running away from the scene
23 of a felony, is it your understanding that you're
24 allowed to shoot them in the back?
25      A    No, that is not my understanding.

Page 109

1   Q   If someone is running away from the scene
2   of a felony and they are going over an eight foot
3   wall from which they could fall and be killed, is it
4   your understanding that you could use the taser on
5   them in that position?
6   A   While they're on top of the wall?
7   Q   Right.
8   A   No, that is not my understanding.
9   Q   So if somebody is running away from the
10  scene of a possible misdemeanor and they are on top
11  of a eight foot wall, you would agree that you're
12  not allowed to use the taser to apprehend them?
13  A   I would agree you should not use the taser
14  on a person that's at an elevated position.
15  Q   No matter what they are running away from?
16  A   Yes.
17  Q   What if they are not on top of an eight
18  foot wall and they're just running away from the
19  scene of a misdemeanor, you think a misdemeanor has
20  occurred and they are running away, is that running
21  away from the scene of a misdemeanor by itself
22  sufficient to justify using a taser on that person?
23  A   If I have probable cause to make a
24  custodial stop and they flee from that custodial
25  stop, then yes.

Page 110

1   Q   Have you received any training from DeKalb
2   County on the subject of what constitutes a
3   sufficiently serious incident to justify the use of
4   a taser against a fleeing subject?
5   A   We have training on the policy of the
6   taser.
7   Q   Does that training on the taser policy
8   include any training on how serious an incident has
9   to be before it is justified to use a taser to stop
10  someone from running away?
11  A   No, I don't believe it is.
12  Q   Do you understand that the policy states
13  that a subject's flight all by itself is not a
14  sufficient reason to use the taser?
15  A   Yes, I understand that.
16  Q   Where do you think the line is where it is
17  sufficient justification to use the taser?
18  A   The way I understand where it says flight,
19  is not -- the flight in and of itself is not
20  sufficient cause.  The way I understand that would
21  be if I were to make a -- just a tier one or a --
22  just walk up, talk to somebody, no reason to make a
23  custodial stop and they would flee, that would not
24  justify the use of a taser, simply fleeing.
25  Q   In your view, if you have stopped a

Page 111

1   vehicle for a traffic violation -- I'm trying to
2   understand what you mean by custodial stop -- is
3   that a custodial stop of a passenger in the vehicle?
4   A   The traffic violation?
5   Q   If you have pulled over a vehicle for a
6   traffic violation, the passenger is not at that
7   point in a custodial stop?
8   A   No.  However, the odor of marijuana causes
9   it to be a custodial stop, passenger and driver.
10  Q   Okay.  So if you had not smelled marijuana
11  and the passenger had gotten out and ran, he would
12  not be leaving the scene of a custodial stop?
13  A   I wouldn't have any -- in my opinion, I
14  don't believe I have any reason to stop him, no.
15  Q   Do you believe that it's the official
16  policy of the DeKalb County Police Department that
17  you are authorized to use a taser on someone because
18  they are fleeing from a custodial stop?
19  A   My understanding of the policy is when a
20  person moves from passive physical resistance to
21  active physical resistance, that you have to have a
22  cause to stop them.  Once they move from passive
23  physical resistance to active physical resistance,
24  the policy allows you to -- the use of the taser.
25  Q   And do you have to have probable cause?

Page 112

1   A   Yes.
2   MR. MOORE:  I don't have anything else.
3   MR. ROSS:  I have no questions.
4   THE VIDEOGRAPHER:  This concludes the
5   deposition at 12:26 p.m. consisting of two
6   media units.  We're off the record.
7   (WHEREUPON, THE DEPOSITION WAS
8   CONCLUDED AT 12:26 P.M.)
9   (PURSUANT TO RULE 30(e) OF THE FEDERAL
10  RULES OF CIVIL PROCEDURE AND/OR O.C.G.A.
11  9-11-30(e), SIGNATURE OF THE WITNESS HAS BEEN
12  RESERVED.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton                                                    June 22, 2017

Page 113

```
1            C E R T I F I C A T E
2    STATE OF GEORGIA )
3    COUNTY OF HALL  )
4            I hereby certify that the foregoing
5    transcript was taken down, as stated in the
6    caption, and the proceedings were reduced to
7    typewriting under my direction and control.
8            I further certify that the transcript is a
9    true and correct record of the evidence given
10   at the said proceedings.
11           I further certify that I am neither a
12   relative or employee or attorney or counsel to
13   any of the parties, nor financially or
14   otherwise interested in this matter.
15           This, the 11th day of July, 2017.
16
17
18
        MICHELLE J. RUIZ
19      CERTIFIED COURT REPORTER, B-1397
20
21
22
23
24
25
```

Page 114

```
1         DISCLOSURE OF NO CONTRACT
2    I, Michelle J. Ruiz, Certified Court
     Reporter, do hereby disclose pursuant to
3    Article 10.B of the Rules and Regulations of
     the Board of Court Reporting of the Judicial
4    Council of Georgia that I am a Georgia
     Certified Court Reporter; I was contacted by
5    the party taking the deposition to provide
     court reporting services for this deposition; I
6    will not be taking this deposition under any
     contract that is prohibited by O.C.G.A.
7    15-14-37(a) and (b) or Article 7.C of the Rules
     and Regulations of the Board; and I am not
8    disqualified for a relationship of interest
     under O.C.G.A. 9-11-28(c).
9         There is no contract to provide reporting
     services between myself or any person with whom
10   I have a principal and agency relationship nor
     any attorney at law in this action, party to
11   this action, party having a financial interest
     in this action, or agent for an attorney at law
12   in this action, party to this action, or party
     having a financial interest in this action.
13   Any and all financial arrangements beyond my
     usual and customary rates have been disclosed
14   and offered to all parties.
15        This, the 11th day of July, 2017.
16
17
18   Michelle J. Ruiz
     Certified Court Reporter
19   Certificate Number B-1397
20
21
22
23
24
25
```

Page 115

```
1    CASE:  Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
2    NAME OF WITNESS:   Officer Casey Benton
3          The preceding deposition was taken
4    in the matter, on the date and at the time and
5    place set out on the title page hereof.
6
7          It was requested that the deposition
8    be taken by the reporter and that same be
9    reduced to typewritten form.
10
11         It was agreed by and between counsel
12   and the parties that the deponent will read and
13   sign the transcript of said deposition.
14
15         Said jurat is to be returned within
16   30 days following receipt of the transcript to
17   the following address:
18
19         Elizabeth Gallo Court Reporting, LLC
20         2900 Chamblee Tucker Road
21         Building 13, First Floor
22         Atlanta, Georgia 30341
23
24
25
```

Page 116

```
1    NAME OF CASE:     Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
     DATE OF DEPOSITION: 06/22/2017
2    NAME OF WITNESS:  Officer Casey Benton
3    EGCR Job No.:    39425
4              CERTIFICATE
5         Before me this day personally
     appeared OFFICER CASEY BENTON, who, being duly
6    sworn, states that the foregoing transcript of
     his/her deposition, taken in the matter, on
7    the date and at the time and place set out on
     the title page hereof, constitutes a true and
8    accurate transcript of said deposition.
9    _____
10         OFFICER CASEY BENTON
11       SUBSCRIBED and SWORN to before me
12   this _____ day of _____ 20___.
13   in the jurisdiction aforesaid.
14
     _____   _____
15   My Commission Expires     Notary Public
16   STATE OF _____
17   COUNTY/CITY OF _____
18
19   []   No changes made to the Errata Sheet;
20   therefore, I am returning only this signed,
21   notarized certificate.
22   []   I am returning this signed,
23   notarized certificate and Errata Sheet with
24   changes noted.
25
```

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton                                                                June 22, 2017

Page 117

```
 1              Errata Sheet
 2  NAME OF CASE:     Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
 3  DATE OF DEPOSITION: 06/22/2017
 4  NAME OF WITNESS:   Officer Casey Benton
 5  Reason Codes:  1. To clarify the record
 6                 2. To correct transcription errors
 7                 3. Other
 8  _____
    _____
 9   Page _____ Line _____ Reason _____
10   From _____ to _____
11   Page _____ Line _____ Reason _____
12   From _____ to _____
13   Page _____ Line _____ Reason _____
14   From _____ to _____
15   Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
18   From _____ to _____
19   Page _____ Line _____ Reason _____
20   From _____ to _____
21   Page _____ Line _____ Reason _____
22   From _____ to _____
23
24   SIGNATURE:_____ DATE:_____
25             Officer Casey Benton
```

Page 118

```
 1              Errata Sheet
 2  NAME OF CASE:     Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
 3  DATE OF DEPOSITION: 06/22/2017
 4  NAME OF WITNESS:   Officer Casey Benton
 5  Reason Codes:  1. To clarify the record
 6                 2. To correct transcription errors
 7                 3. Other
 8  _____
    _____
 9   Page _____ Line _____ Reason _____
10   From _____ to _____
11   Page _____ Line _____ Reason _____
12   From _____ to _____
13   Page _____ Line _____ Reason _____
14   From _____ to _____
15   Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
18   From _____ to _____
19   Page _____ Line _____ Reason _____
20   From _____ to _____
21   Page _____ Line _____ Reason _____
22   From _____ to _____
23
24   SIGNATURE:_____ DATE:_____
25             Officer Casey Benton
```

Case 1:18-cv-01518-CAP  Document 50  Filed 07/31/19  Page 31 of 64
Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton                                                                    June 22, 2017

**Exhibits**

**Exhibit 13** 3:8 5:14,15

**Exhibit 14** 3:8 12:6 72:22

**Exhibit 15** 3:9 73:7 77:16

**Exhibit 16** 3:9 95:7

**Benton Exhibit Binder** 3:6

---

**0**

**001** 12:24

---

**1**

**10** 34:14 40:10 59:6,9, 17

**10-0** 34:15,21

**10-2014** 73:17,23

**100** 99:19

**10:30** 5:24

**11:01** 61:3

**11:12** 61:7

**12** 19:3 76:7,8 77:3,8 90:16 91:7 98:16

**12:08** 98:21

**12:26** 112:5,8

**13** 5:14,15 91:13

**14** 12:2,6 72:22

**15** 41:9 46:2 47:15,24 59:6,9,17 73:3,7 77:16 99:21

**16** 76:15 95:4,7

**1849** 98:7

---

**2**

**2000** 18:2,25

**2006** 15:7,8,11 17:21,23

**2007** 17:24

**2008** 18:25 43:8 76:2

**2009** 7:14 18:3 69:4,7

**2010** 18:3

**2011** 18:5

**2012** 18:5

**2014** 16:14 68:15 76:14, 17

**2015** 12:11 19:14 45:19 73:20,24 75:4 76:9,19, 20 77:13 100:3

**2017** 4:5

**2151** 97:16

**22nd** 4:5

**25** 45:16

**25th** 12:11

---

**3**

**30** 38:12 40:12

**30(e)** 112:9

---

**4**

**40** 38:12

---

**5**

**50,000** 90:19

**55** 60:22

---

**6**

**6th** 19:14 45:19 73:20, 24 75:4 76:9

---

**7**

**7:00** 19:14,21

---

**8**

**8-12-2015** 98:2

---

**9**

**9-11-30(e)** 112:11

**9:55** 4:6

---

**A**

**A-S-P** 47:12

**A.D.** 4:11

**a.m.** 4:6

**AAA** 15:2

**Aaron** 4:24 6:7

**ability** 78:10,21 84:9,17 86:7

**Absolutely** 72:10 93:3

**academy** 15:10 17:23 68:10 99:15

**accident** 15:23,25

**accidents** 71:14,15

**accordance** 74:23

**account** 70:21

**accurate** 73:2 95:18,24 96:20

**accurately** 97:12

**active** 74:20 80:20 81:1 111:21,23

**actively** 81:4

**add** 107:4

**addition** 8:18

**additional** 6:1,2

**adhere** 75:6

**administratrix** 4:8

**adult** 6:19 7:7

**Advanced** 18:19

**advantage** 47:5

**advise** 54:13

**advised** 27:23 28:18 37:23 54:14,15,18 57:18 63:13 96:25

**affairs** 10:18,23 13:16 33:12 45:2,6 68:19 69:3 70:20 71:22 72:5,11,19 103:8,9,14

**age** 78:9,19

**agency** 74:21

**aggression** 74:18

**aggressive** 74:11,14

**agree** 5:9 84:2 90:13,15 109:11,13

**agreed** 5:21

**ahead** 9:17 32:23 93:3

**aim** 89:21

**aimed** 89:23

**aiming** 50:25

**allegations** 70:15,17

**allowed** 30:22 101:14 102:7 108:24 109:12

**allowing** 85:12

**ambiguous** 102:1

**AND/OR** 112:10

**angle** 50:22

**annual** 76:18

**annually** 19:4 43:11 66:1,4

**answers** 8:14 17:7

**anymore** 36:10 67:24

**apartment** 35:7,8,9,13, 19 39:18 50:17 64:7 97:12

**apartments** 21:2,3 22:16,23 97:11

**apologize** 52:20

**apparent** 78:10,20 84:9 86:7

**apparently** 64:22

**appeared** 32:21 35:18 36:2

**appears** 73:2,12 76:13 95:10

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton

June 22, 2017

**applied** 86:12

**apply** 89:16

**apprehend** 46:22 86:23 105:5,13,15 107:6,7,16 109:12

**approach** 27:19

**approached** 27:21,22 38:17 45:24 57:14 101:5 102:11

**April** 66:19,20,21 67:18 76:14

**area** 6:20,25 20:25 21:3,5,11,13,25 22:2,19 35:12 37:8 39:13,21,24 40:3 41:3 46:2 79:22 97:17

**areas** 21:6

**arguable** 102:12

**arm** 46:9,13

**armed** 37:15,17 43:5 46:17 48:2,3

**arms** 35:22

**arrest** 71:19 74:11 80:6,8,14,17 81:4

**arrested** 72:2,3

**arrive** 53:12

**arrived** 28:13,16 29:22 51:9 53:7 56:17 59:8,12

**ASP** 47:10,14 66:11 86:17

**assigned** 21:1 22:11, 13 67:23

**assume** 9:25 20:22 84:18 96:24

**assuming** 84:11 85:2

**assumption** 101:21

**Atlanta** 6:20,21,22,24, 25 7:6,9 21:2 22:16,23 35:8 65:8 97:15

**attached** 58:10 93:20, 22 94:24

**attaches** 93:16

**attacking** 85:25 86:6

**attempt** 40:20

**attempted** 70:7,9

**attempting** 30:25 47:1 70:5 105:13

**attempts** 85:10,11

**attention** 22:21 23:4

**attorney** 17:11

**audio** 11:9 19:23

**August** 12:11,15 15:11 18:9 19:14,20 45:19 73:20,24 75:4 76:9 100:3

**authorization** 75:12, 14

**authorized** 75:17 111:17

**auto** 8:9

**aware** 39:7 50:13,15 72:11 73:23

---

**B**

**back** 16:9 26:3,21,22 28:25 29:20 30:6,22 31:4,11 35:6,9 37:7 38:8 45:19 49:19 51:1 54:12,16 56:23 57:20, 22,24,25 58:2,6,7 59:13 61:6 82:5 89:23 102:24 108:24

