

# EMPLOYEE STATEMENT FORM

### ATTENTION

The following statement is being taken in the course of an Administrative Investigation. The employee making this statement is protected from having this statement used against them in a criminal proceeding. (Garrity vs. State of New Jersey, 385 U.S. 493)

**INTERNAL AFFAIRS CASE#:** 15-0803

**STATEMENT OF:** Officer C. T. Benton #2640

**CURRENT ASSIGNMENT:** Special Services Division / S.T. E. P.

**STATEMENT TAKEN BY:** Detective F. J. Renaud #2303

**DATE:** 1/5/2016                    **TIME:** 1:30 P.M.

(Initial Statement)

On August 6, 2015 at approximately 1850 hours, I was assigned to a robbery suppression detail in the area of 2051 Flat Shoals Rd. This area had been identified as a "Hot Spot" based on recent crime statistics and officers from the S.T.E P. Team were assigned to patrol it throughout the shift at different times. I also knew from experience that this neighborhood had a high volume of narcotics and gang related activity. At this time I was parked inside of The Highlands of East Atlanta Apartments (2051 Flat Shoals Rd.) near the exit. My unit was clearly visible to all vehicles entering and leaving the apartment complex. I observed a white GMC Yukon enter the complex. A very short time later I observed the same vehicle leave the complex. Based on the very short time between when the vehicle entered the complex to when it exited the complex it seemed as if the vehicle did not make any stops

Signature: _____  1   Date: 1/5/16

PLAINTIFF'S EXHIBIT 5 CB
Blumberg No. 5113

Open Records Request DKPD000586



This was suspicious to me because most people that drive into an apartment complex are either residents or have some business in the complex. Based on the facts that the apartment complex had been designated as a high crime "Hotspot", and through my personal experience I knew that this complex had a high level of drug and gang activity, and the vehicle entered and exited the complex in a timeframe that did not seem to allow for time to make any stops or conduct any business, I became suspicious that the occupants of the vehicle may be attempting to engage in some type of illegal activity. As the vehicle passed my unit near the exit, I observed that the vehicle was displaying a dealer issued temporary drive out tag. I did not see an expiration date on the tag.

The rules set forth by the Department of Revenue on the acceptable format of dealer issued temporary tags state that the expiration date must be inscribed clearly and legibly, centered at the bottom of the tag, in dimensions of no less than two inches high and eight inches wide. After seeing that the temporary tag did not appear to have an expiration date, I never looked at the tag again. I became focused on trying to see the occupants in the vehicle and watching for any furtive movement. The vehicle then turned left out of the apartment complex onto Flat Shoals Rd. I then pulled behind the vehicle and initiated a traffic stop on the vehicle. The vehicle turned left onto Fayetteville Rd. and then immediately turned right into a Chevron Gas Station. Officer Franklin also pulled in behind me to assist with the traffic stop.

During my approach on the driver's side I observed that there were two occupants in the vehicle. I then made contact with the driver and advised him of the reason for the stop and he provided me with a GA driver's license. As I was speaking with the driver I detected a faint odor of marijuana coming from inside the vehicle. I then asked the driver if he had any weapons in the vehicle. He very quietly said, "No", while turning his head away from me and looking at the center console. He also began to reach inside the console at the same time. I observed that his answer of "no" was in a much quieter tone than the rest of our conversation and that he broke eye contact with me when I asked him about weapons. I suspected that the driver was being deceptive about his answer. I immediately asked him again if he had any weapons. This time he answered, "I have one weapon". He then told me that it was in the center console. Based on the odor of marijuana and the driver initially lying about having a weapon, I suspected that criminal activity may be occurring in the vehicle.

I asked the driver to step out of the vehicle while I retrieved the weapon. The driver stepped out of the vehicle and stood beside his front driver's side wheel. I located a handgun in the bottom of the console. I observed that the weapon was not in a holster. I immediately removed the magazine and cleared the weapon to make it safe. I observed that the weapon had a loaded magazine and a round chambered. I then passed the weapon to Officer Franklin to secure in a unit while I continued the traffic stop. I asked the driver if he had a conceal carry permit and he advised that he did not. I then told the driver that he could sit in his car. He sat on the driver's seat with his feet hanging outside of the vehicle.

Signature: _____  2642          2          Date: 1/5/16



I then asked the front seat passenger, later identified as Troy Robinson, (will be referred to as Robinson for the remainder of the report) if he had any identification. He quickly said, "No". Officer Niemann, who arrived during my initial contact with the driver, then began to walk around to the passenger side of the vehicle to write down the passenger's name. Robinson then quickly exited the vehicle and began to flee on foot. I then pursued him on foot. Officer Niemann followed me in his unit and Officer Franklin remained with the driver. As I began the pursuit Officer Franklin advised me over the radio to use caution because he could see Robinson holding his waistband. I then also observed that Robinson was holding his waistband with his left hand as if he was possibly concealing something. I suspected that Robinson was possibly armed. The subject ran across Fayetteville Rd. through a small shopping center parking lot and then into a Family Dollar parking lot.

