## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

MARY JO BRADLEY, *et al.*,

        Plaintiffs,

    v.

OFFICER CASEY BENTON, *et al.*,

        Defendants.

CIVIL ACTION NO.

1:18-CV-1518-CAP

## O R D E R

This is a civil rights action brought by the plaintiffs based on the death of Troy Robinson. The plaintiffs are Robinson's mother and his nine surviving children.[1] Robinson died after fleeing a traffic stop conducted by one of the defendants, DeKalb County, Georgia police officer Casey Benton. Officer Benton stopped a vehicle driven by Wilford Sims; Robinson was a passenger in that vehicle. After Officer Benton stopped the vehicle, Robinson fled the scene, and Benton pursued. During the pursuit, Officer Benton tased Robinson. At some point after being tased, Robinson fell from the top of an eight-foot wall that he had climbed. Upon hitting the ground, his neck was broken, and he died before arriving at the hospital. The plaintiffs bring claims for civil rights violations under 42 U.S.C. § 1983 as

---

[1] The minor children are represented by their respective mothers.

well as state law claims for wrongful death and pain and suffering.  They

also seek attorneys' fees and their litigation expenses.  This matter is

currently before the court on the defendants' motion for summary judgment

[Doc. No. 48].

## I.    Background

On August 6, 2015, Officers Benton and Franklin were on patrol in the

area around The Highlands of East Atlanta apartment complex[2] in Atlanta,

Ga. [DSMF ¶ 6].[3]  Around 7:00 PM that evening, Officer Benton observed a

vehicle with a temporary license plate exit the apartment complex, and he

---

[2] This complex is also known as the East Hampton Apartments.  [DSMF ¶ 6].

[3] Citations that reference only paragraph numbers preceded by "DSMF" refer to the defendants' statements of material facts, [Doc. No. 48-2], or portions thereof, that are not disputed. Citations that reference only paragraph numbers preceded by "PSMF" refer to the plaintiffs' statement of material facts, [Doc. No. 69], or portions thereof, that are not disputed. Pursuant to the Local Rules of this court, each of the proponents' facts will be deemed admitted unless the other side "(i) directly refutes the [proponents'] fact with concise responses supported by specific citations to evidence (including page or paragraph number); (ii) states a valid objection to the admissibility of the [proponents'] fact; or (iii) points out that the [proponents'] citation does not support the [proponents'] fact or that the [proponents'] fact is not material or otherwise has failed to comply with the provisions set out in LR 56.1 B(1)." LR 56.1B(2), NDGa. Where a factual assertion or portion thereof is properly disputed, the court will cite to the paragraph appearing in the proponents' statement of material fact; will view the material evidence and factual inferences in the light most favorable to the plaintiffs; and will, where appropriate, also cite directly to the evidence supporting the court's resulting factual recitation.

decided to conduct a traffic stop of the vehicle.  [*Id*. ¶¶ 9, 16].  He announced

his intention to do so over the radio, and Officer Franklin, who was already

in the immediate vicinity patrolling inside the apartment complex, decided

to provide backup.  [*Id*. ¶ 20].  The vehicle contained two individuals, the

driver Wilford Sims and a passenger, Troy Robinson.  [*Id*. ¶ 17].  Sims had

purchased the vehicle a few days previously.  [*Id*. ¶ 18].  After stopping the

vehicle, Officer Benton requested that Sims provide his driver's license.  [*Id*.

¶ 23].  Sims did so, then advised Officer Benton that he had a handgun in

the car.  [*Id*. ¶ 24].  Officer Benton asked Sims to step out of the vehicle.  [*Id*.

¶ 25].  After Sims exited the vehicle, Officer Benton retrieved the handgun

and gave it to Officer Franklin.  [*Id*. ¶ 25].  Officer Benton told Sims that he

could sit in the car, and Sims complied.  [*Id*. ¶ 26].  Officer Benton proceeded

to ask Robinson if he had any identification; Robinson replied that he did

not.  [*Id*. ¶ 27].

Officer L.O. Niemann then arrived on the scene.[4]  [*Id*. ¶ 28].  Officer

Benton asked either Officer Franklin or Officer Niemann to run Robinson's

name in the police department's system.  [*Id*. ¶ 29].  At this time, Robinson

_____

[4] Niemann was dismissed as a defendant in this action pursuant to the
court's order of October 30, 2018.  [Doc. No. 16].  The court found that he was
entitled to qualified immunity and therefore granted the motion to dismiss
the constitutional claim against him.

3

fled from the vehicle.  [*Id*. ¶ 30].  The vehicle was stopped in the parking lot of the Chevron gas station located at the corner of Flat Shoals Road and Fayetteville Road.  [*Id*. ¶ 16].  Upon fleeing from the vehicle, Robinson crossed Fayetteville Road and ran through the parking lot of a Family Dollar store that is located adjacent to the back of The Highlands apartment complex.  [*Id*. ¶ 30].  After Robinson fled, Officer Benton proceeded to chase him on foot while Officer Niemann attempted to follow the chase in his patrol car.  [*Id*. ¶ 31].  Officer Franklin remained with Sims at the vehicle. [*Id*. ¶ 31].  As Officer Benton was engaged in the foot pursuit, Officer Franklin advised him via radio to exercise caution because Robinson was holding something near his waistband, possibly a weapon.  [*Id*. ¶ 32].

The area behind the Family Dollar is wooded and the ground slopes downward to a chain link fence that is separated by several feet from a concrete wall that lines the back of The Highlands apartment complex.  [*Id*. ¶ 33].  By the time Robinson reached the chain link fence, Officer Benton was still several feet behind him.  [*Id*. ¶ 35].  Robinson climbed the chain link fence and proceeded to the top of the concrete wall.  [*Id*. ¶ 38].  At some point during the chase, Officer Benton fired his taser, striking Robinson. [*Id*. ¶ 36].  He stopped firing the taser before it completed the full five-second cycle.  [*Id*. ¶ 38].

Witnesses at The Highlands apartment complex testified that Robinson called for help as he was on top of the concrete wall. [*Id*. ¶ 39]. One witness testified that he saw the wires from the taser on Robinson while he was on top of the wall. [*Id*. ¶ 39]. Two witnesses testified that Robinson appeared to lose his balance while on top of the wall, and one of these witnesses stated that Robinson seemed to be trying to hold onto the wall to prevent falling. [*Id*. ¶¶ 41, 42]. A third witness testified that Robinson appeared to go into shock and stiffened up while atop the wall. [*Id*. ¶ 43]. Robinson fell from the wall, and the resulting trauma caused his death. [*Id*. ¶ 44].

The Georgia Bureau of Investigations ("GBI") arrived at the scene to investigate. [*Id*. ¶ 48]. The GBI sent its findings to the DeKalb County Police Department, and the Police Department concluded that no violations of department policies had occurred. [*Id*. ¶ 49, 51]. These policies include ones for traffic enforcement, conducting vehicle stops, foot pursuits, and using force, including tasers. [*Id*. ¶ 52]. As of August 6, 2015, Officer Benton was properly certified under the appropriate policy to use his taser. [*Id*. ¶¶ 59-61]. DeKalb County policy states that an officer's decision to use his taser must involve either an arrest or custodial situation in which the subject is actively physically resisting. [*Id*. ¶ 62]. The policy also states that

the sole justification for using a taser cannot be that the subject has engaged in flight.  [*Id*. ¶ 63].

## II.    Summary Judgment Standard

Rule 56(a) of the Federal Rules of Civil Procedure authorizes summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party seeking summary judgment bears the burden of demonstrating that no dispute as to any material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 156 (1970); *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996).  The moving party's burden is discharged merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion.  *Johnson*, 74 F.3d at 1090. Once the moving party has adequately supported its motion, the nonmovant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute.  *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In deciding a motion for summary judgment, it is not the court's function to decide issues of material fact but to decide only whether there is such an issue to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). The applicable substantive law will identify those facts that are material. *Id.* at 247. Facts that in good faith are disputed, but which do not resolve or affect the outcome of the case, will not preclude the entry of summary judgment as those facts are not material. *Id.* Genuine disputes are those by which the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* "Genuine" factual issues must have a real basis in the record. *See Matsushita*, 475 U.S. at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587 (citations omitted).

## III. Analysis

### A. The federal claim against Officer Benton

In Count III of the amended complaint, the plaintiffs allege that Officer Benton seized Robinson without probable cause or any other legal justification, and ultimately deprived him of his life and liberty without providing him due process under the law. [Doc. No. 2 at 10-11, Amend. Compl. ¶¶ 46, 48]. Any "person" who, under color of law, causes a United

States citizen to be deprived of a constitutional right may be liable at law or in equity.  42 U.S.C. § 1983.  There are two basic elements to a § 1983 claim. A plaintiff must show (1) that he has been deprived of a right secured by an appropriate federal law and (2) that the defendant was acting under color of state law in depriving him of this right. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980).  There is no dispute that the defendants were acting under color of state law, so the court's analysis will focus solely on whether Officer Benton violated Robinson's constitutional rights.

