[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-11509

_____

D.C. Docket No. 1:18-cv-01518-CAP

MARY JO BRADLEY,
R.B., et al.,

Plaintiffs-Appellees,

versus

CASEY BENTON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(August 26, 2021)

Before JORDAN, BRASHER, and ANDERSON, Circuit Judges.

BRASHER, Circuit Judge:

This appeal is about a traffic stop for an unusual temporary tag that ended in

a fatality. Troy Robinson, a passenger in the stopped vehicle, inexplicably fled the

scene on foot. He ran across a busy road and through a dollar-store parking lot before attempting to scale an eight-foot wall and escape into a nearby apartment complex. What happened next is hotly disputed. But a reasonable jury could find that the pursuing officer, Casey Benton, fired his taser at Robinson while he was on top of the wall and that the shock from the taser incapacitated Robinson, causing him to fall, break his neck, and die. Robinson's family sued, Officer Benton asserted the defense of qualified immunity, the district court rejected that defense, and Officer Benton appealed. After a thorough review and with the benefit of oral argument, we affirm in part and reverse in part. We conclude that Officer Benton cannot be held liable for conducting the traffic stop or pursuing Robinson when he fled. On these two issues, we reverse the district court. But we hold that Officer Benton's decision to tase Robinson at an elevated height violated Robinson's clearly established right to be free from excessive force. On that issue, we affirm.

## I. BACKGROUND

On the day of Robinson's death, Officer Casey Benton of the DeKalb County Police Department was patrolling near The Highlands of East Atlanta apartment complex in Atlanta, Georgia. That area had recently experienced a rise in gang-related and violent crime.

Around 7:00 p.m., Officer Benton observed a white SUV with a temporary license plate leaving the apartment complex shortly after it had entered. He decided

to follow. The SUV was driven by Wilford Sims and its lone passenger was Troy Robinson. Sims had bought it a few days earlier. Officer Benton later testified that he decided to follow the car because he could not see an expiration date on the temporary tag. While Officer Benton was following Sims's car, he looked at the temporary tag and ran the tag number in the police department's computer system. He does not recall the information that was returned by the computer system about the tag, nor did he check the system to see whether the tag was expired. Sims was not suspected of committing any other traffic violations. After about two minutes, Officer Benton stopped the SUV.

Officer Benton asked for Sims's driver's license, and Sims provided it. Officer Benton then asked whether there were any weapons in the car. Sims advised Officer Benton that he was carrying a handgun. Officer Benton asked Sims to step out of the vehicle, and Sims complied. Officer Benton then retrieved a loaded handgun from the center console. Officer Benton told Sims that he could reenter the car, which he did. Officer Benton then asked Robinson if he had any identification. Robinson replied that he did not.

There were two other officers on the scene: Officer C.M. Franklin and Officer L.O. Niemann. When Officer Benton asked one of them to run Robinson's name in the police department's system, Robinson abruptly exited the vehicle and fled on foot. Robinson ran across a road and through the parking lot of a Family Dollar store

3

that abutted the apartment complex. Officer Benton pursued him on foot while Officer Niemann attempted to follow in his patrol car. Officer Franklin remained with Sims.

At some point after Robinson reached the area behind the Family Dollar, Officer Benton fired a single shot from his taser without warning, striking Robinson. The ground behind the store slopes down toward a chain-link fence that, on the day of the chase, was surrounded by thick undergrowth. The fence stands several feet from an eight-foot-high concrete wall that lines the back of the Highlands apartment complex. By the time Robinson reached the chain-link fence, Officer Benton was still ten to fifteen feet behind him. Robinson went over the fence and tried to climb the concrete wall, fell off the wall, and suffered blunt force trauma to his head and neck that caused his death.

Officer Benton testified that he fired his taser without warning while Robinson was still on the ground. As Officer Benton tells it, the taser did not affect Robinson because only one of the two taser probes pierced Robinson's skin, with the other getting stuck in Robinson's clothing. Consequently, Officer Benton stopped his taser short of a full five-second cycle. Robinson proceeded to climb up the fence, then onto the wall, where he lost his balance, fell, and died.