**back-up** 28:16

**background** 14:2

**backing** 24:8

**backs** 35:7 39:17

**backup** 70:3

**Badge** 98:7

**balanced** 78:12

**band** 106:10

**Bandy** 4:11

**bar** 51:20

**base** 53:1

**based** 36:14 37:1 56:6, 7,13 64:3 78:4,7 79:16, 22 80:9,15 86:19 105:17

**basic** 75:20

**basically** 13:13 18:7 21:12 30:23 38:22

**Bates** 12:23

**baton** 47:10,14 66:11, 12 86:17

**began** 15:10 17:21 27:11 28:5 29:24 34:7, 11 38:17 40:17 52:21 55:17 69:4 79:16

**begin** 29:24

**beginning** 6:3 36:3 52:17 87:2,10,12,13 98:19

**behalf** 4:3

**believed** 30:20 32:16 36:22 37:7 44:5 46:17, 19 47:7 53:1

**Benson** 4:14,17

**benton** 4:25 5:14,15 6:7,14,16 12:2 61:9 73:3 95:4,20 96:8 98:21,24

**big** 46:24

**birthday** 30:2

**bit** 18:19 24:8

**blade** 84:18

**blading** 84:11 85:2

**blast** 45:17 51:4

**block** 36:6

**blue** 39:1,4

**bodily** 46:16,20 47:8 86:2,8

**body** 19:24,25 20:23 50:24 83:12 84:6,10,11, 18 85:2,11

**born** 14:3,4,7,14

**bottom** 12:19 28:21 73:14 90:4 96:6

**Boulder** 44:23

**boxer** 84:12,18 85:2

**bracing** 85:11

**Bradbury** 4:8

**break** 10:2,7 60:24 61:4,13 70:12 93:21 98:13,17 99:3

**breathing** 54:16

**broad** 13:11 107:2

**broadcast** 91:4

**broken** 20:4

**brother** 7:3

**building** 88:14 97:17, 19

**buildings** 53:2

**built-in** 91:14

**bumped** 7:25

**buried** 26:9

**business** 65:10

**Butts** 7:2,4

---

**C**

**C.M.** 4:14

**calendar** 76:24,25 77:2

**call** 43:14

**called** 12:23 15:1,2 45:13 63:15

**calls** 95:20 102:15 104:20

**cam** 19:24,25 20:2,23

**capital** 47:12

**Captain** 98:7,8

**caption** 4:7

**car** 15:23,24 20:3,17,19 23:13,20,23,25 24:1 27:21 28:1,2,6,8,11,25 29:4,11,16,20,25 30:5, 9,12,21,23,24 31:4,8, 20,22,24 32:2,5,7,18 34:11,12 36:17 37:16


Elizabeth Gallo
COURT REPORTING, LLC

Case 1:18-cv-01518-CAP   Document 50   Filed 07/31/19   Page 33 of 64

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton                                                    June 22, 2017

39:10 42:12 53:19,21
58:23 59:3,7,10,16
64:25 65:3,11 69:11

**carry** 46:6,9 66:13
75:17 94:11,14

**carrying** 75:3

**cars** 44:7

**cartilage** 93:14

**cartridge** 93:12,15,20
94:5,7,10,11,16,25
97:23 98:9

**cartridges** 45:8 94:14

**Caruth** 21:23,24

**case** 4:7 7:16 15:23
16:18 17:4,7,9 77:6
79:14 98:4 99:4

**Casey** 4:14,17,25 6:7,
16 98:21

**catch** 42:10 54:5

**catching** 35:23

**caught** 22:21 23:3

**caution** 34:15

**Cbenton** 12:23

**center** 14:8 16:1 28:5,
10,21,22 35:1 89:22

**certificates** 18:12

**certification** 18:19
19:3 75:20,22

**certifications** 18:17,
18,21

**certified** 18:22

**cetera** 84:14

**chack** 26:23

**chain** 35:15,17,24 36:4,
5 38:17 40:24 45:24
48:17,24 49:12,20 50:8
51:15,21

**challenge** 78:11,21
80:1 84:9,20 85:1

**challenged** 84:24

**challenging** 85:5

**chance** 29:7,12 35:23
37:17

**change** 41:13

**changed** 18:8 73:23

**channel** 91:5

**charge** 90:19 94:1

**charged** 33:19

**charges** 72:2

**chase** 34:24 35:10
38:2,9,14 44:9 52:17
105:17

**chasing** 7:23 34:7,10,
13 35:14 44:5,9 45:20
99:6

**check** 58:17

**chest** 42:4

**Chevron** 27:17

**choice** 97:3

**CID** 57:9 58:23 59:3,7,
10,16 98:5,6

**circling** 84:12

**circuit** 93:25

**circumstances** 56:7
64:3 78:7 79:1,6,17,23
84:5 88:18 92:13 105:9,
18,23 106:7,11,25
107:3

**citation** 33:15 103:1

**citations** 70:5

**city** 6:22 14:6,8

**CIVIL** 112:10

**claim** 8:1

**claimed** 8:4

**clarify** 102:19

**Clarke** 7:3

**classified** 88:20

**Clayton** 14:22

**clean-up** 72:23

**clear** 19:19 20:8 84:23
88:7

**climb** 36:4

**climbed** 50:8,11

**close** 7:22 23:24 82:16
85:13,17 86:16

**closed** 84:13

**closely** 65:1

**closer** 24:13

**clothes** 58:6,8

**code** 34:14 91:4,6
104:9,12,14

**collapse** 51:25

**collected** 98:5

**college** 14:19,20

**color** 45:17

**Columbus** 14:22

**combined** 18:5

**comma** 78:12

**Commander** 98:6

**commercial** 18:4,6,14,
16

**commit** 56:5

**committed** 36:13,23

**common** 69:16

**communicated** 55:21

**communication** 13:14

**complain** 72:1,6

**complained** 70:13
72:3

**complaining** 69:10

**complaint** 69:5 72:4

**complete** 7:25 15:13
47:19

**completed** 75:15
93:25

**completely** 36:9 51:18

**complex** 22:14,15
23:3,7,18 24:3,6,7,9,10,
21 27:9 35:7,8,9,14,19
39:18 42:14 50:18
52:23 53:20 54:20

55:19,22 56:1,2,23 60:2
63:5 64:7 97:13

**complexes** 22:12

**complies** 77:18

**comply** 84:7 87:7
90:19

**concealing** 36:20
79:21 106:10

**concerned** 26:11

**concerns** 10:21 13:10

**CONCLUDED** 112:8

**concludes** 98:14 112:4

**conclusion** 102:16

**concrete** 36:6,7 49:1,3
83:14

**conduct** 69:23 70:14
102:13

**conducted** 76:5,18

**confirm** 101:9

**confirmed** 101:11
102:5

**confiscated** 63:23

**confront** 107:14

**confronted** 96:8,18
97:2

**confusing** 9:16

**consideration** 83:8
105:10

**considered** 77:24
79:24 80:17

**consistent** 70:21

**consisting** 112:5

**console** 28:5,10,20,21,
22

**consolidate** 54:21

**constitutes** 74:18
110:2

**contained** 100:7

**contend** 72:9

**context** 7:15 13:11



Case 1:18-cv-01518-CAP   Document 50   Filed 07/31/19   Page 34 of 64

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton                                                     June 22, 2017

continually 68:9

continue 35:19 91:25
  102:8

continued 27:13 34:24
  35:10,14 36:3

continues 92:10

continuing 40:19
  81:12,20,21,23 82:13

contraband 36:22

contribute 83:9

control 12:20 30:24
  74:6,10 85:10

conversation 9:6
  28:13,15 30:3 63:10

convicted 17:18

Cooper 15:2

copy 11:22,23,25 12:6
  13:4 71:2 73:7 95:7

corner 12:20 27:18
  35:2 73:15

correct 6:5 19:13 46:11
  48:20,23 53:14 54:10
  60:18 74:7 89:15 92:20
  94:2

counsel 4:18 5:9 9:11,
  20 11:7 95:8

counsel's 9:14

counseled 71:9

counseling 69:15
  70:2,13 71:7

counties 7:1

county 4:16 6:17,18
  7:2,3,4 15:20,21 16:5,7,
  18 17:13 19:9,12 65:12
  68:3 71:13 73:12 90:9
  92:23 99:14 100:23
  101:13 102:7 104:18,24
  110:2 111:16

couple 11:2 15:12 21:2
  23:1 41:15 49:15,17
  67:20 68:11

court 4:4,20 5:12 8:15,
  18,19,25 9:7,14 16:21
  17:3

courthouse 16:19

cover 66:9,22

covered 77:13

covers 66:10

created 12:10 13:9,15

Crest 44:23

crime 17:18 21:6 36:13,
  23,24 37:2 56:5,8

crimes 21:4

criminal 18:9

crowd 56:21

current 12:17,18 67:10
  73:20 91:25

custodial 80:7 107:18
  109:24 110:23 111:2,3,
  7,9,12,18

cut 24:12,14 39:22

cut-through 39:20

cycle 92:7,8,14,15

D

D'ROSA 4:12

danger 37:9 47:8 101:1

dark 44:25

dash 19:24 20:2

date 4:4 12:9,12,18
  21:16 25:1 26:7,13,14
  33:11,22 34:1,3 60:10
  62:3,5,8,9,11,16,25
  63:6,13,16 64:13,16,19,
  23 65:2,7 73:1,2,14
  98:1 100:4,8,11,14,18,
  19 101:5,13,21 102:6,
  11,20 103:19 104:1
  108:8,10

Davis 4:12

day 19:18 44:24 67:6

days 67:21

dealer 26:16,20

death 46:16,20 47:8
  83:22 86:2,7 88:9 89:2

90:8

Decatur 14:4,6

December 76:25

decided 40:19 55:19

decision 54:19 78:7,18
  80:6 81:11 106:3 107:5

declined 6:2

defeat 85:9

defendant 5:24 6:2

defendants 4:24 5:6

define 79:9 81:2

Dekalb 4:15 14:7,10
  15:20 16:18 17:13 19:8,
  12 65:12 68:3 71:12
  90:9 92:23 99:14
  100:23 101:13 102:6
  104:18,24 110:1 111:16

deliver 94:1

department 15:7
  17:13,21,23 111:16

depending 78:8

deploy 77:24 80:6
  81:11 105:7

deployed 36:1 49:8
  52:19,20 53:5,9 54:24
  55:1 83:14 87:23 92:25
  94:3,20 96:9,16,25
  105:11

deploying 66:24 81:18
  83:17 89:25 105:1

deployment 77:20
  83:7 84:2 87:20 89:21
  92:20

deposed 7:11 8:10

deposition 5:7,10,11,
  20,21 6:1,7 10:11 17:4
  61:5 67:4 98:15,18,20
  112:5,7

depositions 77:6

depressed 92:1

description 27:13
  37:24 52:13 59:24

desk 98:8

details 67:11

detain 80:10,16 102:8

detected 101:19

determine 23:9 100:7

determined 63:18,22

device 19:24 74:6
  75:17

dictate 92:13

difference 46:24

difficult 8:25 9:7

digging 30:24

direct 104:8

direction 37:24 52:13

directions 52:25

directly 48:9

dirt 35:12 41:3 46:2

disagree 77:8

discharged 50:14

discipline 71:5,23
  72:20

disciplined 68:22
  69:13,17,23 71:12

discussed 5:20

dispute 50:19

distance 7:23 38:13,
  19,20 86:19 90:24
  100:2

divided 22:12

division 7:6 18:4,10
  57:10

Dobson 4:13

dock 15:5,6

document 12:12,20,
  21,22 73:9 95:9,13

documents 13:8,10
  17:6 101:16

Doe 96:8,11

Dollar 35:4,7,11,13
  38:5 39:14 42:19 43:1
  46:3 49:19 51:9 52:9



Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton
June 22, 2017

54:24 94:4 96:9 99:8

**door** 29:1 51:4 97:23,24 98:4,9

**downward** 50:22

**draw** 45:21 46:4,12,22 47:3,13,22

**drawing** 46:7,8,10

**drawn** 46:18 47:9

**drew** 35:21,24,25 44:11

**drill** 66:24

**drive** 16:1 64:8 70:10

**drive-out** 23:12 24:25 26:17 100:4,11 108:7, 10

**driver** 25:11 27:22 28:1,3,17,24 29:6,20 30:6,13,22 31:13,16,17 33:15 34:8 36:16 54:19 55:9,18,20 60:1 62:2,13 65:9 70:6 79:18 80:10 101:7,18,23 105:25 111:9

**driver's** 27:20,24 28:12,17 29:1 31:9

**driving** 15:4

**drop** 47:4

**dropped** 94:8,17,25 95:3

**drove** 65:7

**drugs** 31:22,24 32:2,5, 8,11

**DUI** 7:20 20:18,20,21

**duly** 5:1

---

### E

**e-mail** 13:18

**e-mails** 13:12

**earlier** 46:1 52:12 63:11

**early** 6:4 92:14,15

**easier** 8:22

**East** 21:2 22:16,22 35:8 65:8 97:10,11,14

**ECD** 74:5,22 75:17 80:6 81:11,19 83:7 84:4 87:3,5,6,11,23 90:5 91:4,6,13,15 92:25 93:11

**edge** 41:5,6 44:20,21 83:11 88:15,16,22 89:1, 8

**effect** 36:2 101:14

**effective** 83:4 86:21,22

**effort** 82:15

**electrical** 90:19 91:25 92:10

**electronic** 74:6

**elevated** 89:19 90:12 109:14

**elevation** 41:14

**Elizabeth** 4:4

**else's** 107:8

**embankment** 49:18

**emergency** 25:6,9 27:16

**EMS** 54:15 57:4,16

**encounter** 47:6

**end** 91:7,18 93:23

**ended** 16:3

**enforcement** 18:4,12, 15 67:23 74:12

**engaging** 81:2,3

**enter** 23:4 24:21

**entered** 40:3

**entire** 25:6 31:18 38:1

**entrance** 22:24 57:3

**environmental** 83:8

**equipment** 25:6,9 27:16

**equipped** 20:2,20

**escalated** 81:24

**escalating** 80:18 81:25

**escalation** 81:12,20,22 82:5,9,13,15,18,19

**escort** 54:19 55:19,21 56:2

**escorted** 64:6

**essentially** 108:17

**Estate** 4:8

**estimate** 59:18

**evasive** 85:9

**event** 79:24

**eventually** 21:15

**evidence** 81:3 97:25 98:7 106:20

**examination** 6:12 103:25

**examine** 57:11,12 58:4 65:1 100:7,22

**examined** 5:1 103:4,22

**excessive** 69:3,5

**excuse** 27:22 29:23

**exhibit** 5:10 12:6 72:22 73:7 74:2 76:11 77:16 95:7

**exhibiting** 84:6

**exit** 22:24,25 23:4,8,11 24:13,15,16,18,20 32:13 42:18

**exited** 33:7 34:4,6 35:11

**exiting** 23:3

**expect** 56:11

**expected** 56:14

**experience** 91:14 92:2, 4

**expiration** 23:13 25:1 26:12,14 33:22 34:1,3 60:10 62:3,5,7,9,11,16, 25 63:13,16 64:13,16, 19,23 65:2,7 100:4,8, 11,13,18 101:5,13,21 102:6,11,20 108:8,10