As he entered the Family Dollar parking lot he began to run toward the rear of the business and I recognized that he was running toward The Highlands of East Atlanta Apartments. Based on the totality of the circumstances (odor of marijuana, driver lying about a weapon, locating a loaded weapon, passenger not identifying himself, passenger fleeing the vehicle, passenger holding his waistband as he ran, and running toward a residential area while possibly armed) I decided to deploy my Taser as he ran behind the Family Dollar to stop him. As Robinson reached a standard height chain link fence just inside of the wood line that separated the Family Dollar from the apartment complex I drew and deployed my Taser. I believed that Robinson had slowed down enough that I could accurately deploy my Taser and that this was a safe location because Robinson was not on pavement and was not on an elevated platform and he was still at the base of the fence. After firing my Taser I immediately recognized that Robinson did not show any physical signs that the Taser was effective.

He started to climb the chain link fence and then stood directly on the chain link fence. He then reached over his head with both hands, and leaned forward and grabbed a concrete wall that was a few feet beyond the chain link fence and higher than the chain link fence. He then threw his right leg up onto the wall and continued completely over the wall. I immediately lost sight of Robinson after he crossed the top of the wall. All of his actions after I fired the Taser appeared to be very deliberate and controlled. I never saw any signs that Robinson was not in complete control of his body. I believed that the Taser was completely ineffective for some unknown reason. I immediately advised my supervisor of the Taser deployment and removed the fired cartridge and dropped it on the ground. I remained in the same location that I deployed my Taser. I chose to not follow Robinson over the wall into the apartment complex because we had been instructed for officer safety reason not to be in this apartment complex alone. Also, I didn't want to take a chance of injuring myself jumping from the wall.

I then gave Officer Niemann directions on how to get to the location inside the apartment complex where Robinson had jumped the wall. I believed that Robinson was running along the base of the wall out of my

Signature: _____ 264c                    Date: 1/5/16

3



line of sight toward the nearest apartment buildings. I gave this information to Officer Niemann over the radio. While I was waiting on Officer Niemann to arrive inside the complex a citizen drove through the complex where Robinson had jumped the wall. He stopped, lowered his window and looked at the ground near where Robinson had jumped the wall.

I then began to suspect that Robinson was on the ground at the base of the wall. Officer Niemann arrived, located and placed handcuffs on Robinson. He advised that Robinson was not conscious and immediately requested EMS. He also advised on the radio that Robinson was breathing and had a pulse.

I then returned to my unit at the original location of the traffic stop. I advised Officer Franklin of the situation and we decided to escort the driver of the Yukon into the apartment complex. I led the vehicle and Officer Franklin followed. Upon arriving on the scene inside the complex I observed that there were several officers on scene and that a large crowd was gathering. I observed that Lt. Vanderpool was kneeling next to Robinson and that Robinson was lying on his stomach with handcuffs on his wrists. Another officer asked me to send Officer Franklin to the front entrance to show EMS how to get to the scene. I then approached Lt. Vanderpool and asked if he would like me to remove the handcuffs because I knew EMS would want them off before they transported him.

He advised me to take the handcuffs off. While speaking with Lt. Vanderpool I observed that the subject had one Taser prong in his back. I did not observe a second prong. I did not remove any prongs from the subject. I did not observe any other visible injuries to Robinson. EMS then arrived on scene and transported the subject to the hospital. After EMS transported the subject I sat inside of a CID unit that was on scene. I could see that the crowd appeared to be getting very loud and I could hear subjects in the crowd yelling at officers. I was scared that the crowd was going to become violent and that the situation was going to get out of control.

After the incident occurred Officer Franklin approached me and asked me what the initial violation was for the traffic stop. I advised him that I did not see an expiration date on the temporary tag. He later came to me and advised that the tag did have an expiration date. I never saw the tag again until I was shown a photograph of it by Internal Affairs. I recognized the photo as being the tag that was on the Yukon that day. When I saw the photograph I observed that there was an expiration date on the tag but it was not in the normal location. The date was written above the word "expires" and somewhat blended into the temporary tag identification number. The normal location for the expiration date was a large white empty space. I believe I did not see the expiration date on the tag because it was not where it is supposed to be located.

MPO C.T. Benton #2640

Signature: _____ 2640    Date: 1/5/16