The defendants argue that Officer Benton is entitled to qualified immunity on this claim.  Their argument is divided into four sections: (1) that Officer Benton had arguable reasonable suspicion to conduct the traffic stop, (2) that he had arguable reasonable suspicion to seize Robinson after he fled from the vehicle, (3) that the force he used against Robinson was objectively reasonable and not excessive, and (4) that his actions on August 6, 2015, did not violate clearly established law.  The plaintiffs respond that there are issues of material facts concerning the traffic stop, such that a jury could find the stop itself to be invalid; that Robinson committed no crime so the fact that he fled from the vehicle cannot support his seizure by Officer Benton; and that there are issues of material fact concerning where Robinson was located at the time that he was tased, such that a jury could

find that Officer Benton's use of the taser qualifies as excessive force.  In his reply brief, Officer Benton contends that the facts the plaintiffs point to concerning the traffic stop are not material;  that the plaintiffs erroneously rely on the exclusionary rule in this civil action under 42 U.S.C. § 1983; that the taser is a non-deadly weapon and Officer Benton deployed it before Robinson started climbing rather than after he had reached the top of the concrete wall; and that the plaintiffs have not cited binding authority from the United States Supreme Court, the Eleventh Circuit, or the Georgia Supreme Court to support their contention that Officer Benton violated clearly established law.  The court will address each of the defendants' four arguments in turn.

"Qualified immunity offers complete protection for individual public officials performing discretionary functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sherrod v. Johnson*, 667 F.3d 1359, 1363 (11th Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  The standard for qualified immunity is objective, "and an officer's subjective

intent or beliefs are irrelevant to the inquiry." *Moreno v. Turner*, 572 F. App'x. 852, 855 (11th Cir. 2014).

To claim qualified immunity, a defendant must first show he was performing a discretionary function. *Id.* at 855. The term "discretionary authority" includes "all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." *Id.* (internal quotations omitted).  The court "must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." *Maughon v. City of Covington*, 505 F. App'x 818, 822 (11th Cir. 2013) (quotations omitted).  There is no dispute amongst the parties that Officer Benton was acting within his discretionary authority "at all relevant times" because he was performing law enforcement related functions as a DeKalb County officer.  [Doc. No. 48-1 at 17, Doc. No. 2 at 3, Amend. Compl. ¶ 7].  "Enforcing traffic laws and conducting traffic stops are squarely within the realm of an on-duty police officer's legitimate job-related functions." *Merritt v. Gay*, No. CV 514-083, 2016 WL 4223687, at *6 (S.D. Ga. Aug. 9, 2016).

"Once discretionary authority is established, the burden then shifts to the plaintiff to show that qualified immunity should not apply." *Edwards v.*

*Shanley*, 666 F.3d 1289, 1294 (11th Cir. 2012) (quoting *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009)). A plaintiff demonstrates that qualified immunity does not apply by showing that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Moreno*, 572 F. App'x at 855.  The court must look at the specific facts of the case in determining whether a constitutional right was clearly established.  *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012).  A plaintiff "can demonstrate that the contours of the right were clearly established in one of three different ways." *Terrell v. Smith*, 668 F.3d 1244, 1255 (11th Cir. 2012).  A plaintiff may (1) show that a case with materially similar facts has already been decided, (2) demonstrate that there is a clearly established legal principle that applies to the facts of his case, or (3) point out that the conduct of the defendants in his case so clearly violates the constitution that it is unnecessary to cite prior case law. *Id*. at 1255, 1256.

### 1. Did Officer Benton have arguable reasonable suspicion to stop Sims' vehicle?

It is undisputed that on August 6, 2015, Officer Benton stopped a vehicle driven by Wilford Sims and containing one passenger, Troy Robinson.  The argument at issue concerns whether Office Benton had legal

justification to conduct the stop. "[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow,* 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio,* 392 U.S. 1, 30 (1968)). "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Id.* at 675–76 (citing *United States v. Sokolow,* 490 U.S. 1, 7 (1989)). "When an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion to support an investigatory stop." *Jackson v. Sauls*, 206 F.3d 1156, 1166 (11th Cir. 2000). The officer's determination of reasonable suspicion requires "more than an inchoate and unparticularized suspicion or hunch." *United States v. Nunez,* 455 F.3d 1223, 1226 (11th Cir. 2006) (quoting *United States v. Powell,* 222 F.3d 913, 917 (11th Cir. 2000)). Instead, it must be based upon the objective facts before the officer at the time. *Nunez* at 1226. An officer may be entitled to qualified immunity even if he mistakenly concludes there is reasonable suspicion for the investigatory stop, as long as his conclusion is reasonable. *Pearson v. Callahan,* 555 U.S. 223, 231 (2009).

The crux of Officer Benton's argument is that he had arguable reasonable suspicion to conduct the traffic stop because "the temporary tag on the vehicle in which Robinson was a passenger appeared to be improper and thus possibly in violation of O.C.G.A. § 40-2-8(b)(2), which requires an expiration date to be displayed and provides that driving with an improper tag is a misdemeanor." [Doc. No. 48-1 at 19].  The plaintiffs contend that this argument contradicts Officer Benton's testimony, because "[h]e testified that he did not see any expiration date; not that he saw an improperly placed expiration date." [Doc. No. 70 at 21].  They also argue there is an issue of material fact as to whether Officer Benton actually saw an expiration date on the license plate, and that he had decided to stop the vehicle simply because he had seen it driving around The Highlands apartment complex.  [*Id*. at 22].  The defendants respond that it is immaterial that (1) Officer Benton decided to follow the vehicle before he even viewed the license tag and (2) he testified in his deposition that he did not see an expiration date on the license tag, as opposed to testifying that he saw the expiration date in an improper place.  [Doc. No. 71 at 2].

"In a traffic-stop setting . . . a lawful investigatory stop . . . is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation." *Arizona v. Johnson*, 555 U.S.

323, 327 (2009). The defendants are correct that police officers may follow a vehicle to see if either probable cause or reasonable suspicion develops that could justify a traffic stop. *See United States v. Benitez*, 541 F. App'x 961, 963 (11th Cir. 2013).  In *Whren v. United  States,* the Supreme Court ruled that the subjective intentions or motivations of an officer conducting a traffic stop are not relevant to the analysis of reasonableness. 517 U.S. 806, 813 (1996); *accord. Benitez* at 963 (finding that an officer's subjective motives in following a car before observing the traffic violation that predicated the stop were not relevant).  Accordingly, it is immaterial whether Officer Benton decided to follow Sims' vehicle before or after he initially viewed the license tag.

However, the officer must have an objectively reasonable basis to actually conduct the traffic stop.  *Benitez* at 963.  This is because a traffic stop constitutes a seizure under the Fourth Amendment, *Whren* at 809–10, *Delaware v. Prouse*, 440 U.S. 648, 653 (1979), and this is true for the vehicle's passengers as well as its driver, *Brendlin v. California,* 551 U.S. 249, 257-58 (2007).  Though temporary, the seizure lasts for the duration of the traffic stop—from the moment the vehicle is pulled over until the officers "inform the driver and passengers they are free to leave." *Arizona* at 333.

Such an investigatory stop is often termed a *Terry* stop, after the

Supreme Court ruled in *Terry v. Ohio,* 392 U.S. 1 (1968), that a police officer

can stop and frisk an individual without probable cause, as long as the

officer has reasonable suspicion to believe that the individual has either

committed a crime, is currently in the process of committing a crime, or is

about to commit a crime.  Specifically, "the officer must have 'a

particularized and objective basis for suspecting the person stopped of

criminal activity.'" *United States v. Campbell*, 912 F.3d 1340, 1349 (11th Cir.

2019) (quoting *Navarette v. California*, 572 U.S. 393, 396 (2014)).[5]  The

court's decision as to whether the officer in the case before it had reasonable

suspicion to believe that criminal activity was afoot must be "determined

from the totality of the circumstances . . . and from the collective knowledge

of the officers involved in the stop." *United States v. Pruitt,* 174 F.3d 1215,

1219 (11th Cir. 1999) (citations omitted).

It is unlawful to stop a vehicle merely because it has a temporary

license tag.  *Berry v. State*, 547 S.E.2d 664, 668 (Ga. Ct. App. 2001).

"[S]topping a car with a drive-out tag solely to ascertain whether the driver

was complying with our vehicle registration laws is also not authorized."

---

[5] Even minor traffic violations fall under the realm of criminal activity.  *See United States v. Chanthasouxat*, 342 F.3d 1271, 1277 (11th Cir. 2003).

*Bius v. State*, 563 S.E.2d 527, 530 (Ga. Ct. App. 2002). The defendants argue that "the temporary tag on the vehicle in which Robinson was a passenger appeared to be improper and possibly in violation of O.C.G.A. § 40-2-8(b)(2), which requires an expiration date to be displayed and provides that driving with an improper tag is a misdemeanor." [Doc. No. 48-1 at 19]. They then cite the following cases to support the proposition that this constituted arguable reasonable suspicion necessary to conduct the traffic stop. In *Green v. State*, the Georgia Court of Appeals ruled that the officer had reasonable suspicion to stop Green's vehicle because the temporary license tag on Green's vehicle did not have a metallic seal or strip on the bottom to prevent tampering with the expiration date as was required by law at that time. 637 S.E.2d 498, 499-500 (Ga. Ct. App. 2006). Green challenged the stop on the basis that it was pretextual. There is no indication in the court's decision that Green's license tag did actually have the seal or metallic strip. In *United States v. DeJesus*, an Alabama state trooper stopped the vehicle DeJesus was in "[b]ecause the minivan had a temporary paper license plate that was just a piece of paper that you could print out . . . with your personal computer and because he could not identify its state of origin." 435 F. App'x 895, 896 (11th Cir. 2011) (internal quotation omitted). In *United States v. Hires*, a St. Petersburg, Florida police officer stopped Hires' vehicle at 3:00

16

AM because the license tag was unreadable or had possibly expired.  282 F. App'x 771, 773 (11th Cir. 2008).  In *United States v. Jennings*, a Florida officer testified that he believed the out-of-state temporary tag had expired and had possibly been altered.  280 F. App'x 836, 840 (11th Cir. 2008).