Robinson's family tells a different story. In their version of events, Officer Benton fired his taser upward at Robinson while he was on top of the wall. The taser

4

probes contacted Robinson with full effect, causing him to become temporarily incapacitated, fall, break his neck, and die. The plaintiffs point to substantial evidence that contradicts Officer Benton's account. First, several days after the incident, another officer investigating the shooting found a green blast door from a taser cartridge inside the complex, on the opposite side of the wall from where Officer Benton was standing when he fired his taser, suggesting that the taser had been fired upwards and over the wall. Second, several eyewitnesses from the nearby apartment complex testified that they saw Robinson fall. One witness testified that she heard a "pop" while Robinson was still visible on top of the wall. Another witness testified that he heard Robinson "yell 'help' three or four times" while on top of the wall. That witness testified that she saw Robinson sitting on the wall until "something occurred" and "[h]is right arm went in the air" before he fell. A third witness said that he also heard Robinson call for help while sitting on the wall. He then saw Robinson "stiffen up" like "he went into shock" before falling over the wall into the apartment complex.

Officer Benton testified that he was aware of and understood police department policy that a taser "will cause most everyone to fall and therefore should not be used when the risk of falling would likely result in death[.]" He also agreed that under that policy it was "not appropriate" to use a taser "if someone is at an elevated height[.]" Tracy Rucker, the master instructor on taser use for DeKalb

County, testified that a person who is tased will experience "neuromuscular incapacitation" and will be paralyzed from pain for around five seconds. He also testified that he instructed DeKalb County officers that tasers could be deadly when the target is in a dangerous position such as an elevated height. And he affirmed that even a fall "from a level that's not that high" can cause serious injury when the victim has been incapacitated by a taser.

Officer Benton never issued a ticket to Sims for a traffic violation. The temporary tag on Sims's vehicle did have an expiration date and was valid. Officer Benton later testified that he never felt like Robinson posed an immediate threat to him or any of the other officers. The officers found no weapons on Robinson's body, and there is no other evidence he had a weapon. A posthumous toxicology report revealed traces of marijuana in Robinson's system. The record does not explain why Robinson ran away from the traffic stop.

Robinson's mother and his nine surviving children sued under federal and state law. Their complaint included the following claims: (1) a 42 U.S.C. § 1983 claim against Officers Benton, Franklin, and Niemann for seizing Robinson; (2) a Section 1983 claim against Officer Benton for pursuing and tasing Robinson; (3) a Section 1983 municipal liability claim against DeKalb County; and (4) state law claims against Officer Benton for pain and suffering and wrongful death.

Officer Benton moved for summary judgment. He argued that the plaintiffs' federal and state law claims against him were barred by qualified immunity and official immunity, respectively. Regarding the Section 1983 claims, he argued that he was entitled to qualified immunity for the traffic stop, the pursuit of Robinson, and the tasing of Robinson. Specifically, he argued that (1) he had reasonable suspicion to conduct the initial stop; (2) he had reasonable suspicion to pursue and seize Robinson after he fled; (3) his use of force against Robinson was not excessive; and (4) even if his conduct was arguably illegal, he did not violate law that was clearly established.

The district court granted the motion in part and denied it in part. The district court concluded that official immunity shielded Officer Benton from the plaintiffs' state law claims against him. But it also concluded that he was not entitled to qualified immunity from the Section 1983 claim. Officer Benton appealed. Because the district court's denial of qualified immunity is an immediately appealable collateral order, we have appellate jurisdiction. *See Hall v. Flournoy*, 975 F.3d 1269, 1276 (11th Cir. 2020) ("[W]hen legal questions of qualified immunity are raised . . . interlocutory appellate jurisdiction exists.").

## II. STANDARD OF REVIEW

We review an order denying summary judgment based on qualified immunity *de novo*. *See Helm v. Rainbow City, Ala.*, 989 F.3d 1265, 1271 (11th Cir. 2021). On

a motion for summary judgment based on qualified immunity, courts "must construe the facts and draw all inferences in the light most favorable to the nonmoving party and when conflicts arise between the facts evidenced by the parties, [they must] credit the nonmoving party's version." *Id.* (quoting *Feliciano v. City of Miami Beach, Fla.*, 707 F.3d 1244, 1252 (11th Cir. 2013)). "Summary judgment is appropriate if 'the evidence before the court shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *McCullough v. Antolini*, 559 F.3d 1201, 1204–05 (11th Cir. 2009) (quoting *Haves v. City of Miami, Fla.*, 52 F.3d 918, 921 (11th Cir. 1995)).

"Qualified immunity shields public officials from liability for civil damages when their conduct does not violate a constitutional right that was clearly established at the time of the challenged action." *Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016)). In other words, an officer is entitled to qualified immunity unless he (1) violated a constitutional right, and (2) that constitutional right was clearly established at the time. *See Helm*, 989 F.3d at 1272. These two elements may be analyzed in any order. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). If the evidence at the summary judgment stage, construed in the light most favorable to the non-movant, contains "facts inconsistent with granting qualified immunity, then the case and the qualified immunity defense proceed to trial." *Stryker v. City of Homewood*, 978 F.3d 769, 773 (11th Cir. 2020).