**expired** 26:24 27:1

**explain** 81:17

**explanation** 98:10

**extent** 39:12 45:6 68:20 95:20

**eyes** 31:13,17

---

### F

**face** 71:10

**Facebook** 13:25

**facing** 30:14 47:25 96:19,21

**fact** 20:17 36:11 37:13 48:2 83:17 102:22 103:24 106:19

**factor** 106:3

**factors** 77:24 78:9 83:8,9 104:25

**facts** 10:14 61:14 99:3

**failure** 69:16

**Fair** 9:25 10:1 13:7

**fall** 41:21 83:22 89:3,4, 5,11 90:6 109:3

**falling** 90:7

**family** 6:24 35:4,7,11, 13 38:4 39:14 42:19 43:1 46:3 49:19 51:9 52:9 54:24 94:4 96:8 99:7

**fast** 54:2,4 99:8

**Fayette** 27:14

**Fayetteville** 25:12 27:14,15,18 34:7,25 35:2 38:11,12

**February** 17:24

**federal** 16:21 17:3 112:9

**feel** 30:15 38:15 40:21

**feet** 29:2 30:13 38:10, 12 40:23 41:9,15,19,25 45:16 46:2 47:15,24 48:18,25 49:4,14,15,17

---



Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton

June 22, 2017

99:21

**fell** 44:16,19,20 52:4
95:2 97:18

**felony** 108:23 109:2

**felt** 37:16

**fence** 35:15,17,20,21,
24 36:4,5 38:18,19
40:18,19,20,22,25 41:8,
11,17,18,22,25 42:19
43:1 45:24 47:17 48:18,
24 49:12,16,20 50:9
51:15,21,23,25

**field** 18:12

**fight** 44:11

**Fighting** 81:8

**figure** 106:23

**file** 70:25 71:3

**filed** 5:11 16:7 72:4

**find** 70:20

**finding** 70:25

**fine** 5:13

**finished** 17:24,25

**fire** 93:19

**firearm** 31:5,8,11

**firearms** 18:18 66:12

**fired** 48:18 49:23 50:21
51:3,10 54:8

**fists** 44:10

**fixed** 20:22

**Flat** 23:14 25:12 27:10,
14,18 35:2,4 38:5 97:16

**flatout** 99:8

**fled** 44:6 55:13

**flee** 16:3 109:24 110:23

**fleeing** 7:19 36:3,19
54:5 65:16 74:17,18
79:19 81:5,25 82:1
110:4,24 111:18

**flight** 110:13,18,19

**focus** 65:3,4 101:2

**follow** 23:6 25:2

**follow-up** 11:1 61:16,
23

**foot** 7:20,24 34:8 35:16
37:23 38:14 41:24
42:22 44:9 45:20 52:16,
17 89:17 109:2,11,18

**force** 20:19,21 45:4
57:7 59:23 60:17 65:13,
15,24,25 66:5,10 68:16,
18 69:3,6 74:24 77:23
82:18 86:11,16,20
87:24 88:3,6,8,12,21
101:14 104:19,25

**forget** 72:2

**form** 13:13 85:11

**forming** 84:14

**forward** 5:22 31:1 36:6

**forwarded** 45:5 68:19

**found** 28:20 37:16
55:15 69:7

**Franklin** 4:15 22:5,10
23:20 24:2 28:12,15,23
31:9,12,16 34:8,13
54:17 55:9,10,16,24
56:3 57:3 59:25 60:6,7
63:3 64:7,22 95:15 96:2

**Franklin's** 97:3

**Frazier** 22:7

**fresh** 65:21

**friend** 4:10,12,13

**front** 28:12,18 89:21
93:17

**FTO** 17:24

**full** 6:15 7:24 91:25
92:11

**function** 9:14

**functioning** 87:3,6

## G

**G.B.** 4:9

**gained** 38:19,20

**gaining** 38:15 100:1

**Gallo** 4:4

**gas** 27:17

**gasoline** 88:17

**gate** 22:24 23:8,11
24:15,16,19,20 65:8

**gathering** 56:22

**gauged** 49:9

**gave** 10:18,22,23 11:3
37:22,24 52:12,24
58:24 59:23 60:15
72:11

**GBI** 10:23 11:1,4 13:17
33:12 64:4

**general** 14:10 18:18
59:24

**Georgia** 4:16 103:10
104:12

**give** 9:1 10:6 17:6
35:10 72:16 91:1

**giving** 23:15 27:11
52:21 105:17

**goal** 82:18

**good** 4:2 9:3 37:17

**grabbed** 36:6 70:11

**graciously** 5:21

**graduated** 14:17 17:23

**grassy** 35:12 41:3 46:2

**great** 9:10 46:16,20
47:8 86:2,8

**greatly** 47:18

**green** 45:18 97:21

**grew** 14:4,15

**ground** 35:25 38:16
41:10,21 49:20 82:2
94:8,17 95:3 97:22

**groups** 81:4

**guess** 10:17 14:7,12
16:3,11,12,25 21:4
32:21 43:14 57:9

**guide** 57:4

**guidelines** 74:23 75:6
84:2

**gun** 79:18,19

## H

**habitually** 87:11

**hand** 31:5 34:24 46:4,5,
7,8,10 73:6 95:7

**handcuffed** 56:20

**handcuffs** 57:14,16
59:13

**handed** 28:22 31:12
96:3

**handgun** 28:19,21,22

**handle** 94:11

**hands** 32:19,22 36:5,7
51:16 82:17 84:13

**hanging** 29:2 30:14

**happen** 92:19

**happened** 22:25 31:7
34:5 36:15 44:15 59:24
60:1 96:1 99:2

**happening** 16:24

**harm** 46:20 47:8 78:11,
22 86:2,8

**Harold** 4:23

**head** 8:24 28:4 36:6
41:25 42:5 51:17 98:3
104:15,16

**heading** 74:2

**hear** 42:16 51:6 52:2
61:12

**heard** 16:23 17:1 33:6
48:5 50:19 54:12,14
56:15 96:7 106:18

**height** 35:15 42:6
90:13 103:13,17

**Henry** 4:3 6:18

**high** 14:16,17 40:23
49:3

**higher** 49:11,13,14,15

Case 1:18-cv-01518-CAP  Document 50  Filed 07/31/19  Page 37 of 64

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton                                    June 22, 2017

**Highland** 97:11

**Highlands** 21:1 22:16, 22 35:8 65:8 97:10,14

**highway** 88:15,23 89:1

**history** 17:20

**hit** 7:20 8:5 89:5

**hitting** 8:4

**hold** 91:21

**holding** 34:16,18,21,23 36:20 37:13 79:21 106:9

**holds** 93:17

**Honestly** 49:9

**hostile** 85:25 86:5

**hour** 66:15

**Howard** 4:3

**Hudson** 22:6

**hunt** 26:10

**Hypothetically** 83:19

---
**I**

**I-20** 70:8

**ID** 29:21 30:25 101:15, 24

**idea** 14:11 16:17 54:3 99:18,20,22

**IDENTIFICATION** 5:16 12:3 73:4 95:5

**identify** 36:18

**identifying** 79:20 106:9

**immediately** 34:7 87:6

**implies** 96:19

**imply** 96:18

**important** 8:23 9:4

**impractical** 86:18,19

**improperly** 87:6

**in-service** 66:18 68:13

**incident** 7:16,18 10:20, 25 13:9,19 15:22 16:13 33:11 43:16 45:3 58:21 59:21 63:7 68:15,23 69:4,7,14 70:18,21 71:6 76:16 78:13,25 79:8,10, 11,12,13,15 95:10 97:25 104:17 105:2 110:3,8

**incidents** 105:4 108:5

**include** 13:12 65:15,18 79:5 83:10 85:5 110:8

**included** 66:12 81:5,7

**includes** 84:10

**including** 52:11 66:11 77:10 105:20

**inconsistent** 95:25

**individual** 12:22 74:14

**individually** 16:10

**individuals** 74:11

**ineffective** 86:12

**information** 26:1,4,8, 9,22 30:1 63:14 96:5

**initially** 20:18 36:16 38:8 101:18

**initiate** 23:16 25:5 27:16

**initiated** 105:22

**injured** 52:6

**injuries** 8:1,2

**injury** 46:16 81:13 82:24,25 83:3,9,22 86:1 89:24

**inside** 22:22 41:2 50:17

**inspections** 18:16

**installed** 45:9

**instruction** 75:16

**instructions** 52:22 84:8

**instructor** 18:17,18

**insurance** 8:9

**insure** 87:3

**intent** 86:7

**interactions** 71:17

**internal** 10:18,22 13:16 33:12 45:2,6 68:19 69:3 70:20 71:22 72:4,11,19 103:8,9,14

**interrogatories** 17:7

**investigate** 31:1

**investigated** 68:17

**investigation** 45:3,7 64:4,5 68:21 69:3 71:22 72:20 102:13

**investigations** 18:10

**investigative** 57:10

**involve** 71:8 80:6

**involving** 7:16 15:16 71:16

**issue** 33:15 45:14 62:12 70:5 103:1

**issued** 18:25 19:1 26:7, 16,20 43:7 75:23

**item** 97:21,22,23

---
**J**

**J.B.** 4:9

**January** 76:24

**jeans** 39:1,4

**Jerry** 21:22

**Jo** 4:7

**job** 9:3 87:5

**John** 96:8,11

**Jonesboro** 14:5,15,17

**June** 4:5

**jury** 7:7

**justification** 110:17

**justified** 110:9

**justify** 109:22 110:3,24

---
**K**

**keeping** 38:16,23 82:7

**kick** 85:12

**kill** 88:18,23

**killed** 109:3

**kind** 21:17 24:12 26:5,9 28:3 29:2 30:2 34:11 35:12,15 39:10 41:13 44:20 52:13 54:21 80:25

**knee** 42:1,3

**kneeling** 56:21 57:13

**knew** 20:11 26:15,17, 19 30:8 31:17 39:10,12 57:16

**knowing** 32:18

**knowledge** 42:13,24 50:1 63:18,21 65:21 73:21 106:18

---
**L**

**L.O.** 4:15

**labeled** 100:13

**language** 81:15 84:6, 10

**large** 18:16

**law** 17:13 18:12 103:10

**lawful** 63:19

**lawsuit** 8:6 10:21 13:10,11 15:16 16:7,12 68:16

**lawsuits** 15:17 17:16

**lawyers** 12:21

**lead** 56:3

**leading** 54:20

**leaned** 36:6

**learn** 63:2

**learned** 34:2 48:3,4 62:24



Case 1:18-cv-01518-CAP   Document 50   Filed 07/31/19   Page 38 of 64

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton                                                June 22, 2017

**leaving** 107:8 108:6
111:12

**led** 58:12

**left** 15:6 27:10,15 30:11
31:3 34:23 52:9 60:20
93:10

**left-hand** 73:15

**leg** 36:8 51:17

**legal** 6:15 102:15 104:6

**legible** 102:23 103:16,
19,21 104:1,3,5,6

**legibly** 103:2

**Leighton** 4:22

**lesser** 86:11,16,20

**lethal** 88:2,6,8,12,20

**letters** 103:2,12,15,18

**level** 41:25 78:3 86:16
87:24 88:2,6,8,12,20

**levels** 66:10

**license** 25:17,18 27:24

**lie** 106:12

**lieutenant** 56:20 57:13,
15 59:13

**lieutenants** 59:1

**light** 19:20

**lights** 53:22

**limited** 83:10 84:11

**limits** 14:9

**link** 35:15,17,24 36:4,5
38:18 40:25 45:24
48:18,24 49:12,20 50:9
51:15,21

**listed** 70:17 85:2,21

**litigation** 12:22

**live** 6:17 7:1,2

**lives** 7:3,4

**loaded** 36:17

**loading** 15:5

**locate** 100:10

**located** 54:13

**locating** 36:17 79:19

**location** 16:4 53:7
54:17 102:21

**locked** 89:13

**log** 67:9

**long** 10:3 16:25 18:24
25:2,13 45:15 53:15
59:4 66:14 99:18,21
100:6,11

**longer** 65:5

**looked** 11:22 104:24

**loose** 39:5

**lose** 39:23

**losing** 38:16 100:1

**lost** 51:18

**lot** 7:22 9:13 16:23 17:1
18:14 35:3,5,6,11,12
41:2,5,7 46:3 54:25
94:20 97:17

**loud** 97:10

**lower** 49:11,20 57:22,
24,25 89:22

**lying** 36:16 72:9,10
79:18 88:16 106:8

---

**M**

**made** 9:14 10:20 27:19
54:18 70:4,25 96:22
98:6

**mails** 13:12,23

**make** 5:9,17 8:22 21:11
43:23 48:12 78:6
107:17 109:23 110:21,
22

**makes** 9:6 85:9,25 86:5

**making** 48:7 68:12

**mandatory** 68:6

**maneuver** 38:18

**marijuana** 27:25 29:3,
10,17 30:20 31:2,20
36:16 37:1 64:11 72:7

79:18 80:9,15 101:19,
23 102:4 104:17 105:6,
8 106:9 107:13,19,24
108:2,13,15 111:8,10

**mark** 12:21 13:2,4

**marked** 5:14,15 12:2,5
22:23 57:8 73:4,6 95:5

**marks** 93:10

**Mary** 4:7

**mass** 89:22

**matter** 20:16 109:15

**meander** 59:15

**meaning** 77:1

**means** 5:8 10:4 34:15
78:5,6,14,17 81:15,18,
22

**measure** 103:15

**media** 13:25 112:6

**median** 16:1

**Medical** 14:8

**meet** 57:4

**Memorial** 16:1

**memory** 10:14 99:3

**mentioned** 15:15
62:12 86:17,18

**messages** 13:12,21

**met** 10:12

**metro** 6:24,25

**microphone** 61:18

**middle** 29:13,14

**mike** 19:24

**mile** 25:4,8

**mind** 24:23

**minimize** 81:13 82:23
83:3

**minimum** 43:11

**minute** 53:16

**minutes** 25:13,15 59:6,
9,17 60:22,25

**misdemeanor** 108:11,
19 109:10,19,21

**missing** 72:4

**mistaken** 77:9,11

**money** 72:3

**monitor** 4:6

**month** 15:10 16:15

**months** 15:12,14,15
19:3 76:7,8,15 77:3,8

**Moore** 4:22 5:3,13,17
6:6,11,13 12:4 60:20,25
61:8,19,20,22 73:5
95:6,22 98:13,23 102:2,
17 104:22 112:2

**morning** 4:2 5:25 18:1

**mother** 4:10,11,13

**mounted** 20:3

**move** 30:25 53:9 54:8
55:25 59:3 111:22

**moved** 17:2,11 18:1,3
57:9 58:23 59:7,8,15

**movements** 48:7,12
85:9,25 86:6

**moves** 111:20

**moving** 54:4,6 60:1
81:1 84:13

**muscle** 81:3

**muscles** 89:13

---

**N**

**named** 16:12 18:8
21:22

**narcotics** 37:1

**narrative** 95:16 97:9

**nature** 66:25 81:9

**necessarily** 101:2
107:10

**needed** 6:1

**Niemann** 4:15 22:5,9
29:22,24 31:5 34:9,11
39:7 42:10 43:2 52:21



Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton                                                   June 22, 2017