As the plaintiffs in the instant case point out, all of these rulings concerned motions to suppress.  [Doc. No. 70 at 22].  In *Green*, the appeals court relied on evidence produced during both the trial in the case and a hearing on the motion to suppress.  637 S.E.2d at 499.  In *DeJesus*, the court relied on the officer's testimony at the suppression hearing.  435 F. App'x at 899.  The same is true in *Hires*, 282 F. App'x at 773, and *Jennings*, 280 F. App'x at 838.[6]  In those cases, the trial court could weigh the evidence and evaluate the credibility of live witnesses, and at least in *Hires*, credibility was a swaying factor.  At the summary judgment stage in a civil action, however, "[t]he court must avoid weighing conflicting evidence or making credibility determinations."  *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242,

---

[6] The court also notes that *DeJesus*, *Hires*, and *Jennings* concerned violations of Alabama and Florida law respectively, whereas the instant case concerns Georgia law.  Further, *DeJesus*, *Hires*, and *Jennings* are unpublished opinions from the Eleventh Circuit.  "Unpublished decisions of this court are not binding precedent."  *Moore v. Barnhart*, 405 F.3d 1208, 1211 n.3 (11th Cir. 2005).

255 (1986)).  Here, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson* at 255.

In determining whether Officer Benton had reasonable suspicion, the court must "look at the 'totality of the circumstances' in each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002).  This suspicion must be grounded in "specific articulable facts, together with rational inferences from those facts." *United States v. Bautista-Silva,* 567 F.3d 1266, 1272 (11th Cir. 2009) (citation and internal quotation omitted).   In his motion for summary judgment, Officer Benton does not specifically point the court to the facts that generated his suspicion that a crime was being committed, other than providing a photograph of the license plate and stating that he was on patrol in a high-crime area.

Reviewing the record, the court has determined that the facts confronting Officer Benton on August 6, 2015, prior to the stop of the vehicle are as follows.  He was assigned to the area in and around The Highlands apartment complex. There had been an increase in gang-related and violent crime in that area.  At approximately 7:00 PM, Officer Benton observed a white Yukon leaving the apartment complex shortly after it had entered it. The vehicle had a temporary license tag.  Officer Benton followed the vehicle

18

out of the apartment complex.  He proceeded to follow the vehicle for

approximately one-quarter of a mile, or two minutes, during which time he

looked at the license tag and ran the tag number in the police department's

system.  He does not recall the information that was returned by the

computer system about the tag, and he did not check the system to see

whether the tag was expired.  At the time of these events, there was

sufficient daylight for him to adequately view the tag.  The driver of the

vehicle did not commit any traffic violations during the time that Officer

Benton was following him.  The driver also proceeded to stop the vehicle in

an orderly fashion after Officer Benton signaled him to stop.  While

approaching the stopped vehicle from the rear, Officer Benton did not look at

the license tag to see if it had an expiration date on it.  The license tag did

have an expiration date.  There is no indication in the record that the vehicle

or its occupants acted suspiciously while in the apartment complex or during

the period that Officer Benton followed their vehicle.  Officer Benton did not

issue a ticket to the driver of the vehicle.

Analyzing the record and the briefing in this case, the court finds that

there is an issue of material fact concerning the traffic stop.  The plaintiffs

dispute Officer Benson's testimony that he did not see an expiration date on

the license tag.  [Doc. No. 68 at 2, PSMF ¶ 9].  The license tag that was on

Sims' vehicle appears as follows:



[Doc. No. 55 at 79].[7]  Officer Benton testified in his deposition that he ran the

number on the tag:

---

[7] The photograph of the license plate provided by defendants contains red
squares on the image that have been added by defense counsel.  [Doc. 48-2 at
4, DSMF ¶ 11].  The plaintiffs do not dispute that the image is a picture of
the actual license tag from Sims' vehicle, however, they argue "that the
image appears to contain alterations and appears to be obscured by water,
which was not the condition of Mr. Sims's tag on the date of the incident."
[Doc. No. 68 at 6, PSMF ¶ 11]. The plaintiffs point the court to two
additional pictures of the license tag in the record, Exhibits 3 and 5 to Sims'
deposition [Doc. No. 57 at 25, 27], however, those pictures also show water
on the tag and include full frames that show the back of the entire vehicle is
wet.  There is another picture of the tag in the record as Exhibit 6 to Officer
Benton's 2019 deposition [Doc. No. 72-6 at 1], however it is poorer quality
reproduction in black and white.  Another image, attached as Exhibit 6 to
Officer Niemann's June 14, 2017, deposition, also shows water droplets on
the tag, but appears to be the clearest image of the tag in the record.  [Doc.
No. 55 at 79].  The court accordingly uses that image above.

**Q**   **Did you see a license number on the tag?**

A   Yes, I believe I remember seeing a license number on the SUV. You talking about –

**Q**   **Did you --**

A   -- the number on the tag itself?

**Q**   **Right.**

A    Yes.

**Q**   **Did you run that number?**

A   I believe I did, yes.

**Q**   **What information did you get?**

A   I don't recall exactly. The stuff we usually get back is registration or registered owner's information, registration information. That kind of thing. But, I don't recall exactly on that tag.

**Q**   **Do you usually get the date it was issued?**

A   It's -- it is on the information, but it's kind of buried in the information.  You kind of have to hunt for it.

**Q**   **But that was what you were concerned about, right, is that you didn't see an expiration date?**

A   Yes, I didn't see an expiration date.

**Q**   **But you knew that this was a tag that had been issued by a dealer?**

A   I knew it was a temporary drive-out tag, yes.

**Q**   **But you had run that number and you knew that was a number that had been issued by a dealer?**

A   I remember the tag came back. I don't remember all the information that came back.

[Doc. No. 50 at 7, Benton Dep. 6/22/2017 at 25:17 – 26:22].  The expiration

date of the license tag is located immediately below the tag number that was

21

run by Officer Benton.  Other than the license tag number and the telephone

number for the dealership that sold the vehicle, the date includes the only

other large-font numerals on the tag.  The year, 2015, even overlaps

partially with the tag number that Officer Benton had to read in order to

input it into the police department's system.

The defendants provided a sample temporary tag issued by the

Georgia Department of Revenue:



[Doc. No. 48-2 at 4, DSMF ¶ 13].[8]  Presumably, the purpose of this example

is to show a juxtaposition between Sims' tag and the type of temporary tag

that Officer Benton might expect to see on a vehicle.[9]  The court finds this

---

[8] This is not a complete license plate, but rather the sticker insert designed
by the Department of Revenue that is then affixed to a temporary license
plate designed by a dealership.  Ga. Comp. R. & Regs. 560-10-32-.05.  The
defendants are comparing this sticker to the correlating sticker portion of
Sims' license plate.  The red square on this sample has been added by
defense counsel.
[9] The location of the expiration date on this sample tag is similar to the
location on Sims' tag, in that both are located under the tag number.

presentation to be a bit disingenuous, however.  As the plaintiffs note, "Defendants do not present undisputed facts to show that Officer Benton had ever seen this alleged 'sample tag' prior to making the stop of Mr. Sims' vehicle."  [Doc. No. 68 at 6, PSMF ¶ 13].  Further, the sample tag is from 2018 and the tag on Sims' car is from 2015.  It is not reasonable to infer that the state did not change the design of its temporary license plates over the course of this three-year period.  Especially considering that the state retains the right to change the design at will and with no prior notice.  Ga. Comp. R. & Regs. 560-10-32-.07(1).

The court disagrees with the defendants that Officer Benton's testimony concerning his reason for conducting the stop is immaterial [Doc No. 71 at 2].  In their statement of material facts, they specifically point the court to his testimony that he did not see an expiration date on the license plate [Doc. No. 48-1 at 3, 5, DSMF ¶¶ 9, 16].  They also argue that he had arguable reasonable suspicion for the traffic stop because the tag "appeared to be improper and thus possibly in violation of O.C.G.A. § 40-2-8(b)(2)." [Doc. No. 48-1 at 19].  In the reply brief, they state that "the expiration date on the vehicle's temporary tag was not in the proper or usual place, such that the tag appeared to be potentially in violation of Georgia law."  [Doc. No. 71 at 2].  The plaintiffs contend that the defendants are trying to

"manufacture an issue of undisputed fact by changing their witness's testimony." [Doc. No. 70 at 21].  At one point, Officer Benton testified that the only reason he stopped Sims' vehicle is because he did not see an expiration date on the license plate.  [Doc. No. 50 at 16, Benton Dep. 6/22/17 at 61:23 – 62:18].  However, in that same deposition he later testified as follows:

> **Q**     **If you had seen the tag having a valid expiration date as you approached it from the rear, would you have had arguable probable cause to conduct any further investigation related to the occupants of the white SUV?**
>
> MR. ROSS:  Objection.  Calls for a legal conclusion.
>
> BY MR. MOORE:
>
> **Q**     **Your understanding --**
>
> A     I want to clarify something, if I could.  So the expiration date is required to be written at a certain size and a certain location on the tag.  So the fact that it wasn't written at a certain size clearly legible is still a violation even if it is written on the tag. So, let me go back to that previous question.  I believe I still would have had cause to issue a citation because it's required to be written legibly at a certain -- and the letters to be a certain size, I believe.
>
> **Q**     **Have you examined the tag?**
>
> A     I have seen pictures of it.
>
> **Q**     **When did you see pictures of it?**

A      Mr. Ross showed me a picture of it and I believe internal
       affairs showed me a picture of it.