## III. DISCUSSION

This appeal is about Officer Benton's qualified immunity defense as to three separate actions: the initial traffic stop, the pursuit of Robinson, and the tasing. We address each in turn.

### A. The Initial Traffic Stop

The district court denied Officer Benton's motion for summary judgment as it pertained to the initial traffic stop, concluding that a jury could find that Benton lacked reasonable suspicion. On appeal, Officer Benton argues that the district court erred because he had a particularized and objective basis for conducting the stop. We agree.

Under the Fourth Amendment an officer may "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). Reasonable suspicion "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence[.]" *Id.* at 123–24 (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Still, it requires "a minimal level of objective justification for making the stop." *Id.* We consider whether a "particularized and objective basis" for the stop existed in light of the totality of the circumstances. *Brent v. Ashley*, 247 F.3d 1294, 1300 (11th Cir. 2001).

Here, Officer Benton had a particularized and objective basis for the stop. He testified that when he first observed Sims's vehicle, he could not see the expiration date on the tag. And he testified that he stopped Sims because the temporary tag on Sims's vehicle appeared to be in violation of state law requiring an expiration date to be displayed. O.C.G.A. § 40-2-8(b)(2). Driving with an improper tag is a misdemeanor. *Id.* Further, the other police officers who were questioned about the temporary tag on Sims's vehicle all believed that it looked unusual enough to warrant suspicion. These officers specifically pointed to the placement of the expiration date as justification for their belief. Officers Franklin and Niemann said that the look of the tag would have caused them to stop the car. We have examined photographs of the tag in the record and concur that the date's location on the tag could lead a reasonable officer to believe that the tag was improper. Accordingly, we have little difficulty in concluding that Officer Benton had reasonable suspicion to make the stop.

The plaintiffs contend that the record contains evidence that could lead a jury to conclude that Officer Benton merely used the tag violation as a pretext for an otherwise unlawful stop. But Officer Benton's subjective purpose for conducting the traffic stop is immaterial. *See Whren v. United States*, 517 U.S. 806, 813 (1996); *see also United States v. Holloman*, 113 F.3d 192, 195–96 (11th Cir. 1997) (traffic stop of a vehicle whose tag light was out did not violate the Fourth Amendment, even

10

though the search was conducted as part of a wider anti-narcotic operation). Under the reasonable suspicion standard, we need not guess at Officer Benton's motivation for initiating the stop. We need only consider whether, given the totality of the circumstances, an objective and particularized basis for the stop existed. *Brent*, 247 F.3d at 1300. Here, one did.

### B. Officer Benton's Pursuit of Robinson

The district court also held that because Officer Benton failed to establish that the initial stop was lawful, he necessarily failed to establish that his pursuit of Robinson was lawful. On appeal, Officer Benton argues that Robinson's headlong flight from the traffic stop justified pursuing him. Again, we agree with Officer Benton.

Whether Officer Benton had reasonable suspicion to pursue Robinson turns on the totality of the circumstances. *See United States v. Gordon*, 231 F.3d 750, 757 (11th Cir. 2000) ("[W]hether reasonable suspicion exists must be determined on a case-by-case basis in view of the totality of the circumstances."). Even though Robinson was merely a passenger in a vehicle that Officer Benton stopped on suspicion of driving with an invalid tag, his behavior was suspicious enough to warrant pursuit. When Officer Benton asked another officer to run Robinson's name through the computer system, Robinson fled the traffic stop by sprinting across a busy road toward the apartment complex. The Supreme Court has held that

11

"[h]eadlong flight—wherever it occurs—is the consummate act of evasion," and though "[i]t is not necessarily indicative of wrongdoing, . . . it is certainly suggestive of such." *Wardlow*, 528 U.S. at 124. *See also United States v. Franklin*, 323 F.3d 1298, 1301 (11th Cir. 2003) (reasonable for officers to pursue someone who ran away); *Gordon*, 231 F.3d at 755 (same). Under these circumstances, Officer Benton did not violate the Constitution by pursuing Robinson on foot.

### C. Officer Benton's Tasing of Robinson

The district court denied Officer Benton qualified immunity for killing Robinson, concluding that a jury could find Benton's use of force was excessive. On appeal, Officer Benton argues that his use of force against Robinson was objectively reasonable and not excessive. Alternatively, he argues that the unlawfulness of his use of force was not clearly established at the time of the incident. We disagree.