53:6,12 54:13 55:14
56:13 96:3,4

**night** 10:25 20:23 44:2

**nodding** 8:23

**nods** 98:3

**non-lethal** 88:20

**noon** 98:16

**normal** 20:19

**note** 5:23

**noted** 98:1

**notice** 5:10 94:24

**noticed** 5:8 36:2 97:22

**notified** 53:4 97:24

**number** 12:21,23
25:17,19,21,24 26:19,
20 38:10 73:3 95:4
98:7,15,20

**numbers** 13:2

---

**O**

**O.C.G.A.** 112:10

**oath** 8:11 61:10 98:25

**obey** 69:16

**object** 5:6 9:11,20 44:7
95:19

**objection** 5:4,22
101:25 102:15 104:20

**objections** 6:8 9:12,
13,15

**objectiveness** 78:5
79:4

**observed** 7:21 34:16,
17,22 97:21

**obtain** 96:5

**OC** 66:11 86:18 87:24

**occasions** 69:18 71:13
72:18

**occupants** 27:21
30:11,21 31:4 32:1,5,11
65:4 101:3,15 102:8,14

**occur** 16:13

**occurred** 16:14 50:8
97:25 109:20

**occurring** 56:8

**October** 76:20

**odor** 27:25 31:1 36:15
37:1 79:17 80:9,15
101:19 106:9 111:8

**offense** 108:11

**offered** 5:24

**officer** 4:14,15,17,25
6:7,14 22:4,5,6,9 23:19
24:2 28:12,15,16,23
29:22,23,24 31:4,9,12,
16 34:8,9,10,13 39:7
42:10 43:2 52:21 53:6,
12 54:12,17 55:9,10,14,
16,24 56:3,13 57:2,3
59:25 60:6,7 61:9 63:3
64:7,22 69:21,24 70:3,4
75:3 77:5 78:9,11,21
81:13 84:10,13 85:13
86:2,8 87:4 90:17
95:15,20 96:2,3,4,8
97:3 98:21,24

**officer's** 78:3 80:5 84:8
85:10

**officers** 7:19 44:8
56:22 65:12,20 68:3
74:22 75:15 82:24 83:7
91:1,11

**official** 104:12 111:15

**ongoing** 15:21

**online** 11:12 66:7

**open** 29:1 84:13

**operations** 18:3,7
21:14

**opinion** 111:13

**opposite** 46:7,8

**option** 86:15

**options** 86:11,20

**order** 43:23 58:19,24
59:5,10,19

**orders** 21:19 45:17

**original** 98:4

**ounce** 108:12

**outcome** 8:6,8

**overnight** 18:2

**overpass** 88:15,23
89:1

**overt** 85:25 86:5

**owner's** 26:4

---

**P**

**p.m.** 19:14 112:5,8

**pace** 38:16,23

**pages** 5:18 13:1

**panel** 7:7

**paragraph** 78:2 80:5
81:10 83:6 84:1 86:25
87:8,23 89:20 90:4,16
91:7,13 93:2 96:7

**parallel** 39:11

**paralleling** 42:12

**parents** 7:2

**parked** 65:8

**parking** 7:21 35:3,5,6,
11 41:2,5,7 46:3 54:25
94:20 97:16

**part** 21:4 43:12 50:24
64:5 68:13 93:14,16
99:13 105:20

**part-time** 87:5

**parts** 24:6

**party** 15:16,17 16:12
17:15 69:10

**passed** 23:11 65:7

**passenger** 29:19,21,
25 30:4,25 31:14,18
32:13,16 79:19,20
80:10 111:3,6,9,11

**passenger's** 30:1
32:19 96:5

**passive** 80:19,24
111:20,22

**past** 67:6

**path** 39:16

**patrol** 21:1,24 22:2,23
28:24 53:19,21 58:22
59:14

**patrolled** 21:11

**patrolling** 21:6 24:5
97:10,11

**pedestrian** 15:22,25

**pedestrian's** 16:16

**pending** 10:4,6 16:18

**Penney** 22:6 57:2

**people** 9:6 56:22 60:2
89:5

**pepper** 47:20,23 88:1,2

**perform** 19:15 43:19
68:4

**performing** 19:5

**period** 23:5

**periodically** 43:13
65:21

**person** 46:25 72:1
88:17,25 89:17 96:14
107:21,22,23,25
109:14,22 111:20

**personally** 92:4

**personnel** 70:24 71:3

**persons** 21:12

**photograph** 93:6,10

**photos** 57:7 60:12

**phrase** 79:7 104:6
106:25 107:1

**phrasing** 104:8

**physical** 80:19,20,24
81:1 99:13 111:20,21,
23

**physically** 78:11,21
79:25 81:8 84:9,20,24
85:1,4,9 93:16

**picture** 103:7,8,23

**pictures** 27:2 103:5,6

---



Case 1:18-cv-01518-CAP Document 50 Filed 07/31/19 Page 40 of 64

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton                                          June 22, 2017

**pierced** 58:3

**pistol** 46:22 47:4 50:4,5

**place** 53:10 64:14

**placement** 93:6

**plaintiff** 4:23

**plaintiffs** 5:24

**plaintiffs'** 5:9

**plan** 21:14

**planted** 72:6

**point** 28:13,15 30:17 33:6 42:10 45:20,21 49:7 51:9,10 58:19 59:10 60:23 89:20 111:7

**pointing** 50:22

**police** 15:6,10,16 17:21,22 34:14 56:4 69:10,21 101:13 102:7 111:16

**policy** 73:13,19 74:2, 21,24 75:7 77:14,23 83:16 84:15 90:10 92:22 104:19,25 110:5, 7,12 111:16,19,24

**polygraph** 72:12,16

**pool** 88:16 89:9,11 90:9

**pop** 50:2,6,7,19

**pops** 50:4

**posing** 46:15,19

**position** 83:21,25 89:19 109:5,14

**possession** 63:19 108:12,16,17

**possibly** 36:25 37:1,8 79:21 106:10

**Post** 11:18 12:24 18:19 67:2,9,12 72:23

**practical** 66:24 90:17

**practice** 89:24

**practices** 69:16

**precinct** 18:1

**precincts** 56:24

**predicated** 101:20

**preparation** 6:1 67:4

**prepare** 5:25 10:10

**prepared** 95:14

**preparing** 101:22

**prescribed** 75:16

**present** 4:3,18

**pretty** 7:9 22:8 32:22 37:17 38:8 40:24

**prevent** 81:11,19,20 82:15,19

**previous** 102:25

**previously** 10:20 68:1

**primarily** 9:12

**primary** 81:10

**printed** 11:23,25 100:17

**prior** 8:5 60:1 67:18 70:6 76:15 77:20 83:6 87:5

**probable** 24:24 80:8,13 102:12 109:23 111:25

**probe** 57:20 93:6

**probes** 51:2 93:7,11, 18,23

**PROCEDURE** 112:10

**procedures** 75:9 100:23 101:14 102:7

**proceed** 101:7

**produce** 17:6

**proper** 65:13 83:23

**properly** 87:4

**property** 98:5

**provide** 65:12 68:3

**provision** 104:12

**proximity** 58:15

**public** 71:17 88:16

**pull** 16:3 70:10 85:12

**pulled** 7:22 23:14,18 24:7,9,23 27:7,9,11 28:14 33:21 63:10 64:25 65:3 67:12,18,20 111:5

**pulling** 47:1 53:21 81:8

**pulse** 54:16

**punishable** 108:19

**purpose** 81:10,18

**PURPOSES** 5:16 12:3

**PURSUANT** 112:9

**push** 85:12

**put** 70:9 103:11

---

### Q

**quarter** 25:4,7

**question** 9:16,17,18 10:4,6 64:17 80:13 82:8 100:9 102:1,25 104:23 108:10

**questions** 8:14 9:11,21 11:1 61:16,23 112:3

**quickly** 54:6

**quiet** 28:4

**quieter** 50:5

---

### R

**R.B.** 4:9

**radio** 23:15,17,23,24 27:12 34:14,20 37:18, 21,23 52:11,22 53:4 54:15 90:24 91:4 96:7, 22,25 97:4,6

**raised** 44:10

**Rakisha** 4:10

**ran** 34:6,24 35:1,3,10, 14 36:12 39:23 85:18 107:14 111:11

**range** 105:4

**Raspberry** 17:10

**re-cert** 43:12

**reach** 35:22

**reached** 28:20 31:11 35:24 36:5 51:16

**reaching** 28:5 31:15 32:21

**read** 93:1 95:16,17 97:9

**reading** 78:8

**reads** 75:15 77:4 90:5, 17

**ready** 44:11

**realized** 40:18

**realm** 108:5

**rear** 31:9 52:9 101:12 102:11

**reason** 7:6 27:23 36:12 37:5,14 60:4 62:17 64:2,14 67:16 72:24 80:10 101:24 106:5,7 107:17 110:14,22 111:14

**reasonable** 78:4,6 79:4

**recall** 8:2,3 12:14 13:6 16:14 23:21,23 26:2,5 39:6,22 42:9,17 43:17 44:25 51:22 52:1 53:23, 24 54:1 55:23 58:1,4 63:17 69:6

**receive** 21:19 68:14,25

**received** 13:18 19:8,12 59:4,10,19 63:15 69:15 110:1

**recent** 76:10,13

**recently** 43:10

**recertification** 66:23 76:5,10,19,23 77:12

**recertified** 76:20 77:7

**recognize** 73:9 95:8

**recollection** 61:13 76:12

**record** 4:19 5:5,19,23 6:15 9:7,12 61:2,7 67:2 98:16,22 112:6

---



Case 1:18-cv-01518-CAP   Document 50   Filed 07/31/19   Page 41 of 64

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton                                                                June 22, 2017

recorded 13:13

recording 19:24

recordings 11:10

reduce 89:23

reference 15:21 21:3,6 97:24

referring 96:24 106:24

refers 75:20

reflect 72:25

reflected 67:9 70:24

refresh 76:12 99:3

refreshed 10:14 61:13

refused 16:2

refusing 79:19 84:7

regard 10:20 13:9

registered 26:3

registration 26:3,4 101:15,24

regular 71:15

related 102:13

relative 7:7

relatives 6:19

released 70:6

relevant 107:5

relinquished 98:6

reload 94:10

reloading 66:25

remain 93:20,22

remember 14:13,14 16:17 17:11 22:8 23:19 24:4,11 25:18 26:21,22 39:3,4 57:5 58:1,25 70:16 104:24

removal 93:9

remove 94:4

removed 93:7

renew 19:2

rephrase 9:19,21,23 64:17 82:8 100:9

101:10 102:3 104:23

replaced 20:22

replied 28:8

report 12:9 45:4,5 57:7 59:23 67:12 68:18 87:6 95:10 96:22 98:1,2,4

reported 20:6

reporter 4:20 8:18,19, 25 9:7

Reporting 4:4

represent 4:19

representing 17:9

request 98:9

requested 27:23

required 65:20,23,25 66:3 68:8,9,13 77:7 83:16 102:20 103:1,12

research 11:13

reserve 6:8

reserved 9:13 112:12

residential 37:8 79:22

resist 81:4

resistance 74:19,20 78:3 80:19,20,24 81:1, 12,20,24 82:6 111:20, 21,23

resistant 74:10,13

resolved 8:7

resort 8:23

responded 56:25

responding 79:13

response 78:3

responses 9:1

responsibilities 75:3

responsibility 87:4

responsive 80:12

restroom 10:2

result 68:22 69:13 71:22 72:20 88:19 89:2 90:7

resulted 71:5 82:17

retraining 68:25

retrieved 31:8,11

return 54:25

review 5:17 10:13 11:3, 9,20 61:12

reviewed 11:16 12:13 13:4 67:1

right-hand 12:19

risk 82:25 83:3 89:23 90:7

road 23:15 25:12 27:11, 14,15,18,19 34:7,25 35:2,3,4 38:11,12 44:22,23 62:1,13 97:16

roadway 34:12 44:21 53:20

robbery 44:5

Robinson 4:9 33:7 34:4,10,16,17,23,24 35:10 36:3,13,18,19 41:17 45:20 51:12 52:23 55:13 56:5,14,15, 19,21 57:11 58:15 74:13 79:14,25 80:8,14 82:3 83:2,13 84:14 85:14 86:3 90:2,20 96:11 97:18 99:6,23 105:12,24 106:4,8,12, 14,17 107:6

Robinson's 107:25

rode 24:11,13

roll 70:7,9

roof 83:11 90:8

Ross 4:24 5:4,6,19 6:5, 10 10:12 12:1 60:23 61:1 95:19 101:25 102:15 103:7 104:20 112:3

rough 59:18

Roughly 42:8 87:17

rule 62:1,13 112:9

RULES 112:10

run 7:20 8:5 25:24

26:19 34:25 38:4 39:19 82:13 99:19,21

running 7:21 35:6,9 37:7,10,12,22,23 40:15 42:15 44:10 52:16 53:1 56:4 79:22 81:5 82:7,10 85:22 86:22 90:23 99:8, 11,23 107:11 108:22 109:1,9,15,18,20 110:10

Rutland 98:7

Rutland's 98:8

---

**S**

safe 40:21

safety 18:16 28:20 30:16 69:16

Sandiford 22:6

sat 28:25 29:1,20 57:8

scale 40:20

scene 31:19 54:25 55:3,7 56:18 59:2,8,9, 12,15,20 92:24 107:8 108:22 109:1,10,19,21 111:12

school 14:16,18

search 30:5 31:22,24 32:1,7,10

searched 32:4

seat 29:2

seconds 23:2 40:4,6 51:11 91:18,22 92:1,8, 11

section 77:23 84:15 87:20 92:19 104:9,14

secure 28:19,23

segregate 58:20

sentence 74:25 75:14, 19 76:4 91:8,24

sequential 13:2

sergeant 21:22,24 57:5,6 59:22 60:12,14, 15

Elizabeth Gallo
COURT REPORTING, LLC

**sergeants** 57:5 59:1

**seriousness** 78:13,25 79:8,10,24 105:2

**served** 5:12 16:24

**session** 66:14

**set** 74:23 75:7

**sets** 77:23

**shaking** 8:24

**sheet** 98:5

**shift** 18:2 87:2,5,10,12, 14

**Shoals** 23:15 25:12 27:10,14,18 35:2,4 38:5 97:16

**shock** 91:19 92:10

**shoot** 108:24

**shopping** 35:1

**short** 23:2,5 61:4 98:17

**short-range** 23:22

**shortly** 17:25

**shot** 50:4,5

**shoulder** 42:1 70:8

**show** 12:5

**showed** 103:7,8

**shows** 81:3

**side** 27:20 28:12,18 29:25 31:10 41:22 42:19 43:1 46:7,8,9,10, 13 48:17,20,21,22 49:4, 21 53:12 55:15 56:12 70:8 92:18 94:4 98:11