**Q      Did you tell internal affairs that you thought the tag
         violated Georgia law?**

A      I believe in my written statement, I put in there that the
       tag is required to have letters written at a certain height --
       in my written statement to internal affairs.

[*Id*. at 26, Benton Dep. 6/22/2017 at 102:10 – 103:14].

Fred Renaud is a detective in the Internal Affairs section of the

DeKalb County police department.  He was the investigator who was

notified about the events in question when they occurred.[10]  At his

deposition, Renaud testified as follows:

A      And then -- he then conducted the stop on the vehicle some
       distance from where he actually saw it.  During that time
       frame, I questioned Officer Benton extensively as to
       whether he saw the -- the date on the tag again, whether
       he could -- at any time, if he could clearly see the date, and
       he said no.  He -- he was very clear on that, that he did not
       recall ever seeing any date or any writing in the location
       that was designated for the date on the drive-out tag.

[Doc. No. 54 at 14, Renaud Dep. 52:22 – 53:4].  This testimony, and the

defendants' arguments, suggest two different possible reasons that Officer

Benton may have had for stopping Sims' vehicle: (1) he did not see an

expiration date on the license tag and thus deemed the tag to be improper, or

---

[10] Renaud is also the county's Rule 30(b)(6) witness.

(2) he considered the tag to be improper because the expiration date was in a different font and location than what he, in his experience, expected to see on a temporary license tag.  The second reason leads to the inference that he did see the expiration date, which conflicts with his express testimony that he did not see an expiration date.

The plaintiffs also dispute the defendants' statement that the "Georgia Department of Revenue regulates the appearance of Georgia temporary license plates." [Doc. No. 48-2 at 4, DSMF ¶ 12, Doc. No. 68 at 6, PSMF ¶ 12].  The two code sections cited by the defendants, O.C.G.A. §§ 40-2-1(3) and 40-2-8 do not mandate that the expiration date on a temporary license tag has to look a certain way.  The first code section, 40-2-1(3), is merely the definition of the word "Department," stating that this stands throughout the code section for "Department of Revenue."  The second code section, 40-2-8, states that 'a temporary plate as provided for by department rules or regulations which may bear the dealer's name and location and shall bear an expiration date 45 days from the date of purchase . . . Such temporary plate shall not resemble a license plate issued by this state."  O.C.G.A. § 40-2-8(b)(2)(B)(i).  The statute goes on to state that "All temporary plates issued by dealers to purchasers of vehicles shall be of a standard design prescribed by regulation promulgated by the department."  O.C.G.A. § 40-2-

26

8(b)(2)(B)(ii). A tag violation is a misdemeanor offense attributable to the

driver or owner of the vehicle.  O.C.G.A. § 40-2-8(b)(2)(A).

The code that regulates the appearance of temporary license tags

provides:

> (1) Temporary Plates shall consist of two parts:
>> (a) A non-permanent license plate that is the same size as a
>> State of Georgia general issue license plate and is displayed
>> no longer than the time period specified in Code Sections 40-
>> 2-8(b) and 40-2-20; and
>> (b) An Insert, which is:
>>> (i) A sticker designed by the Department and provided by a
>>> Registered Temporary Plate Distributor, with security
>>> features;
>>> (ii) Machine printed with an expiration date fixed by the
>>> Department and affixed to the Temporary Plate at the
>>> time of purchase;
>>> (iii) Obtained from the Department or one of the
>>> Department's Registered Temporary Plate Distributors;
>>> and
>>> (iv) Issued by the New Vehicle Dealer or Used Vehicle
>>> Dealer at the time of purchase.

Ga. Comp. R. & Regs. 560-10-32-.05.[11]  Under this regulation, the dealer who

sells the vehicle affixes the expiration date to the license tag.  There is no

requirement in this regulation that the expiration date be in an exact font or

_____

[11] This regulation is referenced in Exhibit 1 to the Declaration of Aaron Ross.
[Doc. No. 48-11 at 5].  This is the regulation that was in effect at the time of
the events in this case; there has been no change to the present day.

font size, nor is there a requirement concerning the exact placement of the expiration date on the tag.

If a reasonable juror can "draw more than one inference from the facts, and that inference creates a general issue of material fact, then the court should refuse to grant summary judgment." *Barfield v. Brierton,* 883 F.2d 923, 933–34 (11th Cir. 1989) (citation omitted).  Viewing the facts and inferences in the light most favorable to the plaintiffs, the court determines that a reasonable jury could find that Officer Benton did see an expiration date on the license tag and that the placement and appearance of the expiration date on the tag did not violate state law.  "[T]he mere presence of [a person] in a 'high-crime area' is insufficient, by itself, to warrant a *Terry* stop and seizure."  *United States v. Parker,* 214 F.Supp.2d 770, 779 (E.D. Mich. 2002).  Further, it is the jury's role as fact finders to weigh the credibility of the witnesses.  Consequently, a reasonable jury could find that Officer Benton lacked arguable reasonable suspicion to conduct the traffic stop.  This precludes the court from granting Officer Benton summary judgment on the traffic stop based on qualified immunity.

### 2. Did Officer Benton have arguable reasonable suspicion to seize Robinson after he fled from the vehicle?

The plaintiffs maintain that "[i]f the jury were to find that Benton's stop of Sims was pretextual and not supported even by arguable reasonable suspicion, the necessary consequence of that finding would be that the encounter never rose above a first-tier encounter for Robinson . . . [a]s such, he was within his rights to depart, or even run away." [Doc. No. 70 at 23]. The defendants counter that "Plaintiffs still must show that, independent of the stop, Benton lacked arguable reasonable suspicion to pursue and seize Robinson after he ran." [Doc. No. 71 at 6].

The defendants' argument is that Robinson's flight in a high crime area provided arguable reasonable suspicion "to pursue and stop Robinson after he fled from Sims' vehicle." [Doc. No. 48-1 at 20]. The defendants rely on *Illinois v. Wardlow*, 528 U.S. 119 (2000). In that case, the officers saw Wardlow standing next to a building holding a bag. Wardlow looked in the direction of the police car as it travelled down the street, then fled. The officers found him, conducted a protective pat down for weapons, and discovered that there was a gun in the bag. The Supreme Court found that Wardlow's flight, when coupled with his presence in a high-crime area, provided the officers with the requisite reasonable suspicion to conduct a

*Terry* stop.  *Id.* at 124. The defendants contend that the situation in

*Wardlow* is analogous to the situation in this case,[12] but that there was even

further cause for Officer Benton to conduct a second *Terry* stop of Robinson

because "one handgun already had been located in the vehicle; and during

the flight, Robinson appeared to be possibly concealing a separate weapon."

[Doc. No. 48-1 at 22].  In their arguments on this issue, the defendants do

not reference Officer Benton's testimony that he smelled marijuana as he

approached the car as providing him with arguable reasonable suspicion to

seize Robinson after he fled the vehicle.  They claim that this is immaterial.

[Doc. No. 48-1 at 6, n.7].  The plaintiffs, however, argue that this is a

material fact.  They contend that Officer Benton lied about smelling

marijuana, and they point to his testimony at his deposition "that, absent

the alleged smell of marijuana, he would have had no reason to apprehend

Mr. Robinson for fleeing the scene, because Mr. Robinson would not have

been subject to a custodial stop." [Doc. No. 69 at 4 PSMF ¶¶ 2, 3].  No

---

[12] The defendants maintain that the area around The Highlands apartment complex is a "high crime area" [Doc. No. 48-1 at 21], because "there had been a rise in gang-related and violent crime" in and around the apartment complex [Doc. No. 48-2 at 2-3, DSMF ¶¶ 6, 7].  The plaintiffs do not dispute this characterization of the neighborhood but assert that it is immaterial "because there is no evidence that anyone involved with this case was a member of a gang."  [Doc. No. 68 at 2].

marijuana was found in Sims' car.  [Doc. No. 57 at 9, Sims Dep. at 33:7 –

34:4].  Robinson's toxicology report did include traces of marijuana [Doc. No.

48-13 at 33-35].  While there is conflict in the record as to whether Sims

forthrightly advised Officer Benton there was a handgun in the car,[13] it is

nonetheless undisputed that the handgun legally belonged to Sims.  Officer

Franklin, who remained at the vehicle with Sims, radioed Officer Benton to

be careful as he thought Robinson might have a weapon because he kept

holding his waistband.  However, this opinion was relayed to Officer Benton

after he had already begun his foot pursuit.

Viewing the facts and inferences in the light most favorable to the

plaintiffs, the court concludes that the facts before Officer Benton at the time

of Robinson's flight were as follows.  Robinson was a passenger in a vehicle

that Benton had stopped at 7:00 PM in the evening after leaving a

residential apartment complex located in a high crime area.  Officer Benton's

---

[13] Sims testified that when Officer Benton asked him if there was a gun in
the car, he immediately replied "yes" and advised Officer Benton of its
location.  [Doc. No. 57 at 15, Sims Dep. 57:5 – 57:18].  He further testified
that he even removed the handgun from the center console and placed it in
the cupholder after he stopped the vehicle so that it would be in plain view
for Officer Benton after he approached the car.  [*Id*. at 14, Sims Dep. at 54:7
– 56:17].  Officer Benton testified that Sims initially lied to him about there
being a gun in the vehicle, and that the handgun was not in plain view.
[Doc. No. 50 at 7, Benton Dep. 6/22/2017 at 28:1 – 28:22].

professed reason for stopping the vehicle was that he did not view an

expiration date on the temporary license tag.  Having an improper license

tag is a misdemeanor offense attributable to the driver of the vehicle.