### 1. Officer Benton Violated Robinson's Constitutional Right to be Free from Deadly Force

Officer Benton maintains that he fired his taser while Robinson was still on the ground. But the plaintiffs point to evidence in the record—eyewitness testimony contradicting Officer Benton and a taser cartridge's blast door on the far-side of the wall from where Officer Benton was standing—suggesting that Officer Benton fired his taser while Robinson was in a precarious position atop the eight-foot wall. On a motion for summary judgment, we resolve doubts about the record in favor of the non-moving party. *See Stryker*, 978 F.3d at 773. So, for the purposes of our analysis,

we assume that Officer Benton fired his taser while Robinson was atop the wall, temporarily paralyzing him and causing him to fall, break his neck, and die. We are tasked with deciding whether Officer Benton's use of force in this context—shooting a taser aimed at a person on top of an eight-foot wall who was unarmed and not suspected of committing any particular crime—was excessive.

We have little trouble in concluding that this use of force was excessive. The amount of force used by an officer "must be reasonably proportionate to the need for that force." *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002). "'The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene,' and the inquiry 'is an objective one.'" *Smith v. LePage*, 834 F.3d 1285, 1294 (11th Cir. 2016) (quoting *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)). A court cannot apply this standard mechanically. *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). Instead, the inquiry "requires careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396.

We therefore consider "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. at 397. When an officer uses

13

deadly force, we must also consider whether the officer (1) "'has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others' or 'that he has committed a crime involving the infliction or threatened infliction of serious physical harm'"; (2) "reasonably believes that the use of deadly force was necessary to prevent escape"; and (3) "has given some warning about the possible use of deadly force, if feasible." *McCullough*, 559 F.3d at 1206 (quoting *Vaughan v. Cox*, 343 F.3d 1323, 1329–30 (2003)); *see also Cantu v. City of Dothan, Alabama*, 974 F.3d 1217, 1229 (11th Cir. 2020).

Here, a reasonable jury could find that that Officer Benton applied deadly force, that is, force that an officer "knows to create a substantial risk of causing death or serious bodily harm." *Pruitt v. City of Montgomery, Ala.*, 771 F.2d 1475, 1479 n.10 (11th Cir. 1985). We have recognized that a taser is generally not a deadly weapon. *Fils v. City of Aventura*, 647 F.3d 1272, 1276 n.2 (11th Cir. 2011). But like many other weapons, a foot, or a fist, a taser may be used to apply deadly force. *See United States v. Guilbert*, 692 F.2d 1340, 1343 (11th Cir. 1982) ("[W]hether an object constitutes a 'dangerous weapon' turns not on the object's latent capability alone, but also on the manner in which the object was used," especially "when used in a manner likely to endanger life or inflict great bodily harm."). As relevant here, we join many other courts that have recognized that tasing a person who is at an elevated height may come with a substantial risk of serious bodily harm or death.

14

*See Peroza-Benitez v. Smith*, 994 F.3d 157, 168 (3d Cir. 2021) (collecting cases); *Baker v. Union Twp.*, 587 F. App'x 229, 234 (6th Cir. 2014) ("It is widely known among law enforcement . . . that tasers should not be employed against suspects on elevated surfaces because of the risk of serious injury from a resulting fall.").

Moreover, again taking the facts in the light most favorable to the plaintiffs, Officer Benton knew that he was using deadly force when he tased Robinson on top of the wall. He had been trained that a person who is tased will experience "neuromuscular incapacitation" and will be paralyzed from pain for around five seconds; more than enough time for Robinson to lose his balance and fall from atop the wall. In his deposition, Officer Benton was asked if he understood department policy that a taser "should not be used when the risk of falling would likely result in death, for example, on a roof or next to a swimming pool." He replied that he did. He was then asked if he agreed that it was "not appropriate" to use a taser "if someone is at an elevated height[.]" He replied, "I agree." *Cf. Lombardo v. City of St. Louis, Missouri*, 141 S. Ct. 2239, 2241 (2021) (when deciding whether to grant summary judgment on an excessive force claim, relevant facts include departmental instructions and other well-known police guidance). Accordingly, considering the facts in the light most favorable to the plaintiffs, Officer Benton applied force that he knew created a substantial risk of serious bodily harm or death.

We also conclude that Officer Benton's decision to use this level of force was not reasonable under these circumstances. This is so for three reasons.