**sidearm** 46:18 47:9

**sidewalk** 44:18,19,20

**sideways** 29:1

**sight** 36:9 39:23 51:18 53:2

**SIGNATURE** 112:11

**signs** 58:17

**similar** 38:13

**Simms** 63:19 64:6

**simply** 46:25 65:9 80:25 101:7 110:24

**siren** 42:16,17 53:25 54:1

**sister** 7:4

**sit** 24:15 28:25 30:22 59:10

**sitting** 22:22,23,25 23:8 24:5,22 30:13 88:13

**situation** 80:7 81:5 108:3

**situations** 74:12

**size** 78:9,19 102:21,22 103:3

**skin** 58:3,8

**slash** 78:9

**slope** 41:10

**slow** 38:18

**slowed** 47:18 99:24

**smell** 101:23 102:3

**smelled** 27:25 29:3 33:6 102:5 105:8 107:13,19,24 108:2 111:10

**smoking** 64:10 105:6 108:15

**Social** 13:25

**someone's** 88:9

**sort** 22:10

**south** 18:1

**spare** 94:11,14,15

**spark** 43:14,19

**speak** 60:4

**speaking** 27:24 101:18

**special** 18:3,7,10 67:24 92:13

**specialized** 18:11,15, 21

**specific** 22:17 27:6 107:3

**specifically** 39:3 42:9 58:1 59:2 70:16 106:24 107:4,25

**speculate** 95:21,23

**speculation** 104:21

**speed** 99:24

**Spence** 4:23

**spoke** 54:17 55:20 60:3

**spot** 40:5 53:11 54:8,23 94:22 99:7

**spray** 47:20,23 66:11 86:18 87:24,25 88:1,2

**sprint** 7:24

**stairwells** 83:11

**stance** 84:12,19 85:3

**stand** 28:11 53:8

**standard** 35:15 40:24 104:7

**Standby** 61:6

**standing** 31:9 41:11, 17,18,24 44:17 45:25 49:7 52:15 83:10 88:15, 22 89:1,8 94:19

**stands** 74:5

**start** 38:9,12

**started** 5:3 7:23 17:22 23:15 34:10 37:22

**state** 4:18 5:4,19 6:14 14:22,23

**stated** 50:18

**statement** 10:17,18,22, 23,24,25 13:8,16 60:16 103:11,14

**statements** 8:13 10:19 11:3

**states** 89:20 91:13,24 110:12

**station** 27:17

**stay** 30:21

**stayed** 18:8 34:8 59:14

**stenographic** 5:8

**stenographically** 8:20

**step** 28:11,17

**steps** 41:4,6

**sticking** 58:5

**stood** 28:17 36:4 51:15, 23 53:6,11

**stop** 7:20,25 8:5 16:2 19:15 21:12 23:10,16, 20 24:1,24 27:1,4,6,12, 16,23 28:3,7,19 31:1 32:24 33:1,6,11 36:11 40:14,15 41:1 47:16,19 54:17 55:4,7 60:5 61:17,24 63:25 64:4 70:3,5,7,12 79:16 80:7 81:25 82:3 86:22 92:15 99:7 101:7 105:23 106:6 107:18 109:24,25 110:9,23 111:2,3,7,9, 12,14,18,22

**stopped** 15:22,24,25 24:18 25:3 28:6 31:10 44:10 60:7 61:25 63:12 65:11 92:14 100:22 110:25

**stopping** 60:23 62:19 101:6

**stops** 19:6 21:12 68:4, 12 91:20

**store** 35:6 39:14 96:9

**story** 88:14

**straight** 24:10 31:3 32:23 55:3

**street** 39:10

**strip** 35:1

**struck** 69:8

**stuff** 26:2

**subheading** 75:12

**subject** 5:22 68:16 69:2 71:19,21 72:19 78:3,9,20 80:18 81:14 84:5,8 85:9,25 86:5 90:14,18 93:6,11 110:2, 4

**subject's** 78:10 81:12 82:6 110:13



Case 1:18-cv-01518-CAP   Document 50   Filed 07/31/19   Page 43 of 64

Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton                                                                    June 22, 2017

**subjected** 90:18

**subjects** 65:16 82:24
83:10 92:5

**Subsection** 85:8,21,24

**subsequent** 13:1

**sue** 16:9

**sued** 16:4

**sufficient** 82:2 109:22
110:14,17,20

**sufficiently** 110:3

**supervisor** 21:20,21
53:5 71:9 87:7 92:24
93:5,10 96:25 97:24

**supervisors** 20:11
77:10

**supplemental** 98:2

**suppose** 74:19 80:17
104:14

**supposed** 21:8,9 22:18

**surrounding** 84:12

**suspect** 7:19,21,24
44:5,6 54:5,13 91:12

**suspect's** 89:23

**suspicious** 21:12

**sustained** 8:3,4

**SUV** 19:15 22:20 23:10,
18 24:18,24 25:2,14,19
32:17 61:25 62:17,19,
20 63:10 64:8,14,19
101:5,12 102:14

**swapped** 43:9

**swear** 4:20

**swim** 89:14

**swimming** 88:16 89:9
90:8

**switch** 92:18

**sworn** 5:1 6:11

---

**T**

**T.B.** 4:9

**T.D.** 4:12

**tag** 23:12,13 24:25
25:1,17,21 26:6,15,17,
21 27:2 33:22 34:1
60:11 62:4,8,16,22,25
63:15 64:13,16,20,23
65:1,5,6 100:4,7,8,11,
15,22 101:4,22 102:6,
10,21,24 103:4,10,12,
23 104:11 105:16,20
106:2,5 108:7,10

**tag's** 63:16

**takes** 15:12 99:18,21

**taking** 8:20 100:21

**Takita** 4:13

**talk** 9:5 11:6 29:6 58:14,
20 59:11 110:22

**talked** 33:10 59:25

**talking** 9:5 25:19 29:8,
13,14 52:18 55:17
69:20 85:22

**talks** 92:19

**Tanner** 6:16

**tape** 60:21

**tased** 16:4 44:11,17

**taser** 18:22 19:11
35:21,24,25 36:1,2
43:5,7 44:11 45:9,21
46:4,6,12,22 47:3,13,22
48:19 49:8,23 50:2,8,
13,15,21 51:2,10 52:19,
21 53:5,10 54:8,24 55:1
57:19 65:18 66:2,11,16,
25 68:15,25 74:8 75:3,
23 76:10 77:25 81:19
82:3,11 83:2,14,17,23
88:5,6,11,17,19,25
89:6,21,22,25 90:14
91:2,18,19 92:2,5,6,16,
20 93:15,17,19 94:3,5,
12,21 96:9,16 97:1,23
98:9,10 105:1,5,7,11
106:4 107:6,7,15 108:6
109:4,12,13,22 110:4,6,
7,9,14,17,24 111:17,24

**tasers** 73:13

**task** 20:18,20,21

**tasked** 21:5

**team** 21:5 22:1,3,12
44:4 57:2

**tee-shirt** 39:2

**telling** 23:19 28:7

**temporarily** 80:16

**temporary** 23:12 24:25
26:17

**tensing** 85:11

**term** 13:11

**terminated** 101:6

**terms** 25:13 80:21

**test** 43:12,14,19 72:12,
16 87:5,11,15 99:13

**tested** 43:10 87:3,9

**testified** 5:2 29:3 61:14
64:18 77:6 102:4

**testimony** 8:14 24:17
50:7 83:15

**tests** 43:22

**text** 13:12,21

**thick** 39:21

**thing** 16:11 26:5 30:3
52:14 72:23

**things** 8:22,24 25:16
66:25 78:17 81:8 84:19
85:14

**thinks** 9:16

**thought** 31:20 42:13
46:21 96:4 103:10

**threat** 30:16 32:17 37:6
46:14,15,19 47:7

**threaten** 56:9

**threatening** 48:7,12
84:6,10

**threats** 84:7

**three-and-a-half**
35:16

**threw** 36:7 44:7 51:17

**Thumb** 92:18

**tier** 110:21

**time** 4:5 6:3 9:10 14:10
20:5,25 21:22 23:2,5
24:2,23 25:7,14 30:16
31:18 32:20,22 36:25
38:20 43:15,25 44:24
45:1,25 50:14 51:8 52:7
56:23 58:14 60:20
61:24,25 66:5,17 83:14
92:1 98:21 101:1
105:19

**timed** 99:10,13,15

**timer** 91:14,17

**times** 31:14

**tip** 9:15

**today** 8:13 10:11

**Today's** 4:4

**told** 20:13 21:24 23:21,
23,24,25 28:24 32:25
33:4,18,20 34:13 52:24,
25 55:11,13,23,24 59:2,
22,25 60:8 63:3,6,12
70:11

**top** 36:4 49:6,11,12,18
50:18 51:15,20,21,23
77:19 83:13,19 86:24
89:17 104:15,16 109:6,
10,17

**totality** 36:14 56:7
79:1,5,17,23 105:9,17,
23 106:6,11,25 107:4

**touch** 86:17

**traffic** 18:6 19:5,15
21:11 23:15,16 25:15
27:12 28:19 31:1 54:17
55:4,7 60:5 61:17,24
63:25 64:4 67:23 68:4,
12 70:3,4,7 71:14 79:16
81:24 90:24 99:7
105:22 106:6,7 107:9
111:1,4,6

**training** 11:16,20 12:7
17:24 18:11,14,15,20
19:5,8,11 65:13,21,24,
25 66:2,6,16 67:2,9,12
68:4,6,13 72:23,25
74:24 92:23 110:1,5,7,8

---



trainings 67:8 68:11

transcript 11:16,21
  12:7

transcripts 11:18

transferred 8:8

transport 57:17

Transportation 15:2,3

transported 98:5

travel 22:10 37:25
  52:13

trigger 91:21 92:1

Troy 4:9 33:6 34:4
  36:13 38:4 39:13 45:20
  46:17 49:19 50:8,18
  56:5 74:13 79:14,25
  80:8,14 82:20 83:2,13
  84:14 85:13 86:3 90:2,
  20 96:11 99:6,23

Troy's 50:24

truck 15:1,2 24:21 29:2

trucks 18:16

True 108:5

Tuesday 6:9

turn 7:7 25:6,9 77:16
  86:24 90:16 91:19
  92:16,17

turned 23:14 25:11
  27:10,15,17 28:4 35:5
  44:10

turns 9:4 91:19

type 7:18 16:11 19:23
  36:22 44:7 45:11,12
  81:3 85:1

types 13:8 45:8

typically 66:23 100:20

U

Uh-huh 82:12

unbecoming 69:24
  70:14

unconscious 54:14
  55:15 56:14,15,19

uncooperative 80:25

undergo 65:20,24

understand 8:11,17
  9:2,8,9,17,18,20,22,24
  10:1,9 45:5 61:9 77:1
  79:7 83:15 85:4,5
  88:10,11 92:3 93:8,13
  98:24 106:2 107:2,3
  108:9 110:12,15,18,20
  111:2

understanding 75:2
  76:22 77:22 78:14
  80:21,23 81:15 82:2
  90:9 92:22 93:4 95:25
  96:12,13 102:18 104:7,
  10,18 108:23,25 109:4,
  8 111:19

unit 18:4,6,8,10,15
  22:23 39:9 44:8 57:8,9
  58:22 59:14 70:4 98:15,
  20

units 20:16,19 28:24
  43:22 44:4,6 56:24
  112:6

University 14:22,23

unmarked 57:9

updates 56:16

user 92:2

utilized 84:4

___

V

valid 65:6 101:4,12,21
  102:6,10

vehicle 7:25 18:4,6,14
  20:2 23:1,3,6 25:11
  27:12,13,19,20 31:10
  32:14 33:7 34:4,6,9
  36:19 38:9 42:18,21
  54:19 55:18 61:25 65:4
  70:10 80:11 100:22
  101:3 102:8 108:2
  111:1,3,5

vehicles 18:17

verbal 9:1 10:24 70:2,
  13 71:7 84:7 91:1

verbally 71:9 90:17

version 73:19

versus 4:14

vicinity 107:21

victims 18:10 67:24

video 4:5 5:22 11:9
  19:23 70:18,22 98:14,
  20

video-graphic 5:25

videoed 70:19

view 74:19 107:15
  110:25

violate 62:2,13

violated 100:23 103:10
  104:11

violation 62:4,6,7 65:5
  102:23 105:16,20
  106:3,5 107:9 111:1,4,6

violence 81:13 82:20,
  21 84:22 85:1

violent 21:4

visible 21:13 22:19

vital 58:17

voice 13:12,23 28:4

volt 90:19

volume 21:4,7

___

W

waist 42:1,5 106:10

waistband 34:16,18,
  22,23 36:20 37:14
  79:21

waited 53:6

walk 27:4 54:23 62:19
  101:22 110:22

walked 31:4 101:11
  107:12,13

walking 16:1 29:24
  96:4

wall 35:20 36:7,8 40:21
  49:1,3,6,11,16 50:11,18
  51:12,14,16,17,18

52:24 53:1,13 55:14,15
  56:12 83:14,20 89:17
  94:4 97:18 98:11 109:3,
  6,11,18

wanted 5:4 57:15
  100:10

warn 90:18

warning 91:11

warnings 91:1

warranted 74:22

watch 18:1

water 83:12

weapon 28:9 30:8
  31:15 32:18 36:17,22
  37:8,16 46:21,25 47:1
  50:14,16 63:20,23 86:6
  96:3 106:8,10,12,17,21

weapons 28:1,8 29:15

wearing 38:25 39:1
  58:7

weather 19:17

week 87:18 98:1

weeks 11:2 17:25 66:7

weigh 78:17,19,24
  106:6

weight 51:25 78:10,20

Westmorland 57:6
  60:14

wheel 28:12,18

white 19:15 22:5 24:18
  39:2 62:17 101:12
  102:14

window 70:11,12 83:12
  88:14 101:22

windows 23:25 70:7,9

wire 58:10,12 93:17

wires 45:15 93:19
  94:24

witnessed 33:5,10

wood 35:12 39:17

wooded 39:13 40:3

Case 1:18-cv-01518-CAP   Document 50   Filed 07/31/19   Page 45 of 64
Mary Jo Bradley, et al. vs Officer Casey Benton, et al.
Officer Casey Benton                                            June 22, 2017

**woods**  39:19,21

**word**  81:22 96:18
  100:18

**words**  97:3

**work**  7:17 15:16 17:20
  20:4 22:12 69:17,20

**worked**  15:1,5 44:13

**working**  20:7,8,11,15
  43:23

**worse**  82:10

**write**  30:2

**written**  10:22,24 13:7,
  13 69:15 102:20,22,24
  103:2,11,13 104:4

---

**X**

---

**X-26**  43:5 45:9

---

**Y**

---

**yards**  99:19

**year**  16:25 18:9 66:19,
  20 76:1,5,7,8,21,23,24,
  25 77:1,2,4 108:20

**years**  68:11

**young**  14:12

**Yukon**  33:16



IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| MARY JO BRADLEY, as Administratrix of the Estate of Troy Robinson; R.B., R.B., T.B., J.B., and G.B., through their mother and next friend RAKISHA BANDY; A.D., A.D., and A.D., through their mother and next friend D'ROSA DAVIS; and T.D., through their mother and next friend TAKITA DODSON, | |
| Plaintiffs, | Civil Action File No. 1:16-cv-03757-WSD |
| v. | |
| OFFICER CASEY BENTON, OFFICER C.M. FRANKLIN, OFFICER L.O. NIEMANN, and DEKALB COUNTY, GEORGIA, | |
| Defendants. | |

**NOTICE OF DEPOSITION OF DEFENDANT CASEY BENTON**

Please take notice that, pursuant to the terms and provisions of Fed. R. Civ.

P. 26 and 30, pursuant to the Court's amended case management order, and by

agreement of the parties, counsel for Plaintiffs will take the deposition of



-1-

Defendant Casey Benton beginning at 10:00 p.m. on Thursday, June 22, at the

DeKalb County Law Department, 1300 Commerce Drive, Decatur, GA 30030.