Robinson told Benton that he did not have any identification on him.  There

was a gun in the vehicle that was not hidden from Officer Benton and was

produced to Officer Benton without resistance.  Officer Benton did not fear

for his safety.  He also had not directed Robinson to remain in the car and

had not engaged with Robinson other than asking for identification.  These

facts alone are not sufficient to support the proposition that Officer Benton

had arguable reasonable suspicion to seize Robinson a second time.  "An

individual's presence in an area of expected criminal activity, standing

alone, is not enough to support a reasonable, particularized suspicion that

the person is committing a crime." *Wardlow,* 528 U.S. at 124 (*citing Brown*

*v. Texas,* 443 U.S. 47, 52 (1979)). *See also United States v. Brown,* 731 F.2d

1491, 1493 (11th Cir. 1984) (finding that the police's determination that the

defendants came from a "source city" for distribution of narcotics was

insufficient to provide the reasonable suspicion necessary to conduct a *Terry*

stop).

The court now turns to the issue of Robinson's flight—relied upon by

the defendants as the source of Officer Benton's arguable reasonable

suspicion necessary to seize Robinson a second time.  They again cite to

*Wardlow*, which states that "[h]eadlong flight – wherever it occurs – is the

consummate act of evasion." 528 U.S. at 124. The defendants' argument is

predicated on attenuation of the connection between the two *Terry* stops that

Officer Benton conducted.  They do not argue that Officer Benton had a right

to control Robinson as the passenger of a car.  At the end of a string cite,

they include O.C.G.A.§ 16-10-24(a), which provides that "a person who

knowingly and willfully obstructs or hinders any law enforcement officer . . .

in the lawful discharge of his or her duties shall be guilty of a misdemeanor."

[Doc. No. 48-1 at 22].  They, however, never make an actual argument that

Robinson obstructed Officer Benton in the performance of his duties.

Indeed, "Georgia law does not authorize law enforcement officers to request

identification from citizens for no reason and charge them with obstruction if

they fail to comply."  *Brown v. GeorgiaCarry.org, Inc.*, 770 S.E.2d 56, 62 (Ga.

Ct. App. 2015).  The defendants' argument thus assumes that the causal

chain between the seizure of Robinson during the traffic stop[14] and the

second seizure after his flight was attenuated.

---

[14] The defendants continue to maintain that Robinson was not seized during
the traffic stop [Doc. No.  48-1 at 18, n. 19], even though this court has ruled
otherwise [Doc. No. 16 at 5-8].

"Supreme Court holdings sculpt out, at least theoretically, three tiers of police-citizen encounters: communication between police and citizens involving no coercion or detention and therefore without the compass of the Fourth Amendment, brief 'seizures' that must be supported by reasonable suspicion, and full-scale arrests that must be supported by probable cause." *United States v. Berry*, 670 F.2d 583, 591 (5th Cir. 1982). *Terry* stops, such as the stop of Sims' vehicle, fall into the second tier.  *United States v. Hastamorir*, 881 F.2d 1551, 1556 (11th Cir. 1989).

The plaintiffs argue that if a jury found there was not arguable reasonable suspicion for the traffic stop, then that would mean that the encounter from Robinson's perspective belonged to the first tier.  [Doc. No. 70 at 23].  "[I]t is well settled that 'a citizen's ability to walk away from or otherwise avoid a police officer is the touchstone of a first-tier encounter.' Indeed, '[e]ven running from police during a first-tier encounter is wholly permissible.'" *Ewumi v. State*, 727 S.E.2d 257, 261 (Ga. Ct. App. 2012) (quoting *Black v. State*, 635 S.E.2d 568, 572 (Ga. Ct. App. 2006)).  The defendants respond that the plaintiffs' argument relies on an inappropriate application of the exclusionary rule.  [Doc. No. 71 at 5].  The court does not agree with this characterization of the plaintiffs' argument, although it can understand why the defendants might view it this way.  The defendants are

correct that the exclusionary rule does not apply in civil lawsuits brought against police officers. *Black v. Wigington*, 811 F.3d 1259, 1268 (11th Cir. 2016). However, the exclusionary rule concerns the suppression of evidence that was unlawfully seized. In this case, the plaintiffs' argument could be characterized as the opposite. Instead of arguing that actions (such as the seizure of evidence) following an illegal detention must also be illegal, they are arguing that actions (such as Robinson's flight) following an illegal detention must be legal. In other words, the plaintiffs' argument here is that if the traffic stop conducted by Officer Benton was illegal, Robinson was then within his legal rights to flee the scene, as he was not a criminal suspect.

Courts have found that a driver's flight from a lawful traffic stop can justify a second investigatory stop of the fleeing individual. *See, e.g.*, *United States v. Edmonds*, No. 12-70, 2013 WL 6002234, at *9 (W.D. Penn. Nov. 12, 2013); *United States v. Espinoza*, No. SA–05–CR–646–OG, 2007 WL 9717692, at *2 (W.D. Texas, Oct. 12, 2007). This is the case even when the passenger of the vehicle flees. *See e.g.*, *United States v. Bonner*, 363 F.3d 213, 218 (3rd Cir. 2004) (holding that a passenger's "flight from a non-consensual, legitimate traffic stop (in which the officers are authorized to exert superintendence and control over the occupants of the car) gives rise to reasonable suspicion"); *United States v. Costner,* 646 F.2d 234, 236 (5th Cir.

35

1981) (finding that passenger's flight following a legal traffic stop "was a sufficient additional factor to increase their reasonable suspicion to probable cause").

In *Reynolds v. State*, Reynolds' vehicle was illegally stopped by the police who then ordered him to get out of the vehicle so that they could question him. The court deemed this to be a second-tier encounter. At the time of this encounter, Reynolds was not suspected of any criminal activity. His vehicle was stopped by officers as it drove by the perimeter they had created around a house where they were executing a valid search warrant. After the officers ordered him to exit his vehicle, one of them noticed a rifle on the floor of his truck and yelled "gun." At that point, Reynolds fled the scene, was apprehended after a brief chase, and was subsequently charged with obstruction of justice. The court ruled that:

> [r]egardless of the propriety of an officer's basis for the execution of a *Terry* traffic investigative stop, attempting to flee from such stop is a separate crime altogether, i.e., fleeing or attempting to elude a police officer. Such offense does not require that the investigative stop be proper. The determination of whether there is a legal basis for a *Terry* stop does not belong to the detainee, thereby giving him the right to flee if he determines he is being stopped illegally.

634 S.E.2d 842, 845 (Ga. Ct. App. 2006).

There is an important distinction, however, between *Reynolds* and the instant action. Georgia has a specific law that makes it "unlawful for any driver of a vehicle willfully to fail or refuse to bring his or her vehicle to a stop or otherwise to flee or attempt to elude a pursuing police vehicle or police officer." O.C.G.A. 40-6-395(a).[15] Thus, the flight of the defendant in *Reynolds* constituted a separate crime and did provide an independent basis for his subsequent arrest. *See People v. Shipp*, 34 N.E.3d 204, 217 (Ill. App. 2d. 2015) (discussing *Reynolds*). "Where Courts have found attenuation in a defendant's flight, it has been premised on a determination that the flight was a truly independent and voluntary act by the defendant; constituted a new, distinct crime; or posed a serious risk to public safety." *United States v. Gallinger*, 227 F. Supp. 3d 1163, 1172-73 (D. Idaho 2017) (citing *United States v. Allen*, 619 F.3d 518, 526 (6th Cir. 2010), *United States v. Boone*, 62 F.3d 323, 324 (10th Cir. 1995), and *United States v. Bailey*, 691 F.2d 1009, 1016-18 (11th Cir. 1982)).

Here, there may not be an independent basis for a second seizure based on Robinson's flight. "Georgia law clearly provides that citizens have no freestanding obligation to comply with a police officer's requests when the

---

[15] This language in the code section has not changed since *Reynolds* was decided in 2006.

officer is not discharging a lawful duty. For example, when an officer detains

an individual without reasonable suspicion, the citizen is free to ignore

requests and/or to walk away, and . . . no charge of obstruction [will] lie."

*WBY, Inc. v. DeKalb Cty., Ga.*, 695 F. App'x 486, 493 (11th Cir. 2017).

(internal quotation marks and citation omitted) (alteration in original).  *See*

*also United States v. Marcelino*, 736 F. Supp. 2d 1343, 1351 (N.D. Ga. 2010)

("Where an officer, without reasonable suspicion or probable cause,

approaches an individual, the individual has a right to ignore the police and

go about his business." (citing *Florida v. Royer,* 460 U.S. 491, 497–98

(1983) (plurality opinion)).  Further, under Georgia law, a person has the

right to resist an illegal arrest, and flight to avoid an illegal arrest will not

be viewed as a crime. *See Thomas v. State,* 18 S.E. 305, 305 (Ga. 1892)

("Every man, however guilty, has a right to shun an illegal arrest by flight.

The exercise of this right should not, and would not, subject him to be

arrested as a fugitive."). *See also Scott v. State,* 182 S.E.2d 183, 184 (Ga. Ct.

App. 1971) ("flight to prevent an illegal arrest is permissible").

The court has found several cases that analyze situations of flight from

unlawful *Terry* stops.  In *People v. Moore,* 676 N.E.2d 700 (Ill. App. 3d.