First, Officer Benton lacked "probable cause to believe that [Robinson] posed a threat of 'serious physical harm'" to anyone. *Cantu*, 974 F.3d at 1229 (quoting *McCullough*, 559 F.3d at 1206). Robinson was unarmed and never made any move indicating that he was about to draw a weapon. The gun in the center console of the car belonged to Sims and had already been retrieved by Officer Benton, eliminating the possibility that Robinson had taken the gun. Robinson made no threatening gestures of any kind. There is no evidence that he posed a threat to anyone in the apartment complex, which he had just left. There is no objective evidence in the record suggesting that Robinson was dangerous at all. This lack of evidence accords with Officer Benton's subjective impression of the situation; he testified that he never felt like Robinson posed an immediate threat to him or any of the other officers.

Second, Officer Benton did not have probable cause to believe Robinson had committed a crime "involving the infliction or threatened infliction of serious physical harm." *McCullough*, 559 F.3d at 1206. In fact, Officer Benton lacked probable cause to believe that Robinson had committed any crime. *See Cantu*, 974 F.3d at 1229; *Graham*, 490 U.S. at 396. Robinson was not the driver of the vehicle that Officer Benton stopped for a suspected tag violation. The vehicle was driven by

and belonged to Sims; Robinson was merely a passenger. And although Robinson's flight from the traffic stop was suspicious, that act alone would not give a reasonable officer probable cause to believe that Robinson had committed crimes involving the infliction of serious physical harm.

Third, Officer Benton fired his taser at Robinson without warning. "When considering whether it was feasible for a police officer to warn a suspect that []he plans to use deadly force, we consider both time and opportunity." *Cantu*, 974 F.3d at 1231. Officer Benton had both. He was never more than a few seconds behind Robinson and had eyes on him throughout the entire chase. He could have ordered Robinson to stop or warned him that he intended to fire his taser if Robinson failed to comply. Instead, he waited until Robinson was on top of the wall before firing his taser at him without warning, causing him to fall to his death.

Accepting the plaintiffs' version of the facts as true, Robinson posed no threat of serious physical harm to anyone. Nor was he suspected of committing a crime involving the infliction or threatened infliction of serious physical harm. He was not even the suspect of the traffic stop; the vehicle was owned and driven by Sims. Nevertheless, Officer Benton applied deadly force without warning to prevent Robinson's escape on foot. Under these circumstances, Officer Benton's use of deadly force was objectively unreasonable.

2. The Tasing Violated Clearly Established Law

To prevail, it is not enough for the plaintiffs to show that Officer Benton violated Robinson's Fourth Amendment right to be free from deadly force. They must also show that the right in question was clearly established at the time of the incident. The ordinary way of showing that a right is clearly established is by showing that "a materially similar case has already been decided." *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011). A plaintiff may also show that a "broader, clearly established principle should control the novel facts [of the] situation." *Mercado*, 407 F.3d at 1159 (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). To control a novel factual situation, a broad principle "must be established with obvious clarity by the case law so that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Waldron v. Spicher*, 954 F.3d 1297, 1305 (11th Cir. 2020) (quoting *Loftus v. Clark-Moore*, 690 F.3d 1200, 1205 (11th Cir. 2012)). In either case, only prior decisions from the United States Supreme Court, this Court, or the relevant state supreme court can put officers on notice regarding the

constitutionality of their actions. *See Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021).

The Supreme Court has held that the existence of materially similar caselaw is "especially important in the Fourth Amendment context." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quotation marks omitted). To defeat a qualified immunity defense without a materially similar precedent on point, a Fourth Amendment plaintiff must show that an officer's "conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official." *Cantu*, 974 F.3d at 1232 (quoting *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997)). She "must show that the official's conduct 'was so far beyond the hazy border between excessive and acceptable force that [the official] had to know he was violating the Constitution even without caselaw on point.'" *Id.* at 1232–33 (quoting *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 926 (11th Cir. 2000)).

This case passes both tests: the right in question was clearly established by a materially similar precedent and was obviously clear in any event.

First, there is a materially similar precedent: *Tennessee v. Garner*, 471 U.S. 1 (1985). There, the Supreme Court held that a police officer used excessive force when he shot an unarmed burglary suspect to stop him from fleeing on foot. *See Garner*, 471 U.S. at 21. The Supreme Court has cautioned us against relying on the holding of *Garner* to the extent that holding is "cast at a high level of generality."