The deposition will take place before an officer duly authorized to administer oaths

and will continue day to day until completed. The deposition will be recorded by

stenographic means.

Dated:  June 19, 2017                    Respectfully submitted,


*s/ Leighton Moore*
Leighton Moore
Georgia Bar No. 520701


The Moore Law Firm, P.C.
100 Peachtree Street NW
Suite 2600
Atlanta, GA 30303
Tel. 678.237.0330
Leighton@moorefirmpc.com

**CERTIFICATE OF COMPLIANCE AND SERVICE**

I hereby certify that the foregoing Notice of Deposition is prepared in 14-point Times New Roman font, and that I have this day electronically filed the same with the Clerk of Court, using the CM/ECF system, which will automatically send e-mail notification of such filing to all counsel of record.

This 19th day of June, 2017.

*s/ Leighton Moore*
Leighton Moore
Georgia Bar No. 520701



**EXHIBIT**

Benton 14
6/22/17  mr



State of Georgia
**Peace Officer Standards and Training Council**
Network Data Gateway



# Data Report System
## Individual Officer Profile

*Created: 08-25-2015 08:08*
*Requested by: Jill Perry*



O136818

| | |
|---|---|
| Officer Key | **O136818** |
| Officer Name | **CASEY T BENTON** |
| Race | **White (Not Hispanic or Latino)** |
| Height | **6' 0"** |
| Weight | **170** |
| Hair Color | **Brown** |
| Eye Color | **Blue** |
| Education | **High School Diploma** |
| Status | **In Good Standing** |

## Officer Certifications

| Certification | Description | Certification Type | Status |
|---|---|---|---|
| PA0220140057S | ADVANCED CERTIFICATE | Career Development | Active |
| PS16100532S | LIDAR (LASER) OPERATOR | Specialized | Active |
| PA01090125S | INTERMEDIATE CERTIFICATE | Career Development | Active |
| PBLE070353S | BASIC LAW ENFORCEMENT | Basic | Active |

## Instructor Certifications

| Code | Description | Issue Date | Expiration Date | Status |
|---|---|---|---|---|
| A013 | Firearms | April 18, 2014 | | Active |
| A013 | General | May 2, 2013 | | Active |

## Employment History

| Agency | Rank | Start Date | End Date | Status |
|---|---|---|---|---|
| DEKALB COUNTY POLICE DEPARTMENT | Peace Officer | August 14, 2006 | | Actively Employed in Law Enforcement |

## Sanctions

None Found

## Investigations

None Found

## Training History

| Date | Number | Course | Hours |
|---|---|---|---|
| July 30, 2015 | CAM11G | SUPERVISION LEVEL II (GPSTC 2013) | 40 |
| July 9, 2015 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| June 10, 2015 | ITE10G | TRAFFIC ENFORCEMENT NETWORK TRNG | 2 |
| June 4, 2015 | NSD02G | DEFENSIVE DRIVING/NAT. SAFETY COUNCL | 8 |
| March 26, 2015 | CAM10G | SUPERVISION LEVEL I (GPSTC 2013) | 40 |
| March 12, 2015 | NX100G | DRUGS | 24 |

CBentonPOST001
*Requestor IP Address: 192.168.1.131*

| January 5, 2015 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
|---|---|---|---|

2015 Total Hours : 116

| July 29, 2014 | UFR00F | FIREARMS REQUALIFICATIONS | 8 |
|---|---|---|---|
| July 22, 2014 | IGB28G | SECURITY AND INTEGRITY OF CHRI (3 HR) | 3 |
| July 22, 2014 | IGB21G | GCIC INQUIRY TERMINAL OPERATOR RECERTIFICATION | 2 |
| April 16, 2014 | ITE00G | TRAFFIC ENFORCEMENT | 2 |
| April 15, 2014 | IAB00G | HEALTH, WELLNESS, & PHYSICAL FITNESS | 2 |
| April 15, 2014 | ILQ00G | SEARCH AND SEIZURE | 2 |
| April 15, 2014 | ICC05G | CRISIS INTERVENTION SKILLS | 3 |
| April 15, 2014 | IDG16G | TASER RECERTIFICATION | 2 |
| April 15, 2014 | IDA02G | EXPANDABLE BATON INSERVICE | 2 |
| April 15, 2014 | IDD07D | DEFENSIVE TACTICS | 2 |
| April 15, 2014 | IFM22G | USE OF DEADLY FORCE | 1 |
| April 15, 2014 | NQM17G | FINANCIAL PLANNING | 3 |
| April 15, 2014 | IGK00G | ETHICS AND PROFESSIONALISM | 1 |
| April 11, 2014 | SIF04F | FIREARMS INSTRUCTOR COURSE | 80 |
| March 31, 2014 | IFM22G | USE OF DEADLY FORCE | 1 |
| March 7, 2014 | NTM24G | CONCEALMENT TECHNIQUES | 16 |
| January 13, 2014 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |

2014 Total Hours : 131

| November 12, 2013 | NSD02G | DEFENSIVE DRIVING/NAT. SAFETY COUNCL | 8 |
|---|---|---|---|
| October 17, 2013 | CAG02G | CRIME SCENE PROCESSING | 24 |
| March 8, 2013 | IFM22F | USE OF DEADLY FORCE | 1 |
| March 8, 2013 | IDD07D | DEFENSIVE TACTICS | 3 |
| March 8, 2013 | IDA02G | EXPANDABLE BATON INSERVICE | 2 |
| March 8, 2013 | IDG16G | TASER RECERTIFICATION | 3 |
| March 7, 2013 | ICD00G | DOMESTIC VIOLENCE | 2 |
| March 7, 2013 | ILM12G | LEGAL ISSUES | 1 |
| March 7, 2013 | IBM59G | HUMAN TRAFFICKING | 2 |
| March 7, 2013 | ILQ00G | SEARCH AND SEIZURE | 2 |
| March 7, 2013 | IAB00G | HEALTH, WELLNESS, & PHYSICAL FITNESS | 2 |
| January 28, 2013 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| January 25, 2013 | SII01G | INSTRUCTOR TRAINING COURSE | 80 |

2013 Total Hours : 131

| October 31, 2012 | NTO01G | PATROL INVESTIGATIVE TECHNIQUES | 24 |
|---|---|---|---|
| August 14, 2012 | IGB21G | GCIC INQUIRY TERMINAL OPERATOR RECERTIFICATION | 2 |
| August 14, 2012 | IGB13G | SECURITY AND INTEGRITY OF CHRI | 4 |
| August 7, 2012 | ITE00G | TRAFFIC ENFORCEMENT | 2 |
| July 2, 2012 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| March 29, 2012 | CAK01F | ADVANCED FIREARMS | 32 |
| March 15, 2012 | IKV12G | ACTIVE SHOOTER RESPONSE | 6 |
| March 15, 2012 | IHQ05G | HOMELAND SECURITY | 3 |
| March 14, 2012 | IDA02D | EXPANDABLE BATON INSERVICE | 2 |
| March 14, 2012 | IDG16G | TASER RECERTIFICATION | 1 |
| March 14, 2012 | IGK00G | ETHICS AND PROFESSIONALISM | 1 |
| March 14, 2012 | IFM22G | USE OF DEADLY FORCE | 1 |

CBentonPOST002

Requestor IP Address: 192.168.1.131

| March 14, 2012 | ITU02G | FELONY TRAFFIC STOPS | 2 |
| March 14, 2012 | ICD05G | ELDER ABUSE | 1 |
| March 14, 2012 | ITI06G | ACCIDENT SCENE SAFETY | 1 |
| January 6, 2012 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| | | | 2012 Total Hours : 84 |
| | | | |
| November 8, 2011 | CAI02G | INTERVIEWS AND INTERROGATIONS | 24 |
| September 13, 2011 | IDA00D | ASP BATON | 2 |
| September 13, 2011 | IDD07D | DEFENSIVE TACTICS | 5 |
| September 13, 2011 | IFM22G | USE OF DEADLY FORCE | 1 |
| September 13, 2011 | IDG02G | TASER | 1 |
| September 12, 2011 | NGW00G | MENTAL HEALTH ISSUES | 1 |
| September 12, 2011 | NSD02G | DEFENSIVE DRIVING/NAT. SAFETY COUNCL | 8 |
| August 12, 2011 | NXI08G | PATROL INTERDICTION | 24 |
| July 29, 2011 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| June 28, 2011 | INS05G | GA. STATE PATROL INSERVICE | 3 |
| April 21, 2011 | NTM06G | COMMERCIAL VEHICLE INTERDICTION | 24 |
| March 2, 2011 | CAH02G | SPECIALIZED PATROL TECHNIQUES | 16 |
| January 31, 2011 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| | | | 2011 Total Hours : 111 |
| | | | |
| November 10, 2010 | ITM07G | STOP STICK TRAINING | 2 |
| November 10, 2010 | ICD05G | ELDER ABUSE | 1 |
| November 10, 2010 | IDA01G | ASP BATON RECERTIFICATION | 1 |
| November 10, 2010 | IFM22F | USE OF DEADLY FORCE | 1 |
| November 10, 2010 | NOD37G | INTERNAL AFFAIRS UPDATE | 1 |
| November 10, 2010 | IDG02G | TASER | 3 |
| October 13, 2010 | IFS02F | SEMIAUTO PISTOL TRANSITION  (W/minimum 1 Hr FA REQUAL) | 18 |
| September 28, 2010 | AGB08G | TERMINAL OPERATOR INQUIRY CERT. | 18 |
| September 28, 2010 | NOC38G | GCIC SECURITY & INTEGRITY | 4 |
| July 20, 2010 | ISD01T | DRIVER TRAINING | 7 |
| July 16, 2010 | ITM39G | NAS TRAINING (STATE) | 40 |
| June 25, 2010 | ITM37G | NORTH AMERICAN STANDARD PART B | 40 |
| June 18, 2010 | ITM36G | NORTH AMERICAN STANDARD PART A | 40 |
| June 1, 2010 | NTM17G | FEDERAL MOTOR CARRIER SAFETY UPDATE | 4 |
| January 20, 2010 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| January 13, 2010 | ATL01R | LIDAR SPEED MEASUREMENT | 8 |
| January 7, 2010 | IDG02G | TASER | 9 |
| | | | 2010 Total Hours : 198 |
| | | | |
| October 30, 2009 | ACD08G | L.E. OFFICER'S RESPONSE TO DOM. VIOL | 40 |
| August 19, 2009 | CAJ02G | SEARCH WARRANTS AND AFFIDAVITS | 16 |
| August 18, 2009 | INM00G | DEPARTMENTAL INSERVICE TRAINING | 2 |
| August 4, 2009 | AWI01G | INTOXIMETER MODEL 5000 CERTIFICATION | 16 |
| July 31, 2009 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| June 12, 2009 | NIM04G | FTO UPDATE | 3 |
| April 9, 2009 | CAF02G | ADVANCED TRAFFIC LAW | 24 |
| March 10, 2009 | INM11G | DEKALB CO. POLICE ANNUAL INSERVICE | 8 |
| March 10, 2009 | IFM22G | USE OF DEADLY FORCE | 1 |

CBentonPOST003
Requestor IP Address: 192.168.1.131

| January 30, 2009 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |

2009 Total Hours : 112

| October 24, 2008 | SAQ07G | FIELD TRAINING OFFICER (GSP) | 40 |
| October 6, 2008 | INM11G | DEKALB CO. POLICE ANNUAL INSERVICE | 9 |
| October 6, 2008 | IFM22G | USE OF DEADLY FORCE | 1 |
| October 1, 2008 | AGB11G | TERMINAL OPERATOR RECERTIFICATION | 2 |
| October 1, 2008 | AGB02G | SECURITY & INTEGRITY OF CJ INFORMATI | 4 |
| September 19, 2008 | IFL03F | PATROL RIFLE | 40 |
| July 31, 2008 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| April 3, 2008 | INM11G | DEKALB CO. POLICE ANNUAL INSERVICE | 9 |
| January 31, 2008 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |

2008 Total Hours : 107

| September 5, 2007 | INM11G | DEKALB CO. POLICE ANNUAL INSERVICE | 9 |
| July 30, 2007 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| June 7, 2007 | ITU00G | VEHICLE PULLOVERS | 4 |
| June 7, 2007 | IDA00G | ASP BATON | 1 |
| June 7, 2007 | IKV12G | ACTIVE SHOOTER RESPONSE | 4 |
| May 8, 2007 | IFM22G | USE OF DEADLY FORCE | 3 |
| February 16, 2007 | BML06G | BASIC LAW ENFORCEMENT TRAINING CRS. | 408 |
| February 16, 2007 | BMS05G | DEKALB CO. P.D. EXTENDED BASIC | 279 |
| January 11, 2007 | CAE01G | OFFICER SURVIVAL | 40 |
| January 2, 2007 | NSD02G | DEFENSIVE DRIVING/NAT. SAFETY COUNCL | 8 |

2007 Total Hours : 757

| December 31, 2006 | PAV14E | NO WAIVER NECESSARY - NOT EMPLOYED AS PEACE OFC THIS YR | 20 |
| December 29, 2006 | CAA01G | CRIMINAL PROCEDURE | 40 |
| December 15, 2006 | AWS93G | STANDARDIZED FIELD SOBRIETY TESTING | 16 |
| December 8, 2006 | CAD01E | FIRST RESPONDER | 40 |
| November 30, 2006 | ADA02D | ASP TACTICAL BATON BASIC | 8 |
| November 27, 2006 | CAC01G | INTERPERSONAL RELATIONS/CRISIS | 8 |
| November 17, 2006 | IDD05D | S.S.G.T. DEFENSIVE TACTICS | 32 |
| November 3, 2006 | AGB02G | SECURITY & INTEGRITY OF CJ INFORMATI | 4 |
| November 3, 2006 | AGB13G | TERMINAL OPERATOR CERTIFICATION | 35 |
| October 27, 2006 | IYG03G | VERBAL JUDO | 8 |
| October 12, 2006 | CAL02G | ADVANCED REPORT WRITING | 16 |
| September 20, 2006 | CAB01G | HEALTH AND WELLNESS AWARENESS | 22 |

2006 Total Hours : 249

### Summary of Hours for 10 Years

| Year | Hours |
| --- | --- |
| 2015 | 116 |
| 2014 | 131 |
| 2013 | 131 |
| 2012 | 84 |
| 2011 | 111 |
| 2010 | 198 |

Requestor IP Address: 192.168.1.131

CBentonPOST004

| | |
|---|---|
| 2009 | 112 |
| 2008 | 107 |
| 2007 | 757 |
| 2006 | 249 |
| **Grand Total of Hours (all years and courses)** | **1,996** |

CBentonPOST005

*Requestor IP Address: 192.168.1.131*



**H.    OFF-DUTY/PART TIME EMPLOYMENT**
1. All authorized part-time employment will be approved as per existing Departmental policy.

2. Officers working part-time employment in uniform must wear the Department issued ASP Baton in the issued Sidebreak Scabbard.

3. Officers working part-time employment in plain clothes must carry the Department issued ASP Baton in the alternative manner as authorized by the agency.

## 4-6.4   ELECTRONIC CONTROL DEVICES - TASERS

**PURPOSE and SCOPE**
The purpose of this policy is to establish guidelines for the DeKalb County Police Department's use of Electronic Control Devices (ECD).