1997), the Illinois appeals court determined that fleeing an illegal *Terry* stop

did not constitute a new crime of resistance or obstructing an authorized act

of a police officer.  "When a police officer approaches a person to make
a *Terry* stop without sufficient articulable facts to warrant the stop, the
officer's actions are not 'justified at the inception' . . .  In this circumstance, a
person who runs away is not resisting or obstructing an authorized act of the
police officer." *Id*. at 704.  *Accord. People v. Shipp*, 34 N.E.3d 204 (Ill. App.
2d. 2015).  The Supreme Court of Tennessee ruled that the seizure of an
individual was unreasonable when he was seized based on the facts that he
was in an area being investigated for gang activity, and he engaged in rapid
flight after the officer told him to "hold up."  *State v. Nicholson*, 188 S.W.3d.
649, 660-61 (Tenn. 2006).  In *Com. v. Warren*, 58 N.E. 3d 333, 341-42 (Mass.
2016), the Supreme Judicial District of Massachusetts found that "[w]here a
suspect is under no obligation to respond to a police officer's inquiry, we are
of the view that flight to avoid that contact should be given little, if any,
weight as a factor probative of reasonable suspicion. Otherwise, our long-
standing jurisprudence establishing the boundary between consensual and
obligatory police encounters will be seriously undermined."  The court went
on to posit that "the finding that black males in Boston are
disproportionately and repeatedly targeted for [stops] suggests a reason for
flight totally unrelated to consciousness of guilt. Such an individual, when
approached by the police, might just as easily be motivated by the desire to

avoid the recurring indignity of being racially profiled as by the desire to

hide criminal activity."[16]  That echoes the words of Justice Stevens in

*Wardlow*:

> Among some citizens, particularly minorities and those residing
> in high crime areas, there is also the possibility that the fleeing
> person is entirely innocent, but, with or without justification,
> believes that contact with the police can itself be dangerous,
> apart from any criminal activity associated with the officer's
> sudden presence. For such a person, unprovoked flight is neither
> "aberrant" nor "abnormal." Moreover, these concerns and fears
> are known to the police officers themselves, and are validated by
> law enforcement investigations into their own practices.
> Accordingly, the evidence supporting the reasonableness of these
> beliefs is too pervasive to be dismissed as random or rare, and
> too persuasive to be disparaged as inconclusive or insufficient. In
> any event, just as we do not require "scientific certainty" for our
> commonsense conclusion that unprovoked flight can sometimes
> indicate suspicious motives . . .  neither do we require scientific
> certainty to conclude that unprovoked flight can occur for other,
> innocent reasons.

528 U.S. 119, 132-35 (2000) (concurring in part and dissenting in part)

(footnotes omitted).  The Supreme Court held in *Wong Sun v. United*

*States*, 371 U.S. 471, 483-84 (1963), that a defendant's flight from a

federal agent's unlawful entry into his home could not give rise to

probable cause, noting that "[a] contrary holding here would mean that

a vague suspicion could be transformed into probable cause for arrest

---

[16] The court notes that Robinson was African-American.

40

by reason of ambiguous conduct which the arresting officers themselves have provoked."

Based on this review, the court cannot find it appropriate to grant Officer Benton summary judgment on the second seizure of Robinson. The connection between the seizure that occurred after Robinson's flight and his initial seizure during the traffic stop is not attenuated. The determination of whether the traffic stop was unlawful having been left to a reasonable jury, the court cannot decide this issue at the summary judgment stage.

### 3. Did Officer Benton use excessive force when he tased Robinson?

The defendants argue that the force exerted when Officer Benton tased Robinson was both objectively reasonable and not excessive. [Doc. No. 48-1 at 23-24]. They maintain that "a taser is a 'non-deadly' weapon" and that the decision to employ a taser was reasonable from Officer Benton's perspective because "Robinson (a) fled from a traffic stop, (b) in a high crime area, (c) from a vehicle in which a loaded handgun had been located in the center console, and (d) continued to flee despite multiple officers in pursuit, while appearing to be possibly holding a weapon, and (f) towards a residential community." [*Id*. at 23, 24]. The plaintiffs respond that the force

used was deadly because they argue the facts show that Robinson was already on top of the eight-foot concrete wall when Office Benton deployed his taser.  [Doc. No. 70 at 24-26].  The defendants reply that "the evidence is undisputed that Benton deployed his taser at Robinson when Robinson was on the ground rather than when Robinson was on top of the wall." [Doc. No. 71 at 6].

Under the Fourth Amendment, a seizure occurs "when the officer, by means of physical force or show of authority, terminates or restrains [a person's] freedom of movement, through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal quotations and citations omitted).  "[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989).  The "proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.  The inquiry into whether the force an officer utilizes is excessive is purely objective: "the question is

whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation." *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004) (quotations omitted). This means that the actions must be viewed through the lens of a reasonable officer on the scene, "rather than with the 20/20 vision of hindsight." *Id.*

This circuit historically correlates the level of the force involved to the severity of the injury suffered. Consequently, excessive force results in significant injuries, or in the very least, injuries requiring more than minor medical treatment. "[T]his Circuit has established the principle that the application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000). For example, this circuit has held that tightening handcuffs to the point of causing skin abrasions does not rise above de minimis force when the plaintiff did not require medical treatment. *Gold v. City of Miami,* 121 F.3d 1442, 1446-47 (11th Cir. 1997). Likewise, the court in *Jones v. City of Dothan,* 121 F.3d 1456, 1460 (11th Cir. 1997), found that the force involved in slamming a person against a wall, kicking his legs apart, and making him raise his hands above his heads was de minimis even though the person received minor medical treatment for pain

43

in his arthritic knee.  Even pushing a plaintiff against a wall after applying a choke hold and handcuffing him, although he was not resisting arrest for a building code violation, has been considered a de minimis level of force.  *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559-60 (11th Cir. 1993).

"[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," *Graham,* 490 U.S. at 396.  However, "even de minimis force will violate the Fourth Amendment if the officer is not entitled to arrest or detain the suspect." *Reese v. Herbert*, 527 F.3d 1253, 1272 (11th Cir. 2008) (quoting *Zivojinovich v. Barner*, 525 F.3d 1059, 1071 (11th Cir. 2008) (per curiam)).  "[I]f a stop or arrest is illegal, then there is no basis for any threat or any use of force, and an excessive force claim would always arise but only collaterally from the illegal stop or arrest claim." *Jackson v. Sauls*, 206 F.3d 1156, 1171 (11th Cir. 2000).  Thus, if a reasonable jury found that the traffic stop was unlawful and that Officer Benton did not have arguable reasonable suspicion to seize Robinson a second time, then it could find that Officer Benton employed excessive force when he tased Robinson.

The court also finds that there is an issue of material fact concerning where Robinson was located when Officer Benton tased him.  Officer Benton testified in his deposition that Robinson was on the ground near the chain-

link fence at the time that he was tased.  His testimony is that after being

tased, Robinson climbed the chain-link fence and then proceeded to go over

the concrete wall.  [Doc. No. 50 at 9, Benton Dep. 6/22/17 at 35:10 – 36:10].

Officer Neimann testified that he saw Officer Benton tase Robinson while

Robinson was still on the ground [Doc. No. 55 at 17-18, Niemann Dep. at

67:9 – 69:25], however, this testimony conflicts with that of Officer Benton,

who testified that Officer Niemann was not present when he tased Robinson

[Doc. No. 50 at , Benton Dep. 6/22/2017 at 42:10 – 42:24].  Witnesses from

the apartment complex testified that Robinson called out for help while he

was on top of the wall.  [Doc. No. 48-2 at 9-10, DSMF ¶ 39].  One witness

even testified that she saw Robinson stiffen up when he was on top of the

wall, then call out for help prior to falling.  [*Id*. at 10, DSMF ¶ 43].  Other

witness testimony indicates that after getting on top of the wall, Robinson

appeared to be holding onto it with his arms to try to prevent falling.  [*Id*. at

10, DSMF ¶ 42].  Officer Rucker, the master instructor on taser use for

DeKalb County, testified a person who is tased will experience

"neuromuscular incapacitation" and will be paralyzed, experiencing pain

"like someone has a jackhammer from the inside of your body for five

seconds."  He rated the level of pain as a ten on scale of one to ten.  [Doc. No.

53 at 11, Rucker Dep. at 39:12 – 40:8].  The court finds it unreasonable to

infer that Robinson climbed a chain-link fence, navigated another several feet of sloping terrain, and then proceeded to climb atop a concrete wall, all after he had been tased.

The Eleventh Circuit has held that the use of a taser does not constitute deadly force.  *See Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1173, n.3 (11th Cir. 2019).  Further, the use of a taser during a *Terry* stop does not automatically constitute excessive force.  *See, e.g., Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004).  This circuit has also held that "the use of a taser gun to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward police is not excessive force." *Zivojinovich*, 525 F.3d at 1073.  This is because, "where a suspect appears hostile, belligerent, and uncooperative, use of a taser might be preferable to a physical struggle causing serious harm to the suspect or the officer." *Fils v. City of Aventura*, 647 F.3d 1272, 1290 (11th Cir. 2011) (quotations omitted) (alteration adopted). However, unprovoked taser use "against a non-hostile and non-violent suspect who has not disobeyed instructions violates that suspect's rights under the Fourth Amendment." *Id*. at 1289.