*Brosseau v. Haugen*, 543 U.S. 194, 199 (2004). But we are concerned with *Garner*'s analogous facts, not *Garner*'s high-level holding. *Garner* clearly established that an officer cannot use deadly force to stop an unarmed man who is not suspected of committing a violent crime from fleeing on foot. That is precisely what happened in *Garner* and that is precisely what happened in this case. Accordingly, *Garner* put Officer Benton on notice that he could not use deadly force to stop Robinson from running away on foot.

To be sure, there is one factual distinction between this case and *Garner*. In *Garner*, the officer shot the suspect with a gun. Here, Officer Benton shot Robinson with a taser. But that is a distinction without a difference. As explained above, taking the facts in the light most favorable to Robinson, Benton used deadly force when he shot Robinson off the eight-foot wall with a taser. That is, he used force that he knew would "create a substantial risk of causing death or serious bodily harm." *Pruitt*, 771 F.2d at 1479 n.10. He used this level of force to stop an unarmed man who was not suspected of committing a violent crime from fleeing on foot. *Garner* establishes that this level of force is excessive in that circumstance.

Officer Benton argues that the law was not clearly established on this point because of our unpublished, nonprecedential opinion in *Harper v. Davis*, 571 Fed. Appx. 906 (11th Cir. 2014). We disagree. In *Harper*, police officers responded to an emergency call about an armed man who "had been drinking all day and taken

20

methadone" and who was "pointin' guns at everybody" and "beatin' on his wife." *Id.* at 908-909. Around 10:30 p.m., the officers donned bullet proof vests and tracked the suspect into the woods. When they found the suspect hiding in a tree with a gun, they shot him with a taser, causing him to fall and suffer serious injuries. *Id.* at 910. We recognized that the officers had used "significant force" that "border[ed] on deadly force" when they shot the suspect with a taser while he was in the tree. *Id.* at 912. But we reasoned that the officers had qualified immunity because of the seriousness of the suspect's crimes and the threat that the armed and violent suspect posed to the safety of the officers and to others. *Id*. at 913-14. Unlike the suspect in *Harper*, Robinson was neither armed nor suspected of committing a violent crime. But, despite lacking these justifications, Officer Benton used the same significant degree of force against Robinson that the officers used in *Harper*. Accordingly, our nonbinding opinion in *Harper* does not support Officer Benton's position.

Second, we would conclude that the use of force here was obviously unconstitutional even absent a case directly on point. Robinson posed no immediate threat to Officer Benton. He never tried to harm any of the officers, nor did he make any threatening movements or gestures. The officers also had no reason to think he posed a threat to anyone in the apartment complex, which he had just left. He was not suspected of committing a crime involving the infliction of serious physical harm. He was not even the suspect of the traffic stop, which was conducted on the

suspicion that Sims was driving with an illegal tag. Yet, without any warning, Officer Benton applied deadly force to prevent Robinson's escape from the traffic stop on foot. We conclude that no reasonable officer could have believed that the application of deadly force was warranted under these circumstances. *See Cantu*, 974 F.3d at 1235 (an officer violated the Fourth Amendment with obvious clarity by, without warning, shooting a non-violent suspect who had tried but failed to grab the officer's taser); *Mercado*, 407 F.3d at 1159 (an officer violated the Fourth Amendment with obvious clarity by, without warning, firing a high velocity projectile at a suspect who, though he had a knife and was threatening suicide, was non-threatening toward the officers).

## IV. CONCLUSION

We see no constitutional infirmity in either Officer Benton's decision to conduct the initial traffic stop or to pursue Robinson on foot, and we reverse the district court's ruling as to those two issues. Regarding the main issue in this case—Officer Benton allegedly tasing Robinson on top of the wall, causing him to fall, break his neck, and die—we affirm the district court's denial of Officer Benton's motion for summary judgment on qualified immunity grounds, and remand so that the plaintiffs' claims against Officer Benton relating to the tasing may proceed to trial.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

August 26, 2021

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  20-11509-BB
Case Style:  Mary Bradley, et al v. Casey Benton
District Court Docket No: 1:18-cv-01518-CAP

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause. Non-incarcerated pro se parties are permitted to use the ECF system by registering for an account at www.pacer.gov. Information and training materials related to electronic filing, are available at www.ca11.uscourts.gov.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, each party to bear own costs.

Please use the most recent version of the Bill of Costs form available on the court's website at www.ca11.uscourts.gov.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Tonya L. Richardson, BB at (404) 335-6174.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Djuanna H. Clark
Phone #: 404-335-6151

OPIN-1A Issuance of Opinion With Costs