**POLICY**
An ECD may be used to control resistant or aggressive individuals in arrest and other enforcement situations. It is the policy of this agency that officers use an ECD when warranted, but only in accordance with the guidelines set forth here, in training,  and in the use-of-force policy. An ECD is on the same level of force as Oleoresin Capsicum in the non-deadly force category. **An ECD is a control device.**

The Taser X26 will be the standard authorized electronic control device issued to members of the DeKalb County Police Department.

It shall be the policy of the DeKalb County Police Department to resolve incidents requiring law enforcement intervention in as humane and safe a manner as reasonably possible.

**PROCEDURES**
A.    **AUTHORIZATION**
1. Only officers who have completed the prescribed course of instruction on the use of the ECD will be authorized to carry the device.
2. Basic certification for the use of an ECD shall consist of no less than the manufacturer's minimum recommendation.
3.  Re-certification shall be conducted once a year.
4. Training topics for both the basic certification and annual re-certification should consist of, but are not limited to, the following topics:
    a. Manufacturer's Recommendations / Maintenance
    b. Deployment / Use / Documentation
    c. Response to Resistance Matrix Levels and other Tactical Options
    d. ECD Retention and Transition Drills
    e. Scenario Based Training
    f. Recognition of Symptoms: Excited Delirium, Medical Concerns, etc.

5. Only current Manufacturer Certified Instructors are eligible to instruct officers in the use of an ECD.
6. Officers whose normal duties/assignments may require them to make arrests or supervise arrestees shall carry the authorized departmental ECD.
7. Uniformed Supervisors/Officers shall carry only a departmental authorized ECD in the issued cross-draw holster.  Non-uniformed officers may carry the ECD in alternative devices as authorized by the agency.

**DEKALB COUNTY POLICE DEPARTMENT**

**B.   PRIOR TO DEPLOYMENT**

1.   An officer's response level to subject resistance should always be based upon reasonable objectiveness,  and depending upon subject/officer factors such as age, size, weight, and the subject's apparent ability to physically challenge the officer or do harm to himself or others, balanced against the seriousness of the incident.

2.   An officer's decision to deploy the ECD shall involve an arrest or custodial situation wherein the subject is escalating resistance from passive physical resistance towards active physical resistance.  Passive resistance includes subjects who question an officer's commands in a non-threatening manner and persons who are participating in a non-violent public protest. The ECD shall not be used as a tool of coercion to intimidate an individual into compliance with simple requests or directives by an officer.

3.   The primary purpose in the decision to deploy the ECD is to prevent a continuing escalation of the subject's resistance or violence and to minimize injury to both the officer(s) and subject(s).

4.   Prior to deployment of the ECD, officers must take into consideration environmental factors which may contribute to serious injury. These factors include but are not limited to; subjects standing on or near the edge of a roof, stairwells, next to a window or body of water.

5.   No policy or guideline can anticipate every situation that officers might face, but in general terms, the following deployment procedures are established. An ECD can be utilized under the following circumstances:

   a.   When the subject is exhibiting threatening body language associated with verbal threats or refusing to comply with the officer's instructions, and the subject has the apparent ability to physically challenge the officer. Threatening body language includes, but is not limited to:
       1. blading the body
       2. assuming a "boxer stance"
       3. circling or surrounding the officer
       4. moving the hands from open to closed, forming a fist, etc.

   b.   When a subject makes physically evasive movements to defeat an officer's attempt to control. This may be in the form of:
       1. bracing or tensing of the body
       2. attempts to kick, push, or pull away
       3. not allowing the officer to get close to him

   c.   When a subject makes overt, hostile, attacking movements, which may cause injury, but are not likely to cause death or great bodily harm to the officer or others.

   d.   When subject makes overt, hostile, attacking movements with or without a weapon with the intent and apparent ability to cause death or great bodily harm to the officer or others.

   e.   When lesser force options may be ineffective.

6.   The ECD is a sensitive electronic device (similar to a cell phone) and should be treated with appropriate care.  It should not be dropped or thrown around. When not in use it should remain in an approved holster and should be protected from rain.

7.   The ECD will be turned over to any supervisor or the Internal Affairs Unit upon request to investigate the use of the ECD.

USE OF FORCE

8. Only department issued batteries and cartridges will be used with the Taser.  No changes, alterations, modifications or substitutions shall be made to the Taser.  All repairs to a Taser shall be completed by an authorized vendor or armorer.

9. At the beginning of each shift the ECD shall be tested to ensure it is functioning properly.  It is the responsibility of each officer to test the ECD prior to the shift or part time job, and to immediately report any improperly functioning ECD to their supervisor.

**IMPORTANT:** Make sure to remove the air cartridge prior to testing and replace it afterwards. Defective ECD's and cartridges should be returned to the Training Division as soon as possible and should not be used until repaired or replaced.

10. Personnel issued a Taser shall be issued a minimum of one spare cartridge as a backup in case of cartridge failure or the need for reapplication.  The spare cartridges shall be stored and carried in a manner consistent with training and the cartridges replaced by the officer's division.  Each division/unit/precinct will maintain an adequate supply and keep a log of the cartridge serial number, date of issue, and the name of the officer to whom cartridge was issued.  Always replace the Air Cartridges by the expiration date and use expired cartridges for training purposes only.

11. The Taser shall be pointed at the ground in a safe direction with the safety on during administrative handling procedures.

**C. DEPLOYMENT**

1. The ECD should be deployed at the same level of force as OC spray.

2. Prior to the deployment of the Taser the officers deploying the device have the responsibility to reasonably visually and physically confirm that the use of force tool selected is in fact the Taser and not a firearm.

3. When multiple officers are present and an ECD is to be used on a subject, **only one officer should deploy the ECD on the subject.**  In the event the ECD malfunctions or both probes are not in contact with the subject, an additional officer may deploy an ECD if compliance has not been gained.  Officers will communicate with each other on which officer will deploy the ECD and which officers will act to take the subject into physical custody.

4. Care should be taken that the ECD not be aimed at the neck or above, and the point of aim for front deployment of the Taser should be lower-center of mass, when possible.  The Taser should be aimed at the suspect's back to reduce risk of injury; however, this may not always be possible.

5. When possible, avoid prolonged, extended, uninterrupted discharges or extensive multiple discharges.  When activating the ECD the officer should use it for one cycle and stop to evaluate the situation and the subject.  Use of the Taser should be combined with physical restraint techniques to minimize the total duration of the struggle and Taser use.  **Every attempt should be made to take the subject into custody as quickly as possible after the initial deployment of the ECD in order to reduce the need for subsequent cycles of the ECD. Officers should transition to a different force option if multiple Taser deployments fail to gain compliance.**

6. When reasonable, the ECD should not be used near flammable liquids and fumes. Do not deploy the ECD near suspected meth labs, or after alcohol-based OC spray has been deployed.

7. The ECD will cause most everyone to fall and therefore should not be used when the risk of falling would likely result in death (e.g. on a roof or next to a swimming pool).

**DEKALB COUNTY POLICE DEPARTMENT**

8. The ECD should not be used against handcuffed subjects, pregnant women, juveniles, or the elderly unless exigent circumstances exist.

9. The ECD is prohibited from being used, or threatened to be used, in questioning or interrogating a suspect. It is prohibited to use the ECD as a "prod," to awaken a person, to needlessly display the ECD, or to exhibit careless or haphazard muzzle control of the ECD.

10. An officer's decision to deploy the ECD on fleeing person(s) who are subject to arrest, should be predicated upon the totality of the circumstance and the considerations outlined above, along with distance and the difficulty in accurately deploying on a moving subject. A subject's flight should not be the sole justification for deploying the ECD.

11. The ECD should not be deployed on subjects in physical control of a moving motor vehicle while the engine is running, or the vehicle is in gear.

12. If practical, the officer should verbally warn the subject that they will be subjected to a 50,000 volt electrical charge if they do not comply. Officers should also give verbal warnings of "taser, taser, taser" (this term will be used as long as the department uses the Taser International's M26 or X26 Taser) to let other officers know that an ECD is being deployed. *This is to alert other officers that the ECD is being deployed so that officers do not mistake the "POP" of the ECD for a gunshot.* If possible, any officer on the scene shall broadcast a "Code ECD," via the radio channel. Dispatch shall acknowledge this broadcast and repeat the announcement (note, *the officer does not have to wait for radio to acknowledge before taking action*).

13. The ECD has a built-in 5-second timer. The electrical current will continue for the full five seconds every time the trigger is depressed. Unless special circumstances dictate the 5-second cycle should never be stopped early. If needed, pressing the trigger again can extend the cycle.

14. The Taser is an effective tool for stopping the aggressive behavior of wild or potentially dangerous animals. Reporting procedures should be followed with the completion of an incident report.

15. Often, the mere display of the Taser or the activation of the laser on the subject will gain compliance. This compliance should be noted in the incident report and on a Taser Use of Force supplemental form.

**D.     AFTER DEPLOYMENT– REPORTING and APPROPRIATE MEDICAL AID**

Once the subject is subdued, restrained and in custody the arresting officer shall notify the chain of command that the subject has been subject to an ECD discharge. The officer's immediate supervisor will go to the scene. The supervisor will photograph the subject and the probe placement before the probes are removed. After removal the supervisor will photograph any marks left on the subject by the ECD as well as the probes with the cartridge.

1. Under certain circumstances, Fire Rescue shall be summoned to evaluate and treat the victim. Police officers must provide Fire Rescue personnel with as much information as possible (i.e. history of the original incident, behavior observed, symptoms, etc.). This information would include, but not be limited to:
   a. Probe embedded in the eyeball or inside the mouth
   b. Unconscious even for short period
   c. Visible seizure when ECD is NOT being discharged
   d. Display of signs consistent with excited delirium
   e. Obvious significant injury from fall or take-down
   f. Person volunteers that they are having chest pain or trouble breathing

**USE OF FORCE**

      g.   Persistent confusion or altered mental status more than one minute after application of the ECD

      h.   Victim of an ECD used by a member of the public (i.e., non-police use)

      i.   If the victim requests EMS

      j.   Any use of an ECD on a juvenile (17 years of age or younger), pregnant female or elderly person

      k.   If an officer has any doubt as to the health of the person based on:

            1.  The officer's training

            2.  The officer's previous use of an ECD

            3.  The subject exhibits any of the conditions and/or symptoms above

            4.  The subject exhibits any unusual behavior

2. Fire Rescue will not be responsible for the removal of probes embedded in a subject. It shall be the responsibility of the officer discharging the ECD to remove the probes.

3. Probes embedded in the neck, head, groin area or a woman's breast should only be removed by qualified medical personnel at a hospital. The officer will remove probes in any other location. Probes that have penetrated the body should be placed in "sharps" containers. These containers will be maintained in the trunk of all supervisor vehicles.

4. Immediately after deploying the ECD, employee should be alert to any indications that the individual needs medical care and will ensure appropriate medical aid. The employee will summon emergency medical aid.

5. The following reports will be completed after a deployment of the ECD. Incident report, Use of Force Report and an ECD Report. The Department will conduct an annual analysis of reported usage of the ECD's, via documented reports conducted by the Internal Affairs Unit.

6. In order to minimize the stress involved in the use of any force, any officer or non-sworn personnel involved in a use of force incident, which results in death or serious injury, will be placed on "administrative leave" directly upon completion of their preliminary report of the incident. This leave will be without loss of pay or benefits, pending the results of the investigation. The assignment to administrative leave will not be interpreted or indicate that the employee has acted improperly.

7. While on administrative leave, the employee will remain available at all times for official departmental interviews and statements regarding the incident and shall be subject to recall at any time. The employee will not discuss the incident with anyone except the District Attorney, departmental personnel assigned to the investigation, the employee's private attorney, the employee's psychologist, the employee's chosen clergy, and the employee's immediate family. Upon returning to duty, the employee may be assigned to "administrative duty" for a period of time deemed appropriate by the employee, his psychologist, and the Chief of Police.

E.    **TASER TRACKING CHIP DOWNLOAD AND REVIEW**

    Each Taser device is equipped with an internal tracking chip. This chip stores the time and date of the last 1500 firings of the X26 model Taser. Supervisors can retrieve information stored in the data chip by connecting to the data port on the rear of the Taser and downloading the information into the Department's computer system.

    The Taser data chip will be downloaded for investigative purposes in reference to any use of force incident, or in reference to a complaint of the use of the Taser that was not reported on a use of force report. The downloaded report will be attached to the use of force report or to any report where the Taser was alleged to have been used. Additionally, the Taser data chip should be downloaded prior to return for repair or return for any other reason.

**F.    OFF-DUTY/PART TIME EMPLOYMENT**
1.  All authorized part-time employment will be approved as per existing Departmental policy.
2.  Officers working part-time employment in uniform must wear the Department issued ECD in the approved holster.
3.  Officers working part-time employment in plain clothes must carry the Department issued ECD in the alternative manner as authorized by the agency.

## 4-6.5   SPECIALITY LETHAL and LESS-LETHAL WEAPONS

### PURPOSE
The purpose of this specific policy in the Use of Force section is to establish guidelines for the use of lethal and less-lethal systems by the S.W.A.T. Team following their deployment.

### POLICY
Use of Force guidelines are no different for the S.W.A.T. Team than for any other officer, with the exception that the team deploys more options as related to less-lethal systems and due to the nature of team deployment, the totality of the operation circumstances and combined information may likely be used in the determination of the need to use reasonable force to defend self and/or third person(s) against unlawful force and/or the use of force likely to cause death or great bodily harm. The use of deadly force in hostage situations will become an option only after there is clear and sufficient reason to believe that the person against whom the force is used is threatening the life of hostages, innocent civilians, or public safety officers or to prevent the commission of a forcible felony.

### A.    AUTHORIZATON
The S.W.A.T. Team Commander has the authority to determine the force required to complete a tactical situation successfully. Force may include, but is not limited to, the use of chemical agents, direct assault or the use of selective firepower.

Less-Lethal systems include but are not limited to impact projectiles and chemical munitions, which can be fired, launched, placed or otherwise propelled for the purpose of compliance, overcoming resistance, or preventing serious injury without posing a significant potential for causing death. Authorization for use is located in this section entitled, *Authorization for Use of All Departmental Weapons*.

### B.    USAGE CRITERIA
The approval of said systems will be for certified S.W.A.T. officers, as later listed, and will be approved by the Less-Lethal and Chemical Munitions supervisor who will forward the requested approval through the Entry Team Leader and the S.W.A.T. command staff.

All current systems and munitions will only be used by trained and certified S.W.A.T. officers, who have received appropriate training via the system manufacturer, P.O.S.T. courses and other approved chemical agents and less-lethal courses, such as the 40-hour course provided by the FBI.

Less-lethal systems and chemical munitions will be deployed according to manufacturers and tactical deployment specialist's recommendations.

### C.    RESPONSE, MEDICAL AID FOLLOWING LESS LETHAL and LETHAL USAGE
DeKalb Fire and Rescue Department medical personnel currently support the DeKalb Police S.W.A.T. Team. This group of tactical medics has received additional training, related to supporting a tactical team for emergency medical attention. In addition, they all have completed the basic DeKalb Police S.W.A.T. course. This team provides medical support not only to the team, but also to any suspect, victim, civilian and/or other personnel as needed. This support includes medical aid and/or supportive care for less-lethal and chemical munitions.