The use of a taser can constitute excessive force based on the environment in which it is deployed.  Especially in light of the facts

46

confronting the officer at the time he decides to fire the taser.  This is apparent in the Eleventh Circuit's rulings in *Harper v. Perkins*.  The defendants cite to the circuit's ruling in the case at the summary judgment stage, and the plaintiffs cite to the circuit's ruling at the motion to dismiss stage.  At the motion to dismiss stage, the Eleventh Circuit "found—based on scarce evidence in the complaint—that Harper (1) was at least four feet up in a tree with his hands raised, (2) posed no threat to [the officers'] safety or the safety of others, (3) had no chance, and did not attempt, to flee, and (4) merely put his hands in the air in compliance with the instructions of at least one officer."  571 F. App'x 906, 913 (11th Cir. 2014) (internal quotation omitted).  At that stage of the proceedings, based on the facts before it, the court found that using a taser on someone four-feet high in a tree did qualify as excessive force.  "After discovery we know, however, that defendants were told Harper overdrank, beat his wife, fired a rifle in his home, threatened suicide, then fled with his weapon into the woods. Harper's crimes were indeed so worrisome that Gourley, Davis, and the other officers donned bulletproof vests before tracking. We doubt a reasonable officer would find it 'readily apparent' that defendants' force was excessive under the circumstances."  *Id.*

In the instant action, Officer Benton did not feel that Robinson posed an immediate threat to him. [Doc. No. 50 at 12, Benton Dep. 6/22/2017 at 46:12 – 47:9]. Robinson was fleeing from what was at most a misdemeanor charge. No weapon was found on Robinson's body and there is no testimony in the record that he pulled a weapon. If Officer Benton fired his taser when Robinson was on top of the wall, that would constitute deadly force. Other courts have found similarly. *See Peabody v. Perry Twp.*, No. 2:10-cv-1078, 2013 U.S. Dist. LEXIS 46344 (S.D. Ohio Mar. 29, 2013) (denying qualified immunity to an officer that tased a fleeing suspect as he was on top of an eight-foot fence because "a reasonable jury could find that the force used by [the officer] was excessive in that it created a substantial risk of causing death or serious bodily harm"); *Snauer v. City of Springfield,* No. 09-CV-6277-TC, 2010 WL 4875784 (D. Or. Oct. 1, 2010), adopted by 2010 WL 4861135 (D. Or. Nov. 23, 2010) (denying qualified immunity to an officer that used a taser on a suspect who was at the top of a six to seven-foot high wooden fence because "[i]t does not take a panel of judges to alert a reasonable police officer that causing a paralyzed man to tumble head first onto the ground from a platform six to seven feet above the ground creates a substantial risk of causing death or serious bodily injury.") (internal quotation omitted).

48

A reasonable jury could find that Robinson was on top of the wall at the time he was tased. Such a finding would have distinct bearing on the determination of whether Officer Benton employed excessive force during the second seizure of Robinson. For the reasons stated above, the court finds that Officer Benton is not entitled to qualified immunity on the claim that he used excessive force against Robinson.

### 4. Did Officer Benton's actions violate clearly established law?

The defendants argue that "the unlawfulness of Benton's conduct was not clearly established as of August 6, 2015." [Doc. No. 48-1 at 26]. In order to be considered clearly established, the legal principle at issue must have a clear foundation in precedent at the time the events occurred. *District of Columbia v. Wesby*, 583 U.S. --, 138 S. Ct. 577, 589 (2018). A right is considered to be clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Evans v. Stephens,* 407 F.3d 1272, 1282 (11th Cir. 2005).

"It has been clearly established since the Supreme Court decided *Terry* that an investigative stop—a seizure for Fourth Amendment purposes—performed without reasonable suspicion violates the Fourth Amendment." *Childs v. DeKalb County, Ga.*, 286 F. App'x 687, 695 (11th Cir. 2008). *Terry*

was decided in 1968.  As far back as 1980, the Supreme Court in *United States v. Mendenhall* determined that the arbitrary seizure of an individual by law enforcement implicates the Fourth Amendment.  446 U.S. 544, 553-54 (1980).

Further, the conduct may be "so bad that case law is not needed to establish that the conduct cannot be lawful." *Vinyard v. Wilson,* 311 F.3d 1340, 1350 (11th Cir. 2002).  In such an instance, the officer's conduct "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the official], notwithstanding the lack of fact-specific case law" on point. *Id.* at 1355 (quoting *Lee v. Ferraro,* 284 F.3d 1188, 1199 (2002)).  Under this test, "the law is clearly established, and qualified immunity can be overcome, only if the standards set forth in *Graham* and our own case law 'inevitably lead every reasonable officer in [the defendant's] position to conclude the force was unlawful.'" *Lee,* 284 F.3d at 1199 (quoting *Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1559 (11th Cir. 1993)).

The plaintiffs cite to *Tennessee v. Garner*, 471 U.S. 1 (1985) for the proposition that "[i]t is clearly established, and has been for decades, that an officer cannot use deadly force to apprehend a suspect who does not pose a threat to the officer or others." [Doc. No. 70 at 24].  In that case, the

50

Supreme Court held that the "use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable."  471 U.S. at 11 ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.").  The Eleventh Circuit has found that "[n]o particularized, preexisting case law was needed to inform [the defendant] that an officer is not entitled to qualified immunity where his conduct goes 'so far beyond the hazy border between excessive and acceptable force that [he knows that he is] violating the Constitution.'" *Reese v. Herbert*, 527 F.3d 1253, 1274 (11th Cir. 2008) (quoting *Priester v. City of Riviera Beach,* 208 F.3d 919, 926–27 (11th Cir. 2000)).

In *Oliver v. Fiorino*, the Eleventh Circuit found that an officer's repeated use of a taser on an individual who was not suspected of a crime and who struggled and pulled away from an officer as he attempted to leave was a constitutional violation because "the force employed was so utterly disproportionate to the level of force reasonably necessary that any reasonable officer would have recognized that his actions were unlawful." 586 F.3d 898, 908 (11th Cir. 2009).  Here, Robinson was not suspected of any crime, and any charge that could have been levelled against him would have

been no greater than a misdemeanor.  Therefore, a jury could find that the use of force employed by Officer Benton violated clearly established law.

## B.      The state law claims against Officer Benton

Officer Benton asserts that official immunity bars the plaintiffs' state law claims.  [Doc. No. 48-1 at 26-27].  The plaintiffs did not respond to this argument.  The defendants contend that this failure to respond constitutes abandonment of these claims.  [Doc. No. 71 at 11].  However, "[t]he non-movant's failure to respond to a defendant's motion for summary judgment is not fatal; rather, the court must determine if the facts in the record illustrate that the movant is entitled to summary judgment." *Ogwo v. Miami Dade Cty. Sch. Bd.*, 702 F. App'x 809, 810 (11th Cir. 2017).  *See also Dixie Stevedores, Inc. v. Marinic Maritime, Ltd.*, 778 F.2d 670, 673 (11th Cir. 1985) ("hold[ing] that mere failure of the non-moving party to create a factual dispute does not automatically authorize the entry of summary judgment for the moving party").

Georgia's official immunity doctrine "offers public officers and employees limited protection from suit in their personal capacity." *Cameron v. Lang*, 549 S.E.2d 341, 344 (Ga. 2001). The doctrine applies differently depending on whether the officer was engaged in a ministerial or discretionary act. *Tisdale v. Gravitt*, 51 F. Supp. 3d 1378, 1398–99 (N.D. Ga.

2014) (noting differing standards of liability between an official's ministerial and discretionary acts). Because there is no dispute that Officer Benton's acts were discretionary, the court need address official immunity only as it applies to discretionary acts.

Georgia's constitution provides officers with official immunity for discretionary acts unless "they act with actual malice or with actual intent to cause injury in the performance of their official functions." GA. CONST. art. I, § 2, ¶ IX(d); *see also* O.C.G.A. § 36-33-4 ("Members of the council and other officers of a municipal corporation shall be personally liable to one who sustains special damages as the result of any official act of such officers if done oppressively, maliciously, corruptly, or without authority of law."). "Actual malice is a demanding standard: it requires an officer to act with a deliberate intention to do a wrongful act." *Black v. Wigington*, 811 F.3d 1259, 1266 (11th Cir. 2016) (internal citations and quotations omitted). Intent to injure is a similarly demanding standard: it requires an officer to act with "intent to cause the harm suffered by the plaintiff." *Tisdale*, 51 F. Supp. 3d at 1399.

"Actual malice does not include implied malice, or the reckless disregard for the rights and safety of others." *Selvy v. Morrison*, 665 S.E.2d 401, 405 (Ga. 2008) (holding also that poor judgment and rude behavior does

not constitute actual malice). *See also Bashir v. Rockdale Cty.*, 445 F.3d 1323, 1333 (11th Cir. 2006) (holding that although sheriff's deputies acted unreasonably and violated plaintiff's Fourth Amendment rights in arresting plaintiff after their warrantless entry into his home, deputies were entitled to official immunity under Georgia law on state law claims because plaintiff failed to demonstrate that the deputies possessed a deliberate intention to do wrong sufficient to satisfy the actual malice standard).  Evidence of excessive force is usually insufficient for a finding of actual malice. *See, e.g.*, *Dukes v. Deaton*, 852 F.3d 1035, 1045 (11th Cir. 2017), *cert. denied*, 138 S. Ct. 72 (2017) (holding that the officer's use of a flash bang grenade before entering a room, although the occupants were asleep at the time, at most establishes recklessness, not malice, so officer was entitled to official immunity); *Phillips v. Hanse*, 637 S.E.2d 11, 14 (Ga. 2006) (granting official immunity to officer who allegedly rammed a fleeing vehicle during a high-speed chase on the interstate in a major city, causing a crash which resulted in the death of another driver and significant injuries to three minor passengers, because although the officer's conduct was reckless, there was no evidence this was done to physically harm the suspect or any other individual); *Tittle v. Corso*, 569 S.E.2d 873, 877 (Ga. Ct. App. 2002) (threatening and slamming compliant subject onto the hood of patrol car—without more—does not

establish actual malice).  Unreasonable conduct also does not support an

inference of actual malice.  *See Bashir,* 445 F.3d at 1333.  Even reckless

disregard for the safety or rights of others does not support an inference of

actual malice.  *See Daley v. Clark*, 638 S.E.2d 376, 386 (Ga. Ct. App. 2006)

(holding that conduct displaying a reckless disregard for human life, such as

actively hindering efforts to assist a high school student who suffered cardiac

arrest during a fight, does not support a finding of actual malice).  Viewing

the facts in the light most favorable to the plaintiffs, the court cannot find

anything that suggests Officer Benton acted with actual malice.  The court

cannot speculate about Officer Benton's motives or "make assumptions that

simply are not justified by the record." *Conley v. Dawson*, 572 S.E.2d 34, 37

(Ga. Ct. App. 2002).  The court therefore finds that Officer Benton is entitled

to official immunity on the plaintiffs' state law claims.