## DEKALB COUNTY POLICE DEPARTMENT
### GA0440200
### INCIDENT REPORT

Case #: 15-077124

**EVENT**

| Incident Type: | | Counts | Incident Code | Offense Jurisdiction | Arrest Jurisdiction |
|---|---|---|---|---|---|
| TRAFFIC STOP | | 1 | Nonc | COUNTY | COUNTY |
| 16-8-6 (2399) PROPERTY FOUND | | 1 | 2399 | COUNTY | COUNTY |

| Premise Type: | Weapon Type: | Forcible: | Stranger To Stranger: | Hate Motivated: | Loc Code: |
|---|---|---|---|---|---|
| ALL OTHER | | | | | 360 |

| Date Report: | Incident Start: | Incident End: | Incident Location |
|---|---|---|---|
| 8/6/2015 7:05:00 PM | 8/6/2015 7:03:00 PM | 8/6/2015 11:00:00 PM | 1981 FLAT SHOALS ROAD ATLANTA GA |

**VICTIM**

Name (Last, First Middle): STATE OF GEORGIA
Moniker: DOB: Age: Sex: Race: Ethnicity:

Address: 1960 W. EXCHANGE PLACE TUCKER GA 30084-
Home #: Work #: Cell #: Email:

SSN: Resident Status: HGT: WGT: Hair Color: Hair Style: Hair Length: Eye Color: OLN #: State:

Occupation: Employer: Address: Employer Phone:

Victim Type: LAW ENFORCEMENT OFFIC
Student: Yes No
If Yes, Name of Victim's School
LEOKA Activity Type: LEOKA Assignment Type:

Injuries: None Minor Internal Teeth Unconscious Lacerations Bones Other
Used: Drugs Alcohol Computer

SMTs:

Relationship To Offenders: (1) (2) (3) (4) (5)
(6) (7) (8) (9) (10)

Offenses Involved: (1) Nonc (2) (3) (4) (5)
(6) (7) (8) (9) (10)

**OFFENDER**

Name: DOE, JOHN
Moniker: DOB: Age: 00 Sex: M Race: B Ethnicity:

Address: Home Phone: Work Phone: Cell Phone: Email:

SSN: Resident Status: HGT: WGT: Hair Color: Hair Style: Hair Length: Eye Color: OLN #: State:

Occupation: Employer: Address: Employer Phone:

SMTs:

Offenses Involved:
(1) (2)
(3) (4)
(5) (6)
(7) (8)
(9) (10)

WANTED: WARRANT: ARREST: SUSPECT ARMED: WEAPON:
Used: Drugs Alcohol Computer

TOTAL NUMBER ARRESTED: 0 ARREST AT OR NEAR OFFENSE SCENE: Yes: No: ●

**PROPERTY**

| | | CURRENCY, NOTES, ETC. | JEWELRY, PREC. METALS | FURS |
|---|---|---|---|---|
| VEHICLES | | | | |
| STOLEN | $0.00 | $0.00 | $0.00 | $0.00 |
| RECOVERED | $0.00 | $0.00 | $0.00 | $0.00 |
| CLOTHING | | OFFICE EQUIP. | TV, RADIO, ETC | HOUSEHOLD GOODS |
| STOLEN | $0.00 | $0.00 | $0.00 | $0.00 |
| RECOVERED | $0.00 | $0.00 | $0.00 | $0.00 |
| FIREARMS | | CONSUMABLE GOODS | LIVESTOCK | OTHER | TOTAL |
| STOLEN | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| RECOVERED | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

**ADM.**

GCIC ENTRY   ☐ WARRANT   ☐ MISSING PERSONS   ☐ VEHICLE   ☐ ARTICLE   ☐ BOAT   ☐ GUN   ☐ SECURITIES

**DRUG**

DID INVESTIGATION INDICATE THAT THIS INCIDENT WAS DRUG-RELATED? ☐ YES ☒ NO
IF YES, PLEASE INDICATE THE TYPE OF DRUG(S) USED BY OFFENDER
☐ 1 - Amphetamine   ☐ 2 - Barbiturate   ☐ 3 - Cocaine   ☐ 4 - Hallucinogen   ☐ 5 - Heroin
☐ 6 - Marijuana   ☐ 7 - Methamphetamine   ☐ 8 - Opium   ☐ 9 - Synthetic Narcotic   ☐ U - Unknown

**CLEAR**

REQUIRED DATA FIELDS FOR CLEARANCE REPORT   ☐ CLEARED BY ARREST   ☐ EXCEPTIONALLY CLEARED   ☐ UNFOUNDED   DATE OF CLEARANCE   ☐ ADULT   ☐ JUVENILE

REPORTING OFFICER: Franklin jr c m
NUMBER: 1774
APPROVING OFFICER:
NUMBER:



EXHIBIT
Bentor 16
6/22/17 mv

EXHIBIT
A

# DEKALB COUNTY POLICE DEPARTMENT
## GA0440200
### ADDITIONAL VICTIMS

**Case #:** 15-077124

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Name (Last, First Middle): | | Moniker: | DOB: | Age: | Sex: | Race: | Ethnicity: |
| STATE OF GEORGIA | | | | | | | |

| Address | Home #: | Work #: | Cell #: | Email: |
|---|---|---|---|---|
| 3630 CAMP CIR DECATUR GA | | 404-294-2278 | | |

| SSN: | Resident Status: | HGT: | WGT: | Hair Color: | Hair Style: | Hair Length: | Eye Color: | OLN #: | State: |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

| Occupation: | Employer: | Address: | Employer Phone: |
|---|---|---|---|
| MILITARY/POLICE SERVICE | | | |

| Victim Type: | Student: Yes No | If Yes, Name of Victim's School: | LEOKA Activity Type: | LEOKA Assignment Type: |
|---|---|---|---|---|
| LAW ENFORCEMENT OFFIC | | | | |

Injuries:  None  Minor  Internal  Teeth  Unconscious  Lacerations  Bones  Other          Used:  Drugs  Alcohol  Computer

SMTs:

| Relationship To Offenders | (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|---|
| | (6) | (7) | (8) | (9) | (10) |
| Offenses Involved | (1) 2399 | (2) | (3) | (4) | (5) |
| | (6) | (7) | (8) | (9) | (10) |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Name (Last, First Middle): | | Moniker: | DOB: | Age: | Sex: | Race: | Ethnicity: |
| | | | | | | | |

| Address | Home #: | Work #: | Cell #: | Email: |
|---|---|---|---|---|
| | | | | |

| SSN: | Resident Status: | HGT: | WGT: | Hair Color: | Hair Style: | Hair Length: | Eye Color: | OLN #: | State: |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

| Occupation: | Employer: | Address: | Employer Phone: |
|---|---|---|---|
| | | | |

| Victim Type: | Student: Yes No | If Yes, Name of Victim's School: | LEOKA Activity Type: | LEOKA Assignment Type: |
|---|---|---|---|---|
| | | | | |

Injuries:  None  Minor  Internal  Teeth  Unconscious  Lacerations  Bones  Other          Used:  Drugs  Alcohol  Computer

SMTs:

| Relationship To Offenders | (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|---|
| | (6) | (7) | (8) | (9) | (10) |
| Offenses Involved | (1) | (2) | (3) | (4) | (5) |
| | (6) | (7) | (8) | (9) | (10) |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Name (Last, First Middle): | | Moniker: | DOB: | Age: | Sex: | Race: | Ethnicity: |
| | | | | | | | |

| Address | Home #: | Work #: | Cell #: | Email: |
|---|---|---|---|---|
| | | | | |

| SSN: | Resident Status: | HGT: | WGT: | Hair Color: | Hair Style: | Hair Length: | Eye Color: | OLN #: | State: |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

| Occupation: | Employer: | Address: | Employer Phone: |
|---|---|---|---|
| | | | |

| Victim Type: | Student: Yes No | If Yes, Name of Victim's School: | LEOKA Activity Type: | LEOKA Assignment Type: |
|---|---|---|---|---|
| | | | | |

Injuries:  None  Minor  Internal  Teeth  Unconscious  Lacerations  Bones  Other          Used:  Drugs  Alcohol  Computer

SMTs:

| Relationship To Offenders | (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|---|
| | (6) | (7) | (8) | (9) | (10) |
| Offenses Involved | (1) | (2) | (3) | (4) | (5) |
| | (6) | (7) | (8) | (9) | (10) |

## DEKALB COUNTY POLICE DEPARTMENT
## GA0440200
### INCIDENT PROPERTY

Case #: 15-077124

| Class: L. | Description: Other | | Status: F |
|---|---|---|---|
| Make: | Model: | | Serial: |
| TASER CARTRIDGE DOOR | | | |
| Property Location: PARKING LOT | QTY: 1 | Value: $20.00 | UCR Code: 2399 |
| Released To: STATE OF GEORGIA | Date Recovered: 8/12/2015 | Recovery Code: | Jurisdiction Stolen: | Jurisdiction Recovered: DEKALB |

| Class | Description | | Status |
|---|---|---|---|
| Make | Model | | Serial |
| Property Location | QTY | Value | UCR Code |
| Related To | Date Recovered | Recovery Code | Jurisdiction Stolen | Jurisdiction Recovered |

| Class | Description | | Status |
|---|---|---|---|
| Make | Model | | Serial |
| Property Location | QTY | Value | UCR Code |
| Related To | Date Recovered | Recovery Code | Jurisdiction Stolen | Jurisdiction Recovered |

| Class | Description | | Status |
|---|---|---|---|
| Make | Model | | Serial |
| Property Location | QTY | Value | UCR Code |
| Related To | Date Recovered | Recovery Code | Jurisdiction Stolen | Jurisdiction Recovered |

| Class | Description | | Status |
|---|---|---|---|
| Make | Model | | Serial |
| Property Location | QTY | Value | UCR Code |
| Related To | Date Recovered | Recovery Code | Jurisdiction Stolen | Jurisdiction Recovered |

| Class | Description | | Status |
|---|---|---|---|
| Make | Model | | Serial |
| Property Location | QTY | Value | UCR Code |
| Released To | Date Recovered | Recovery Code | Jurisdiction Stolen | Jurisdiction Recovered |

| Class | Description | | Status |
|---|---|---|---|
| Make | Model | | Serial |
| Property Location | QTY | Value | UCR Code |
| Related To | Date Recovered | Recovery Code | Jurisdiction Stolen | Jurisdiction Recovered |

| Class | Description | | Status |
|---|---|---|---|
| Make | Model | | Serial |
| Property Location | QTY | Value | UCR Code |
| Related To | Date Recovered | Recovery Code | Jurisdiction Stolen | Jurisdiction Recovered |

| DEKALB COUNTY POLICE DEPARTMENT GA0440200 NARRATIVE | Case #: 15-077124 | |
|---|---|---|

| Officer ID/Name: 1774        Franklin jr c m | Date: 8/6/2015 7:05:00 PM | Approving Officer ID/Name: | Date: |
|---|---|---|---|

| Title. | INITIAL REPORT |
|---|---|

ON 08/06/2015 AT 19:05 HRS. OFFICER BENTON CONDUCTED A TRAFFIC STOP AT 1905 FLAT SHOALS ROAD ON A CHEVROLET TAHOE WHITE IN COLOR FOR A TAG VIOLATION. I WAS DIRECTLY BEHIND OFFICER BENTON WHEN HE ACTIVATED HIS EMERGENCY EQUIPMENT AS THE TAHOE PULLED INTO THE PARKING LOT OF THE CHEVRON SERVICE STATION.
WE EXITED OUR PATROL CARS.  AS OFFICER BENTON WALKED TO THE DRIVER SIDE WINDOW TO SPEAK WITH THE DRIVER, I APPROACHED THE VEHICLE ON THE PASSENGER SIDE AND OBSERVED AND UNKNOWN MALE SITTING IN THE FRONT PASSENGER SEAT. OFFICER BENTON SPOKE WITH THE DRIVER FOR A FEW MOMENTS WHEN I OBSERVED THE DRIVER STEP OUT OF THE CAR. I WALKED AROUND TO ASSIST OFFICER BENTON WHEN I OBSERVED HIM RETRIEVE A FIREARM FROM INSIDE OF THE DRIVER SIDE AREA OF THE VEHICLE.
OFFICER BENTON CLEARED THE WEAPON AND HANDED THE FIREARM TO ME TO HOLD WHILE HE SPOKE TO THE DRIVER. OFFICER NIEMANN THEN PULLED INTO THE PARKING LOT OF THE CHEVRON AND EXITED HIS CAR. I HANDED HIM THE WEAPON TO SECURE IN HIS PATROL CAR. I WALKED BACK TO THE PASSENGER SIDE OF THE TAHOE TO OBTAIN JOHN DOE'S INFORMATION. THE PASSENGER THEN OPENED HIS DOOR AND FLED ON FOOT SOUTHBOUND TOWARDS THE FAMILY DOLLAR PARKING LOT.
OFFICER BENTON GAVE CHASE ON FOOT AS OFFICER NIEMANN FOLLOWED IN HIS PATROL CAR. I STAYED AT THE SCENE WITH THE DRIVER AND THE CHEVROLET TAHOE SO HE WOULD NOT LEAVE THE TRAFFIC STOP SCENE. I HEARD OVER THE RADIO THAT OFFICER BENTON CONFRONTED JOHN DOE BEHIND THE FAMILY DOLLAR STORE AND DEPLOYED HIS TASER.
ENGINE 64 ALONG WITH MEDIC 83 RESPONDED TO 2501 FLAT SHOALS ROAD TO TREAT JOHN DOE FOR HIS INJURIES. JOHN DOE WAS LATER TRANSPORTED BY MEDIC 83 FOR FURTHER TREATMENT AT GRADY MEMORIAL HOSPITAL. MAJOR FELONY WAS NOTIFIED OF THE INCIDENT AND RESPONDED. THE INVESTIGATION WAS THEN TURNED OVER TO THE GBI.

| DEKALB COUNTY POLICE DEPARTMENT GA0440200 NARRATIVE | | | Case #: 15-077124 | |
|---|---|---|---|---|
| Officer ID/Name: 1946 | White t m | Date: 8/12/2015 3:35:00 PM | Approving Officer ID/Name: 2057    Westmoreland ii I n | Date: 8/12/2015 4:00:00 PM |
| Title: | ADDITIONAL NARRATIVE | | | |

Report Date: 08/12/2015 13:45:00
Reporting Officer: - TM WHITE # 1946
Approving Officer: 2057 - Westmoreland ii I n

WHILE PATROLLING IN THE HIGHLAND EAST APARTMENTS ( 2051 FLATSHOALS RD) IN THE PARKING LOT NEAR BUILDING (N), I OBSERVED A GREEN ITEM ON THE GROUND. UPON LOOKING AT THE ITEM, I NOTICED THAT THE ITEM WAS THE DOOR TO A TASER CARTRIDGE. I NOTIFIED SUPERVISOR IN REFERENCE TO THE DOOR BEING EVIDENCE FROM THE INCIDENT THAT OCCURRED ON LAST WEEK. (SEE ORIGINAL CASE REPORT). THE DOOR WAS COLLECTED AND TRANSPORTED TO C.I.D AND PROPERTY SHEET WAS MADE OUT AND RELINQUISHED OVER TO C.I.D COMMANDER. CAPT. RUTLAND#1849. THE EVIDENCE WAS PLACED ON HER DESK PER CAPT. RUTLAND'S REQUEST.