### C.    The federal claim against Officer Franklin

The plaintiffs have also asserted a federal claim against Officer

Franklin under 42 U.S.C. § 1983.  The defendants contend that Officer

Franklin is entitled to qualified immunity on this claim because he merely

served as backup on the traffic stop and he never engaged with Robinson.

[Doc. No. 48-1 at 27-28].  The plaintiffs have not responded to this argument.

Under the doctrine of qualified immunity an officer is immune from suit when he makes a reasonable mistake of fact or law. *Pearson v. Callahan,* 555 U.S. 223, 231 (2009). Cases in this district and circuit have found that backup, or assisting, officers are generally entitled to qualified immunity because their knowledge at the time the events unfolded would not have "alerted a reasonable officer in his shoes that his conduct might result in the violation of [the plaintiff's] Fourth Amendment rights." *Shepard v. Hallandale Beach Police Dept.,* 398 F. App'x 480, 484 (11th Cir. 2010) (holding that a backup officer was entitled to qualified immunity on the plaintiff's Fourth Amendment claims concerning a warrantless arrest). *See also Smith v. LePage*, No. 1:12-cv-0740-AT, 2015 WL 13260394, at *10 (N.D. Ga. Mar. 31, 2015) (granting qualified immunity to backup officers for warrantless entry into plaintiff's house); *Smith v. Confreda*, No. 6:14-cv-1704-Orl-37TBS, 2016 WL 3344481 at *8 (M.D. Fla. June 15, 2016) (finding that officer was entitled to qualified immunity when following the direction of his supervising agent).

Assisting officers are "entitled to qualified immunity when there is no indication that they acted unreasonably in following the lead of a primary officer or that they knew or should have known that their conduct might result in a [constitutional] violation, even when the primary officer is not

entitled to qualified immunity." *Shepard at 483* (citing *Brent v. Ashley*, 247 F.3d 1294, 1306 (11th Cir. 2001)). The facts before the court in this case demonstrate that Officer Franklin's actions were objectively reasonable. He arrived on the scene after Officer Benton had already stopped Sims' vehicle. While Officer Benton chased Robinson, Officer Franklin remained at the vehicle with Sims. He did not in any way interact with Robinson. Accordingly, the court finds that Officer Franklin is entitled to summary judgment on the plaintiffs' federal claim.

### D.    The federal claim against DeKalb County

The defendants argue that DeKalb County is also entitled to summary judgment because "there is no evidence whatsoever of any official or unofficial policy or practice of DeKalb County that reasonably could be said to have been the moving force behind Robinson's alleged constitutional injury." [Doc. No. 48-1 at 30]. In response, the plaintiffs point to the testimony of DeKalb County's Rule 30(b)(6) witness, who they say "testified that DeKalb does not train its officers with any specificity whatsoever as to what types of offense are serious enough to justify that level of force." [Doc. No. 70 at 27].

Municipalities are "persons" subject to liability under § 1983. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). While

the Supreme Court has stated that municipalities do not receive qualified immunity from suit, *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166 (1993), municipal liability under Section 1983 is strictly limited. *Grech v. Clayton Cty., Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003). In *Monell*, the Supreme Court held that municipalities are not subject to § 1983 liability on the theory of respondeat superior. 436 U.S. at 690. That is, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694.

Thus, to impose § 1983 liability on a municipality, a plaintiff must show that a municipal employee or agent committed a constitutional violation and did so based on a municipal policy or custom. "Random acts or isolated incidents" are usually insufficient to demonstrate a policy or custom; the plaintiff must instead show a "persistent and wide-spread practice." *Depew v. City of St. Mary's, Ga.*, 787 F.2d 1496, 1499 (11th Cir. 1986). In addition, the plaintiff must show that the "policy or custom of the city 'subjected' him, or 'caused him to be subjected' to the deprivation of

constitutional rights." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 828

(1985). A "single incident of a constitutional violation is insufficient to prove

a policy or custom even when the incident involves several employees of the

municipality." *Craig v. Floyd Cty., Ga.*, 643 F.3d 1306, 1311 (11th Cir.

2011).

The plaintiffs contend that DeKalb County failed to adequately train

its officers "as to the seriousness of an offense that could justify the use of a

TASER [sic] to apprehend a suspect." [Doc. No. 70 at 27]. They reference

another lawsuit in this court against Officer Benton for the use of excessive

force in an incident involving a taser, *Kinlocke v. Benton, et al.*, Civil Action

No. 1:16-cv-4165-MLB (N.D. Ga. Dec. 6, 2019). The defendants have sought

leave to file a notice of supplemental authority in support of their motion for

summary judgment containing the court's decision in that case. [Doc. No.

74]. [17] The plaintiffs have filed no response in opposition. Further, as the

plaintiffs have referenced this case in their arguments, the court finds the

notice of supplemental authority to be appropriate. Accordingly, the

defendant's motion for leave to file is GRANTED. [Doc. No. 74].

---

[17] The *Kinlocke* case was decided after briefing in this instant action was
completed.

The court in *Kinlocke* granted summary judgment in favor of Officer Benton, on the grounds of qualified immunity.  The events in *Kinlocke* occurred in November 2014, approximately nine months before the events in the instant action.  In *Kinlocke*, Officer Benton tased an individual who repeatedly resisted his commands during a *Terry* stop.  Relying extensively on the footage from Officer Benton's body cam,[18] the court ruled that the force applied was not excessive.  This case does not bolster the plaintiffs' argument.  The presiding court found that the force employed was not excessive.  There was no claim in *Kinlocke* for municipal liability and the other defendant was sued for medical indifference, not excessive force.  Also, the fact that Officer Benton is a defendant in both *Kinlocke* and the instant action does not support a theory of widespread policy or deficient training to multiple employees.

The failure of a municipality to train its police officers may be properly thought of as a city 'policy or custom' that is actionable under § 1983 only when the failure "amounts to deliberate indifference to the rights of persons

_____

[18] The court notes that there is no body cam or dash cam footage in the instant action.  In fact, Officer Franklin testified at his deposition that the officers had not yet been issued body cams.  [Doc. No. 51 at 8, Franklin Dep. at 31:3 – 31:11].  The court finds this testimony somewhat perplexing since Officer Benton was wearing a body cam approximately nine months before the events in the instant action occurred.

with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Accordingly, a claim for failure to train is predicated on the deficiency of the training program and its application "over time to multiple employees." *Bd. of the Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 407 (1997). "Mere allegations that an officer was improperly trained or that an injury could have been avoided with better training are insufficient to prove liability." *Miller v. Calhoun Cty.*, 408 F.3d 803, 816 (6th Cir. 2005)

To show deliberate indifference in the application of a facially valid municipal policy, "a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold v. Miami,* 151 F.3d 1346, 1350 (11th Cir. 1998). Deliberate indifference can also be shown by the municipality's "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees." *Brown,* 520 U.S. at 407. Either way, "[t]his high standard of proof is intentionally onerous for plaintiffs; imposing liability on a municipality without proof that a specific policy caused a particular violation would equate to subjecting the municipality to respondeat superior liability—a result never intended by section 1983." *Gold,* 151 F.3d at 1351 n. 10. "To adopt lesser standards of fault and causation would open

municipalities to unprecedented liability under § 1983. In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *City of Canton,* 489 U.S. at 391-92 (1989).

The Eleventh Circuit "repeatedly has held that without notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train or supervise." *Gold* at 1351. Although there is clearly a need to train officers with respect to the constitutional limitations regarding the use of deadly force, *City of Canton,* 489 U.S. at 390 n.10, the record supports a finding that DeKalb County does provide training with respect to the use of tasers and the situations in which the use of a taser could constitute deadly force.  Accordingly, DeKalb County is entitled to summary judgment on the plaintiffs' § 1983 claim.

## IV.   Conclusion

The defendants' motion for leave to file a notice of supplemental authority is GRANTED.  [Doc. No. 74].  The defendants' motion for summary judgment is GRANTED IN PART AND DENIED IN PART.  [Doc. No. 48]. Summary judgment is granted as to the federal claims against Officer Franklin and DeKalb County, Georgia.  The clerk is DIRECTED to

terminate these parties as defendants in this action.  Summary judgment is granted as to the state law claims against Officer Benton.  Summary judgment is denied as to the federal claim against Officer Benton.  The plaintiffs and Officer Benton are DIRECTED to file their proposed consolidated pretrial order within thirty days of the entry date of this order.

**SO ORDERED** this 13th day of April, 2020.


/s/CHARLES A. PANNELL, JR.
CHARLES A. PANNELL, JR.
United States District Judge